KAREN MATTESON, Cal. Bar No. 102103
Email: mattesonk@sec.gov
ROBERTO A. TERCERO, Cal. Bar No. 143760
Email: terceror@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
John M. McCoy III, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908



FILED
CLERK, U.S. DISTRICT COURT

JUN 24 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

    v.

PETER L. JENSEN AND THOMAS C.
TEKULVE, JR.,

       Defendants.

Case No. CV11-05316 P (AGRx)

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), 21A(a)(1)(A) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), 78u-1(a)(1)(A) & 78aa(a). Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

1    2.    Venue is proper in this district pursuant to Section 22(a) of the

2  Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

3  § 78aa(a), because the defendants reside in and/or transact business in this district

4  and certain of the transactions, practices, and courses of business constituting

5  violations of the federal securities laws occurred within this district.

6                                    **SUMMARY**

7    3.    This case involves a fraudulent scheme by the senior management of

8  Basin Water, Inc. to overstate the company's financial results for each of its

9  quarters beginning with its initial quarter as a public company (the first quarter of

10  its fiscal year 2006 ended March 31, 2006) through its fiscal year 2007 ended

11  December 31, 2007. The company's senior management responsible for the fraud

12  were its founder, Chairman of the Board and Chief Executive Officer, Defendant

13  Peter L. Jensen, and its Chief Financial Officer, Defendant Thomas C. Tekulve, Jr.

14  The Defendants materially overstated and caused Basin to materially overstate its

15  revenues by improperly recognizing and reporting substantial amounts of revenue

16  from the company's purported sales of water treatment systems. The purported

17  revenue failed to meet the most basic Generally Accepted Accounting Principles

18  ("GAAP") for recognizing revenue. In particular, as explained below, several

19  sales were contingent on the customer's acceptance of the treatment system or

20  resale of the system to an ultimate customer; several sales did not occur in the

21  quarter for which revenue was recognized; several sales were recorded even

22  though the company never delivered the treatment system; and in several sales,

23  collectability was not reasonably assured and the company in fact did not receive

24  the required payments from the customer. Finally, in 2007, the Defendants caused

25  the creation of two special purpose entities to which Basin purportedly sold

26  systems in sham transactions that had no economic substance and which involved

27  Basin round-tripping its own cash to purchase the revenue. The Defendants

28  materially overstated Basin's 2006 revenues by 13% and its 2007 revenues by 74%

as well as materially overstating Basin's revenues for interim quarterly periods. On August 11, 2008, the company announced it was restating its financial results for these periods, which restatement was issued on February 10, 2009.

4.     Prior to the August 11, 2008, announcement that Basin would restate, between December 12, 2006 and August 7, 2008, on the basis of material nonpublic information that the company's financial results were being and had been materially overstated, Defendant Peter L. Jensen engaged in insider trading, selling 1,660,943 shares of company stock, gaining and realizing profits of $9,173,075. Additionally, he made charitable donations of 290,000 shares of company stock, taking a total of $763,345 in tax deductions. All of these sales of stock and charitable donations were made within twelve months of Basin filing a Form 10-Q or Form 10-K which was subsequently restated due to the material noncompliance of Basin, as a result of misconduct, with financial reporting requirements under the securities laws, as alleged below.

5.     By engaging in this conduct, the Defendants violated the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); the antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, both as primary violators, and as control persons pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); the books and records provisions of Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1, and the officer certification provisions of Rule 13a-14, 17 C.F.R. § 240.13a-14. Defendant Thomas C. Tekulve, Jr. also violated the prohibition against making misrepresentations to auditors, Rule 13b2-2, 17 C.F.R. § 240.13b2-2. The Defendants aided and abetted the company's violations of the issuer reporting provisions of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-13, and are also liable to the same extent as Basin because they were its

1   control persons.  Finally, the Defendants failed to comply with the reimbursement
2   provisions of Section 304(a) of the Sarbanes-Oxley Act of 2002, 15 U.S.C. §
3   7243(a).  The Commission seeks permanent injunctions prohibiting future
4   violations, disgorgement of ill-gotten gains together with prejudgment interest
5   thereon, civil penalties, officer and director bars, and reimbursement of bonuses
6   and any other incentive-based or equity-based compensation and any profits
7   realized from the sale of company securities for the twelve-month period following
8   each of the false filings with the Commission.

9                            **THE DEFENDANTS**

10       6.    **Peter L. Jensen ("Jensen")** was the founder, chief executive officer
11  and chairman of the board of Basin Water, Inc. from December 1999 until
12  February 19, 2008, when he resigned as CEO.  Jensen continued to be a member of
13  the board of directors, however, until March 11, 2008.  Jensen received a masters'
14  degree in Chemical Engineering from the Massachusetts Institute of Technology in
15  1974.  Jensen resides in San Diego, California.

16       7.    **Thomas C.Tekulve, Jr. ("Tekulve")** was the chief financial officer
17  of Basin Water, Inc. from September 2004 to May 2008 and Vice President of
18  Business Development from June 2008, until he resigned effective October 8,
19  2008.  As CFO, Tekulve was responsible for creating the financial structure and
20  organization within Basin.  Prior to his tenure at Basin, Tekulve was an officer of
21  two other public companies: from 1999 to 2004 he was the VP Finance of
22  Southwest Water, Inc., and from 1994 to 1998 he was the CFO of Safeguard
23  Health Enterprises.  Tekulve was licensed by the State of Oregon as a certified
24  public accountant in 1978.  During the relevant period, Tekulve's CPA license was
25  on inactive status.  Tekulve earned an MBA degree in 1987.  Tekulve resides in
26  Yorba Linda, California.

27                            **RELATED ENTITY**

28       8.    **Basin Water, Inc. ("Basin")** was a Delaware corporation

4

1  headquartered in Rancho Cucamonga, California. During the relevant period,

2  Basin was engaged in the business of designing, manufacturing and servicing

3  groundwater treatment systems. It was founded by Jensen on or about December

4  1999. Basin became a public company on May 11, 2006, when its stock was

5  initially registered with the Commission pursuant to Section 12(g) of the Exchange

6  Act, 15 U.S.C. § 78*l*(g). Basin's stock traded on the Nasdaq National Market until

7  July 31, 2006, when its common stock became registered pursuant to Section 12(b)

8  of the Exchange Act, 15 U.S.C. § 78*l*(b), and began trading on the Nasdaq Global

9  Market. On July 16, 2009, Basin filed a bankruptcy petition under Chapter 11 of

10  the Bankruptcy Code. On August 5, 2009, the Nasdaq delisted Basin's stock

11  effective August 17, 2009. Basin's stock is presently quoted on OTC Link

12  (formerly known as the "Pink Sheets").

13  **THE FRAUDULENT SCHEME**

14       9.    Beginning with Basin's very first public filing with the Commission

15  on June 26, 2006, for its quarter ended March 31, 2006 -- its first quarter 2006

16  Form 10-Q -- the Defendants embarked on a scheme to fraudulently inflate Basin's

17  revenues. As set forth with particularity below, the Defendants caused material

18  overstatements in almost all of Basin's quarterly filings and both of its annual

19  filings for its fiscal years 2006 and 2007. On February 10, 2009, after each of the

20  defendants had resigned from their positions as CEO and CFO, respectively, Basin

21  restated its financial results, filing amended Forms 10-Q and 10-K for each of the

22  relevant periods. The Defendants' fraudulent acts caused the following

23  overstatements of Basin's financial results:

24  ///

25  ///

26  ///

27  ///

28  ///

### Basin's Overstated Financial Results – 2006

| | Q1 2006 | Year-To-Date Q2 2006 | Q3 2006 | Year-To-Date Q3 2006 | FY 2006 |
|---|---|---|---|---|---|
| **Reported System Sales** | $3,091,000 | $7,258,000 | $3,936,000 | $11,194,000 | $13,861,000 |
| **Adjusted System Sales** | $1,591,000 | $5,908,000 | $3,484,533 | $9,392,533 | $11,930,283 |
| **Percentage Overstatement of System Sales** | 94% | 23% | 13% | 19% | 16% |
| **Reported Total Revenue** | $3,703,000 | $8,666,000 | $4,846,000 | $13,512,000 | $17,114,000 |
| **Adjusted Total Revenue** | $2,203,000 | $7,316,000 | $4,394,533 | $11,710,533 | $15,183,283 |
| **Percentage Overstatement of Total Revenue** | 68% | 18% | 10% | 15% | 13% |
| **Reported Gross Profit** | $1,147,000 | $2,545,000 | $309,000 | $2,805,000 | $(2,992,000) |
| **Adjusted Gross Profit** | $277,479 | $1,762,431 | $85,765 | $1,231,765 | $(3,789,492) |
| **Percentage Overstatement of Gross Profit** | 313% | 44% | 260% | 128% | 21% |

///
///
///
///
///
///
///
///
///

## Basin's Overstated Financial Results – 2007

| | Q2 2007 | YTD Q2 2007 | Q3 2007 | YTD Q3 2007 | Q4 2007 | FY 2007 |
|---|---|---|---|---|---|---|
| **Reported System Sales** | $5,199,0000 | $6,128,000 | $3,773,000 | $9,901,000 | $3,576,000 | $13,477,000 |
| **Adjusted System Sales** | $1,234,746 | $2,163,746 | $1,852,490 | $4,016,236 | $1,474,064 | $5,490,297 |
| **Percentage Overstatement of System Sales** | 321% | 183% | 104% | 147% | 143% | 145% |
| **Reported Total Revenue** | $6,414,000 | $8,021,000 | $5,346,000 | $13,367,000 | $5,417,000 | $18,784,000 |
| **Adjusted Total Revenue** | $2,449,746 | $4,056,746 | $3,425,490 | $7,482,236 | $3,315,064 | $10,797,297 |
| **Percentage Overstatement of Total Revenue** | 162% | 98% | 56% | 79% | 63% | 74% |
| **Reported Gross Profit** | $25,000 | $(262,000) | $(6,779,000) | $(7,041,000) | $894,000 | $(6,147,000) |
| **Adjusted Gross Profit** | $(515,161) | $(802,161) | $(6,995,399) | $(7,797,560) | $183,706 | $(7,613,857) |
| **Percentage Overstatement Gross Profit** | 105% | 67% | 3% | 10% | 387% | 19% |

10.     During the period when he was causing Basin to fraudulently inflate its revenues, beginning on December 12, 2006, and continuing through August 7, 2008, prior to Basin's August 11, 2008, announcement that it would restate its

2006 and 2007 financial statements, on the basis of material nonpublic information regarding Basin's true financial condition, and in breach of his duty of trust or confidence owed directly, indirectly or derivatively to Basin and its shareholders, Jensen sold 1,660,943 shares of Basin stock and gifted 290,000 more to his *alma mater*, MIT, gaining and realizing profits of $9,173,075 and taking charitable tax deductions of $763,345 as alleged below.  Jensen has not reimbursed Basin for any of the profits realized from these sales and gifts of Basin securities.

      11.    During the period when they were causing Basin to fraudulently inflate its revenues and for the twelve-month period following each of the false filings with the Commission, Jensen received $476,894 and Tekulve received $479,759 in salary, and Jensen received $210,385 and Tekulve received $150,000 in bonuses, some or all of which constituted incentive-based compensation.  Additionally, during the same period, the Defendants each received equity-based compensation:  Jensen received approximately $135,281 in Basin stock; and Tekulve received approximately $79,921 in Basin stock and $407,617 in Basin stock options.  Neither Jensen nor Tekulve has ever reimbursed Basin for any of this incentive-based or equity-based compensation.

## A.    The Defendants Materially Overstate Basin's Q1 2006 Financial Results By Recognizing Revenue On A Sale That Had Not Been Finalized, And For Which $1.35 Million Was Uncollectable

      12.    In or about December 2005, Jensen contacted Martin Benowitz ("Benowitz"), an attorney he knew represented foreign investors, proposing that an investor group purchase two Basin units in exchange for money and five percent of the shares of BionBasin, Inc. ("BION"), a wholly owned subsidiary of Basin.  Subsequently, on or about December 22, 2005, Tekulve, pursuant to Jensen's instructions, sent to Benowitz by fax a letter "Agreement for purchase of two Basin Water ion exchange units," copying Jensen by email.  Jensen then sent an email to Benowitz instructing him to redline his comments and return the letter to Tekulve.

After Benowitz did so on December 26, Tekulve emailed him a revised version, copying Jensen, on December 28. Benowitz then signed the letter as the "legal representative" of Opus Trust, Inc., an investor group purportedly based in the Caribbean island of Nevis, and faxed it to Tekulve on or about December 29, 2005 (the "Opus Letter"). The Opus Letter had a designated space for Jensen to sign on behalf of Basin in his capacity as Basin's president, which Jensen never signed.

13. The Opus Letter provided, among other things, that:

    a.    The agreement was between Basin and Opus;

    b.    The two systems to be sold were units located in the East Valley Water District;

    c.    In addition to the $150,000 down payment for the systems, which Opus paid by checks transmitted to Tekulve on or about December 29, 2005, Opus was required to pay $1.35 million balance within two years, and Basin would grant Opus Trust 5% or 500,000 shares of stock in its wholly-owned subsidiary, BION, upon Opus Trust's final payment for the units; and

    d.    A "definitive purchase agreement" would be prepared by the seller, Basin, and was subject to review by Opus and its counsel.

14. On December 29, 2005, after receiving the signed Opus Letter from Benowitz as well as an email from Benowitz stating that he would be sending the $150,000 down payment by Federal Express to Basin that evening, Tekulve sent an email to Benowitz stating: "Marty, That's Great! Next week I'll get going on the definitive agreement. I hope to have a draft to you by the first part of the week of January 9th."

15. In negotiating the agreement with Jensen and Tekulve in 2005, Benowitz made clear that he wanted an extension of the agreement in case there was a delay in BION going public. Jensen and Tekulve assured Benowitz that it should

never reach the point of Opus Trust having to come up with the $1,350,000 balance because BION would either be a public company or Basin would have sold it.

16.   On March 3, 2006, Tekulve sent an email to Jensen attaching the Opus Letter signed by Benowitz, stating:

> Attached is the Benowitz letter.
>
> I don't think you or I ever signed it!
>
> This copy has the comments I've made – several items I'd like to change/clarify with him, since the December date is not critical.
>
> But we'll need this one in Q1 (Obviously).

17.   Over three months later, after the close of Basin's first quarter on March 31, 2006, on or about June 16, Tekulve sent Jensen an email attaching a redline version of a draft Unit Purchase Agreement with Opus Trust, pointing out, among other things, that the length of time for Opus Trust to make the final payment had been extended to three years, that the units Opus Trust would own "as of March 30" would be certain units in Salinas, and that the BION stock would have to be issued immediately and escrowed, rather than being issued after Opus made its final payment, because to do otherwise would "reduce today's revenues."

18.   On June 20, 2006, Tekulve sent to Benowitz a redline version of the draft Unit Purchase Agreement, which identified units in Salinas as the units to be sold to Opus Trust, which differed from the Salinas units identified in the version he sent to Jensen on June 16.

19.   On or about June 22, 2006, Jensen signed and initialed a "Unit Purchase Agreement" ("Opus Agreement") purporting to be dated "as of March 30, 2006," on behalf of BION.

20.   On or about June 22, 2006, Tekulve emailed to Benowitz the Opus Agreement, noting in his diary "I finalized the Benowitz deal & sent email off, [Benowitz] will sign in am." On or about June 23, 2006, Benowitz signed and initialed the Opus Agreement on behalf of Opus Trust, and caused it to be faxed to Tekulve.

21.     The terms of the Opus Agreement differ from those in the Opus letter in that:

a.     The Agreement was between BION, rather than Basin, and Opus Trust;

b.     Different systems, located in Salinas, California, rather than the East Valley Water District, had been substituted for the units that were the subject of the Opus Letter;

c.     The Agreement contained a liquidated damages clause, limiting Basin's right to recover to payments already made by Opus Trust should Opus Trust default on its obligation to purchase the units, which payments totaled $150,000 at the time the Agreement was executed; and

d.     The balance would be paid by Opus Trust in three years, rather than two years, and that that period could be extended by two years upon the request of Opus Trust and payment of an additional $250,000 by Opus Trust.

22.     Notwithstanding their understanding with Benowitz that Opus Trust would never have to pay the remaining $1,350,000 of the purchase price for the two water systems, and the lack of a definitive agreement reflecting the understanding of the parties, Jensen and Tekulve caused Basin to recognize $1,500,000 in revenue from a purported sale to Opus Trust based on the Opus Letter. In fact, as of March 30, 2006, no definitive purchase agreement had been prepared or signed. Nor had Basin signed the Opus Letter. The revenue recognized on the Opus Trust transaction constituted 41% of the company's quarterly revenues.

23.     On June 23, 2006, one day after completing the backdated Opus Agreement, Jensen and Tekulve each signed a letter to Singer Lewak Greenbaum & Goldstein, LLP ("SingerLewak"), Basin's auditors. Jensen and Tekulve

1   confirmed "that we are responsible for the fair presentation of the interim financial
2   information in conformity with accounting principles generally accepted in the
3   United States of America and Rule 10-01(a)-(c) of Regulation S-X." They further
4   represented in this Management Representation Letter, among other things, that:

    a.    The interim financial information is presented in accordance
with GAAP applicable to interim financial information applied
on an basis substantially consistent with the same period in the
prior year, the immediately preceding quarter and the prior
fiscal year;

    b.    They had made available to SingerLewak all financial records
and related data;

    c.    They had no knowledge of any fraud or suspected fraud
affecting the Company involving management;

    d.    There are no material transactions that have not been properly
recorded in the accounting records underlying the interim
financial information;

    e.    The Company has complied with all aspects of contractual
agreements that would have a material effect on the interim
financial information in the event of noncompliance; and

    f.    No events or transactions other than those disclosed in the
interim financial information have occurred subsequent to
March 31, 2006 that would require adjustment to, or disclosure
in, the interim financial information.

24   Each of these representations was false because recognition of revenue from the
25   Opus Trust transaction did not comply with GAAP, and these revenues were
26   material to Basin's financial statements.

27       24.    Specifically, recognizing $1.5 million in revenue from the purported
28   sale to Opus Trust for the quarter ended March 31, 2006, violated the GAAP

requirements for recognizing revenue because, as Commission Staff Accounting

Bulletin ("SAB") 104 provides, among other provisions, for revenue to be

recognized: (1) persuasive evidence of an arrangement must exist; and (2)

reasonable assurance of collectability is required (citing Accounting Research

Bulletin ("ARB") 43). Here, there was no persuasive evidence of an arrangement

as of March 31, 2006, when revenue was recognized because no definitive

purchase agreement had been prepared; the parties to the final agreement, executed

in June 2006, were different, and the terms of the June 2006 agreement were

materially different because different systems were being sold to Opus, a

liquidated damages clause had been inserted into the agreement, and the term for

payment to Basin had been extended from two years to three years. Additionally,

collectability was not reasonably assured because of the liquidated damages clause,

the three year payment period, and Jensen's and Tekulve's utter failure to conduct

any due diligence to determine Opus Trust's ability to pay. In fact, Opus Trust

never did make any payments for the systems other than the $150,000 down

payment in made in December 2005.

     25.    On June 26, 2006, Tekulve caused Basin to issue its first quarter

earnings release at about 5:00 a.m. Pacific Time. Tekulve caused it to be filed with

the Commission on Form 8-K and signed the filing. The headline on the press

release was "**Revenues Increase to $3.7 Million, Gross Profit Increase [sic] to**

**$1.1 Million.**" In the press release, it is represented that:

> Revenues increased 311% to $3.7 million for the first quarter of 2006
> as compared to $0.9 million for the same period of 2005. Revenues
> from both system sales and contract revenues continue to grow
> compared to the prior year quarter.

> Gross profit increased for the quarter by 267% to $1.1 million
> compared to $0.3 million for 2005 as a result of the increased volume

1       in system sales. Gross profit as a percentage of revenues was 31%. . .

2 Additionally, Jensen is quoted in the press release as saying: "[W]e are pleased

3 with our first quarter results. . . . We anticipate that our revenues will continue to

4 grow during the next several quarters. . . ." These representations were materially

5 false and misleading because $1.5 million -- over half -- of Basin's system sales

6 revenues consisted of the improperly recognized revenue from the Opus Trust

7 transaction. The press release also stated that the company would provide more

8 detail regarding its first quarter results in a conference call and web cast to be held

9 at 1:30 p.m. Pacific Time that same day. Tekulve had prepared the script for that

10 call earlier that day.

11       26.    Shortly thereafter that same day, Jensen and Tekulve caused Basin to

12 file with the Commission its first quarterly report on Form 10-Q, for its first

13 quarter 2006 ("Q1 2006") ended March 31, 2006. Jensen read the Form 10-Q

14 before it was filed, and Tekulve signed the Form 10-Q as Basin's CFO. Among

15 other results, Basin's Form 10-Q reported system sales of $3,091,000 and total

16 revenues of $3,703,000. These system sales and revenues included the $1,500,000

17 in revenue purportedly earned from a sale of systems to Opus Trust. Additionally,

18 the Form 10-Q states that its revenue increase "by $2.8 million, or 313%" from its

19 first quarter of the prior year "occurred primarily as a result of growth in sales of

20 our groundwater treatment systems." Basin's Form 10-Q does not disclose that

21 41% of its purported revenues and 76% of its profits were derived from a

22 purported sale to a single customer for which revenues were not in fact properly

23 recognized.

24       27.    On or about June 26, 2006, Jensen and Tekulve each certified, among

25 other things, with regard to the Form 10-Q, that:

26           a.    He had reviewed the Form 10-Q;

27           b.    Based on his knowledge, the Form 10-Q did not contain any

28                 untrue statement of material fact or omit to state a material fact

1        necessary to make the statements made, in light of the

2        circumstances under which they were made, not misleading

3        with respect to the period covered by the report;

4    c.  Based on his knowledge, the financial statements, and other

5        financial information included in the report fairly presented in

6        all material respects the financial condition, results of

7        operations and cash flows of Basin as of and for the periods

8        presented in the report; and

9    d.  He had disclosed to Basin's auditors and the audit committee of

10        Basin's Board of Directors any fraud that involved company

11        management.

12  These certifications were false in that the Form 10-Q contained material

13  misrepresentations and omissions of material fact regarding Basin's quarterly

14  revenues, and did not fairly represent Basin's financial condition, and Jensen and

15  Tekulve had not disclosed to either Basin's auditors or its audit committee their

16  fraud in causing the improper revenue recognition.

17  **B.**   **Basin Files A Securities Registration Statement Incorporating By**

18      **Reference Future Annual And Quarterly Filings**

19      28.   On May 15, 2006, Jensen and Tekulve signed, and caused Basin to

20  file, a registration statement on Form S-8 ("S-8 Registration Statement") with the

21  Commission registering the offering of approximately 6.7 million shares of its

22  common stock, which offering included  any shares issuable pursuant to Basin's

23  equity incentive, stock option, and employee stock purchase plans.  The S-8

24  Registration Statement incorporated by reference all documents to be filed by

25  Basin pursuant to Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act, 15

26  U.S.C. §§ 78m(a), 78m(c), 78n or 78o(d), after the date of the S-8 Registration

27  Statement and prior to the filing of a post-effective amendment indicating that all

28  securities offered had been sold or deregistering the securities then remaining

1  unsold. A document incorporated by reference was to become and became a part
2  of the S-8 Registration Statement from the date that the document was filed with
3  the Commission, including the materially false and misleading Forms 8-K, 10-Q,
4  and 10-K identified in this Complaint.

5  **C.  The Defendants Materially Overstate Basin's Year-To-Date Financial**
6     **Results In Its Second Quarter 2006 Form 10-Q**

7       29.    Early the morning of August 14, 2006, Tekulve caused Basin to issue
8  its second quarter 2006 earnings release. Tekulve caused it to be filed with the
9  Commission on Form 8-K and signed the filing. The headline on the press release
10 stated in relevant part: "**Quarterly Revenues Increase to $5 Million, Gross**
11 **Profit to $1.4 Million**." In the press release, it is represented that:

12       Revenues increased by 200% to $8.7 million for the six months ended
13       June 30, 2006 compared to $2.9 million for the same period in 2005.
14       Revenue from . . . system sales. . . continue to increase compared to
15       the prior year as a result of growth in placement of our groundwater
16       treatment systems.
17       Gross profit for the six months ended June 30, 2006 was $2.5 million
18       compared to $0.9 million for the same period in 2005.

19 Jensen is quoted in the release as saying "We are pleased with our second quarter
20 results which reflect continued growth in all areas of our business. . . ." The
21 representations in the release were false and misleading because they did not
22 disclose that $1.5 million of the $8.7 million in revenues for the first six months of
23 2006 was the revenue that was improperly recognized from the Opus Trust
24 transaction.

25       30.    Also on August 14, 2006, Jensen and Tekulve each signed a letter to
26 SingerLewak, Basin's auditors. Jensen and Tekulve confirmed "that we are
27 responsible for the fair presentation of the interim financial information in
28 conformity with accounting principles generally accepted in the United States of

America and Rule 10-01(a)-(c) of Regulation S-X." They further represented in
this Management Representation Letter, among other things, that:

    a.    The interim financial information is presented in accordance
          with GAAP applicable to interim financial information applied
          on an basis substantially consistent with the same period in the
          prior year, the immediately preceding quarter and the prior
          fiscal year;

    b.    They had made available to SingerLewak all financial records
          and related data;

    c.    They had no knowledge of any fraud or suspected fraud
          affecting the Company involving management;

    d.    There are no material transactions that have not been properly
          recorded in the accounting records underlying the interim
          financial information;

    e.    The Company has complied with all aspects of contractual
          agreements that would have a material effect on the interim
          financial information in the event of noncompliance; and

    f.    No events or transactions other than those disclosed in the
          interim financial information have occurred subsequent to June
          30, 2006 that would require adjustment to, or disclosure in, the
          interim financial information.

Each of these representations was false because recognition of revenue from the
Opus Trust transaction did not comply with GAAP, and these revenues were
material to Basin's year-to-date financial statements included in its second quarter
financial statements.

        31.    At about noon Pacific Time on August 14, 2006, Jensen and Tekulve
caused Basin to file with the Commission its quarterly report on Form 10-Q, for its
second quarter 2006 ("Q2 2006") ended June 30, 2006.  Jensen read the Form 10-

17

1 | Q before it was filed, and Tekulve signed the Form 10-Q as Basin's CFO.  Among
2 | other results, Basin's Form 10-Q reported system sales of $7,258,000 for the first
3 | six months of 2006 and total revenues of $8,666,000 for that period.  These system
4 | sales and revenues included the $1,500,000 in revenue purportedly earned from a
5 | sale of systems to Opus Trust.  Basin's Form 10-Q does not disclose that 17% of
6 | its purported revenues and 31% of its profits were derived from a purported sale to
7 | a single customer for which revenues were not in fact properly recognized.

8 |      32.    On or about August 14, 2006, Jensen and Tekulve each certified,
9 | among other things, with regard to the Form 10-Q, that:

10 |        a.    He had reviewed the Form 10-Q;
11 |        b.    Based on his knowledge, the Form 10-Q did not contain any
12 |             untrue statement of material fact or omit to state a material fact
13 |             necessary to make the statements made, in light of the
14 |             circumstances under which they were made, not misleading
15 |             with respect to the period covered by the report;
16 |        c.    Based on his knowledge, the financial statements, and other
17 |             financial information included in the report fairly presented in
18 |             all material respects the financial condition, results of
19 |             operations and cash flows of Basin as of and for the periods
20 |             presented in the report; and
21 |        d.    He had disclosed to Basin's auditors and the audit committee of
22 |             Basin's Board of Directors any fraud that involved company
23 |             management.
24 | These certifications were false in that the Form 10-Q contained material
25 | misrepresentations and omissions of material fact regarding Basin's year to date
26 | revenues, and did not fairly represent Basin's financial condition, and Jensen and
27 | Tekulve had not disclosed to either Basin's auditors or its audit committee their
28 | fraud in causing the improper revenue recognition.

33.     At about 1:30 p.m. Pacific Time on August 14, 2006, Jensen and
Tekulve participated on behalf of Basin in an analyst conference call, for which
Tekulve had drafted the script that morning.  Among other representations, Jensen
stated that: "for the six months of 2006, revenues grew to $8.7 million compared to
$2.9 million for the same period in 2005, a 200% increase."  This statement was
materially false and misleading because $1.5 million of the revenues, or 17%, were
revenues that were improperly recognized pursuant to the transaction with Opus
Trust.  Jensen similarly falsely represented that "Gross profits for the six month
period grew by 177% to 2.5 million compared to 0.9 million in the same period
'05," when in fact gross profits for the period had only grown by 96% if the
revenue improperly recognized from the Opus Trust transaction was excluded.

**D.      The Defendants Materially Overstate Basin's Q3 2006 Revenues By
         Recognizing $451,000 On A Contingent Sale Of Systems Basin Never
         Shipped And Continue To Overstate Basin's Year-To-Date Results**

34.     In 2005, James Sabzali ("Sabzali"), general manager of the chemical
division of Thermax, Inc., contacted Jensen on behalf of Thermax.  Sabzali told
Jensen that Thermax had a client in Venezuela, PDVSA, for which Thermax was
interested in purchasing Basin units.  After protracted negotiations during which
Jensen repeatedly pressed Sabzali for Thermax to send him a purchase order, on
July 5, 2006, Sabzali sent an email to Jensen and others at Basin stating that
PDVSA had verbally committed to buying a softening system from Thermax; that
once Thermax received a purchase order and first partial payment from PDVSA
which was expected in late August, it would issue a purchase order to Basin, which
it expected to do in late September; and that it anticipated shipment by Basin
would be needed in early January 2007.  On July 7, 2006, Jensen forwarded the
email to Tekulve, whom he had periodically informed regarding the negotiations
with Thermax.

35.     On August 18, 2006, Pat Kelly, Basin's head of manufacturing,

1   reminded Jensen in an email that, with regard to the potential order from Thermax,

2   Basin had done no engineering work on modifying its units for ocean travel, that

3   "At best all we would be able to accomplish in the way of revenue recognition in

4   Q3, if an order came in Q3, would be parts delivery and some subassembly

5   efforts."

6       36.     Jensen repeatedly pressed Thermax for a purchase order, informing

7   Sabzali that Basin needed the purchase order in September before the end of the

8   quarter because it would be a significant component to Basin's quarterly reported

9   financial information.

10      37.     On or about September 12, 2006, Sabzali sent a memorandum on

11  behalf of Thermax to Jensen "RE: Purchase Order for PDVSA Softening System,"

12  which set forth several "caveats" that would apply to the purchase order Thermax

13  "will be sending Basin Water later this month."  These caveats included that the

14  purchase order from Thermax "is predicated on Thermax Inc. receiving a similar

15  purchase order from PDVSA," and that if PDVSA failed to issue a purchase order

16  to Thermax by November 30, Thermax's purchase order to Basin would be

17  canceled.

18      38.     Jensen was angered by the "caveat" that Thermax would have to

19  receive a purchase order from PDVSA before issuing a purchase order to Basin; he

20  therefore called Sabzali and told him this caveat was "unacceptable" and that such

21  a purchase order is "absolutely not valid at all," and that he expected Thermax to

22  send a purchase order without that contingency.

23      39.     On September 28, 2006, Jensen received a purchase order from

24  Thermax.  The purchase order stated that it was subject to terms and conditions

25  stated on Addendum "A."  That Addendum, which Sabzali had put on a separate

26  page at Jensen's request, contained the provision that the date of shipment and

27  terms and conditions were "TBA," which Jensen understood meant "to be

28  advised."  Additionally, with respect to the terms and conditions, the purchase

1  order provided that it was "Agreed that the T&C to Basin will reflect the T&Cs on
2  PDVSA's PO to Thermax Inc.," which Jensen understood to be similar, if not
3  identical, to the prior purchase order he had rejected. Jensen nevertheless had no
4  discussions and raised no concerns about the purchase order with anyone at Basin;
5  nor did he further discuss this condition with Thermax.

6      40.    Also on September 28, 2006, Tekulve received the Thermax purchase
7  order including Addendum A, and forwarded it by email to Basin's controller,
8  understanding that it was subject to the terms and conditions set forth in
9  Addendum A.

10     41.    On the morning of November 14, 2006, Tekulve caused Basin to issue
11 its third quarter 2006 earnings release. Tekulve caused it to be filed with the
12 Commission on Form 8-K and signed the filing. The headline on the press release
13 stated in relevant part: **"Quarterly Revenues at $4.8 Million, Nine-Month**
14 **Revenues Increase 75% from 2005 to $13.5 Million"** In the press release, it is
15 represented that:

16         For the third quarter of 2006, revenues of $4.8 million were a slight
17         improvement over the third quarter of 2005. Meanwhile 2006 nine-
18         month revenues increased by 75% to $13.5 million compared to $7.7
19         million for the first nine months of 2005. System sales revenues for
20         the third quarter 2006 were $3.9 million compared to $4.2 million in
21         the same period in 2005.

22 Jensen is also quoted in the press release. The above representations were false
23 and misleading because they did not disclose that $451,000, or 9%, of the $4.8
24 million in third quarter revenue was revenue improperly recognized from the
25 Thermax transaction, and that almost $2 million of the $13.5 million in revenues
26 for the first nine months of 2006 was revenue that was improperly recognized from
27 the Opus Trust and Thermax transactions ($1.5 million and $451,000 respectively).

28     42.    Also on November 14, 2006, Jensen and Tekulve caused Basin to file

with the Commission its quarterly report on Form 10-Q, for its third quarter 2006

("Q3 2006") ended September 30, 2006.  Jensen read the Form 10-Q before it was

filed, and Tekulve signed the Form 10-Q as Basin's CFO.  Among other results,

Basin's Form 10-Q reported quarterly system sales of $3,936,000 and total

revenues of $4,846,000.  These system sales and revenues included recognition of

$451,000 in revenue purportedly earned from the sale of systems to Thermax

which was not in fact properly recognized.

43.     Additionally, the Form 10-Q reports $11,194,000 in system sales and

$13,512,000 in total revenue for the first nine months of 2006.  These systems

sales and revenues included almost $2 million in revenues improperly recognized

from the Opus Trust ($1.5 million) and Thermax ($451,000) transactions.

44.     On or about November 14, 2006, Jensen and Tekulve each certified,

among other things, with regard to the Form 10-Q, that:

      a.    He had reviewed the Form 10-Q;

      b.    Based on his knowledge, the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

      c.    Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Basin as of and for the periods presented in the report; and

      d.    He had disclosed to Basin's auditors and the audit committee of Basin's Board of Directors any fraud that involved company management.

These certifications were false in that the Form 10-Q contained material

1  misrepresentations and omissions of material fact regarding Basin's quarterly

2  revenues, and did not fairly represent Basin's financial condition, and Jensen and

3  Tekulve had not disclosed to either Basin's auditors or its audit committee their

4  fraud in causing the improper revenue recognition in connection with the Opus

5  Trust and Thermax transactions.

6      45.    At about 1:30 p.m. Pacific Time on November 14, 2006, Jensen and

7  Tekulve participated on behalf of Basin in an analyst conference call, for which

8  Tekulve had drafted the script that morning.  They were joined by Michael Stark

9  ("Stark"), who had just been appointed the new president and chief operating

10 officer.  Among other representations, Jensen represented that "our revenues of

11 $4.8 million were a slight improvement over the prior quarter.  Meanwhile, nine

12 months 2006 revenues increased by 75% to $13.5 million compared to $7.7 million

13 for the nine months of 2005."  This statement was materially false and misleading

14 because $1.5 million of the revenues and $451,000, totaling 13%, were revenues

15 that were improperly recognized pursuant to the transactions with Opus Trust and

16 Thermax, respectively.

17     46.    Thermax never received a purchase order from PDVSA, and never

18 made any payments to Basin, and Basin never in fact shipped any units to Thermax

19 pursuant to the September 28, 2006, purchase order, notwithstanding that Jensen

20 was responsible for keeping in contact with Thermax in order to obtain a shipping

21 date from them.  Nor did Basin attempt to collect from Thermax based on the

22 purchase order.

23 **E.    The Defendants Materially Overstate Basin's FY 2006 Revenues**

24     47.    On the morning of March 29, 2007, Tekulve caused Basin to issue its

25 Fiscal Year 2006 earnings release.  Tekulve caused it to be filed with the

26 Commission on Form 8-K and signed the filing.  The headline on the press release

27 stated in relevant part: **"Twelve Month Revenues Increase 40% from 2005 to**

28 **$17.1 Million"**  In the press release, it is represented that:

1    For the year ended 2006, revenues increased by 40% to $17.1 million
2    compared to $12.2 million for the year 2005.  For the year, system
3    sales revenues were $13.9 million, compared to $10.0 million in the
4    same twelve-month period in 2005.

5  Jensen is quoted as saying, among other things, that "We have grown our revenues
6  significantly this year."  These statements were false and misleading in light of the
7  fact that almost $2 million – a material portion – of the $17.1 million in revenues
8  was improperly recognized as a result of the Opus Trust ($1.5 million) and
9  Thermax ($451,000) transactions.

10        48.    At about 1:30 Pacific Time on March 29, 2007, that same day, Jensen
11 and Tekulve participated on behalf of Basin in an analyst conference call, together
12 with Stark, for which call Tekulve had drafted the script that morning.  Among
13 other representations, Jensen represented that "For the full year 2006, revenues
14 increased by 40% to 17.1 million in 2006 compared to $12.2 million in 2005."
15 This statement was materially false and misleading because $1.5 million and
16 $451,000, totaling 11% of Basin's FY 2006 revenue, were revenues that were
17 improperly recognized pursuant to the transactions with Opus Trust and Thermax,
18 respectively.

19        49.    Jensen also stated in the earnings conference call that "On our sales
20 for standard systems, we recorded revenues of $8 million with a gross margin of
21 3.5 million, a gross profit margin of 44%.  This is in line with our typical margins."
22 This statement was materially false and misleading because $1.5 million and
23 $451,000, totaling 11% of Basin's FY 2006 systems revenue, were revenues that
24 were improperly recognized pursuant to the transactions with Opus Trust and
25 Thermax, respectively.  Basin's annual system revenues were accordingly
26 overstated by 16%.

27        50.    On March 30, 2007, Jensen and Tekulve each signed a letter to
28 SingerLewak, Basin's auditors.  Jensen and Tekulve confirmed "that we are

responsible for the fair presentation of the interim financial information in conformity with accounting principles generally accepted in the United States of America and Rule 10-01(a)-(c) of Regulation S-X." They further represented in this Management Representation Letter, among other things, that:

      a.    The financial statements were fairly presented in conformity with GAAP;

      b.    They had made available to SingerLewak all financial records and related data;

      c.    They had no knowledge of any fraud or suspected fraud affecting the Company involving management;

      d.    There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements;

      e.    The Company has complied with all aspects of contractual agreements that would have a material effect on the interim financial information in the event of noncompliance; and

      f.    The Company has properly recorded all revenue transactions in accordance with revenue recognition policies, including under the percentage-of-completion method.

51.    Each of these representations was false because recognition of revenue from the Opus Trust and Thermax transactions did not comply with GAAP, the Thermax revenue, recognized under a percentage-of-completion method, was not recognized consistent with GAAP or Basin's own internal revenue recognition policy governing use of percentage-of-completion methodology, and these revenues were material to Basin's financial statements.

52.    On April 2, 2007, Jensen and Tekulve caused Basin to file with the Commission its annual report on Form 10-K, for its fiscal year 2006 ("FY 2006") ended December 31, 2006. Jensen read the Form 10-K before it was filed, and

1 | Jensen and Tekulve signed the Form 10-K.

2 |      53.    Basin's FY 2006 Form 10-K reported system sales of $13,861,000 for

3 | the year and $17,114,000 in total revenues for the year. These system sales and

4 | total revenues included the $1,500,000 in revenue purportedly earned from a sale

5 | of systems to Opus Trust in Q1 and $451,000 in revenue purportedly earned from a

6 | sale to Thermax. Basin's Form 10-K does not disclose that 13% of its purported

7 | system sales and 11% of its revenues were derived from the sales to Opus Trust

8 | and Thermax, for which revenues were not in fact properly recognized.

9 |      54.    On or about April 2, 2007, Jensen and Tekulve each certified, among

10 | other things, with regard to the Form 10-K, that:

11 |         a.    He had reviewed the Form 10-K;

12 |         b.    Based on his knowledge, the Form 10-K did not contain any

13 |               untrue statement of material fact or omit to state a material fact

14 |               necessary to make the statements made, in light of the

15 |               circumstances under which they were made, not misleading

16 |               with respect to the period covered by the report;

17 |         c.    Based on his knowledge, the financial statements, and other

18 |               financial information included in the report fairly presented in

19 |               all material respects the financial condition, results of

20 |               operations and cash flows of Basin as of and for the periods

21 |               presented in the report; and

22 |         d.    He had disclosed to Basin's auditors and the audit committee of

23 |               Basin's Board of Directors any fraud that involved company

24 |               management.

25 | These certifications were false in that the Form 10-K contained material

26 | misrepresentations and omissions of material fact regarding Basin's quarterly

27 | revenues, and did not fairly represent Basin's financial condition, and Jensen and

28 | Tekulve had not disclosed to either Basin's auditors or its audit committee their

1 | fraud in causing the improper revenue recognition in connection with the Opus

2 | Trust and Thermax transactions.

3 | **F.**    **The Defendants Materially Overstate Basin's Q2 2007 And Year-To-**

4 |      **Date Revenues By Engaging In A Sham $3.8 Million Sale To A Special**

5 |      **Purpose Entity They Directly Or Indirectly Cause To Be Created**

6 |      55.    Initially, in most cases Basin was placing units on customer sites and

7 | signing long-term leases with those customers. In or about early 2007, Basin

8 | began to engage in transactions pursuant to which it recognized additional revenue

9 | by purporting to sell the systems rather than by leasing them. Tekulve was

10 | primarily responsible for carrying out Basin's plan.

11 |      56.    Basin paid a consultant, Charles Litt, to obtain financial partners to

12 | facilitate purchase of units from Basin. Litt introduced Basin to CCH Netherlands

13 | and its related companies ("CCH"), and to Lloyd Ward ("Ward"), a Dallas, Texas

14 | attorney. Because CCH did not want to do a transaction with Basin in its own

15 | name, Ward created VL Capital, LLC. Tekulve was Ward's sole contact at Basin.

16 |      57.    VL Capital, LLC ("VL Capital") was registered in Delaware as an

17 | LLC on June 29, 2007, one day before the end of Basin's Q2 2007 on June 30,

18 | 2007, and Ward was its Managing Member, and sole member. VL Capital was

19 | created to purchase units from Basin. It had no other business. Accordingly, it

20 | was a "special purpose entity" ("SPE"). Tekulve received the invoices from Ward

21 | relating to formation of VL Capital and drafting of documents relating to the

22 | agreements between Basin and VL Capital and VL Capital and CCH; Basin agreed

23 | to pay and paid these fees.

24 |      58.    Jensen participated with Tekulve in internal Basin discussions about

25 | engaging in transactions with VL Capital, and was insistent that Tekulve ensure

26 | that revenue be recognized in the second quarter of 2007 pursuant to purported

27 | sales by Basin to VL Capital.

28 |      59.    Just before the end of Basin's Q2 2007, Basin purportedly sold and

1  delivered ten operating treatment systems to VL Capital.  Tekulve caused Basin to

2  record $3.8 million in revenue from the sale of these systems, which revenue

3  represented the majority of its quarterly revenues.  Jensen was aware that revenue

4  was recognized in Q2 2007 from the purported transaction with VL Capital.

5         60.     Recognition of the $3.8 million in revenue was improper under GAAP

6  for four reasons:

7              a.     Basin did not have a definitive agreement with VL Capital in

8                    Q2 2007.  Tekulve, who negotiated and/or drafted all

9                    agreements with VL Capital, knew this.  Indeed, the purported

10                   arrangement between the parties changed several times.  In a

11                   letter dated June 27, 2007, (the "VL Letter"), two days before

12                   VL Capital was even legally formed, VL Capital purported to

13                   advise Tekulve (who had in fact negotiated the terms of the

14                   letter) that it had approved the purchase of treatment systems

15                   from Basin, but that such purchase was subject to:  (1) the

16                   negotiation and preparation of documentation acceptable to VL

17                   Capital and its counsel; (2) the nonoccurrence of any material

18                   adverse changes with respect to the financial or business

19                   condition of Basin or the parties to any water service

20                   agreement; and (3) the final acceptance of the financing terms

21                   by VL Capital and its lender.  Tekulve signed this letter as

22                   "Acknowledged and Agreed" on or about June 28, 2007.  Basin

23                   and VL did not in fact sign agreements until on or about

24                   September 14, 2007, and October 19, 2007, (the "VL

25                   Agreements"), which agreements were signed by Tekulve on

26                   behalf of Basin, namely the Security Agreement and Agreement

27                   to Sell & Purchase "dated as of September 14, 2007 and

28                   effective as of June 30, 2007"; the Escrow Agreement dated "as

1    of September 14 2007"; and the First Amendment to Escrow

2    Agreement "made as of October 19, 2007." The terms of the

3    agreements ultimately signed in fact did differ from the terms

4    set forth in the VL Letter, as explained below.

5    b.    Basin's sale to VL Capital had no economic substance as, under

6          both the VL Letter and the subsequent VL Agreements, all

7          negotiated by Tekulve, Basin essentially paid VL Capital to

8          purchase the systems. Specifically:

9          (i)    Under the VL Letter, VL Capital was to pay Basin the $5

10                million purchase price for the ten systems by making a

11                $500,000 cash down payment at the April 1, 2008, closing

12                and 72 monthly payments of $62,500 beginning April 1,

13                2008. The VL Letter, however, also provided that Basin

14                assigned all of its rights to payments from its customers to

15                VL Capital at $69,250 per month for 80 months beginning

16                on July 1, 2007, resulting in Basin having paid $623,250 in

17                nine monthly payments prior to the $500,000 down

18                payment owed by VL Capital becoming due on April 1,

19                2008. Additionally, once VL Capital began making the

20                monthly payments of $62,500 to Basin, Basin would

21                nevertheless continue to pay VL Capital "for varying

22                amounts, initially at $69,250 per month," which would

23                result in a $6,750 monthly deficit to Basin;

24         (ii)   Under the Agreement to Sell and Purchase, "made as of

25                the 14th of September, 2007 and effective as of June 30,

26                2007," VL Capital was to pay Basin $56,250 per month

27                (rather than $62,500) for 72 months beginning April 1,

28                2008, and, pursuant to the First Amendment to Escrow

Agreement, "made as of October 19, 2007," no later than "the Closing Date (as defined in the Purchase Agreement)," which date, September 7, 2007, had already passed, Basin itself was to round-trip its cash by depositing $189,000 into an escrow account as part of the $500,000 down payment, which VL Capital was purporting to pay to Basin. The escrow deposits of $189,000 and $311,000 were made on October 19, 2007 by Basin and VL Capital respectively.

c.   The VL Letter contained the contingency that for the $500,000 down payment to become due from VL Capital, Basin had to obtain within 90 days from the date of closing written consent to the sale of the systems from each of the ten customers who had leased them; Basin in fact never satisfied this contingency, as Tekulve, who was responsible for obtaining the consents, only obtained four of them;

d.   Collectability was not reasonably assured because VL Capital was a newly formed SPE with no operations, and absent each of Basin's customers making payments that Basin had assigned to VL Capital, VL Capital would have been unable in turn to make payments to Basin.

Because of these facts, revenue recognition did not comply with GAAP, including SAB 104 and ARB 43, which require that collectability be reasonably assured. Additionally, because Basin retained a majority of the risk from the transaction, VL Capital's financial statements should have been consolidated with Basin's financial statements under GAAP, specifically Financial Accounting Standards Board Interpretation No. 46 (revised December 2003) ("FIN46R").

61.   Even though Basin was in fact financing the transaction with VL

1   Capital, as explained above, VL Capital entered into a purported agreement with

2   CCH dated June 29, 2007, which described the "transaction structure" as: "[Basin]

3   will sell the equipment used to perform the WSA [water services] agreements to

4   VLC[apital] and VLC will purchase said equipment utilizing funding from CCH."

5   Tekulve saw or was otherwise aware of this letter. The letter also stated that "The

6   initial closing shall take place no later than June 30th 2007," the final day of

7   Basin's second quarter. This letter was materially misleading, including to Basin's

8   auditors, as Basin, not CCH, was financing the transaction through assignment by

9   Basin of its rights to lease payments for nine months prior to VL Capital being

10   required to pay Basin. Indeed, Tekulve understood that Basin, rather than CCH,

11   was "obviously" financing at least the majority of the transaction with VL Capital.

12           62.     On or about August 8, 2007, pursuant to a request by Basin's auditor,

13   Basin's Director of Finance, Douglas Hansen ("Hansen"), prepared a

14   memorandum, or "white paper," which, after being reviewed and approved by

15   Tekulve, was provided to Basin's auditors and discussed with Basin's Audit

16   Committee on or about August 9, 2007, and which purported to justify recognition

17   of revenue based on the June 27, 2007, VL Letter signed by Tekulve on June 28.

18   The memorandum was materially misleading in part because it failed to disclose

19   that VL Capital was an SPE with no operations which Basin caused to be created

20   for the sole purpose of creating purported revenues. The memorandum was also

21   materially misleading because it failed to explain the timing of the respective

22   payments by Basin and VL Capital to each other, which resulted in Basin

23   effectively financing the transaction. Specifically, the memorandum does not

24   explain that Basin would be making payments commencing immediately, on July

25   1, 2007, which payments totaled a greater amount than the $500,000 down

26   payment payable by VL Capital to Basin on April 1, 2008. Additionally, the

27   memorandum misleadingly states that "collectability is reasonably assured"

28   because VL Capital had "already placed $500,000 in escrow" "as of" June 30,

1   2007, when in fact no monies had yet been deposited into escrow.  Indeed, when

2   monies were subsequently deposited on October 19, 2007, pursuant to the VL

3   Agreements rather than the VL Letter, $189,000 of the funds were deposited by

4   Basin itself, rather than VL Capital.

5        63.    On August 13, 2007, Tekulve signed a letter to SingerLewak, Basin's

6   auditors.  Tekulve confirmed "that we are responsible for the fair presentation of

7   the interim financial information in conformity with accounting principles

8   generally accepted in the United States of America and Rule 10-01(a)-(c) of

9   Regulation S-X."  He further represented in this Management Representation

10  Letter, among other things, that:

11               a.   The interim financial information is presented in accordance

12                    with GAAP applicable to interim financial information applied

13                    on an basis substantially consistent with the same period in the

14                    prior year, the immediately preceding quarter and the prior

15                    fiscal year;

16               b.   He had made available to SingerLewak all financial records and

17                    related data;

18               c.   He had no knowledge of any fraud or suspected fraud affecting

19                    the Company involving management;

20               d.   There are no material transactions that have not been properly

21                    recorded in the accounting records underlying the interim

22                    financial information;

23               e.   The Company has complied with all aspects of contractual

24                    agreements that would have a material effect on the interim

25                    financial information in the event of noncompliance;

26               f.   He had responded fully to all inquiries made by the auditors;

27               g.   He confirmed that "the transaction with VL Capital on June 28,

28                    2007 for the sale of 10 water treatment units is recorded in the

1   proper period and the valuation of the transaction is proper in

2   accordance with [GAAP]"; and

3   h.   No events or transactions other than those disclosed in the

4   interim financial information have occurred subsequent to June

5   30, 2007, that would require adjustment to, or disclosure in, the

6   interim financial information.

7   Each of these representations was false because recognition of revenue from the

8   VL Capital transaction did not comply with GAAP, and these revenues were

9   material to Basin's financial statements.

10   64.   Late on the evening of August 13, 2007, Tekulve caused Basin to

11   issue its Q2 2007 earnings release for release the next day.  Tekulve caused it to be

12   filed August 14, 2007, with the Commission on Form 8-K and signed the filing.

13   The headline on the press release stated in part: **"Quarterly Revenues at $6.4**

14   **Million"**  In the press release, it is represented that:

15   For the second quarter of 2007, revenues of $6.4 million increased

16   $1.4 million when compared to revenues of $5.0 million in the second

17   quarter of 2006, a 28% increase.  System sales revenues were $5.2

18   million for the second quarter of 2007, compared to $4.2 million in

19   the same period in 2006.  As anticipated, the increase in system sales

20   revenue this quarter was due primarily to a third party financing

21   arrangement whereby Basin Water sold 10 water treatment systems of

22   various capacities which had previously been placed with customers.

23   The release also reported that six month results included revenues of $8 million.

24   All of these representations were materially false and misleading as the $3.8

25   million in revenue recognized from the VL Capital transaction was not, in fact, the

26   result of a "third party financing arrangement" and had no economic substance.

27   65.   On or about August 14, 2007, Tekulve also caused Basin to file with

28   the Commission its quarterly report on Form 10-Q, for its second quarter 2007

("Q2 2007") ended June 30, 2007.  Jensen read the Form 10-Q before it was filed, and Tekulve signed the Form 10-Q as Basin's CFO.  Among other results, Basin's Form 10-Q reported system sales of $5,199,000 and total revenues of $6,414,000. These system sales and revenues included the $3.8 million in revenue purportedly earned from the sale of systems to VL Capital.  In describing Basin's revenues, the Form 10-Q states that:

> Revenues from system sales increased $1.0 million, or 24%, in the second quarter of 2007 when compared to the same period in 2006. This was due to the previously announced third party financing arrangement whereby we sold 10 water treatment systems of various capacities for $3.8 million which had previously been placed with customers.

This statement is false and misleading as the "third party" to which Basin claims to have sold the systems was in fact an SPE created solely for making the purchase of these systems and substantially increasing Basin's quarterly revenues, and the "financing" was in fact provided by Basin.

66.     On or about August 14, 2007, Jensen and Tekulve each certified, among other things, with regard to the Form 10-Q, that:

        a.     He had reviewed the Form 10-Q;

        b.     Based on his knowledge, the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

        c.     Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Basin as of and for the periods

1      presented in the report; and

2          d.      He had disclosed to Basin's auditors and the audit committee of

3                  Basin's Board of Directors any fraud that involved company

4                  management.

5  These certifications were false in that the Form 10-Q contained material

6  misrepresentations and omissions of material fact regarding Basin's quarterly

7  revenues, and did not fairly represent Basin's financial condition, and Jensen and

8  Tekulve had not disclosed to either Basin's auditors or its audit committee their

9  fraud in causing the improper revenue recognition.

10         67.     At about 1:30 p.m. Pacific Time on August 14, 2007, Jensen and

11 Tekulve participated on behalf of Basin in an analyst conference call, together with

12 Stark, for which call Tekulve had drafted the script the previous day.  Among other

13 representations, Basin's officers represented that Basin had "third party financed"

14 thirteen systems, including "today's 10," and that "there is a total of 10 systems

15 that were sold."  This representation, which was misleading because the "third

16 party financing" was in fact provided by Basin itself, was not corrected by either

17 Jensen or Tekulve to disclose the material facts surrounding the purported sales to

18 VL Capital, or that the revenue from these purported sales was, in fact, improperly

19 recognized.

20 **G.    The Defendants Materially Overstate Basin's Q3 2007 And Year-To-**

21         **Date Revenues By Engaging In A Sham $2.1 Million Sale To Another**

22         **Special Purpose Entity They Caused To Be Created**

23         68.     Water Services Solutions, LLC ("WSS") was registered as an LLC on

24 September 27, 2007, three days before the end of Basin's Q3 2007 on September

25 30, 2007.  Ward was its Managing Member, and sole member.   Like VL Capital,

26 WSS was created solely to purchase units from Basin.  It had no other business.

27 Accordingly, like VL Capital, it was an SPE.

28         69.     Seventeen days before it was legally formed, on September 10, 2007,

WSS transmitted a letter to Tekulve signed by Ward, which proposed that WSS purchase systems then being manufactured by Basin for lease to the City of Cottonwood for $4.4 million less the present value of expected costs of insurance and property taxes related to the purchase (the "WSS Letter"). Tekulve signed the WSS Letter as "acceptable and agreed to" on or about September 24, 2007.

70.   Tekulve caused Basin to recognize $2.1 million in revenue in Q3 2007 relating to the purported sale of the units to WSS based on the "percentage of completion method" for recognizing revenue. Recognition of this revenue was improper, however, because:

a.   Basin did not have a definitive agreement with WSS, as required by the WSS letter, such agreement (the WSS Agreement") not being prepared and signed by Tekulve until the end of the next quarter, December 2007, and being made "as of December 27, 2007 and effective as of September 24, 2007"; additionally, the WSS Agreement contained materially different terms, such as a lower purchase price of $3,845,073, and payment of the $25,000 down payment at the December 27, 2007, closing date;

b.   WSS had not made the initial down payment of $25,000 required by the WSS Letter "to be held in escrow pending execution of definitive documentation" and in fact, never paid it;

c.   Collectability was not probable in that WSS had no assets and was dependent on a $2.1 million loan from a third party, National City Energy Capital, LLC based in Cincinnati, Ohio, and the initial closing date of the loan was December 31, 2007, as set forth in the September 28, 2007, correspondence from National City to WSS which Tekulve received that same day;

1    that loan was never finalized or funded as National City

2    "walked away" from the transaction in the summer of 2008, as

3    Tekulve was aware; and

4         d.  Delivery by Basin of the systems, which were being

5    manufactured, had not occurred.

6    71.  On or about October 31, 2007, pursuant to a request by Basin's

7    auditor, Basin's Director of Finance, Hansen, prepared a memorandum, or "white

8    paper," which, after being reviewed and approved by Tekulve on or about

9    November 1, was provided to Basin's auditors.  The memorandum purported to

10   justify recognition of revenue based on the September 10, 2007, WSS Letter

11   signed by Tekulve on September 24.  The memorandum was materially misleading

12   in part because it failed to disclose that WSS was an SPE with no operations which

13   Basin caused to be created for the sole purpose of creating purported revenues.

14   Additionally, the memorandum misleadingly states that "collectability is

15   reasonably assured" because WSS "is backed by National City, a large Chicago

16   bank," when National City was, in fact, National City Energy Capital LLC, based

17   in Cincinnati, Ohio; and because the $25,000 deposit had been made into an

18   escrow account when in fact no such deposit had been made.  In fact, as stated

19   above, the National City financing and $25,000 escrow deposit never occurred.

20   72.  On November 13, 2007, Tekulve signed a letter to SingerLewak,

21   Basin's auditors.  Tekulve confirmed "that we are responsible for the fair

22   presentation of the interim financial information in conformity with accounting

23   principles generally accepted in the United States of America and Rule 10-01(a)-

24   (c) of Regulation S-X."  He further represented in this Management Representation

25   Letter, among other things, that:

26        a.  The interim financial information is presented in accordance

27   with GAAP applicable to interim financial information applied

28   on an basis substantially consistent with the same period in the

prior year, the immediately preceding quarter and the prior fiscal year;

b.   He had made available to SingerLewak all financial records and related data;

c.   He had no knowledge of any fraud or suspected fraud affecting the Company involving management;

d.   There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial information;

e.   The Company has complied with all aspects of contractual agreements that would have a material effect on the interim financial information in the event of noncompliance;

f.   He had responded fully to all inquiries made by the auditors;

g.   He confirmed that "the transaction with Water Services Solutions, LLC (WSS) on September 24, 2007 of [sic] water treatment units is recorded in the proper period and the valuation of the transaction is proper in accordance with [GAAP]"; and

h.   No events or transactions other than those disclosed in the interim financial information have occurred subsequent to September 30, 2007, that would require adjustment to, or disclosure in, the interim financial information.

Each of these representations was false because recognition of revenue from the WSS transaction did not comply with GAAP, and these revenues were material to Basin's financial statements.

73.   On or about November 13, 2007, Tekulve caused Basin to file with the Commission its quarterly report on Form 10-Q, for its third quarter 2007 ("Q3 2007") ended September 30, 2007. Jensen read the Form 10-Q before it was filed,

and Tekulve signed the Form 10-Q as Basin's CFO. Among other results, Basin's Form 10-Q reported system sales of $3,773,000 and total revenues of $5,346,000. These system sales and revenues included the $2.1 million in revenue purportedly earned from the sale of systems to WSS, resulting in material overstatements of Basin's system sales and total revenues of 104% and 56% respectively. Additionally, the Form 10-Q reports for the nine months ended September 30, 2007, $9,901,000 in system sales and $13,367,000 in total revenues, which revenues include both the $3.8 million in revenue purportedly earned from the sale of systems to VL Capital, and the $2.1 million in revenue from the purported sales to WSS, totaling $5.9 million or 60% of Basin's year-to-date system sales and 45% of its total revenues.

74. On or about November 13, 2007, Jensen and Tekulve each certified, among other things, with regard to the Form 10-Q, that:

    a.    He had reviewed the Form 10-Q;

    b.    Based on his knowledge, the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

    c.    Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Basin as of and for the periods presented in the report; and

    d.    He had disclosed to Basin's auditors and the audit committee of Basin's Board of Directors any fraud that involved company management.

These certifications were false in that the Form 10-Q contained material

1  misrepresentations and omissions of material fact regarding Basin's quarterly
2  revenues, and did not fairly represent Basin's financial condition, and Jensen and
3  Tekulve had not disclosed to either Basin's auditors or its audit committee their
4  fraud in causing the improper revenue recognition.

5       75.    On the morning of November 14, 2007, Tekulve caused Basin to issue
6  its Q3 2007 earnings release.  Tekulve caused it to be filed with the Commission
7  that day on Form 8-K and signed the filing.  The headline on the press release
8  stated in part: **"Quarterly Revenues Increase 10% to $5.3 Million Over Prior**
9  **Quarter"**  In the press release, it is represented that:

10         For the third quarter of 2007, revenues of $5.3 million increased $0.5
11         million when compared to revenues of $4.8 million in the third quarter
12         of 2006, a 10% increase.  System sales revenues were $3.8 million. . .
13  The release also reported that nine month results included revenues of $13.4
14  million.  All of these representations were materially false and misleading as the
15  $5.3 million in quarterly revenue included $2.1 million recognized from the WSS
16  transaction, and the $13.4 million year-to-date revenue included both the $2.1
17  million in revenue from the WSS transaction and the $3.8 million from the VL
18  Capital transaction, none of which was properly recognized.

19       76.    At about 1:30 p.m. Pacific Time on November 14, 2007, Jensen and
20  Tekulve participated on behalf of Basin in an analyst conference call, together with
21  Stark, for which call Tekulve had drafted the script earlier that day, making
22  changes together with Jensen and Stark.  During this call, in response to an
23  analyst's question as to whether all of Basin's $3.8 million in systems sales were
24  all "new" revenues or "do we have any of those third party financings we had in
25  the last quarter?", Tekulve represented that "there is a single third party financing
26  but that's on a new sale.  It simply was a lease arrangement that we third party
27  financed."  This representation, was materially false and misleading because it did
28  not disclose that over half of the systems revenue, $2.1 million, constituted that

"single third party financing"; that the financing had not in fact yet occurred; the transaction had not been finalized; and revenue should not in fact have been recognized on it. Nor did Tekulve disclose that the transaction was with a "third party," WSS, which was in fact an SPE created by Basin for no other purpose than to purchase the Cottonwood systems to boost Basin's revenue.

**H.   Tekulve Materially Overstates Basin's FY 2007 Revenues**

77.   On or about December 26, 2007, five days before the end of Basin's fiscal year, Tekulve initiated documentation of two additional purported sales to SPEs, one with VL Capital and one with WSS. Although, as he noted in his calendar on December 28, 2007, Tekulve found it to be "a pain," he further noted "but we need the revenues."

78.   Tekulve caused Basin to enter into an agreement with WSS "as of the 26th day of December 2007 and effective as of the same date" which purported to sell an existing system to WSS for $1,353,079. Tekulve signed this agreement on behalf of Basin.

79.   Tekulve also caused Basin to enter into an agreement with VL Capital "as of the 31st day of December 2007 and on [sic] that same date" which purported to sell an existing system to VL Capital for $763,330. Tekulve signed this agreement on behalf of Basin.

80.   Tekulve caused Basin to recognize the full amount of revenue of $1,353,079 on the second WSS agreement and $489,000 on the second VL Capital agreement, purporting to use the "percentage of completion" method for recognizing revenue, recognizing a total of $1,842,079 in revenue.

81.   Recognition of revenue on these purported sales was improper for several reasons. First, delivery had not occurred, and services had not been rendered. Second, collectability was not reasonably assured as the payment terms only required small down payments of $5,000 by WSS and $10,000 by VL Capital into an escrow or trust account respectively, which payment was conditioned on

1  customer acceptance of the systems; larger payments of $561,606 by WSS and

2  $30,568 by VL Capital after customer acceptance; and a long-term loan by Basin

3  for the balance (ten year repayment by WSS with no payment due for the first five

4  years, and no payment due at all if the lessee purchased the system within five

5  years; and nine year repayment by VL Capital). This final provision meant that

6  Basin was round-tripping its own cash to pay for the revenues that Tekulve wrote

7  in his calendar "we need."

8      82.   On March 17, 2008, Tekulve signed a letter to SingerLewak, Basin's

9  auditors. Tekulve confirmed "that we [Basin management] are responsible for the

10  fair presentation of the interim financial information in conformity with accounting

11  principles generally accepted in the United States of America." He further

12  represented in this Management Representation Letter, among other things, that:

13          a.   The financial statements were fairly presented in conformity

14               with GAAP;

15          b.   He had made available to SingerLewak all financial records and

16               related data;

17          c.   He had no knowledge of any fraud or suspected fraud affecting

18               the Company involving management;

19          d.   There are no material transactions that have not been properly

20               recorded in the accounting records underlying the financial

21               statements;

22          e.   The Company has complied with all aspects of contractual

23               agreements that would have a material effect on the interim

24               financial information in the event of noncompliance; and

25          f.   The Company has properly recorded all revenue transactions in

26               accordance with revenue recognition policies, including under

27               the percentage-of-completion method.

28  Each of these representations was false because recognition of revenue from the

1   two WSS and two VL Capital transactions did not comply with GAAP, and these
2   revenues were material to Basin's financial statements.

3       83.    At or about 1:01 p.m. on March 17, 2008, Tekulve caused Basin to
4   issue its FY 2007 earnings release.  Tekulve caused it to be filed with the
5   Commission that day on Form 8-K and signed the filing.  The headline on the press
6   release stated in part: **"Twelve Month Revenues Increase 10% to $18.8 Million"**
7   In the press release, it is represented that:

8         For the year ended 2007, revenues increased by 10% to $18.8 million
9         compared to $17.1 million for the year 2006.  For the year, system
10        sales revenues were $13.5 million. . . .

11        For the fourth quarter of 2007, revenues of $5.4 million were
12        approximately 50% higher than our revenues for the fourth quarter of
13        2006.  For the fourth quarter of 2007, system sales revenues were $3.6
14        million. . . .

15  All of these representations were materially false and misleading as (1) the
16  quarterly revenue included the $1,353,079 in revenue recognized on the second
17  WSS agreement and the $489,000 recognized on the second VL Capital agreement,
18  purporting to use the "percentage of completion" method for recognizing revenue –
19  a total of $1,842,079 in revenue; and (2) the annual revenue included both the
20  improperly recognized $1,842,079 in fourth quarter revenues, but also $2.1 million
21  in revenue from the third quarter WSS transaction and the $3.8 million from the
22  second VL Capital transaction, none of which was properly recognized.  These
23  $7.7 million in revenues were material, constituting 42% of Basin's reported
24  annual revenue.

25      84.    Also on March 17, 2008, Tekulve caused Basin to file with the
26  Commission its annual report on Form 10-K, for its fiscal year 2007 ("FY 2007")
27  ended December 31, 2007.  Tekulve signed the Form 10-K as Basin's CFO.
28  Basin's FY 2007 Form 10-K reported total revenues of $18,784,000, and system

1    sales of $13,477,000.  Although the Form 10-K does disclose that VL Capital and
2    WSS accounted for 26% and 14% of those revenues respectively, it does not
3    disclose that VL Capital and WSS were SPEs created by Basin for the sole purpose
4    of Basin "selling" them systems on which it would then recognize revenue, and
5    that Basin itself was "lending" its own monies to these entities in order to purchase
6    that revenue.  The Form 10-K further failed to disclose that none of the revenues
7    purportedly received from transactions with VL Capital and WSS were properly
8    recognized.
9        85.    On or about March 17, 2008, Tekulve certified, among other things,
10   with regard to the Form 10-K, that:
11           a.    He had reviewed the Form 10-K;
12           b.    Based on his knowledge, the Form 10-K did not contain any
13                 untrue statement of material fact or omit to state a material fact
14                 necessary to make the statements made, in light of the
15                 circumstances under which they were made, not misleading
16                 with respect to the period covered by the report;
17           c.    Based on his knowledge, the financial statements, and other
18                 financial information included in the report fairly presented in
19                 all material respects the financial condition, results of
20                 operations and cash flows of Basin as of and for the periods
21                 presented in the report; and
22           d.    He had disclosed to Basin's auditors and the audit committee of
23                 Basin's Board of Directors any fraud that involved company
24                 management.
25   These certifications were false in that the Form 10-K contained material
26   misrepresentations and omissions of material fact regarding Basin's quarterly and
27   annual revenues, and did not fairly represent Basin's financial condition, and
28   Tekulve had not disclosed to either Basin's auditors or its audit committee his and

Jensen's fraud in causing the improper revenue recognition in connection with the SPE transactions.

86.   At about 1:30 p.m. Pacific Time on March 17, 2008, Tekulve and Stark participated on behalf of Basin in an analyst conference call, for which Tekulve had edited the script earlier that day. Among other representations, Tekulve represented that "Our annual revenues were $18.8 million, an increase of $1.7 million or 10% growth over the prior year. . . . We also achieved nearly similar levels of system sales as we did in 2006." This statement was materially false and misleading because it failed to disclose that 42% of Basin's annual revenues, and 58% of its system sales, were improperly recognized pursuant to the transactions with the SPEs. Moreover, when an analyst asked "who is VL Capital? And then, who is Water Services Solutions? Are those metropolitans or municipalities?" the analyst was told VL Capital was "a financing group," and regarding VL Capital and WSS, "They're the owners of the assets," when in fact, the purported transactions with VL and WSS were financed by Basin itself, and VL Capital and WSS in fact did not own the assets. Finally, when asked about "The issuance of $3.4 million of notes receivable? What was that in connection with?", Tekulve responded "That was actually in connection with the V LC transaction. It was a combination – the sale to V LC was a combination of cash and a long term note receivable," without explaining that the transactions with VL Capital in fact had no economic substance and revenue should not have been recognized from them.

**I.   Defendant Jensen Engages In Insider Trading, Gaining And Realizing Over $9.1 Million From Selling Basin Stock And Taking Charitable Tax Deductions Of $763,345, And Fails To Reimburse Basin For His Realized Profits**

87.   Defendant Jensen sold Basin stock on the basis of material nonpublic information about the true financial condition of Basin described in detail above, in

breach of a duty of trust or confidence that he owed directly, indirectly, or derivatively, to Basin and its shareholders by reason of his position as CEO, Chairman of the Board and/or member of the Board when he became aware of the material nonpublic information, through brokerage accounts he controlled in his own name at Charles Schwab & Co., Inc. ("CS"), and in his and his wife's names jointly with right of survivorship at Cannacord Adams, Inc. ("CA") and Albert Fried & Company, LLC ("AF"), gaining and realizing profits as set forth below; as well as donating shares of Basin stock to his *alma mater*, MIT, and taking charitable tax deductions, also set forth below:

**Jensen's Sales and Charitable Contributions of Basin Stock**

| Date | Sale or Contribution | Number of Shares | Price | Profit | Account | Tax Deduction |
|------|------|------|------|------|------|------|
| 6/26/06 | *Q1 2006 Form 10-Q filed including improper Opus Trust revenue* | | | | | |
| 11/14/06 | *Q3 2006 Form 10-Q filed including improper Thermax revenue* | | | | | |
| 12/12/06 | Sale | 50,000 | $6.41 | $320,500 | CA | |
| 12/29/06 | Gift | 5,000 | | | | $35,000 |
| 2006 TOTAL | | 55,000 | | $320,500 | | $35,000 |
| 2/20/07 | Sale | 57,281 | $8.00 | $458,248 | CA | |
| 2/21/07 | Sale | 42,719 | $8.00 | $341,752 | CA | |
| 4/2/07 | *2006 Form 10-K filed including improper Opus Trust and Thermax Revenue* | | | | | |
| 7/2/07 | Sale | 15,400 | $9.00 | $138,605 | CA | |
| 7/3/07 | Sale | 14,951 | $9.01 | $134,655 | CA | |
| 7/5/07 | Sale | 69,649 | $9.03 | $628,930 | CA | |
| 7/16/07 | Sale | 32,110 | $10.00 | $321,177 | CA | |
| 7/17/07 | Sale | 7,890 | $10.00 | $78,900 | CA | |

| Date | Sale or Contri-bution | Number of Shares | Price | Profit | Account | Tax Deduction |
|---|---|---|---|---|---|---|
| 7/19/07 | Sale | 40,000 | $12.72 | $508,800 | CA | |
| 8/14/07 | Q2 2007 Form 10-Q filed including improper VL revenue | | | | | |
| 10/25/07 | Gift | 85,000 | | | | $371,803 |
| 11/14/07 | Q3 2007 Form 10-Q filed including improper WSS revenue | | | | | |
| **2007 TOTAL** | | **365,000** | | **$2,611,067** | | **$371,803** |
| | | | | | | |
| 3/17/08 | 2007 Form 10-K filed including improper VL and WSS revenue | | | | | |
| 4/10/08 | Gift | 200,000 | | | | $356,542 |
| 5/15/08 | Sale | 78,129 | $5.01 | $391,426 | CA | |
| 5/16/08 | Sale | 2,607 | $5.00 | $13,035 | CA | |
| 5/20/08 | Sale | 169,264 | $5.00 | $846,320 | CA | |
| 6/10/08 | Sale | 1,092 | $4.20 | $4,586 | CS | |
| 6/11/08 | Sale | 23,908 | $4.20 | $100,414 | CS | |
| 6/13/08 | Sale | 4,100 | $4.25 | $17,425 | CS | |
| 6/16/08 | Sale | 20,900 | $4.25 | $88,825 | CS | |
| 6/20/08 | Sale | 20,000 | $4.39 | $87,800 | CS | |
| 6/24/08 | Sale | 2,696 | $4.50 | $12,132 | CS | |
| 6/26/08 | Sale | 3,968 | $4.50 | $17,856 | CS | |
| 7/2/08 | Sale | 13,336 | $4.50 | $60,161 | CS | |
| 7/10/08 | Sale | 30,000 | $4.43 | $132,900 | AF | |
| 7/11/08 | Sale | 30,000 | $4.32 | $129,600 | AF | |
| 7/14/08 | Sale | 88,000 | $4.34 | $381,920 | AF | |
| 7/15/08 | Sale | 500 | $4.21 | $2,105 | AF | |
| 7/17/08 | Sale | 5,000 | $4.24 | $21,200 | AF | |
| 7/18/08 | Sale | 693 | $4.20 | $2,911 | AF | |

| Date | Sale or Contri-bution | Number of Shares | Price | Profit | Account | Tax Deduction |
|------|----------|----------|-------|--------|---------|---------------|
| 7/21/08 | Sale | 81,500 | $4.21 | $343,115 | AF | |
| 7/23/08 | Sale | 500 | $4.20 | $2,100 | AF | |
| 7/28/08 | Sale | 4,000 | $4.00 | $16,000 | AF | |
| 7/29/08 | Sale | 5,100 | $3.94 | $20,094 | AF | |
| 7/30/08 | Sale | 6,000 | $3.89 | $23,340 | AF | |
| 7/31/08 | Sale | 15,000 | $3.82 | $57,300 | AF | |
| 8/1/08 | Sale | 12,000 | $3.86 | $46,320 | AF | |
| 8/4/08 | Sale | 9,300 | $3.77 | $35,061 | AF | |
| 8/6/08 | Sale | 20,850 | $3.75 | $78,188 | AF | |
| 8/7/08 | Sale | 882,500 | $3.75 | $3,309,375 | AF | |
| **2008 TOTAL** | | **1,530,943** | | **$6,241,508** | | **$356,542** |
| **GRAND TOTAL** | | **1,950,943** | | **$9,173,075** | | **$763,345** |

88.     Jensen has not reimbursed Basin for any of the profits realized from these sales and gifts of Basin securities.

**J.     Basin Announces It Intends To Restate Its Financial Statements For Each Of The Relevant Periods, And Its Stock Price Collapses**

89.     On August 11, 2008, four days after Jensen made his final sale on the basis of material nonpublic information, profiting by over $3.3 million on that sale alone, Basin issued a press release, announcing that Basin believed "that it may be necessary to restate previously issued financial statements for certain periods as a result of the Company's revenue recognition relating to certain specific transactions."  Basin also announced that it would not timely file its report on Form 10-Q for the quarter ending June 30, 2008.  Basin further announced that it no longer believed that it would achieve analysts' revenue estimates and did not

1    intend to provide any further revenue guidance for the year.  On August 11, 2008,

2    Basin also filed its report on Form 8-K regarding the August 11 press release and

3    its contents and attaching a copy of it as an exhibit.

4          90.    On August 11, 2008, Basin's stock price closed at $2.36 per share,

5    down from the previous day's close of $3.62, a 35% decline.

6          91.    On February 10, 2009, Basin filed a restatement on Form 10-K/A

7    ("Restatement") with the Commission.  The Restatement amended the annual

8    report on Form 10-K for the year ended December 31, 2007, filed with the

9    Commission on March 17, 2008.  The Restatement also included amended and

10   restated consolidated financial statements and related financial information for the

11   years ended December 31, 2006 and 2007, including the financial results in each of

12   the quarterly periods in 2006 and 2007.  The Restatement contained a list of

13   "significant determinations" including conclusions that

14        a.    Basin improperly recognized $1.5 million in revenues with

15              respect to the Opus Trust transaction in Q1 2006.  Instead,

16              Basin should have recognized the down payment, "$0.2

17              million," that it received in Q2 2006 "when the transaction

18              documentation was completed and executed" and "the

19              remaining $1.3 million as revenues upon collection."

20        b.    Basin improperly recognized revenues with respect to the

21              Thermax transaction because there was no shipping date for the

22              units purportedly sold, no shipping date ever specified, and the

23              units were never shipped.  Basin conceded that Thermax

24              claimed a right of return but also stated that Basin disputed that

25              claim.  Basin reversed the revenues "in the amount of $0.1

26              million and $0.6 million in 2007 and 2006, respectively."

27        c.    Basin improperly recognized revenues in the VL Capital and

28              WSS and transactions because "the financial statements of VLC

49

1   and WSS should be consolidated with those of the Company in
2   accordance with FIN 46(R).  This analysis is based on the fact
3   that the structure of the transactions with VLC and WSS did not
4   effectively transfer sufficient risk to the other parties to the
5   transactions, leaving the Company with the majority of the
6   risks.  In addition, in the transactions with WSS, the contract
7   conditions of the transactions were not fulfilled.  As a result, the
8   Company incorrectly recognized revenues from these
9   transactions."  Although Basin correctly concluded that the VL
10   Capital and WSS transactions should not have been reflected in
11   the financial statements under FIN 46R, the transactions should
12   not have been reported as revenue for the reasons set forth
13   above before even reaching an analysis of FIN 46R.

14   On February 10, 2009, Basin's stock price closed at $0.96, up one cent from the
15   previous day's close.

## FIRST CLAIM FOR RELIEF

### Fraud In The Offer Or Sale Of Securities

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

20   92.     The Commission realleges and incorporates by reference paragraphs
21   1 through 91 above.

22   93.     The Defendants, by engaging in the conduct described above, directly
23   or indirectly, in the offer or sale of securities by the use of means or instruments of
24   transportation or communication in interstate commerce or by use of the mails:

25   a.     with scienter, employed devices, schemes, or artifices to
26   defraud;

27   b.     obtained money or property by means of untrue statements of a
28   material fact or by omitting to state a material fact necessary in

1    order to make the statements made, in light of the

2    circumstances under which they were made, not misleading; or

3    c.    engaged in transactions, practices, or courses of business which

4    operated or would operate as a fraud or deceit upon the

5    purchaser.

6    94.    By engaging in the conduct described above, the Defendants violated,

7    and unless restrained and enjoined will continue to violate, Section 17(a) of the

8    Securities Act, 15 U.S.C. § 77q(a).

9    ## SECOND CLAIM FOR RELIEF

10   **Fraud In Connection With The Purchase Or Sale Of Securities**

11   **Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

12   **(Against All Defendants, Both As Primary Violators And As Control Persons)**

13   95.    The Commission realleges and incorporates by reference paragraphs 1

14   through 91 above.

15   96.    The Defendants and Basin, by engaging in the conduct described

16   above, directly or indirectly, in connection with the purchase or sale of a security,

17   by the use of means or instrumentalities of interstate commerce, of the mails, or of

18   the facilities of a national securities exchange, with scienter:

19   a.    employed devices, schemes, or artifices to defraud;

20   b.    made untrue statements of a material fact or omitted to state a

21   material fact necessary in order to make the statements made, in

22   light of the circumstances under which they were made, not

23   misleading; or

24   c.    engaged in acts, practices, or courses of business which operated

25   or would operate as a fraud or deceit upon other persons.

26   97.    By engaging in the conduct described above, the defendants violated,

27   and unless restrained and enjoined will continue to violate, Section 10(b) of the

28   Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §

1  240.10b-5.

2      98.    The Defendants were control persons of Basin because each

3  possessed, directly or indirectly, the power to direct or cause the direction of the

4  management and policies of Basin.  Accordingly, pursuant to Section 20(a) of the

5  Exchange Act, 15 U.S.C. § 78t(a), each Defendant is liable to the Commission

6  same extent as Basin would be.

### THIRD CLAIM FOR RELIEF

#### Issuer Reporting Violations

#### Section 13(a) of the Exchange Act,

#### and Rules 12b-20, 13a-1 and 13a-13 thereunder

#### (Against All Defendants, Both As Aiders And Abettors

#### And As Control Persons)

13      99.    The Commission realleges and incorporates by reference paragraphs 1

14  through 91 above.

15      100.   Basin violated Section 13(a) of the Exchange Act, 15 U.S.C. §

16  78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20,

17  240.13a-1 & 240.13a-13, by filing with the Commission required periodic reports

18  for the first through third quarters of its fiscal years 2006 and 2007, and annual

19  reports for its fiscal years 2006 and 2007 which failed to include material

20  information necessary to make the required statements, in light of the

21  circumstances under which they were made, not misleading.

22      101.   The Defendants knowingly provided substantial assistance to Basin's

23  violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-

24  13 thereunder.

25      102.   By engaging in the conduct described above and pursuant to Section

26  20(e) of the Exchange Act, 15 U.S.C. § 78t(e), the Defendants aided and abetted

27  Basin's violations, and unless restrained and enjoined will continue to aid and abet

28  violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules

12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-13.

103.   The Defendants were control persons of Basin because each possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Basin.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), each Defendant is liable to the Commission same extent as Basin would be.

## FOURTH CLAIM FOR RELIEF

### Record-Keeping Violations

### Violations of Section 13(b)(5) of the Exchange Act and

### Rule 13b2-1 thereunder

### (Against All Defendants)

104.   The Commission realleges and incorporates by reference paragraphs 1 through 91 above.

105.   By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), by knowingly falsifying books, records and accounts issuers are required to make and keep, in reasonable detail, accurately and fairly reflecting the issuer's transactions and dispositions of its assets; and Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1, by, directly or indirectly, falsifying or causing to be falsified issuer books, records, and accounts.

## FIFTH CLAIM FOR RELIEF

### Misrepresentations To Accountants

### Violations of Exchange Act Rule 13b2-2

### (Against Defendant Tekulve)

106.   The Commission realleges and incorporates by reference paragraphs 1 through 91 above.

107.   Defendant Tekulve, by engaging in the conduct described above,

directly or indirectly:

      a.    made or caused to be made materially false or misleading statements to accountants in connection with; or

      b.    omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to accountants in connection with:

            i.    an audit, review or examination of the financial statements of the issuer required to be made; or

            ii.    the preparation or filing of a document or report required to be filed with the Commission.

108.  By engaging in the conduct described above, defendant Tekulve violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

## SIXTH CLAIM FOR RELIEF

### False Certification Violations

### Violations of Exchange Act Rule 13a-14

### (Against All Defendants)

109.  The Commission realleges and incorporates by reference paragraphs 1 through 91 above.

110.  The Defendants, by engaging in the conduct described above, falsely certified, among other things, that Basin's 2006 and 2007 Forms 10-Q and 10-K fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company, when, in fact, the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading.

111.  By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule

1  13a-14, 17 C.F.R. § 240.13a-14.

2  ### SEVENTH CLAIM FOR RELIEF

3  #### Failure To Reimburse

4  **Violations of Section 304 of the Sarbanes-Oxley Act of 2002**

5  **(Against All Defendants)**

6      112.   The Commission realleges and incorporates by reference paragraphs 1

7  through 91 above.

8      113.   The Defendants, by engaging in the conduct described above, failed to

9  reimburse the issuer, Basin, for any bonus or other incentive based or equity-based

10  compensation received by them from Basin during the twelve-month period

11  following each of the public filings of the Forms 10-K and 10-Q alleged herein,

12  which filings required restatement due to the material noncompliance of Basin, as a

13  result of misconduct, with financial reporting requirements under the securities laws.

14      114.   Defendant Jensen, by engaging in the conduct described above, failed

15  to reimburse the issuer, Basin, for any profits realized from the sale of Basin

16  securities during the twelve-month period following each of the public filings of

17  the Forms 10-K and 10-Q alleged herein, which filings required restatement due to

18  the material noncompliance of Basin, as a result of misconduct, with financial

19  reporting requirements under the securities laws.

20      115.   By engaging in the conduct described above, the Defendants violated

21  Section 304(a)(1) of the Sarbanes-Oxley Act, 15 U.S.C. § 7243(a)(1), and

22  defendant Jensen violated Section 304(a)(2) of the Sarbanes-Oxley Act, 15 U.S.C.

23  § 7243(a)(2).

24  ### PRAYER FOR RELIEF

25      WHEREFORE, the Commission respectfully requests that the Court:

26  #### I.

27      Issue findings of fact and conclusions of law that Defendants committed the

28  alleged violations.

## II.

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants Jensen and Tekulve and their agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78m(b)(5), and Rules 10b-5, 13a-14 and 13b2-1 thereunder, 17 C.F.R. §§ 240.10b-5, 240.13a-14 & 240.13b2-1, and from aiding and abetting any violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-13, and further permanently enjoining Tekulve and his agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, from violating Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

## III.

Order defendants Jensen and Tekulve to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## IV.

Order defendants Jensen and Tekulve to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## V.

Order defendant Jensen to pay civil penalties for insider trading under Section 21A(a) of the Exchange Act, 15 U.S.C. § 78u-1(a).

## VI.

Order defendants Jensen and Tekulve to pay reimbursement of all bonus or other incentive-based or equity-based compensation received by them from Basin

1  during the twelve-month period following each of the public filings of the Forms

2  10-K and 10-Q alleged herein.

### VII.

4      Order defendant Jensen to pay reimbursement of all profits realized from the

5  sale of Basin securities during the twelve-month period following each of the

6  public filings of the Forms 10-K and 10-Q alleged herein.

### VIII.

8      Enter an order against defendants Jensen and Tekulve pursuant to Section

9  20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the

10  Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting each of them from acting as an

11  officer or director of any issuer that has a class of securities registered pursuant to

12  Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports

13  pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

### IX.

15      Retain jurisdiction of this action in accordance with the principles of equity

16  and the Federal Rules of Civil Procedure in order to implement and carry out the

17  terms of all orders and decrees that may be entered, or to entertain any suitable

18  application or motion for additional relief within the jurisdiction of this Court.

### X.

20      Grant such other and further relief as this Court may determine to be just and

21  necessary.

23  DATED:  June 24, 2011

KAREN MATTESON
Attorney for Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Manuel Real and the assigned discovery Magistrate Judge is Alicia G. Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV11- 5316 R (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

Unless otherwise ordered, the United States District Judge assigned to this case will hear and determine all discovery related motions.

==========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>**312 N. Spring St., Rm. G-8**<br>**Los Angeles, CA 90012** | [ ] **Southern Division**<br>**411 West Fourth St., Rm. 1-053**<br>**Santa Ana, CA 92701-4516** | [ ] **Eastern Division**<br>**3470 Twelfth St., Rm. 134**<br>**Riverside, CA 92501** |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Karen Matteson, Cal. Bar No. 102103
Email: mattesonk@sec.gov
Roberto A. Tercero, Cal. Bar No. 143760
Email: terceror@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998 / Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | **CV11-05316** P(AGRx) |
| v. | |
| PETER L. JENSEN AND THOMAS C. TEKULVE, JR. | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Karen Matteson / Roberto A. Tercero_, whose address is _SEC, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036_. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

JUN 2 4 2011

Clerk, U.S. District Court

Dated: _____

By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

Karen Matteson, Cal. Bar No. 102103
Email: mattesonk@sec.gov
Roberto A. Tercero, Cal. Bar No. 143760
Email: terceror@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998 / Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | CV11-05316 R(AGRx) |
| v. | |
| PETER L. JENSEN AND THOMAS C. TEKULVE, JR. | **SUMMONS** |
| DEFENDANT(S). | |

TO:      DEFENDANT(S): _____
_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney,  Karen Matteson / Roberto A. Tercero , whose address is  SEC, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

JUN 2 4 2011

Clerk, U.S. District Court

JULIE PRADO   SEAL

Dated: _____

By: _____
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) <br> SECURITIES AND EXCHANGE COMMISSION | DEFENDANTS <br> PETER L. JENSEN AND THOMAS C. TEKULVE, JR. |
|---|---|
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br><br> Karen Matteson / Roberto A. Tercero    (323) 965-3998 <br> Securities and Exchange Commission <br> 5670 Wilshire Boulevard, 11th Floor, Los Angeles, CA 90036 | Attorneys (If Known) <br><br> Please see attachment. |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No    ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
The Complaint alleges violations of the federal securities laws. 15 U.S.C. §§77t(b),77t(d)(1) & 77v(a); 15 U.S.C. §§78u(d)(1),78u(d)(3)(A), & 78u(e),78u-1(a)(1)(A)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:** Case Number:_____  **CV11-05316**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
  ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| L A | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Thomas C. Tekulve, Jr.-Orange County | Peter L. Jensen-San Diego County |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
  Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date  June 24, 2011

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

Counsel Information for *SEC v. Peter L. Jensen and Thomas C. Tekulve, Jr.*

**Counsel for Peter L. Jensen:**
David Scheper, Esq.
William H. Forman, Esq.
Jean Nelson, Esq.
Scheper Kim & Harris LLP
One Bunker Hill
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
T/213-613-4655

**Counsel for Thomas C. Tekulve, Jr.:**
Seth Aronson, Esq.
O'Melveny & Myers, LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
T/(213) 430-6000