1   KAREN MATTESON, Cal. Bar No. 102103
    Email:  mattesonk@sec.gov
2   ROBERTO A. TERCERO, Cal. Bar No. 143760
    Email:  terceror@sec.gov
3
    Attorneys for Plaintiff
4   Securities and Exchange Commission
    Michele Wein Layne, Regional Director
5   John M. McCoy III, Associate Regional Director
    John W. Berry, Regional Trial Counsel
6   5670 Wilshire Boulevard, 11th Floor
    Los Angeles, California 90036
7   Telephone:   (323) 965-3998
    Facsimile:    (323) 965-3908
8

9                   UNITED STATES DISTRICT COURT
10                  CENTRAL DISTRICT OF CALIFORNIA
11                       WESTERN DIVISON
12

13  SECURITIES AND EXCHANGE              Case No. CV 11-05316 R (AGRx)
    COMMISSION,
14                                       **MEMORANDUM OF POINTS AND**
                                         **AUTHORITIES IN SUPPORT OF**
                 Plaintiff,              **PLAINTIFF SECURITIES AND**
15                                       **EXCHANGE COMMISSION'S**
          vs.                            **MOTION FOR SUMMARY**
16                                       **JUDGMENT AGAINST**
    PETER L. JENSEN and THOMAS C.        **DEFENDANT THOMAS C.**
17  TEKULVE, JR.,                        **TEKULVE, JR., AND FOR**
                                         **PARTIAL SUMMARY JUDGMENT**
18               Defendants.             **AGAINST DEFENDANT PETER L.**
                                         **JENSEN**
19
                                         Date:        August 20, 2012
20                                       Time:        10:00 a.m.
                                         Place:       Courtroom 8
21                                                    (Honorable Manuel L. Real)
22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...........................................................................1

II.   ARGUMENT...................................................................................4

    A.  The Defendants Violated Multiple Federal Securities
    Laws .........................................................................................4

        1.  The Defendants Violated The Antifraud
        Provisions.....................................................................4

            a)  The Defendants Were Control Persons
            Of Basin .........................................................5

            b)  The Defendants' Fraudulent Acts And
            Representations................................................7

                (1)  The Purported Q1 2006 Sale To Opus
                Trust....................................................10

                (2)  The Purported Q3 2006 Sale To
                Thermax...............................................11

                (3)  The 2007 Sham SPE Transactions .......11

            c)  Jensen And Tekulve Acted With Scienter.....................13

        2.  The Defendants Are Liable For Basin's Violations
        Of The Issuer Reporting Provisions...........................18

        3.  The Defendants Falsified Basin's Books And
        Records.......................................................................19

        4.  Tekulve Lied To The Auditors ...................................19

        5.  The Defendants Falsely Certified Commission
        Filings........................................................................20

        6.  Jensen Engaged In Insider Trading............................20

i

B.    The Commission Is Entitled To The Relief It Seeks ..........................21

    1.    Permanent Injunctions Are Appropriate ...................................21

    2.    Disgorgement Should Be Ordered .............................................21

    3.    Reimbursement Should Be Ordered ..........................................22

    4.    Remedies Act Civil Penalties Should Be Imposed..................23

    5.    Jensen Should Be Ordered To Pay A Triple
        ITSA Penalty.............................................................................24

    6.    Permanent Officer And Director Bars Are
        Appropriate ...............................................................................25

III.    CONCLUSION...................................................................................25

## **TABLE OF AUTHORITIES**

Page

## **CASES**

*Barrie v. Intervoice-Brite, Inc.*
   397 F.3d 249, 262 (5th Cir. 2005), *modified on other grounds,*
   409 F.3d 653, 656 (5th Cir. 2005) ...................................................13

*Basic Inc. v. Levinson*
   485 U.S. 224 (1988)........................................................................7

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)........................................................................4

*Freedman v. Louisiana Pacific Corp.*
   922 F. Supp. 377 (D. Or. 1996) ......................................................9

*Ganino v. Citizens Utils. Co.*
   228 F.3d 154 (2d Cir. 2000) ...........................................................8

*Herman & MacLean v. Huddleston*
   459 U.S. 375 (1983).......................................................................14

*In re Peritus Software Services, Inc.*
   52 F. Supp. 2d 211 (D. Mass. 1999)................................................9

*In re Rehm Eagle Fin. Corp.*
   954 F. Supp. 1246 (N.D. Ill. 1997)................................................14

*Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*
   927 F. Supp. 1297 (C.D. Cal. 1996) ......................................... 9, 14

*Ponce v. SEC*
   345 F.3d 722 (9th Cir. 2003) ........................................................18

*Provenz v. Miller*
   102 F.3d 1478 (9th Cir. 1996) ......................................................14

*SEC v. Abacus International Holding Corp.*
    2001 U.S. Dist. LEXIS 12635,
    2001 WL 940913 (N.D. Cal. August 16, 2001) ...........................................24

*SEC v. Caserta*
    75 F. Supp. 2d 79 (E.D.N.Y. 1999).......................................................8, 9

*SEC v. Chester Holdings, Inc.*
    41 F. Supp. 2d 505 (D.N.J. 1999).........................................................18

*SEC v. Dain Rauscher, Inc.*
    254 F.3d 852 (9th Cir. 2001) ...........................................5, 7, 14

*SEC v. Fehn*
    97 F.3d 1276 (9th Cir. 1996) ...............................................................8

*SEC v. First City Financial Corp., Ltd.*
    890 F.2d 1215 (D.C. Cir. 1989).........................................................22

*SEC v. First Pacific Bancorp*
    142 F.3d 1186 (9th Cir. 1998) ..................................................... 22, 25

*SEC v. Hopper*
    2006 WL 778640 (S.D. Tex. 2006)...................................................12

*SEC v. Indigenous Global Development Corp.*
    2008 U.S. Dist. LEXIS 50434 (N.D. Cal. June 30, 2008).................... 20, 25

*SEC v. Jenkins*
    2010 U.S. Dist. LEXIS 57023 (D. Az. 2010)..............................................23

*SEC v. JT Wallenbrock & Associates*
    440 F.3d 1109 (9th Cir. 2006) ...........................................................22

*SEC v. Manor Nursing Centers, Inc.*
    458 F.2d 1082 (2d Cir. 1972) ...........................................................18

*SEC v. Mozilo*
    2010 U.S. Dist. LEXIS 98203 (C.D. Cal. September 16, 2010).................21

*SEC v. Murphy*
    626 F.2d 633 (9th Cir. 1980) ...........................................................21

*SEC v. Platforms Wireless*
    617 F.3d 1072 (9th Cir. 2010) ................................................22

*SEC v. Rana Research, Inc.*
    8 F.3d 1358 (9th Cir. 1993) ..................................................5

*SEC v. Softpoint, Inc.*
    958 F. Supp. 846 (S.D.N.Y. 1997) .............................................19

*SEC v. Solucorp Ind. Ltd.*
    274 F. Supp. 2d 379 (S.D.N.Y. 2003) ..........................................8

*SEC v. Todd*
    642 F.3d 1207 (9th Cir. 2011) .............................. 5, 6, 7, 8, 14, 18, 19

*TSC Indus., Inc. v. Northway, Inc.*
    426 U.S. 438 (1976)...........................................................7

*United States v. Arthur Young & Co.*
    465 U.S. 805 (1984)...........................................................2

*United States v. Crop Growers Corp.*
    954 F. Supp. 335 (D.D.C. 1997)...............................................19

*United States v. Nacchio*
    519 F.3d 1140 (10th Cir. 2008) ...............................................8

*United States v. O'Hagan*
    521 U.S. 642 (1997)..........................................................20

*Van de Velde v. Coopers & Lybrand*
    899 F. Supp. 731 (D. Mass. 1995).............................................14

## **FEDERAL STATUTES**

26 U.S. C. § 6621 ..............................................................22

### **Securities Act of 1933**

Section 17(a)
    [15 U.S.C. § 77q(a)] ......................................................4, 5

Section 17(a)(2)
      [15 U.S.C. § 77q(a)(2)]..............................................................5

Section 17(a)(3)
      [15 U.S.C. § 77q(a)(3)]..............................................................5

**Securities Exchange Act of 1934**

Section 10(b)
      [15 U.S.C. § 78j(b)] .................................................. 4, 5, 20, 25

Section 13(a)
      [15 U.S.C. § 78m(a)] ...........................................................18

Section 13(b)(2)(A)
      [15 U.S.C. § 78m(b)(2)(A)] ...................................................19

Section 13(b)(5)
      [15 U.S.C. § 78m(b)(5)] ........................................................19

Section 20(a)
      [15 U.S.C. § 78t(a)] ...............................................................5

Section 21(d)(2)
      [15 U.S.C. § 78u(d)(2)] .........................................................25

Section 21(d)(3)(B)(iii)
      [15 U.S.C. § 78u(d)(3)(B)(iii)] ..............................................23

Section 21A(a)(1)(A)
      [15 U.S.C. § 78u-1(a)(1)(a)] ..................................................24

Section 21A(a)(1)(A)(2)
      [17 U.S.C. § 78u-1(a)(1)(A)(2)] ............................................24

Section 3(a)(37)
      [15 U.S.C. § 78c(a)(37)] .......................................................19

**Sarbanes-Oxley Act of 2002**

Section 304
      [15 U.S.C. § 7243].................................................. 1, 4, 22, 23

# FEDERAL REGULATIONS

17 C.F.R. § 201.1003 ...................................................................................24

17 C.F.R. § 201.1004 ...................................................................................24

Regulation S-X
[17 C.F.R. §§ 210.1-02(a)(2), 249.308a]......................................................9

Rule 10b-5
[17 C.F.R. § 240.10b-5] .................................................. 4, 5, 19, 20

Rule 10b5-1(b)
[17 C.F.R. § 240.10b5-1(b)] .............................................................20

Rule 10b5-1(c)(1)(i)(A)
[17 C.F.R. § 240.10b5-1(c)(1)(i)(A)] ...............................................21

Rule 10b5-1(c)(1)(ii)
[17 C.F.R. § 240.10b5-1(c)(1)(ii)]....................................................21

Rule 12b-20
[17 C.F.R. § 240.12b-20]..................................................................18

Rule 13a-1
[17 C.F.R. § 240.13a-1] ....................................................................18

Rule 13a-13
[17 C.F.R. § 240.13a-13] ..................................................................18

Rule 13a-14
[17 C.F.R. § 240-13a-14] ..................................................................20

Rule 13b2-1
[17 C.F.R. § 240.13b2-1]...................................................................19

Rule 13b2-2
[17 C.F.R. § 240.13b2-2]............................................................ 19, 20

Rule 405
[17 C.F.R. § 230.405] .........................................................................5

1

# **FEDERAL RULES OF CIVIL PROCEDURE**

2

Fed. R. Civ. P. 56 ................................................................................4

3

Fed. R. Civ. P. 56(c) ..........................................................................4

4

5

# **STAFF ACCOUNTING BULLETIN**

6

SAB 104 ................................................................................................9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  I.    **INTRODUCTION**

2        The uncontroverted facts establish that both Defendants in this action violated

3  the federal securities laws by dramatically and repeatedly inflating the reported

4  revenues of Basin Water, Inc. ("Basin").  The Defendants – Basin's CEO and CFO –

5  began their fraudulent scheme the very first quarter Basin became a public company

6  and continued their scheme for two years.  During that two year period, Defendant

7  Peter L. Jensen ("Jensen"), Basin's CEO, realized over $9 million by selling his

8  shares of Basin stock, and further profited by donating shares of Basin stock to his

9  *alma mater*, MIT, and taking $763,345 in tax deductions for those donations.

10       Plaintiff Securities and Exchange Commission ("Commission") moves for

11  summary judgment against both Defendant Jensen and Defendant Thomas C.

12  Tekulve, Jr. ("Tekulve") with regard to their financial fraud and related violations.

13  Additionally, the Commission moves for partial summary judgment against Jensen

14  for his insider trading in 2006 and 2007.[1]  The Commission's motion is based upon

15  the uncontroverted facts establishing that the Defendants caused Basin to fraudulently

16  recognize and report inflated revenues in seven of the eight quarters during the years

17  2006 and 2007.  The uncontroverted facts further establish that when Jensen sold his

18  Basin stock in 2006 and 2007, he was aware of the material nonpublic information

19  that the company's reported revenues (and hence its stock price) were inflated.

20       The accompanying Statement Of Uncontroverted Facts ("Facts") sets forth a

21  litany of fraudulent acts by the Defendants that occurred in seven of the eight

22  quarters of 2006 and 2007.  The Facts set forth, chronologically, the following

23  _____

24  [1]    If summary judgment is granted, the sole remaining issue will be whether Jensen's trades in 2008, after he left his position as Chairman of the Board and

25  became a consultant, constituted insider trading entitling the Commission to additional penalty relief.  Even absent a fraud finding with regard to these trades,

26  however, Jensen's profits realized from these trades are subject to reimbursement under Section 304 of the Sarbanes-Oxley Act of 2002 ("SOX"), because they were

27  made within twelve months of Jensen's certification of Basin's third quarter 2007 Form 10-Q filed with the Commission.  The Commission does seek such

28  reimbursement by summary judgment.  Accordingly, the only relief the Commission is not seeking by this motion is an insider trading penalty on Jensen's 2008 trades.

repeated pattern of fraudulent conduct in each quarter:

- A few days before the end of the quarter, but more often after quarter-end but before filing of the Form 10-Q or 10-K, the Defendants negotiated and/or documented a purported sale which they knew did not meet the standards under Generally Accepted Accounting Principles ("GAAP") for revenue recognition.[2] In most cases, the transactions had no economic substance whatsoever, and were out-and-out shams. Additionally, most of these purported sales were supported by backdated documents created by Tekulve and in the case of the first quarter, signed by Jensen after quarter end.

- In order to increase reported revenues, the Defendants recognized material amounts of revenue based on the dubious or sham transaction.

- The Defendants then lied to the auditors, signing a quarterly management representation letter falsely representing that all transactions were properly recorded under GAAP and the Defendants were not aware of any fraud. Additionally, in three cases, Tekulve prepared or supervised the preparation of memoranda to the auditors addressing specific transactions which Tekulve represented to the auditors were properly recorded when he knew they were not.

- Tekulve prepared or supervised preparation of the materially false filing, which he and Jensen reviewed, signed and certified, falsely representing to the public the inflated system sales, and resulting inflated revenues and gross profits resulting from their fraud.

- Tekulve prepared the false quarterly earnings release, also filed with the Commission, which contained the falsely inflated revenue figures, and Jensen reviewed and approved any quotation attributed to him in the release, including those falsely representing Basin's financial condition.

---

[2] GAAP are the conventions, rules and procedures that constitute the professional standards of the accounting profession. *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n.7 (1984).

● The Defendants participated in a quarterly conference call with analysts, in which one or both of them read from a script presenting the false financial results, which script was substantially prepared by Tekulve, and which Jensen reviewed at least to the extent he was to make the scripted remarks. In many instances, they further embellished their fraudulent representations by making additional false representations in response to questions by analysts.

● Jensen sold stock, profiting by millions of dollars, when the stock reached various target prices, which prices were reached as a result of the false picture he had presented to the public regarding Basin's financial situation.

These acts violated the antifraud, books and records and certification provisions of the federal securities laws.  Tekulve also lied to company auditors. The Defendants are also liable either as control persons or aiders and abettors of Basin for violating the company issuer reporting requirements.  Finally, by engaging in insider trading, Jensen further violated the antifraud provisions.

The undisputed Facts are established by the Defendants' own admissions, by the annual and quarterly reports signed and certified by the Defendants, by the Defendants' recorded and transcribed misrepresentations during earnings conference calls with analysts, and by documents the Defendants indisputably participated in creating and/or signing and presenting to the auditors or the public. The Defendants' fraudulent acts were repeated, egregious, and intentional.  Jensen also profited from his fraud by insider trading, receiving over $9 million.

The Commission accordingly seeks by this motion entry of a final judgment against each Defendant permanently enjoining him from future violations of the above statutory and regulatory provisions; ordering each to disgorge his ill-gotten gains, consisting of salary and bonuses and, in the case of Jensen, insider trading profits and tax deductions; ordering each to pay a civil penalty of $260,000; and permanently barring each from acting as an officer or director of a public company. Additionally, the Commission seeks reimbursement from each Defendant pursuant

to SOX Section 304 of his bonuses and incentive based compensation and, in the case of Jensen, the over $9 million he received from his sales of Basin stock. Finally, the Commission seeks triple penalties from Jensen for his insider trading in 2006 and 2007, by which he profited by almost $3 million.

## II. ARGUMENT

Summary judgment is appropriate when the pleadings, affidavits, and other supporting papers permitted by Rule 56 of the Federal Rules of Civil Procedure demonstrate that there is no genuine issue of material fact, and the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  As set forth below, the undisputed facts, established primarily by the Defendants' own admissions supported by documentary evidence, demonstrate that they violated the antifraud and other provisions of the federal securities laws and that the Commission is entitled to the relief it seeks.

### A. The Defendants Violated Multiple Federal Securities Laws

#### 1. The Defendants Violated The Antifraud Provisions

Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder prohibit fraud.  Rule 10b-5, which is worded similarly to Section 17(a) provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a)     to employ any device, scheme or artifice to defraud,

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

1    in connection with the purchase or sale of any security.

2    The Defendants violated the antifraud provisions of Section 10(b), 15 U.S.C.

3    § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by making (1)

4    material misrepresentations, (2) in connection with the purchase or sale of a

5    security, (3) with scienter, (4) by use of the jurisdictional means. *See SEC v. Rana*

6    *Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993). Section 17(a) requires

7    essentially the same proof, except that the Commission is not required to prove

8    scienter, but merely negligence, to establish violations of Section 17(a)(2),

9    prohibiting misrepresentations and omissions of material fact, or 17(a)(3),

10   prohibiting conduct which operates or would operate as a fraud or deceit. *See SEC*

11   *v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

12   As set forth in more detail below, the facts establish that key elements of a

13   fraud violation:  (1) that Defendants' acts constituted (a) devices, schemes or

14   artifices to defraud, (b) material misrepresentations and omissions, and/or (c) a

15   course of business that operated as a fraud upon Basin investors and potential

16   investors; and (2) that the Defendants acted with scienter.

17   Finally, these Defendants are liable for certain of their Exchange Act violations, not

18   just because the Commission has presented uncontroverted facts establishing that they

19   directly violated the antifraud provisions, but because they were control persons of Basin.

20            a)      **The Defendants Were Control Persons Of Basin**

21   Under Exchange Act Section 20(a), 15 U.S.C. § 78t(a), a defendant may be

22   held liable for securities violations if: (1) there is a violation of the Exchange Act;

23   and (2) the defendant directly or indirectly controls any person liable for the

24   violation. *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).  "Control" is "the

25   possession, direct or indirect, of the power to direct or cause the direction of the

26   management and policies of a person, whether through ownership of voting

27   securities, by contract or otherwise." *Id.* at n.4, *quoting* 17 C.F.R. § 230.405.  The

28   definition of the "person" who may be deemed "controlled" under Section 20(a)

1  includes a company.  *SEC v. Todd*, 642 F.3d at 1223.

2       Indicia of control include whether the person managed the company on a

3  day-to-day basis and was involved in the formulation of financial statements,

4  which is sufficient to "presume control over the 'transactions giving rise to the

5  alleged securities violation.'"  *SEC v. Todd*, 642 F.3d at 1223.  [citation omitted.]

6  Actual authority over the preparation and presentation of the financial statements is

7  sufficient to demonstrate control.  *Id.*

8       The Defendants' control over Basin during the relevant period is

9  indisputable.  As Jensen asserts, during the period he was CEO, until February

10  2008, only he and Tekulve were running the company.  (Facts ¶ 6.)  They

11  accordingly managed the company on a day-to-day basis.

12       Moreover, Jensen admits he saw himself as "kind of the deal guy," and "kind

13  of a leader" who would "see opportunities," and negotiate deals.  (Facts ¶ 4.)  These

14  deals included the first two fraudulent deals with Opus Trust and Thermax, described

15  below.  Jensen also signed and certified the relevant Forms 10-Q and the 2006 Form

16  10-K, knowing that they included these revenues, as well as subsequent 2007 filings.

17  (Facts ¶¶ 59-61, 63, 73-75, 99-101, 113-15, 132-39, 144-49.)  Additionally, in

18  management representation letters provided to the auditors, Jensen and Tekulve both

19  confirmed that they were "responsible for the fair presentation" of the financial

20  information "in conformity with" GAAP."  (Facts ¶¶ 48, 68, 96, 106.)

21       Tekulve was also a control person of Basin.  He admits he had responsibility

22  for the Basin's financial structure and organization; indeed, Tekulve created the

23  financial organization within Basin.  (Facts ¶ 10.)  Among other things, with

24  Jensen's knowing consent, Tekulve hired as his Director of Finance Douglas

25  Hansen ("Hansen"), an individual who had previously been enjoined in a

26  Commission fraud action and who had been barred from appearing and practicing

27  as an accountant before the Commission.  (Facts ¶¶ 10-13.)  Tekulve and Hansen

28  also recommended hiring Singer Lewak Greenbaum & Goldstein ("SingerLewak")

as Basin's auditor.  (Facts ¶ 11.)  Tekulve was responsible for establishing a system of internal controls for the company.  (Facts ¶ 14.)  Tekulve further understood he was ultimately responsible for the accuracy of Basin's financial statements as well as its Management Discussion and Analysis ("MD&A") section of the quarterly Forms 10-Q and annual Forms 10-K filed with the Commission. (Facts ¶ 15.)  Tekulve always fully reviewed the Forms before they were filed. (Facts ¶ 15.)  He too signed and certified the Forms, including the 2007 Form 10-K.  (Facts ¶¶ 59-62, 73, 75, 99-101, 113-15, 132-34, 144-48, 162-64.)

These facts are more than sufficient to establish that Jensen and Tekulve had actual authority over the preparation and presentation to the public of the financial statements. This is sufficient to demonstrate their control.  *SEC v. Todd*, 642 F.3d at 1223.[3]

### b)    <u>The Defendants' Fraudulent Acts And Representations</u>

Violations of the antifraud provisions require that misstatements and omissions made by the defendant concern material facts.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  *See also SEC v. Dain Rauscher, Inc.* 254 F.3d at 856.  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *Id.*  Liability arises not only from affirmative representations but also from failures to disclose material information.  *SEC v. Dain Rauscher*, 254 F.3d at 855-56.  The antifraud provisions impose "a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading."  *SEC v. Fehn*, 97

---

[3]    These defendants cannot establish they acted in "good faith," which they must do to defeat summary judgment as to their control person liability.  To establish such a "good faith" defense, the Defendants must establish that they (1) did not act recklessly *and* (2) did not induce the violations.  The evidence, discussed below, that the Defendants acted at least recklessly, precludes their ability to rely on the good faith defense to defeat summary judgment.  *SEC v. Todd*, 642 F.3d at 1224. Additionally, because the Defendants both engaged in dissemination of false information to the public, through the false filings, the earnings press releases and the analyst conference calls, they cannot establish that they did not induce the fraud.  *Id.*

1    F.3d 1276, 1290 n.12 (9th Cir. 1996).

2         Here, the Defendants unquestionably made misrepresentations of material fact.

3    Information relating to a company's financial condition is material.  *SEC v. Todd*,

4    642 F.3d 1207; *see also* Facts ¶ 48 (Tekulve admits that "almost everything was

5    material.  We were such a small company.").  Moreover, how officers and directors

6    of a public corporation describe revenue growth to investors is important.  *Id.*  By the

7    very nature of the information, financial reports are relevant to investment decisions.

8    *See SEC v. Caserta*, 75 F. Supp. 2d 79, 92-93 (E.D.N.Y. 1999); *see also SEC v.*

9    *Solucorp Ind. Ltd.*, 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003).

10        In this case, the Defendants caused the recognition of revenue from several

11   purported sales, which accounted for material amounts of Basin's revenues in each

12   of the relevant quarters and years. The amounts recognized were significantly above

13   the 5% quantitative threshold for assuming on a preliminary basis that a misstated

14   amount is material.  *See United States v. Nacchio*, 519 F.3d 1140, 1162-63 (10th

15   Cir. 2008) (concluding 4.2% revenue shortfall is not immaterial as a matter of law),

16   *citing Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162-64 (2d Cir. 2000) (holding

17   on the basis of Staff Accounting Bulletin No. 99 ("SAB 99") that "numerical

18   benchmark[s]" are informative but not the "exclusive" test of materiality).

19        These overstatements of revenue were material because they misrepresented

20   and concealed Basin's true (poor) financial performance.  As explained in more

21   detail below, however, the Defendants' actions in furtherance of the fraudulent

22   scheme went well beyond simply causing the material overstatement in revenue to

23   be falsely reported.  Rather, Jensen negotiated two of the key deals, with Opus

24   Trust and Thermax, and signed the Opus Trust agreement well after quarter-end;

25   Tekulve drafted key documents falsely depicting the transactions and ignored

26   relevant GAAP provisions.  Both lied to company auditors including in

27   management representation letters and, in the case of Tekulve, in various

28   memoranda describing certain transactions.  Tekulve also wrote the financial

1  portions of the false Forms 10-Q and Forms 10-K filed with the Commission, and

2  scripted and participated in quarterly analyst conference calls where

3  misrepresentations regarding company financial performance were repeated.

4      The Commission's regulations require that interim financial statements be

5  prepared in accordance with GAAP, and failure to do so makes the financial

6  statements presumptively misleading. *SEC v. Caserta*, 75 F. Supp. 2d at 90, *citing*

7  Regulation S-X, 17 C.F.R. §§ 210.1-02(a)(2), 249.308a.  In 2009, Basin restated

8  the financial statements for the relevant periods, reversing recognition of revenue

9  on each of the transactions at issue in this case.  (Facts ¶¶ 171-173.)  Such a

10  restatement may be an admission sufficient to show that material misstatements

11  were made in a company's financial statements. *See In re Peritus Software*

12  *Services, Inc.*, 52 F. Supp. 2d 211, 213 (D. Mass. 1999).  Moreover, violations of

13  GAAP provisions may indicate that the antifraud provisions have been violated.

14  *See Freedman v. Louisiana Pacific Corp.*, 922 F. Supp. 377, 391 (D. Or. 1996);

15  *SEC v. Caserta*, 75 F. Supp. 2d at 90 (a statement made in violation of GAAP may

16  be found to be misleading under the federal securities laws; by their very nature,

17  financial reports are relevant to investment decisions); *Marksman Partners, L.P. v.*

18  *Chantal Pharmaceutical Corp.*, 927 F. Supp. 1297, 1305 (C.D. Cal. 1996).

19      Here, the Defendants violated very basic GAAP concerning revenue recognition

20  with which Tekulve, who had been licensed as a CPA, was quite familiar.  (*See* Facts ¶

21  20.)  Jensen, an experienced CEO of public companies, also understood there were

22  GAAP requirements for recognizing revenue, and knew at least some of those

23  requirements which were relevant to the transactions at issue.  (*See* Facts ¶¶ 2 & 21.)

24      The relevant GAAP provision is Staff Accounting Bulletin ("SAB") 104,

25  which sets forth the four elements required to recognize revenue:

26      1.    Persuasive evidence of an arrangement between the parties;

27      2.    Delivery has occurred or services have been rendered;

28      3.    The seller's price to the buyers is fixed and determinable; and

1    4.    Reasonable assurance of collectability.

2  (Facts ¶ 20.)  Tekulve correctly understood these were the "four major prongs" of

3  SAB 104 (*Id.*)  Jensen also understood that there were requirements for

4  recognizing revenue, including that an order is not valid if it is contingent, and that

5  collectability was relevant to recognizing revenue.  (Facts ¶ 21.)

6    As described below, neither elements (1) nor (4) were present with respect to any

7  of the transactions for which the Commission contends revenue should not have been

8  recognized.  Additionally, delivery did not occur with respect to most of the transactions.

9  **(1)    The Purported Q1 2006 Sale To Opus Trust**

10    The Defendants commenced their fraudulent scheme the very first quarter of

11  Basin's existence as a public company.   Basin was to receive $1.5 million from an

12  offshore entity based in Nevis, Opus Trust, in exchange for two Basin systems.

13  Neither Jensen nor Tekulve ever investigated whether the offshore entity could pay

14  $1.5 million, or even learned who comprised the entity.  (Facts ¶¶ 28-29.)

15  Moreover, not only was there no reasonable assurance of collectability, but there

16  was no evidence of an arrangement, as the deal materially changed after the first

17  quarter, in which the $1.5 million in revenue was recognized.  (Facts ¶¶ 33 & 40.)

18  Most significantly, a liquidated damages clause, limiting Opus Trust's liability to

19  Basin to the amount already paid – $150,000 – was inserted into the final

20  agreement, signed after March 31, 2006.  (Facts ¶¶ 39-40.)

21    Clearly, there was no evidence of an arrangement between the parties as of

22  March 31, 2006, when revenue was recognized.  The presence of the liquidated

23  damages clause in the Agreement also meant that the price was not fixed and

24  determinable as of March 31, 2006.  Additionally, there was no reasonable

25  assurance that the remaining $1.35 million in recognized revenue was collectable

26  for two obvious reasons.  First, the liquidated damages clause precluded Basin

27  from collecting this revenue.  Second, even absent the liquidated damages clause,

28  neither Defendant investigated the financial wherewithal of Opus Trust to pay the

1    substantial remaining sum, notwithstanding that both knew a reasonable assurance

2    of collectability was required for recognition of revenue.  (*See* Facts ¶¶ 20-21.)

3           The $1.5 million constituted over 40% of Basin's first quarter revenue – an

4    amount that Tekulve admits was material.  (Facts ¶¶ 42 & 45.)  The Defendants did

5    not correct this material overstatement of revenue, which was included in Basin's

6    year-to-date revenues reported in Q2 2006.

7                        **(2)      The Purported Q3 2006 Sale To Thermax**

8           Jensen negotiated a second transaction in the third quarter of 2006 for which he

9    and Tekulve caused revenue to be improperly recognized.  Specifically, on September

10   28, 2006, Jensen obtained an order from Thermax to purchase a water softening

11   system, which he passed on to Tekulve that same day.  That order was, however,

12   explicitly contingent upon a Venezuelan entity, PDVSA, purchasing the system from

13   Thermax.  (Facts ¶¶ 87 & 89.)  Jensen and Tekulve nevertheless caused $451,000 in

14   revenue to be recognized on the transaction, without persuasive evidence of an

15   arrangement between Basin and Thermax in light of the contingent nature of the deal.

16   (Facts ¶ 92.)  Neither Jensen nor Tekulve asked to see the purchase order from

17   PDVSA, which purchase order did not exist.   (Facts ¶¶ 88 & 90.)

18          Not only did Thermax never receive a purchase order from PDVSA, but it

19   never made any payments to Basin, and Basin never in fact shipped any units to

20   Thermax pursuant to the order.  (Facts ¶ 93.)  This meant that three of the four

21   requirements for revenue recognition were not met – there was no persuasive

22   evidence of an arrangement, no delivery occurred, and there was no reasonable

23   assurance of collectability in light of the contingent nature of the agreement.

24                       **(3)      The 2007 Sham SPE Transactions**

25          In 2007, the Defendants continued their fraudulent course of conduct.  With

26   the exception of the first quarter, millions of dollars of revenue was recognized each

27   quarter based upon purported sales to Special Purpose Entities ("SPEs"), assetless

28   companies created specifically for that purpose.  Much like the deal with Opus

Trust, each of these transactions involved creation of an initial agreement dated "as of" a date at or before the end of the relevant quarter, followed up by much more lengthy complex documentation which included additional and inconsistent terms, meaning that there was no persuasive evidence of an arrangement at the outset, as required by SAB 104 for revenue recognition.  Additionally, because the SPEs – VL Capital and WSS – had no assets, and in three of the four transactions, had received no loan from a third party financing entity, there was no reasonable assurance of collectability, also required by GAAP.  Also, the transactions required Basin to round-trip its own cash to finance the deals, including by making payments of "standby" fees received from the lessees of the system before any payment toward purchase was due by the SPE, or by making loans to the SPE.  (Facts ¶¶ 123(1)(a) & (b); 123(2)(a) & (b); & 158.e.)  As one court has explained, "round-trip trades are sham transactions, and therefore have an inherent tendency to deceive." *SEC v. Hopper*, 2006 WL 778640, *11 (S.D. Tex. 2006).

Millions of dollars of revenue were recognized on these sham deals, which Tekulve was very involved in negotiating – $3.8  million in Q2 2007 for the first deal with VL Capital; $2.1 million in Q3 2007 for the first deal with WSS; and $1,842, 079 in Q4 2007 on second deals with VL Capital ($489,000 recognized) and WSS ($1,353,079 recognized).  (Facts ¶¶ 117, 132, 145 & 155-157.)  Not only were these revenues from the purported SPE transactions a large percentage of quarterly revenues, but in total the $7.7 million recognized for these purported sales to SPEs represented 42% of Basin's 2007 annual revenues.  (Facts ¶ 161 .)

Jensen did not negotiate these deals, as he had negotiated the Opus Trust and Thermax deals.  Nevertheless, like Tekulve, Jensen signed and certified false Form 10-Qs for Q2 and Q3 2007 that he knew included millions of dollars in revenues for the first transactions with VL Capital and WSS, without investigating these transactions; he also participated in the analyst conference calls, in which Tekulve made misleading statements regarding the transactions.  (Facts ¶¶ 132-137, 144-49

& 152-153.)  Jensen is liable for his silence.  *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005) (citation omitted), *modified on other grounds*, 409 F.3d 653, 656 (5th Cir. 2005) (high ranking company official cannot escape liability by keeping silent while false statements are made in an analyst call).

Tekulve also lied to the auditors by signing additional false management representation letters and supervising Hansen in preparation of "white papers" requested by the auditors which provided misleading explanations for the Q2 transaction with VL Capital and the Q3 transaction with WSS.  (Facts ¶¶ 127-129 & 141-143.)  For example, with regard to VL Capital, Tekulve failed to disclose in the white paper the timing of the respective payments by Basin and VL Capital to each other, which masked the fact that Basin was roundtripping its own cash to finance the transaction, and falsely stated that VL Capital had placed $500,000 in escrow "as of" June 30, 2007, when no monies had been deposited into escrow.  (Facts ¶ 128.)  Similarly, with regard to WSS, the white paper claimed that WSS was "backed by National City, a large Chicago bank," when in fact the relevant financing entity, National City Energy Capital LLC, based in Cincinnati, had not agreed – and never did agree – to finance the transaction, and falsely stated that WSS had made the required $25,000 deposit into escrow when it had not.  (Facts ¶ 141.)

The above acts by the Defendants constituted employment of devices, schemes and artifices to defraud, misrepresentations and omissions of material fact, and a course of business which operated as a fraud upon investors and potential investors, as indicated by the sharp drop of 35% in the company's stock price following the announcement by Basin that it would likely have to restate its 2006 and 2007 financial results.  (Facts ¶¶ 171-172.)  As set forth below, the Defendants acted with scienter in performing these acts and making the material misrepresentations and omissions.

      **c)**    <u>**Jensen And Tekulve Acted With Scienter**</u>

In the Ninth Circuit, scienter may be established by a showing of

1  recklessness.  *SEC v. Todd*, 642 F.3d at 1215.  The Ninth Circuit has held that:

2      Reckless conduct is conduct that consists of a highly unreasonable act,

3      or omission, that is an "extreme departure from the standards of

4      ordinary care, and which presents a danger of misleading buyers or

5      sellers that is either known to the defendant or is so obvious that the

6      actor must have been aware of it."

7  *Id., citing SEC v. Dain Rauscher, Inc.*, 254 F.3d at 856.  Proof of recklessness may

8  be inferred from circumstantial evidence.  *Herman & MacLean v. Huddleston*, 459

9  U.S. 375, 390-91, n.30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).[4]

10      As explained above, both Defendants were aware of certain requirements for

11  revenue to be recognized (Facts ¶¶ 20-21.); both were aware of the timing and

12  amounts of revenue recognized on each transaction up through Q3 2007, and

13  Tekulve was additionally aware of the timing and amounts of revenue recognized

14  on the last two SPE transactions he papered in December 2007.  Each Defendant

15  had experience as a  high level officer of multiple public companies.  (Facts ¶¶ 2 &

16  8.)  Tekulve had additionally been licensed as a CPA, and had been a staff auditor

17  for a major accounting firm early in his career.  (Facts ¶ 9.)  Each Defendant

18  signed management representation letters to the auditors affirmatively stating that

19  they "are responsible for the fair presentation" of the financial information in

20  conformity with GAAP and that they were not aware of material transactions that

21  had not been properly recorded; reviewed, signed and certified quarterly and

22  annual filings with the Commission; reviewed the earnings press releases; and

23

24  [4]    For example, courts have held that significant overstatements of revenue "tend to support the conclusion that the defendants acted with scienter."  *Marksman*

25  *Partners v. Chantel Pharm. Corp.*, 927 F. Supp. at 1314; *In re Rehm Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997).  Furthermore, drastic overstatements

26  of revenue are particularly suspect when the transaction occurs at a suspicious time, such as the end of a fiscal quarter or year.  *Van de Velde v. Coopers & Lybrand*, 899

27  F. Supp. 731, 735-36 (D. Mass. 1995).  Courts have also held that violation of a company's own revenue recognition policy supports an inference of scienter.  *Provenz*

28  *v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *Van de Velde*, 899 F. Supp. at 735.

participated in quarterly earnings conference calls.

Some of the additional evidence of Jensen's scienter includes:

- Jensen personally negotiated the Opus Trust and Thermax deals.

- Jensen was reminded in March 3, 2006, and June 16, 2006, emails from Tekulve that Basin "obviously" needed the revenue from the Opus transaction in Q1, and that BION stock had to issue to Benowitz to prevent reduction of "today's revenues." (Facts ¶¶ 32-33.)  After quarter end, Tekulve further reminded Jensen on June 17 that the auditors were looking for the "Benowitz Agreement" by forwarding to Jensen the auditor's June 16 email to prompt Jensen to review the draft agreement he had sent to him on June 16.  (Facts ¶¶ 34.)

- Jensen not only signed the Opus Agreement, he specifically initialed the liquidated damages clause that was in all capital letters that prevented Basin from seeking collection from Opus Trust of the remaining $1.35 million owed under the Agreement, which Jensen knew had already been recognized as revenue. (Facts ¶¶ 38-39 & 44.)  Jensen's practice was to review contracts before signing them on behalf of Basin.  (Facts ¶ 39.)

- Although Jensen knew that collectability was relevant to recognizing revenue, he did not investigate whether Opus Trust, a purported offshore entity based in Nevis, had the financial wherewithal to pay the full $1.5 million owed pursuant to the initial Opus Letter (Facts ¶¶ 21 & 28.)

- Even though he angrily rejected a letter setting forth "caveats" or conditions by Thermax, which included that the purchase order from Thermax was conditioned on Thermax receiving a purchase order from its own customer, PDVSA, Jensen nevertheless accepted a document labeled "purchase order" that he received a few days later on September 28, 2006, right before quarter's end on September 30, that included the same conditions.  He did so even though he knew that a purchase order "was not a valid order if it was contingent."  (Facts ¶¶ 84-87.)

- Jensen never asked to see the PDVSA purchase order, even though he

15

1   understood that he terms and conditions of that order were part of Basin's deal with

2   Thermax, and those terms and conditions were reflected in a purchase order from PDVSA.

3   (Facts ¶ 88.)  Indeed, he did not know if the PDVSA order had been issued.  (Facts ¶ 88.)

4        ●    Jensen participated in internal Basin discussions regarding VL

5   Capital, and was aware revenue was recognized on it; in fact, the $3.8 million was

6   more than half of Basin's Q2 2007 revenues.  (Facts ¶¶ 120-122.)  Notwithstanding

7   that the revenues from VL Capital were so significant, Jensen signed and certified

8   the Q2 2007 Form 10-Q, which included the false representation that the ten

9   systems were sold as part of a "third party financing arrangement" and sold "to a

10  third party affiliate of a bank," without asking any questions about this footnote to

11  the financial statements, or about the transaction generally.  (Facts ¶¶ 133 & 135.)

12       ●    Jensen similarly signed and certified the Q3 2007 Form 10-Q, which

13  included recognition of $2.1 million from a purported transaction with WSS, another

14  SPE, knowing that WSS "was one of these financing deals," but not knowing if the

15  disclosures in that Form 10-Q related to the VL Capital transaction for the prior

16  quarter, and not having had any discussions with anyone about whether specific

17  disclosure should be made about the WSS transaction.  (Facts ¶ 149.)

18       Some of the additional evidence of Tekulve's scienter includes:

19       ●    Tekulve edited several drafts of the Opus Agreement which included

20  the liquidated damages clause.

21       ●    Tekulve took no steps, such as requesting or obtaining financial

22  statements, to determine whether collectability was reasonably likely from Opus Trust

23  and/or Benowitz even though he had no knowledge of their finances.  (Facts ¶¶ 29.)

24       ●    Tekulve knew that "we'll need this one [the Opus Trust transaction] in

25  Q1 (obviously)," and told Jensen so on March 3, 2006.  (Facts ¶ 32.)

26       ●    Tekulve received the Thermax purchase order on September 28, 2006

27  from Jensen, and understood it was subject to the conditions in Addendum A,

28  which included that the terms and conditions were reflected on a purchase order

16

from PDVSA.  (Facts ¶¶ 89-90.)  He never asked Thermax for a copy of the purchase order.  (Facts ¶ 90.)

●    Before the 10-Q was filed, Tekulve was also told by Sabzali that Thermax had not received a purchase order from PDVSA; Tekulve never did see a purchase order from PDVSA.  (Facts ¶¶ 91 & 93.)  Nevertheless, on March 6, 2007, Tekulve falsely represented in a memo to the auditors entitled "Analysis of Bad Debt Reserve as of 12/31/06" submitted on or about March 6, 2007, right before the 2006 Form 10-K was filed, that "Management expects full collection of the entire contract amount. Accordingly, management does not believe that any specific bad debt reserve is necessary as of 12/31/06."  (Facts ¶ 104.)

●    Tekulve knew that VL Capital and WSS were newly formed entities with no assets.  (Facts ¶¶ 119 & 138.)

●    Tekulve knew that Basin did not have definitive agreements with VL Capital on June 30, 2007, or with WSS on September 30, 2007, as he subsequently signed Agreements which differed materially in their terms from the end of quarter Commitment Letters.  (Facts ¶¶ 118 & 140.a.)

●    Tekulve understood that Basin was "obviously" financing the majority of the VL Capital transaction, including because "a half million dollars in cash [] was put into the transaction by Basin." (Facts ¶ 124.)

●    Tekulve approved Hansen's "white papers" prepared at the request of the auditors to explain the VL and WSS transactions, even though those white papers were materially misleading.  (Facts ¶ 128 & 141.)

●    Tekulve knew that collectability from WSS was not probable, as it was dependent on a loan from a third party which was not funded, and as WSS had not paid the initial down payment.  (Facts ¶ 140.b. & c.)

●    Tekulve initiated documentation for two new purported sales to SPEs, one to VL Capital and one to WSS, on December 26, 2007, because, as he noted in his calendar on December 28, "we need the revenues." (Facts ¶ 154.)  Although he

never even approached Basin's customers to obtain their required consents to the assignments of the water services agreements to the SPEs, Tekulve caused $1,842,079 in revenue to be recognized on these transactions.  (Facts ¶ 155-158.)

The undisputed evidence is thus overwhelming:  both Jensen and Tekulve acted knowingly or recklessly.

## 2.   <u>The Defendants Are Liable For Basin's Violations Of The Issuer Reporting Provisions</u>

Issuers of securities are required to file annual Forms 10-K and quarterly Forms 10-Q with the Commission.  Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.13a-1 & 240.13a-13.  These reports must be prepared in conformity with GAAP.[5]  Because Basin's Forms 10-Q and 10-K were misleading and not prepared in conformity with GAAP, Basin violated the reporting requirements.[6]

The Defendants are liable for Basin's violations of the company reporting provisions of the Exchange Act as either control persons or aiders and abettors.  Because the reporting provisions do not require proof of scienter by the company, *Ponce v. SEC*, 345 F.3d 722, 737 n.10 (9th Cir. 2003), and the Defendants meet the definition of control person, the fact that the filings were materially false is sufficient to hold the Defendants liable as control persons.  The evidence also establishes the following elements necessary to establish aiding and abetting:  (1) Basin violated these provisions; (2) the Defendants had knowledge of the primary violation and of their role in furthering it; and (3) the Defendants provided substantial assistance in the primary violation.  *See SEC v. Todd*, 642 F. 3d at

---

[5]     *Ponce v. SEC*, 345 F.3d at 735; *see also SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 526 (D.N.J. 1999), *citing* Rule 12b-20, 17 C.F.R. § 240.12b-20 (statements in the reports must not be misleading and financial reports are presumed to be misleading if not filed in accordance with GAAP).

[6]     The acts of Jensen, Tekulve and other Basin employees may be imputed to Basin.  *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (imputing individual's scienter to entities he controlled).

1225, *citing Ponce v. SEC*, 345 F.3d at 737.

### 3.    The Defendants Falsified Basin's Books And Records

The Defendants also directly violated Section 13(b)(5) of the Exchange Act, which states that:  "No person shall . . . knowingly falsify any book, record, or account. . . ."  Their conduct further violated Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1, which prohibits the direct or indirect falsification of company books and records.

Section 3(a)(37) of the Exchange Act, 15 U.S.C. § 78c(a)(37), defines "records" as follows:  including "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type. . . ."  Financial statements themselves constitute books and records within the meaning of Section 13(b)(2)(A) (and thus Rule 13b2-1) and Section 13(b)(5).  *See United States v. Crop Growers Corp.*, 954 F. Supp. 335, 357 (D.D.C. 1997).

There is no requirement that the Defendants act with scienter to violate Rule 13b2-1.  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865-66 (S.D.N.Y. 1997).  However, the Defendants' conduct in falsifying the books and records in fact was knowing; it therefore also violated Section 13(b)(5) of the Exchange Act.

### 4.    Tekulve Lied To The Auditors

Officers of issuers are prohibited from making or causing to be made materially false or misleading statements or omissions of material fact to accountants in connection with audits, quarterly reviews or examinations of company financial statements or the preparation and filing of required Commission reports.  Commission Rule 13b2-2, 17 C.F.R. § 240.13b2-2.  The level of scienter required to establish a violation of Rule 13b2-2 is the same as for establishing violations of Rule 10b-5.  *SEC v. Todd*, 642 F.3d at 1220.  Because Tekulve acted with scienter with respect to the 10b-5 violations, he therefore knew that the management representation letters he was signing were false.  *Id.*  Likewise, he knew that the 2006 "Analysis of Bad Debt" memo where he falsely represented that management expected to collect the full amount owed by Thermax, and the white papers to the auditors misrepresenting the

first VL Capital and WSS transactions were false.  His presentation of these memoranda to the auditors thus also violated Rule 13b2-2.

### 5.     The Defendants Falsely Certified Commission Filings

Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14, requires that a company's principal executive and principal financial officers certify that the Form 10-Q or Form 10-K being signed fully complies with the requirements of the Exchange Act and fairly presents, in all material respects, the financial condition and results of operations of the company.  As described above, the Defendants' certifications of the Forms 10-Q and 10-K were false, as these filings contained material misrepresentations regarding Basin's financial condition.  *See SEC v. Indigenous Global Development Corp.*, 2008 Fed. Sec. L. Rep. (CCH) ¶ 94,768, 2008 U.S. Dist. LEXIS 50434 * 44 (N.D. Cal. June 30, 2008) (granting Commission summary judgment as to Rule 13a-14 violations).

### 6.     Jensen Engaged In Insider Trading

Under the "traditional" or "classical" theory of insider trading liability, Section 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material nonpublic information.  *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).   A purchase or sale of securities is made "on the basis of" material nonpublic information "if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale."  Exchange Act Rule 10b5-1(b), 17 C.F.R. § 240.10b5-1(b).

Here, Jensen was not only aware of the material nonpublic information that Basin's financial condition was being materially misrepresented to the public – he created and disseminated false information regarding Basin's financial condition. He then sold large amounts of Basin stock, profiting by millions of dollars.

Although Jensen will undoubtedly argue that the shares he sold were sold pursuant to a 10b5-1 plan providing for automatic sales of his stock when the price reached certain trigger points, he cannot meet his burden to establish this

affirmative defense because for the defense to apply, he must demonstrate that before becoming aware of the information, he adopted his written 10b5-1 plan. Rule 10b5-1(c)(1)(i)(A).  However, Jensen cannot make this showing because he entered into his plan December 13, 2006, after the false Q3 2006 10-Q which he certified was filed with the Commission on November 14, 2006.  (Facts ¶ 168.)[7] Jensen understood that he was only permitted to enter into such a trading plan when he was not in possession of material nonpublic information.  (Facts ¶ 169.) That 10-Q included the revenue fraudulently recognized for the Opus Trust and Thermax transactions Jensen had negotiated.  Rule 10b5-1(c)(1)(ii).  *See SEC v. Mozilo*, 2010 U.S. Dist. LEXIS 98203 * 63-67 (C.D. Cal. September 16, 2010).

## B.   The Commission Is Entitled To The Relief It Seeks

### 1.   Permanent Injunctions Are Appropriate

To obtain an injunction, the Commission must establish that there is a reasonable likelihood of future violations.  *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  Whether a likelihood of future violations exists depends upon the totality of the circumstances.  *Id.*  The existence of past violations may give rise to an inference that there will be future violations.  *See id.*  Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the violative conduct, the defendant's recognition of the wrongful nature of the conduct, the likelihood that, because of the defendant's occupation, future violations may occur, and the sincerity of defendant's assurances (if any) against future violations.  *SEC v. Murphy*, 626 F.2d at 655.  Because all of the above factors are present, permanent injunctions are appropriate.

### 2.   Disgorgement Should Be Ordered

Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and

---

[7]    The plan was entered into one day after Jensen made his sole trade in 2006, whereby he profited by $320,000.  (*See* Facts ¶ 167 (chart).)  For this threshold reason, Jensen cannot use the existence of the plan as a defense for his 2006 sale.

to deter others from violating securities laws by making violations unprofitable; a district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through violation of the securities laws. *SEC v. Platforms Wireless*, 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). "The amount of disgorgement should include all gains flowing from the illegal activities." *See SEC v. Platforms Wireless*, 617 F.3d at 1096, *quoting  SEC v. JT Wallenbrock*, 440 F.3d 1109, 1114 (9th Cir. 2006).

The Commission need only present evidence of a "reasonable approximation" of the defendant's ill-gotten gains. *See SEC v. Platforms Wireless*, 617 F.3d at 1096; *SEC v. JT Wallenbrock*, 440 F.3d at 1113-14. The burden then shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *SEC v. Platforms Wireless*, 617 F.3d at 1096, *quoting SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989).

In this case, the Commission seeks disgorgement of salaries, bonuses and stock compensation, and with respect to Jensen, his insider trading profits for 2006 and 2007 and a reasonable approximation of his tax deductions. These amounts total $3,771,214 for Jensen and $721,424 for Tekulve. (Tercero Declaration ¶ 93.)

Additionally, disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct, which may be calculated based on the rate provided in 26 U.S.C. § 6621 for tax underpayments. *SEC v. Platforms Wireless*, 617 F.3d at 1099. Jensen and Tekulve thus owe $856,033.59 and $152,078.52 respectively in prejudgment interest. (Tercero Declaration ¶ 95.)

### 3.    Reimbursement Should Be Ordered

SOX Section 304, 15 U.S.C. § 7243 provides that:

If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for –

22

(1)   any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever occurs first) of the financial document embodying such financial reporting requirement; and

(2)   any profits realized from the sale of securities of the issuer during that 12-month period.

Section 304 does not require personal misconduct by the CEO or CFO; it merely requires misconduct by the issuer, Basin.  *See SEC v. Jenkins*, 2010 U.S. Dist. LEXIS 57023 * 6-8 (D. Az. 2010).  As explained, Basin's financial statements were repeatedly and materially misstated, as a result of violations of very basic GAAP provisions governing revenue recognition.  This resulted in restatement of Basin's 2006 and 2007 financial statements.  (Facts ¶ 173.)  The Defendants should accordingly be required to disgorge as reimbursement their equity-based compensation and bonuses; Jensen should further be ordered to reimburse his trading profits, including from 2008.  Jensen should reimburse $9,533,617; Tekulve should reimburse $396,280.  (Tercero Declaration ¶ 93.)

### 4.   Remedies Act Civil Penalties Should Be Imposed

If the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons" a third tier penalty may be imposed.  *See* Section 21(d)(3)(B)(iii) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(B)(iii).  Plaintiff Commission recommends that two $130,000 maximum third tier civil money penalties totaling $260,000 be imposed against each Defendant representing two violations.[8]  The assessment of a penalty in

---

[8]   The statutory amounts found in the Exchange Act have been amended by the Debt Collection Improvement Act of 1996, Pub L. No. 104-134, Section 31001(s), April 26, 1996.  The amendments authorize the Commission to adjust the civil penalties for inflation by rulemaking.  The Commission has done so.  *See* 17

1    this amount is appropriate because these Defendants not only violated the antifraud
2    provisions, but their conduct directly or indirectly created a risk of substantial losses
3    to other persons, as evidenced by the dramatic 35% drop in share price following the
4    announcement that Basin might have to restate its revenues.  (Facts ¶ 171.)

5         The proposed penalties reflect, in the case of Jensen, his involvement in the Benowitz
6    and Thermax transactions.  In the case of Tekulve, a double penalty is appropriate in light
7    of his continued involvement in the fraudulent scheme for a period of two years.

8         The factors used to determine the appropriateness of an injunction are helpful
9    when assessing penalties.  *SEC v. Abacus International Holding Corp.*, [2001 Transfer
10   Binder] Fed. Sec. L. Rep. (CCH) ¶ 91,542, 2001 U.S. Dist. LEXIS 12635, 2001 WL
11   940913, *5 (N.D. Cal. August 16, 2001).  Evaluation of these factors indicates that
12   imposition of the requested $260,000 penalties against each defendant is appropriate.

### 5.    Jensen Should Be Ordered To Pay A Triple ITSA Penalty

14        In addition to Remedies Act penalties for his financial fraud, Jensen should
15   be ordered to pay penalties under the Insider Trading Sanctions Act ("ITSA").
16   Section 21A(a)(1)(A) of the Exchange Act, 15 U.S.C. § 78u-1(a)(1)(A), provides
17   that the Court has jurisdiction to impose a civil penalty of up to "three times the
18   profit gained . . . as a result of such unlawful . . . sale."  17 U.S.C. § 78u-
19   1(a)(1)(A)(2).  Here, Jensen created a false picture of the company's finances,
20   negotiating the Opus and Thermax deals for which it was clear little, if any,
21   revenue would flow to Basin; he nevertheless caused $2 million in revenue to be
22   recognized on these transactions, disseminated that false revenue information to
23   the public, and benefited significantly from selling Basin shares while the true
24   financial information remained nonpublic.  The Commission seeks a triple ITSA

25

26   C.F.R. §§ 201.1003 & 201.1004 & Tables III & IV (2011).  For conduct occurring
27   subsequent to February 14, 2005, but prior to March 3, 2009, the third tier imposes
     maximum limits for each violation of the greater of $130,000 for natural persons
28   respectively, or the "gross amount of pecuniary gain" to the defendant, rather than
     the $100,000 set forth in the statute.  (*Id.*)

penalty on Jensen's trades in 2006 and 2007, made before he signed and certified his final Basin filing with the Commission, the Q2 Form 10-Q on November 14, 2007, and before he left his position as Basin CEO on February 19, 2008. (*See* Facts ¶¶ 1 &167(chart).)  Jensen's profits gained in 2006 and 2007 totaled $2,845,034.  A triple ITSA penalty would total $8,535,102.

### 6.    **Permanent Officer And Director Bars Are Appropriate**

The Court is authorized to prohibit any person who violates Section 10(b) from acting as an officer or director of any public company if the person's conduct demonstrates unfitness to serve as an officer or director.  *See* Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).  Previously, the statute required proof of "substantial unfitness," in 2002 Congress lowered the Commission's burden, merely requiring it to establish the defendant's "unfitness."  *See SEC v. Indigenous Global Development Corp.*, 2008 U.S. Dist. LEXIS 50434 at ** 53-54.  Under the older, more stringent standard, the Ninth Circuit held that, in determining whether to order such a bar, a court may consider: (1) the egregiousness of the underlying violation; (2) the defendant's "repeat offender" status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur. *SEC v. First Pacific Bancorp*, 142 F.3d at 1193 (upholding permanent bar).  Each of these factors favors imposition of a permanent bar against both defendants.

## III.   **CONCLUSION**

For the reasons stated, the Commission's motion should be granted.


Dated: July 23, 2012                              Respectfully submitted,


                                                  /s/Karen Matteson
                                                  Karen Matteson
                                                  Attorney for Plaintiff
                                                  Securities and Exchange Commission

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On July 23, 2012, I caused to be served the document entitled **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT THOMAS C. TEKULVE, JR., AND FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT PETER L. JENSEN** on all the parties to this action addressed as stated on the attached service list:

[ ]   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[ ]   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ]   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]   **HAND DELIVERY:**  I caused to be hand delivered each such document to the office of the addressee as stated on the attached service list.

[ ]   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

[ ]   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[X]   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

[ ]   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 23, 2012                              /s/ Karen Matteson
                                                 Karen Matteson

1
2
3

**SEC v. Peter L. Jensen, et al.**
**United States District Court – Central District of California**
**Case No. CV 11-05316 R (AGRx)**
**(LA-3478)**

4

## MASTER SERVICE LIST

5
6
7
8
9
10
11

David Scheper, Esq.
William H. Forman, Esq.
Jean M. Nelson, Esq.
Scheper Kim & Harris LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
T/213-613-4655
F/213-613-4656
dscheper@scheperkim.com
wforman@scheperkim.com
jnelson@scheperkim.com
***Attorneys for Defendant, Peter L. Jensen***

12
13
14
15
16
17
18

Seth Aronson, Esq.
Carolyn Kubota, Esq.
Tamar Braz, Esq.
O'Melveny & Myers, LLP
400 S. Hope Street
Los Angeles, CA  90071
T/(213) 430-6000
F/(213) 430-6407
saronson@omm.com
ckubota@omm.com
tbraz@omm.com
***Attorneys for Defendant, Thomas C. Tekulve, Jr.***

19
20
21
22
23
24
25
26
27
28