1  KAREN MATTESON, Cal. Bar No. 102103
   Email: mattesonk@sec.gov
2  ROBERTO A. TERCERO, Cal. Bar No. 143760
   Email: terceror@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  John M. McCoy III, Associate Regional Director
   John W. Berry, Regional Trial Counsel
6  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
7  Telephone: (323) 965-3998
   Facsimile: (323) 965-3908
8
9              UNITED STATES DISTRICT COURT
10            CENTRAL DISTRICT OF CALIFORNIA
11                 WESTERN DIVISION
12
   SECURITIES AND EXCHANGE            Case No. CV 11-05316 R (AGRx)
13 COMMISSION,
                                      [PROPOSED] STATEMENT OF
14              Plaintiff,            UNCONTROVERTED FACTS AND
                                      CONCLUSIONS OF LAW BY
15      v.                            PLAINTIFF SECURITIES AND
                                      EXCHANGE COMMISSION IN
16 PETER L. JENSEN AND THOMAS C.      SUPPORT OF ITS MOTION FOR
   TEKULVE, JR.,                      SUMMARY JUDGMENT AGAINST
17                                    DEFENDANT THOMAS C.
                Defendants.           TEKULVE, JR., AND FOR
18                                    PARTIAL SUMMARY JUDGMENT
                                      AGAINST DEFENDANT PETER L.
19                                    JENSEN
20                                    Date:      August 20, 2012
                                      Time:      10:00 a.m.
21                                    Place:     Courtroom 8
                                                 (Honorable Manuel L. Real)
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ................................................................................1

II.    STATEMENT OF UNCONTROVERTED FACTS.....................................1

    A.    The Defendants And Their Roles As Control Persons .........................1

        1.    Peter L. Jensen ............................................................1

            a)    Jensen's Background, Including As An Officer
                 Of Public Companies.........................................1

            b)    Jensen's Controlling Role At Basin ................................2

        2.    Thomas C. Tekulve, Jr. ...................................................2

            a)    Tekulve's Background, Including As An
                 Accountant And Officer Of Public Companies...............2

            b)    Tekulve's Controlling Role At Basin .............................3

    B.    The Related Entity...................................................................6

    C.    Summary Of The Fraudulent Scheme......................................6

        1.    Summary Of Overstatements Of Basin's Financial
            Results ...........................................................6

        2.    Summary Of Jensen's Trading Profits........................................8

        3.    Summary Of Jensen And Tekulve's Compensation,
            Including Incentive-Based Compensation .................................9

    D.    The Defendants Caused Basin To Materially Overstate
        Its Financial Results Throughout 2006 And 2007 .............................10

        1.    Basin Filed A Securities Registration Statement
            Incorporating By Reference Future Annual And
            Quarterly Filings ......................................................10

2.    The Defendants Materially Overstated Basin's Q1
2006 Financial Results By Recognizing Revenue On
A Sale That Had Not Been Finalized, And For Which
$1.35 Million Was Uncollectable ............................................11

a)    Jensen Negotiated A Purported $1.5 Million Deal
With Opus Trust And Martin Benowitz; Tekulve
Prepared The Deal Documents ......................................11

b)    Jensen And Tekulve Caused Revenue To Be
Improperly Recognized On The Opus Trust Deal..........17

c)    Jensen And Tekulve Made Misrepresentations
And Omissions Of Material Fact Regarding
The Opus Deal To Basin's Auditors .............................19

d)    Jensen And Tekulve Caused Basin's Materially
False Financial Results To Be Disseminated To
The Investing Public ....................................................22

(1)    The Defendants Issued A False Earnings
Release...............................................................22

(2)    The Defendants Caused The Filing Of A
False First Quarter 2006 10-Q, And Falsely
Certified Its Accuracy .........................................23

(3)    The Defendants Made False And
Misleading Statements In The Q1 2006
Analyst Conference Call ......................................25

3.    The Defendants Materially Overstated Basin's
Year-To-Date Financial Results In Basin's Second
Quarter 2006 Form 10-Q .........................................................26

a)    Jensen And Tekulve Continued To Make
Misrepresentations And Omissions Of
Material Fact Regarding The Opus Deal To
Basin's Auditors ............................................................26

b)    The Defendants Issued A False Earnings Release .........28

ii

c)    The Defendants Caused The Filing Of A
False Second Quarter 2006 10-Q, And
Falsely Certified Its Accuracy ........................................29

d)    The Defendants Made False And Misleading
Statements In The Q2 2006 Analyst
Conference Call ..............................................................30

4.   The Defendants Materially Overstated Basin's
Q3 2006 Revenues By Recognizing $451,000
On A Contingent Sale Of Systems Basin Never
Shipped And Continued To Overstate Basin's
Year-To-Date Results ...............................................................31

a)    Jensen Negotiated A Purported Deal With
Thermax Improperly Based On A Conditional
Purchase Order Of Which Tekulve Was Aware ...........31

b)    Jensen And Tekulve Cause Revenue To Be
Improperly Recognized On The Thermax Deal............35

c)    Jensen And Tekulve Made Misrepresentations
And Omissions Of Material Fact Regarding
The Thermax Deal To Basin's Auditors ......................36

d)    Jensen And Tekulve Caused Basin's Materially
False Financial Results To Be Disseminated
To The Investing Public ..................................................37

(1)    The Defendants Issued A False Earnings
Release...................................................................37

(2)    The Defendants Caused The Filing Of
A False Third Quarter 2006 10-Q, And
Falsely Certified Its Accuracy............................38

(3)    The Defendants Made False And
Misleading Statements In The Q3 2006
Analyst Conference Call ......................................40

iii

5.   The Defendants Materially Overstated Basin's
     FY 2006 Revenues ...................................................................41

     a)   Jensen And Tekulve Continued To Make
          Misrepresentations And Omissions Of Material
          Fact Regarding The Opus Trust And Thermax
          Deals To Basin's Auditors..............................................41

     b)   The Defendants Issued A False Earnings Release .........42

     c)   The Defendants Made False And Misleading
          Statements In The FY 2006 Analyst
          Conference Call .............................................................43

     d)   The Defendants Caused To Be Filed A False
          And Misleading Annual Report On Form 10-K.............44

6.   The Defendants Materially Overstated Basin's
     Q2 2007 And Year-To-Date Revenues By Engaging
     In A Sham $3.8 Million Sale To A Special Purpose
     Entity They Directly Or Indirectly Caused To
     Be Created..................................................................................46

     a)   The Defendants Caused Basin To Recognize
          Revenue On A Sham Transaction ..................................46

     b)   The Defendants Made False Representations
          To Basin's Auditor About The VL Transaction.............52

     c)   Jensen And Tekulve Caused Basin's
          Materially False Financial Results To Be
          Disseminated To The Investing Public...........................54

          (1)   Tekulve Issued A False Earnings Release ...........54

          (2)   The Defendants Caused The Filing
                Of A False Second Quarter 2007 10-Q,
                And Falsely Certified Its Accuracy......................55

iv

(3)   Tekulve Made False And Misleading
Statements In The Q2 2007 Analyst
Conference Call Which Neither He Nor Jensen
Corrected ............................................................57

7.   The Defendants Materially Overstated Basin's
Q3 2007 And Year-To-Date Revenues By Engaging
In A Sham $2.1 Million Sale To Another Special
Purpose Entity Tekulve Caused To Be Created ......................58

a)   Tekulve Caused Basin To Recognize Revenue
On A Second Sham Transaction......................................58

b)   Tekulve Made False Representations To
Basin's Auditor About The WSS Transaction ..............59

c)   Jensen And Tekulve Caused Basin's
Materially False Financial Results To
Be Disseminated To The Investing Public ....................61

(1)   The Defendants Caused The Filing
Of A False Third Quarter 2007 10-Q,
And Falsely Certified Its Accuracy......................61

(2)   Tekulve Caused Basin To Issue A
False Earnings Release.........................................64

(3)   Tekulve Made False And Misleading
Statements In The Q3 2007 Analyst
Conference Call Which Neither He Nor
Jensen Corrected ...................................64

8.   Tekulve Materially Overstated Basin's FY 2007
Revenues ...........................................................65

a)   Tekulve Caused Basin To Recognize Revenues
On Two Additional Sham SPE Transactions .................65

b)   Tekulve Made False Representations To
Basin's Auditor About The Second VL Capital
And WSS Transactions...................................67

          c)     Jensen And Tekulve Caused Basin's
Materially False Financial Results To Be
Disseminated To The Investing Public...........................68

              (1)    Tekulve Caused Issuance Of A False
Earnings Release ..................................68

              (2)    Tekulve Caused The Filing Of A False
2007 Form 10-K, And Falsely Certified
Its Accuracy.........................................70

              (3)    Tekulve Made False And Misleading
Statements In The 2007 Analyst
Conference Call....................................71

E.     Defendant Jensen Engaged In Insider Trading, Gaining
And Realized Over $9 Million From Selling Basin Stock
And Taking Charitable Tax Deductions Of $763,345,
And Failed To Reimburse Basin For His Realized Profits................72

F.     Basin Announced It Intended To Restate Its Financial
Statements For Each Of The Relevant Periods, And
Its Stock Price Collapsed..................................................76

III.    CONCLUSIONS OF LAW .........................................................78

A.    Jurisdiction And Venue........................................................78

B.    The Defendants Violated The Antifraud, Issuer Reporting,
And Record Keeping Provisions, And Tekulve Additionally
Lied To Basin's Auditors ..................................................78

     1.    The Defendants Violated The Antifraud Provisions
Of Section 17(a) Of The Securities Act....................................78

     2.    The Defendants Violated The Antifraud Provisions
Of Section 10(b) Of The Exchange Act And Rule 10b-5
Thereunder, Both As Primary Violators And As Control
Persons .........................................................................79

     3.    Jensen Engaged In Insider Trading............................80

4. The Defendants Are Liable For Violations By Basin Of The Issuer Reporting Provisions, Both As Aiders And Abettors And As Control Persons Of Basin ................................................................. 81

5. The Defendants Violated The Record-Keeping Provisions .................................................................. 81

6. Defendant Tekulve Violated The Prohibition Against Making Misrepresentations And Omissions Of Material Fact To Auditors .................................... 82

7. The Defendants Falsely Certified Basin's Forms 10-K And 10-Q ........................................................ 82

8. The Defendants Failed To Reimburse Basin For Any Bonus Or Other Incentive-Based Or Equity Based Compensation Received From Basin In Violation Of Section 304 Of The Sarbanes-Oxley Act ........... 83

C. The Commission Is Entitled To Relief ................................. 83

1. The Commission Is Entitled To Permanent Injunctive Relief ......................................................... 83

2. Disgorgement Should Be Ordered ........................... 84

3. Reimbursement Should Be Ordered ......................... 85

4. Remedies Act Civil Penalties Should Be Imposed ................ 86

5. Jensen Should Be Ordered To Pay A Triple ITSA Penalty ......................................................... 87

6. Permanent Officer And Director Bars Are Appropriate ......................................................... 87

## I.     INTRODUCTION

Plaintiff Securities and Exchange Commission ("Commission") files this Statement of Uncontroverted Facts and Conclusions of Law in Support of its Motion for Summary Judgment Against Defendant Thomas C. Tekulve, Jr., And for Partial Summary Judgment Against Defendant Peter L. Jensen pursuant to Fed. R. Civ. P. 56(c)(1) and Local Rule 56-1.

## II.    STATEMENT OF UNCONTROVERTED FACTS

### A.     The Defendants And Their Roles As Control Persons

#### 1.     Peter L. Jensen

##### a)     Jensen's Background, Including As An Officer Of Public Companies

1.     **Peter L. Jensen ("Jensen")** was the founder, chief executive officer ("CEO") and chairman of the board of Basin Water, Inc. ("Basin") from December 1999 until February 19, 2008, when he resigned as CEO.  [Exhibit ("Ex.") 1 (Complaint) ¶ 6; Ex. 2 (Jensen Answer) ¶ 6[1]]  Jensen continued to be a member of the board of directors, however, until March 11, 2008.  [Ex. 1 (Complaint) ¶ 6; Ex. 2 (Jensen Answer) ¶ 6]

2.     Prior to founding Basin, Jensen held officer and/or director positions with three other public companies:  first, Jensen was president and member of the board of directors of another public company, Yuba Natural Resources, from 1983-1990, and was also its CEO and chairman from 1989-90; second, he was on the board of directors of a related successor public company, Yuba West Gold, from 1990-92; and third, he was CEO of Western Water from about 1992 to 1997, and its chairman from about 1992 until 1999.  [Ex. 5 (Jensen Deposition ("Depo.")) 17:10-20:17.]

3.     Jensen is presently the CEO of Empire Water Company, a private company that has ownership of a water canal and water assets in Riverside and San

---

[1]     All references to exhibits are to exhibits to the accompanying Declaration of Roberto A. Tercero, unless otherwise stated.

1  Bernardino Counties.  [Ex. 5 (Jensen Depo.) 14:21-15:5.]  Jensen received a

2  masters' degree in Chemical Engineering from the Massachusetts Institute of

3  Technology in 1974.  Jensen resides in San Diego, California.  [Ex. 1 (Complaint)

4  ¶ 6; Ex. 2 (Jensen Answer) ¶ 6.]

5                **b)**     **Jensen's Controlling Role At Basin**

6         4.    During his tenure at Basin, Jensen saw himself as "kind of the deal

7  guy," and "kind of a leader" who would "see opportunities" "to build shareholder

8  value," including by negotiating the deals with Martin Benowitz and Opus Trust

9  and with Thermax discussed below, where he dealt directly with those customers.

10 [Ex. 5 (Jensen Depo.) 51:21-52:21.]

11        5.    During his tenure as Basin's CEO, Jensen was generally aware of how

12 many water systems were under service contracts.  [Ex. 5 (Jensen Depo.) 91:18-

13 91:21.]  In 2006, Jensen was involved in most of the projects, and was generally

14 aware of how many systems had been leased and how many had been sold.  [Ex. 5

15 (Jensen Depo.) 91:22-92:3, 92:5-92:8, 92:10-92:21.]  Although he became less

16 involved after Basin hired Michael Stark ("Stark") as Chief Operating Officer

17 ("COO") in about October 2006, Jensen stayed involved and knew about

18 transactions at least through the end of 2006 because customers contacted him.

19 [Ex. 5 (Jensen Depo.) 92:22-93:2, 93:5-93:14, 94:5.]  Moreover, as set forth below,

20 Jensen continued to review, sign and certify Basin's annual and quarterly filings

21 with the Commission through November 2007, when Basin filed its 10-Q for the

22 quarter ended September 30, 2007.

23        6.    During the period Jensen was CEO, only he and Tekulve were

24 running the company.  [Ex. 5 (Jensen Depo.) 79:11-79:14.]

25        **2.**     **Thomas C. Tekulve, Jr.**

26           **a)**     **Tekulve's Background, Including As An Accountant**

27                    **And Officer Of Public Companies**

28        7.    **Thomas C. Tekulve, Jr. ("Tekulve")** was the chief financial officer

of Basin Water, Inc. from September 2004 to May 2008; he was demoted to the position of Vice President of Business Development in June 2008, in which position he remained until he resigned effective October 8, 2008.  [Ex. 1 (Complaint) ¶ 7; Ex. 3 (Tekulve Answer) ¶ 7; Ex. 6 (Tekulve Depo.) 17:24-18:1.]

8.     Prior to his tenure at Basin, Tekulve was an officer of two other public companies: from 1999 to 2004 he was the VP Finance of Southwest Water, Inc., and from 1994 to 1998 he was the CFO of Safeguard Health Enterprises.  [Ex. 1 (Complaint) ¶ 7; Ex. 3 (Tekulve Answer) ¶ 7; Ex. 6 (Tekulve Depo.) 15:22-16:17.] Tekulve has been employed as director of finance for Primoris Services Corporation, a public company headquartered in Dallas, Texas, since September 2009.  [Ex. 6 (Tekulve Depo.) 12:17-13:21, 13:24-13:25, 14:20-14:20.]  In that capacity, he reports directly to the chief financial officer of Primoris, and assists in the preparation of financial statements, including initially drafting them as well as the company's quarterly and annual filings with the Commission on Forms 10-Q and 10-K.  [Ex. 6 (Tekulve Depo.) 13:22-13:23, 14:5-14:18.]

9.     Tekulve was licensed by the State of Oregon as a certified public accountant in 1978.  [Ex. 6 (Tekulve Depo.) 13:22-13:23, 14:5-14:18.]  During the relevant period, Tekulve's CPA license was on inactive status.  [*Id.*]  Tekulve was a staff auditor for the major accounting firm Arthur Andersen from 1971-78; when he left Arthur Andersen, Tekulve was at least a senior auditor, and he supervised lower level accounting personnel on some audits.  [Ex. 6 (Tekulve Depo.) 11:23-12:16.]  Tekulve earned an MBA degree in 1987.  [Ex. 1 (Complaint) ¶ 7; Ex. 3 (Tekulve Answer) ¶ 7.]  Tekulve resides in Yorba Linda, California.  [*Id.*]

### b)   **Tekulve's Controlling Role At Basin**

10.     As CFO, Tekulve had responsibility for, among other things, Basin's financial structure and organization within Basin.  [Ex. 1 (Complaint) ¶ 7; Ex. 3 (Tekulve Answer) ¶ 7.]  Tekulve created the financial organization within Basin. [Ex. 6 (Tekulve Depo.) 18:5-18:8, 18:15.]  When Tekulve joined Basin, it was

supported by one half-time accountant.  [*Id.*]  Tekulve hired various individuals, including his friend Douglas Hansen, who he hired as Basin's Director of Finance. Tekulve hired Hansen even though Hansen had been enjoined in a previous lawsuit brought against him by the Commission, and barred from appearing or practicing before the Commission as an accountant, facts which Tekulve knew and conveyed to Jensen before Basin became a public company, as explained below.  [*See* Ex. 6 (Tekulve Depo.) 32:11-32:24, 33:14-33:23, 34:13-34:19; Ex. 7 (Hansen Depo.) 29:2-29:3, 46:15-46:20.]

11.    Hansen reported directly to Tekulve.  [Ex. 5 (Jensen Depo.) 64:9-64:14; Ex. 7 (Hansen Depo.) 46:15-46:20.]  In 1994, the Commission had sued Hansen for violation of the antifraud provisions of the federal securities laws. *SEC v. Hansen*, CV94-6548 (C.D. Cal.).  [Ex. 8 (Depo. Ex. 909 (Complaint).)]  On February 16, 1995, a permanent injunction was entered against Hansen pursuant to his consent.  [Exs. 9 & 10 (Depo. Exs. 904 & 905 (Judgment and Consent); Ex. 7 (Hansen Depo.) 22:13-22:22 & 22:21-22:22; 23:4-23:15; 23:18-24:9; 40:17-41:3.] Additionally, Hansen was denied the privilege of appearing or practicing as an accountant before the Commission in a Commission administrative proceeding brought based upon the injunction.  [Ex. 11 (Depo. Ex. 908 (Order)); *see also* Ex. 7 (Hansen Depo.) 25:11-25:16; 25:25-26:3.]  Hansen was also investigated by criminal authorities in connection with the facts alleged in the Commission action; Hansen did not tell Singer Lewak Greenbaum & Goldstein LLP ("SingerLewak"), Basin's auditors, or Jensen or Tekulve about this investigation.  [Ex. 6 (Tekulve Depo.) 33:9-33:13; Ex. 7 (Hansen Depo.) 38:16-39:23; 39:7-39:20.]  Hansen relinquished his CPA license because the California State Board of Accountancy noticed a hearing relating to the allegations made by the Commission.  [Ex. 7 (Hansen Depo.) 16:4-16:13; 16:21-16:23.]

12.    Hansen told Tekulve that he had been sued by Commission when Tekulve interviewed him for a position as controller at Southwest Water, where

both were employed prior to being employed at Basin; Hansen reminded Tekulve that he had been sued by the Commission when Hansen approached him in 2005 about working at Basin, and told Tekulve he should tell Jensen as well. [Ex. 6 (Tekulve Depo.) 32:11-32:24, 33:14-33:23, 34:13-34:19; Ex. 7 (Hansen Depo.) at 35:11-37:14.]

13.    Before Basin hired Hansen, Tekulve did tell Jensen that Hansen had "entered into a consent decree with the Commission that prohibited him from being an officer." [Ex. 5 (Jensen Depo.) 64:18-64:3; *see also* Ex. 6 (Tekulve Depo.) 33:14-33:19, 34:13-34:19.] Tekulve understood that Hansen was not permitted to sign company filings; he nevertheless did not consider whether Hansen should be signing management representation letters to Basin's auditors, which Hansen did, as set forth below. [Ex. 6 (Tekulve Depo.) 33:20-34:9.] Jensen conducted no further investigation regarding Hansen; nor did he discuss the matter with Hansen. [Ex. 5 (Jensen Depo.) 64:18-65:9.]

14.    Tekulve was also responsible for establishing a system of internal controls for the company. [Ex. 6 (Tekulve Depo.) 19:11-19:23.] These "controls" included "vetting" transactions between Tekulve and Hansen. [Ex. 6 (Tekulve Depo.) 19:20-19:23.] Tekulve and Hansen also recommended hiring SingerLewak as Basin's auditor, which recommendation was formally approved by Basin's audit committee. [Ex. 6 (Tekulve Depo.) 19:24-21:5.] SingerLewak was recommended in part because Basin was a small company without a lot of resources, and Tekulve understood that Singer would "work with" Basin, accept its small size, and charge a smaller fee. [Ex. 6 (Tekulve Depo.) 21:6-21:24.]

15.    Tekulve understood that he was ultimately responsible for the accuracy of Basin's financial statements. [Ex. 6 (Tekulve Depo.) 21:25-22:4.] Tekulve also always reviewed the final version of the Management Discussion and Analysis ("MD&A") section of Basin's filings with the Commission, as well as sometimes preparing the first draft of the MD&A. [Ex. 6 (Tekulve Depo.) 22:5-

1   22:9, 22:22-23:13, 23:16-23:19.]  With regard to the remainder of the Forms 10-Q
2   and 10-K, Tekulve acted as both drafter and reviewer, but regardless of who
3   drafted the document, Tekulve always fully reviewed it.  [Ex. 6 (Tekulve Depo.)
4   24:4-24:9, 24:16-24:17, 24:21-25:2.]

5         **B.    The Related Entity**

6         16.    **Basin Water, Inc. ("Basin")** was a Delaware corporation
7   headquartered in Rancho Cucamonga, California.  [Ex. 1 (Complaint) ¶ 8; Ex.2
8   (Jensen Answer) ¶ 8; Ex. 3 (Tekulve Answer) ¶ 8.]  During the relevant period,
9   Basin was engaged in the business of designing, manufacturing and servicing
10  groundwater treatment systems.  [*Id.*]  It was founded by Jensen on or about
11  December 1999.  [*Id.*]  Basin became a public company on May 11, 2006, when its
12  stock was initially registered with the Commission pursuant to Section 12(g) of the
13  Exchange Act, 15 U.S.C. § 78*l*(g).  [Ex. 1 (Complaint) ¶ 8; Ex. 3 (Tekulve
14  Answer) ¶ 8.]  Basin's stock traded on the Nasdaq National Market until July 31,
15  2006, when its common stock became registered pursuant to Section 12(b) of the
16  Exchange Act, 15 U.S.C. § 78*l*(b), and began trading on the Nasdaq Global
17  Market.  [Ex. 1 (Complaint) ¶ 8; Ex. 2 (Jensen Answer) ¶ 8 (admitting Basin stock
18  publicly traded on NASDAQ); Ex. 3 (Tekulve Answer) ¶ 8.]  On July 16, 2009,
19  Basin filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code.  [Ex. 1
20  (Complaint) ¶ 8; Ex. 3 (Tekulve Answer) ¶ 8.]  On August 5, 2009, the Nasdaq
21  delisted Basin's stock effective August 17, 2009.  [Ex. 1 (Complaint) ¶ 8; Ex. 3
22  (Tekulve Answer) ¶ 8.]

23        **C.    Summary Of The Fraudulent Scheme**

24              **1.    Summary Of Overstatements Of Basin's Financial Results**

25        17.    As set forth with particularity below, the Defendants caused material
26  overstatements in almost all of Basin's quarterly filings and both of its annual
27  filings for its fiscal years 2006 and 2007.  On February 10, 2009, after each of the
28  Defendants had resigned from their positions as CEO and CFO, respectively, Basin

restated its financial results, filing amended Forms 10-Q and 10-K for each of the relevant periods.  [*See* Ex. 1 (Complaint) ¶ 9; Ex. 2 (Jensen Answer) ¶ 9; Ex. 3 (Tekulve Answer) ¶ 9; Ex. 12 (Depo. Ex. 845, Restated Forms 10-K).]  The Defendants' fraudulent acts caused the following overstatements of Basin's financial results:

### Basin's Overstated Financial Results – 2006

| | Q1 2006 | Year-To-Date Q2 2006 | Q3 2006 | Year-To-Date Q3 2006 | FY 2006 |
|---|---|---|---|---|---|
| **Reported System Sales** | $3,091,000 | $7,258,000 | $3,936,000 | $11,194,000 | $13,861,000 |
| **Adjusted System Sales** | $1,591,000 | $5,908,000 | $3,484,533 | $9,392,533 | $11,930,283 |
| **Percentage Overstatement of System Sales** | 94% | 23% | 13% | 19% | 16% |
| **Reported Total Revenue** | $3,703,000 | $8,666,000 | $4,846,000 | $13,512,000 | $17,114,000 |
| **Adjusted Total Revenue** | $2,203,000 | $7,316,000 | $4,394,533 | $11,710,533 | $15,183,283 |
| **Percentage Overstatement of Total Revenue** | 68% | 18% | 10% | 15% | 13% |
| **Reported Gross Profit** | $1,147,000 | $2,545,000 | $309,000 | $2,805,000 | $(2,992,000) |
| **Adjusted Gross Profit** | $277,479 | $1,762,431 | $85,765 | $1,231,765 | $(3,789,492) |
| **Percentage Overstatement of Gross Profit** | 313% | 44% | 260% | 128% | 21% |

///
///
///
///

**Basin's Overstated Financial Results – 2007**

| | Q2 2007 | Year-To-Date Q2 2007 | Q3 2007 | Year-To-Date Q3 2007 | Q4 2007 | FY 2007 |
|---|---|---|---|---|---|---|
| **Reported System Sales** | $5,199,0000 | $6,128,000 | $3,773,000 | $9,901,000 | $3,576,000 | $13,477,000 |
| **Adjusted System Sales** | $1,234,746 | $2,163,746 | $1,852,490 | $4,016,236 | $1,474,064 | $5,490,297 |
| **Percentage Overstate-ment of System Sales** | 321% | 183% | 104% | 147% | 143% | 145% |
| **Reported Total Revenue** | $6,414,000 | $8,021,000 | $5,346,000 | $13,367,000 | $5,417,000 | $18,784,000 |
| **Adjusted Total Revenue** | $2,449,746 | $4,056,746 | $3,425,490 | $7,482,236 | $3,315,064 | $10,797,297 |
| **Percentage Overstate-ment of Total Revenue** | 162% | 98% | 56% | 79% | 63% | 74% |
| **Reported Gross Profit** | $25,000 | $(262,000) | $(6,779,000) | $(7,041,000) | $894,000 | $(6,147,000) |
| **Adjusted Gross Profit** | $(515,161) | $(802,161) | $(6,995,399) | $(7,797,560) | $183,706 | $(7,613,857) |
| **Percentage Overstate-ment Gross Profit** | 105% | 67% | 3% | 10% | 387% | 19% |

[Declaration of Roger Boudreau (Commission accountant), ¶¶ 3-16.]

### 2.   Summary Of Jensen's Trading Profits

18.   Beginning on December 12, 2006, and continuing through August 7,

2008, prior to Basin's August 11, 2008, announcement that it would restate its 2006 and 2007 financial statements, Jensen sold 1,860,943 shares of Basin stock and gifted 290,000 more to his *alma mater*, MIT, gaining and realizing profits of $9,029,331 and taking charitable tax deductions of $763,345 (thereby receiving a gain from his tax deductions of approximately $220,655) as set forth below.  [*See* Ex. 1 (Complaint) ¶ 10; Ex. 2 (Jensen Answer) ¶ 10 (admitting that he sold and donated Basin shares from December 12, 2006 through August 11, 2008; Tercero Dec. ¶¶ 78, 92]  Jensen has not reimbursed Basin for any of the profits realized from these sales and gifts of Basin securities.

### 3.   Summary Of Jensen And Tekulve's Compensation, Including Incentive-Based Compensation

19.   During the period when they were causing Basin to fraudulently inflate its revenues and for the twelve-month period following each of the false filings with the Commission, Jensen received $421,894 and Tekulve received $325,144 in salary, and Jensen received $210,385 and Tekulve received $150,000 in bonuses, some or all of which constituted incentive-based compensation.  [Ex. 4 (proxy statement) at 01646660; *see also* Ex. 3 (Tekulve Answer) ¶ 11 (Tekulve admits he received an annual salary of $125,000 in 2005, that his salary increased to $151,250 in the second quarter of 2006, and that his salary later increased to $200,000; he also admits he received a $100,000 bonus in 2007 and a $50,000 bonus in 2008.]  Additionally, during the same period, the Defendants each received equity-based compensation:  Jensen received approximately $73,276 in Basin stock; and Tekulve received approximately $41,243 in Basin stock and $205,037 in Basin stock options.  [Ex. 4 at 01646660; *see also* Ex. 3 (Tekulve Answer) ¶ 11 (Tekulve admits he was granted shares of Basin common stock and options for shares of Basin common stock).]  Neither Jensen nor Tekulve has ever reimbursed Basin for any of this incentive-based or equity-based compensation. [Ex. 3 (Tekulve Answer) ¶ 11.]

**D.    The Defendants Caused Basin To Materially Overstate Its
Financial Results Throughout 2006 And 2007**

20.    With regard to all of the transactions described below, and during the
entire time Tekulve was employed by Basin, Tekulve understood what was
required by Generally Accepted Accounting Principles ("GAAP") to recognize
revenue.  [Ex. 6 (Tekulve Depo.) 17:7-18:4.]  Tekulve correctly understood that
the "four major prongs" of Staff Accounting Bulletin ("SAB") 104 were:

> a.    Evidence of "an agreement between two parties";
>
> b.    A "fixed and determinable price";
>
> c.    Reasonable assurance of collectability;
>
> d.    Provision of either a service or goods.

[*Id.* 17:14-17:20; *see also* Boudreau Declaration ¶ 17 & Ex. 2 thereto at 11-13
(copy of SAB 104) (generally describing the four criteria:  (1) Persuasive evidence
of an arrangement exists; (2) Delivery has occurred or services have been
rendered; (3) The Seller's price to the buyers is fixed or determinable; and (4)
Collectibility is reasonably assured).]

21.    Jensen also understood there were requirements for recognizing
revenue.  Among other things, he understood, based on his experience, that an order
was not valid if it was contingent.  [Ex. 5 (Jensen Depo.) 12:17-12:18.]  He more
specifically understood, including in 2006, that revenue could not be recognized on a
contingent order.  [*Id.* 14:1-14:5.]  Jensen further understood, including in 2006, that
collectability was relevant to recognizing revenue.  [*See id.* 14:6-14:20.]

**1.    Basin Filed A Securities Registration Statement
Incorporating By Reference Future Annual And Quarterly
Filings**

22.    On May 15, 2006, Jensen and Tekulve signed, and Basin filed, a
registration statement on Form S-8 ("S-8 Registration Statement") with the
Commission registering the offering of approximately 6.7 million shares of its

10

common stock, which offering included any shares issuable pursuant to Basin's equity incentive, stock option, and employee stock purchase plans.  [Ex. 1 (Complaint) ¶ 28; Ex. 2 (Jensen Answer) ¶ 28; Ex. 3 (Tekulve Answer) ¶ 28; Ex. 13 (S-8 Registration Statement).]  The S-8 Registration Statement incorporated by reference all documents to be filed by Basin pursuant to Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(c), 78n or 78o(d), after the date of the S-8 Registration Statement and prior to the filing of a post-effective amendment indicating that all securities offered had been sold or deregistering the securities then remaining unsold.  [Ex. 3 (Tekulve Answer) ¶ 28; Ex. 13 (S-8 Registration Statement) at 01645432.]  A document incorporated by reference was to become and became a part of the S-8 Registration Statement from the date that the document was filed with the Commission, including the materially false and misleading Forms 8-K, 10-Q, and 10-K identified in this Statement Of Facts.  [Ex. 13 at 01645432.]

**2.**     **The Defendants Materially Overstated Basin's Q1 2006 Financial Results By Recognizing Revenue On A Sale That Had Not Been Finalized, And For Which $1.35 Million Was Uncollectable**

**a)**     **Jensen Negotiated A Purported $1.5 Million Deal With Opus Trust And Martin Benowitz; Tekulve Prepared The Deal Documents**

23.     In or about December 2005, Jensen contacted Martin Benowitz ("Benowitz"), an attorney he knew represented foreign investors, proposing that an investor group purchase two Basin units in exchange for money and five percent of the shares of BionBasin, Inc. ("BION"), a wholly owned subsidiary of Basin.  [*See* Ex. 1 (Complaint) ¶ 12; Ex. 2 (Jensen Answer) ¶ 12; Ex. 14 (Jensen Testimony ("Test."))[2] 26:23-27:10).]

---

[2]     All references to "testimony" are to testimony taken by the Commission in its investigation that preceded the filing of this action.

24.     Subsequently, on or about December 22, 2005, Tekulve, pursuant to
Jensen's instructions, sent to Benowitz by fax a letter re: "Agreement for purchase of
two Basin Water ion exchange units," copying Jensen by email.  [*See* Ex. 1 (Complaint)
¶ 12; Ex. 2 (Jensen Answer) ¶ 12; Ex. 3 (Tekulve Answer) ¶ 12; Ex. 15 (Tekulve Test.)
20:23-21:18; Ex. 6 (Tekulve Depo.) 40:18-41:12; Ex. 16 (Depo. Ex. 7) (letter).]

25.     Jensen then sent an email to Benowitz instructing him to redline his
comments and return the letter to Tekulve.  [Ex. 17 (Depo. Ex. 9 (email chain)) at
00001914-15.]  After Benowitz did so on December 26, Tekulve emailed him a
revised version, copying Jensen, on December 28.  [Ex. 1 (Complaint) ¶ 12; Ex. 3
(Tekulve Answer) ¶ 12; *see also* Ex. 2 (Jensen Answer) ¶ 12; Ex. 17 (email chain)
at 00001914.]  Benowitz then signed the three page letter as the "legal
representative" of Opus Trust, an investor group purportedly based in the
Caribbean island of Nevis, and faxed it to Tekulve on or about December 29, 2005
(the "Opus Letter").  [*See* Ex. 1 (Complaint) ¶ 12; Ex. 3 (Tekulve Answer) ¶ 12;
Ex. 6 (Tekulve Depo.) 40:1-40:17; Ex. 18 (Depo. Ex. 514, Opus Letter).]

26.     The Opus Letter had a designated space for Jensen to sign on behalf
of Basin in his capacity as Basin's president, which Jensen never signed.  [*See* Ex.
5 (Jensen Depo.) 35:15-36:12 & 36:14; Ex. 6 (Tekulve Depo.) 42:8-42:25; Ex. 19
(Depo. Ex. 223, 3/3/06 email from Tekulve to Jensen).]

27.     The Opus Letter provided, among other things, that:

a.     The agreement was between Basin and Opus [Ex. 18 at
00842086];

b.     The two systems to be sold were units located in the East
Valley Water District [Ex. 18 at 00842086; Ex. 14 (Jensen
Test.) 37:5-38:11];

c.     In addition to the $150,000 down payment for the systems,
which Opus paid by checks transmitted to Tekulve on or about
December 29, 2005 [Ex. 15 (Tekulve Test.) 38:6-38:20; Ex. 20

(Depo. Ex. 4, checks)], Opus was required to pay $1.35 million balance within two years [Ex. 18 at 00842086 at ¶ 2.b.ii.], and Basin would grant Opus Trust 5% or 500,000 shares of stock in its wholly-owned subsidiary, BION, upon Opus Trust's final payment for the units [Ex. 18 at 00842087 at ¶ 6]; and

d.     A "definitive purchase agreement" would be prepared by the seller, Basin, and was subject to review by Opus and its counsel [Ex. 18 at 00842087 at "Other Provisions" ¶ 1.].

[Ex. 18 (Depo. Ex. 514, the Opus Letter); *see also* Ex. 3 (Tekulve Answer) ¶ 13.]

28.     Jensen did not know in 2006, and does not now know, who "Opus Trust" is, who the trustee was, who the beneficiaries were, how many beneficiaries there were, or what assets Opus Trust had; all he knew was that Benowitz had a relationship with them and represented them in some capacity.  [Ex. 5 (Jensen Depo.) 29:7-30:6.]  Jensen took no steps to ensure that Opus Trust had the financial wherewithal to pay the $1.5 million owed pursuant to the Opus Letter. [*Id.* 31:13-31:18.]  Nor did Jensen instruct anyone in Basin's accounting department to look into Opus Trust and determine whether or not it could pay for the units, or discuss with anyone in Basin's accounting department whether Opus Trust could pay for the units.  [*Id.* 31:13-31:4.]

29.     Tekulve also did not know who Opus Trust was beyond "it revolved primarily around" Benowitz, although he does not know Benowitz' specific role; nor does Tekulve recall if there was a trustee or beneficiaries.  [Ex. 6 (Tekulve Depo.) 38:11-38:25, 39:3-39:7, 39:9-39:25.]  Tekulve took no steps, such as requesting or obtaining financial statements, to determine whether collectability was reasonably likely from Benowitz and/or Opus Trust; instead, he relied on the fact that Benowitz had been "a longtime investor" in Basin and "had a relationship with Peter Jensen," even though he had no specific direct knowledge of Benowitz' finances and made no attempt to determine what Opus Trust's finances were, what their assets were or how

1   Basin would obtain payment from Opus Trust if it did not pay timely.  [Ex. 6
2   (Tekulve Depo.) 51:20-53:11. 53:13-53:15; 53:17-53:23, 54:5-54:9.]

3          30.    On December 29, 2005, after receiving the signed Opus Letter from
4   Benowitz as well as an email from Benowitz stating that he would be sending the
5   $150,000 down payment by Federal Express to Basin that evening, Tekulve sent an
6   email to Benowitz stating: "Marty, That's Great!  Next week I'll get going on the
7   definitive agreement.  I hope to have a draft to you by the first part of the week of
8   January 9th."  [*See* Ex. 3 (Tekulve Answer) ¶ 13 (Tekulve admits that Basin received a
9   $150,000 payment for the Opus Trust transaction in December 2005); Ex. 20 (checks).]

10         31.    On March 3, 2006, Tekulve sent an email to Jensen attaching the
11  Opus Letter signed by Benowitz, which included Tekulve's handwritten
12  suggestions for changes to the agreement.  [Ex. 6 (Tekulve Depo.) 42:8-43:4.
13  43:15-46:5; Ex. 19 (Depo. Ex. 223 (3/3/06 email and attachment)).]  Among other
14  suggestions, Tekulve was trying to specifically identify the units to be sold to Opus
15  Trust and Benowitz because Basin's auditors had raised the issue, precluding
16  revenue recognition in December 2005; Tekulve discussed identification of units to
17  be sold with Jensen during the first quarter, which ended March 31, 2006.  [Ex. 6
18  (Tekulve Depo.) 43:18-44:11, 46:12-47:4.]

19         32.    Tekulve's March 3, 2006, email to Jensen stated:
20               Attached is the Benowitz letter.
21               I don't think you or I ever signed it!
22               This copy has the comments I've made – several items I'd like to
23               change/clarify with him, since the December date is not critical.
24               But we'll need this one in Q1 (Obviously).
25  [Ex. 1 (Complaint) ¶ 16; Ex. 3 (Tekulve Answer) ¶ 16; *see also* Ex. 2 (Jensen
26  Answer) ¶ 16; Ex. 5 (Jensen Depo.) 35:15-36:12 & 36:14; Ex. 19 (Depo. Ex. 223,
27  3/3/06 email); Ex. 6 (Tekulve Depo.) 42:8-42:25.]

28         33.    Over three months later, after the close of Basin's first quarter on

March 31, 2006, and after $1.5 million in revenue had been recognized on the
purported transaction with Opus Trust, on or about June 16, Tekulve sent Jensen an
email attaching a redline version of a draft Unit Purchase Agreement with Opus
Trust.  [*See* Ex. 1 (Complaint) ¶ 17; Ex. 3 (Tekulve Answer) ¶ 17 (admitting he
emailed a redlined document he describes as the "Opus Letter" to Jensen on June
16, 2006); Ex. 5 (Jensen Depo.) 67:13-67:23; Ex. 21 (Depo. Ex. 224 (email)).].
The email pointed out, among other things, that the length of time for Opus Trust
to make the final payment had been extended from two to three years, that the units
Opus Trust would own "as of March 30" would be certain units in Salinas, and that
the BION stock would be issued "today," before Opus Trust made its final
payment, because to do otherwise would "reduce today's revenues."  [*See id.*; *see
also* Ex. 2 (Jensen Answer) ¶ 17.]

        34.    Also on June 16, 2006, a SingerLewak auditor, Helen Wuu, emailed
to Tekulve a request for a copy of the "Benowitz Agreement," among other items,
which she described as "All important," in conducting the review of Basin's Q1
financial statements for the period ended March 30, 2006; Tekulve forwarded
Wuu's email to Jensen on June 17, 2006, because he wanted to prompt Jensen to
review the draft agreement he had sent to Jensen on June 16, 2006.  [Ex. 21 (Depo.
Ex. 224 (June 16 email from Tekulve to Jensen attaching draft agreement); Ex. 22
(Depo. Ex. 974 (email); Ex. 5 (Jensen Depo.) 68:22-70:5, 70:8; Ex. 6 (Tekulve
Depo.) 63:23-64:15, 64:16-64:25.]

        35.    On June 20, 2006, Tekulve sent to Benowitz a redline version of the
draft Unit Purchase Agreement, which identified units in Salinas as the units to be
sold to Opus Trust, which differed from the Salinas units identified in the version
he sent to Jensen on June 16.  [*See* Complaint ¶ 18; Ex. 3 (Tekulve Answer) ¶ 18;
*see also* Ex. 6 (Tekulve Depo.) 66:19-67:4; Ex. 24 (Depo. Ex. 225 (email with
draft Agreement).]  It was Tekulve's practice to review redline drafts of the
Agreement before sending them to Benowitz.  [Ex. 6 (Tekulve Depo.) 67:21-68:2.]

36.     Later on June 20, 2006, Benowitz responded with two emails containing additional proposed language.  [Ex. 6 (Tekulve Depo.) 68:23-70:2; Ex. 25 (Depo Ex. 516 (Benowitz email); Ex 26 (Depo. Ex. 517) (Benowitz email).]

37.     On or about June 23, 2006, Tekulve emailed to Benowitz the Opus Agreement, noting in his diary "I finalized the Benowitz deal & sent email off, [Benowitz] will sign in am."  [Ex. 1 (Complaint) ¶ 20; Ex. 3 (Tekulve Answer) ¶ 20.]  On or about June 23, 2006, Benowitz signed and initialed the Opus Agreement on behalf of Opus Trust, and caused it to be faxed to Tekulve.  [*See* Ex. 6 (Tekulve Depo.) 77:15-78:3.]

38.     Sometime after Benowitz signed the Opus Agreement, and possibly as late as September 5, 2006, Jensen signed and initialed the sixteen page "Unit Purchase Agreement" ("Opus Agreement") purporting to be dated "as of March 30, 2006," on behalf of BION.  [*See* Ex. 1 (Complaint) ¶ 19; Ex. 2 (Jensen Answer) ¶ 19; *see also* Ex. 3 (Tekulve Answer) ¶ 19; Ex. 6 (Tekulve Depo.) 54:18-55:12, 78:9-79:4; Ex. 23 (Depo. Ex. 12, the Opus Agreement); Ex. 27 (Depo. Ex. 521, 9/5/06 Tekulve email to auditors attaching Opus Agreement signed by Jensen).]

39.     Certain of the clauses in the Opus Agreement were required to be specifically initialed by the parties, including a clause labeled "Liquidated Damages," which was printed in all capital letters, and which provided that Basin's recovery of damages from the buyer would be limited to the "progress payments" in the event of default by the buyer, which in this case consisted of the $150,000 paid by Benowitz in December 2005.  [Ex. 23 (Opus Agreement) at 9-10 ¶ 18]  Jensen signed the document and initialed this clause.  [*Id.*; Ex. 5 (Jensen Depo.) 33:4-33:21.]  Although Jensen does not have a specific recollection of whether he read the document before signing and initialing it, it was his practice when he signed a contract on behalf of Basin to review the contract before signing it.  [*Id.* 33:22-34:15; 34:17.]  Jensen was also aware when he signed the agreement, that Opus had paid only $150,000 of the purchase price.  [*Id.* 38:5-38:8.]  Tekulve also read the

1   entire agreement before Benowitz signed it.  [Ex. 6 (Tekulve Depo.) 81:12-81:13.]

2                   **b)**     **Jensen And Tekulve Caused Revenue To Be**

3                          **Improperly Recognized On The Opus Trust Deal**

4          40.   The terms of the sixteen page Opus Agreement differ from those in

5   the three page Opus Letter in that:

6                   a.    The Agreement was between BION, rather than Basin, and

7                         Opus Trust;

8                   b.    Different systems, located in Salinas, California, rather than the

9                         East Valley Water District, had been substituted for the units

10                        that were the subject of the Opus Letter;

11                  c.    The Agreement contained a liquidated damages clause, all in

12                        capital letters, limiting Basin's right to recover to payments

13                        already made by Opus Trust should Opus Trust default on its

14                        obligation to purchase the units, which payments totaled

15                        $150,000 at the time the Agreement was executed; and

16                  d.    The balance would be paid by Opus Trust in three years, rather

17                        than two years, and that that period could be extended by two

18                        years upon the request of Opus Trust and payment of an

19                        additional $250,000 by Opus Trust.

20  [*See* Ex. 1 (Complaint) ¶ 21; Ex. 3 (Tekulve Answer) ¶ 21; Ex. 23 (Opus

21  Agreement); Ex. 18 (Opus Letter).]

22         41.   Notwithstanding the liquidated damages clause in the Opus

23  Agreement that meant that Opus Trust would never have to pay the remaining

24  $1,350,000 of the purchase price for the two water systems, and the lack of a

25  definitive agreement on March 30, 2006, reflecting the understanding of the

26  parties, Jensen and Tekulve caused Basin to recognize $1,500,000 in revenue from

27  a purported sale to Opus Trust based on the Opus Letter.  [Ex. 1 (Complaint) ¶ 22;

28  Ex. 3 (Tekulve Answer) ¶ 22 (admitting Basin recognized $1,500,000 in revenue).]

In fact, as of March 30, 2006, Basin had not signed the Opus Letter. Nor had a definitive purchase agreement been prepared or signed by either party.

42. The revenue recognized on the Opus Trust transaction constituted 41% of the company's quarterly revenues. [Ex. 1 (Complaint) ¶ 22; Ex. 3 (Tekulve Answer) ¶ 22 (admitting the $1.5 million in revenue recognized constituted slightly more than 40% of the revenues reported for the first quarter of 2006); Ex. 6 (Tekulve Depo.) 47:19-47:24; *see also* Boudreau Declaration, ¶ 3 (chart).]

43. Moreover, pursuant to the Opus Agreement, Benowitz was receiving payments from Basin. [*See* Ex. 27 (email); Ex. 28 (Depo. Ex. 520 (8/22/06 email from Tekulve to Benowitz explaining amount due Benowitz for April-June 2006 is $45,000.] Jensen and Tekulve were both aware that Benowitz was supposed to receive payments under the Opus Agreement and was complaining about not receiving payments timely from Basin. [*See* Ex. 5 (Jensen Depo.) 49:7-49:18.]

44. Jensen understood at the time that the full amount of the revenue on the Benowitz transaction ($1,500,000) was recognized in the first quarter of 2006, which ended March 30, 2006, and that it would be reported in Basin's first quarter ("Q1") Form 10-Q. [Ex. 5 (Jensen Depo.) 70:23-71:3, 71:5-71:11, 71:16-72:1.] He nevertheless did not discuss with Tekulve the fact that the Benowitz agreement was still in draft form in mid-June. [Ex. 5 (Jensen Depo.) 70:9-70:11, 70:14.]

45. Tekulve also understood that the full $1.5 million was recognized on the transaction with Opus Trust in the first quarter of 2006 ended March 31, 2006 and that it was about 40% of Basin's revenue. [Ex. 6 (Tekulve Depo.) 47:19-47:24.] Tekulve also understood that this amount of revenue was material to Basin; indeed, in his view, "almost everything was material. We were such a small company." [Ex. 6 (Tekulve Depo.) 47:25-48:3, 48:16-48:19, 48:23-48:24.]

///

///

///

18

c)   **Jensen And Tekulve Made Misrepresentations And Omissions Of Material Fact Regarding The Opus Deal To Basin's Auditors**

46.   Jensen never discussed with anyone at SingerLewak, Basin's auditors, the transaction with Benowitz and Opus Trust.  [Ex. 5 (Jensen Depo.) 59:6-59:8.] Nor was Jensen ever present at any discussion with the auditors about the transaction. [*Id.* 59:9-59:13.]  In fact, Jensen never had any conversations with the auditors, beyond being introduced by Tekulve to Gale Moore, the audit partner.  [*Id.* 59:14, 59:17-60:8.]  Nor did Jensen ever consult the auditors about any transaction or ask anyone in the accounting department, including Tekulve, to consult with the auditors about any specific transaction Basin did.  [*Id.* 60:9-60:11, 60:14-60:20, 61:14-61:19.] Similarly, Jensen never asked any attorney for Basin whether the accounting for a specific transaction was proper; nor did he ask Tekulve to ask attorneys for Basin whether accounting for any specific transaction was proper.  [*Id.* 61:20-62:2.]

47.   Tekulve also cannot identify any specific conversation he had with any of the auditors, notwithstanding his statement in an email that he intended to run the Opus deal by the auditors.  [Ex. 6 (Tekulve Depo.) 72:1-73:15, 74:2-74:18, 74:23, 74:25-75:23.]

48.   On June 23, 2006, the same day Benowitz signed the backdated Opus Agreement, Jensen and Tekulve each signed a management representation letter to SingerLewak, Basin's auditors, in connection with SingerLewak's review of Basin's Q1 financial statements.  [Ex. 1 (Complaint) ¶ 23; Ex. 2 (Jensen Answer) ¶ 23; Ex. 3 (Tekulve Answer) ¶ 23; Ex. 5 (Jensen Depo.) 62:3-62:18; Ex. 6 (Tekulve Depo.) 89:18-89:24, 90:24-91:2; Ex. 28 (Depo Ex. 636 (letter)) at 4.]  Jensen and Tekulve confirmed "that we are responsible for the fair presentation of the interim financial information in conformity with accounting principles generally accepted in the United States of America and Rule 10-01(a)-(c) of Regulation S-X."  [Ex. 28 at 1.]  They further represented in this Management Representation Letter, among other things, that:

a.   The interim financial information was presented in accordance with GAAP applicable to interim financial information applied on a basis substantially consistent with the same period in the prior year, the immediately preceding quarter and the prior fiscal year [Ex. 28 at1 ¶ 1];

b.   They had made available to SingerLewak all financial records and related data [Ex. 28 at1 ¶ 2.a.];

c.   They had no knowledge of any fraud or suspected fraud affecting the Company involving management [Ex. 28 at1-2 ¶ 6.a.];

d.   There were no material transactions that had not been properly recorded in the accounting records underlying the interim financial information [Ex. 28 at 2 ¶ 12]; and

e.   No events or transactions other than those disclosed in the interim financial information had occurred subsequent to March 31, 2006 that would require adjustment to, or disclosure in, the interim financial information [Ex. 28 at 3].

[*See also* Ex. 1 (Complaint) ¶ 23; Ex. 3 (Tekulve Answer) ¶ 23.]  Each of these representations was false because recognition of revenue from the Opus Trust transaction did not comply with GAAP, these revenues were material to Basin's financial statements, and the Opus Agreement, finalized after March 31, 2006, on or about the day the management representation letter was signed, differed materially from the Opus Letter upon which revenue recognition had been based.

49.   Specifically, recognizing $1.5 million in revenue from the purported sale to Opus Trust for the quarter ended March 31, 2006, violated the GAAP requirements for recognizing revenue because SAB 104 provides, among other provisions, that for revenue to be recognized:  (1) persuasive evidence of an arrangement must exist; and (2) reasonable assurance of collectability is required

20

(citing Accounting Research Bulletin ("ARB") 43).  [*See* Ex. 1 (Complaint) ¶ 24; Ex. 3 (Tekulve Answer) ¶ 24 (admitting these are some of the revenue recognition criteria of SAB 104); Boudreau Declaration at ¶¶ 17-18 & Exs. 2 (SAB 104) & 3 (excerpt of ARB 43).]  Here, there was no persuasive evidence of an arrangement as of March 31, 2006, when revenue was recognized, because no definitive purchase agreement had been prepared; the parties to the final agreement, executed in June 2006, were different; and the terms of the June 2006 agreement were materially different because different systems were being sold to Opus, a liquidated damages clause had been inserted into the agreement, and the term for payment to Basin had been extended from two years to three years.  Additionally, collectability was not reasonably assured because of the liquidated damages clause, the three year payment period, and Jensen's and Tekulve's utter failure to conduct any due diligence to determine Opus Trust's ability to pay.  In fact, Opus Trust never did make any payments for the systems other than the $150,000 down payment in made in December 2005.  [Ex. 1 (Complaint) ¶ 24; Ex. 3 (Tekulve Answer) ¶ 24.]

50.    Tekulve understood that the auditors were entitled to rely on the representations being made to them in this and other management representation letters. [Ex. 6 (Tekulve Depo.) 27:3-28:12; 90:15-90:18, 90:21-90:23.]

51.    In addition to Jensen and Tekulve signing the Management Representation Letter, the letter was also signed by Hansen, Basin's Director of Finance.  [Ex. 28 (letter) at 5.)]

52.    Neither Jensen, Tekulve nor Hansen ever told anyone at SingerLewak that Hansen had been sued for fraud by the Commission, and subsequently enjoined.  [Ex. 7 (Hansen Depo.) 38:4-38:6; Ex. 5 (Jensen Depo.) 65:10-65:12; Ex. 29 (Moore Depo.) 83:19-83:25, 84:5-84:15; *see also* Ex. 6 (Tekulve Depo.) 34:10-34:12 (does not recall whether or not he informed SingerLewak).]

53.    SingerLewak relied on representations made by Hansen in the management representation letters. [Ex. 29 (Moore Depo.) 84:16-84:22.]  It would

have been material to SingerLewak to know that Hansen had been enjoined in an injunctive action brought by the Commission because it would have been relevant to SingerLewak's evaluation of the integrity of Basin management; for the same reason, it would have been material to SingerLewak to know that Hansen had been suspended from practice before the Commission.  [Ex. 29 (Moore Depo.) 85:1-85:3, 85:10-85:15, 85:17-85:22, 85:25-86:2, 86:4-86:5. ]  Additionally, these facts would have been material to the auditors because they were relevant to whether the auditors could rely on representations made to them in management representation letters and otherwise.  [Ex. 29 (Moore Depo.) 86:6-86:10.]

        **d)**     **<u>Jensen And Tekulve Caused Basin's Materially False Financial Results To Be Disseminated To The Investing Public</u>**

        **(1)**     **<u>The Defendants Issued A False Earnings Release</u>**

54.     On June 26, 2006, Tekulve caused Basin to issue its first quarter earnings release.  [Ex. 1 (Complaint) ¶ 25; Ex. 2 (Jensen Answer) ¶ 25; Ex. 3 (Tekulve Answer) ¶ 25; Ex. 6 (Tekulve Depo.) 94:6-94:15.]  Tekulve caused it to be filed with the Commission on Form 8-K and signed the filing.  [Ex. 3 (Tekulve Answer) ¶ 25; Ex. 30 (Depo Ex. 975, Form 8-K).]  Tekulve participated in drafting the release.  [Ex. 6 (Tekulve Depo.) 94:19-94:21.]  Both Jensen and Tekulve reviewed Basin's earnings releases before they were issued.  [Ex. 5 (Jensen Depo.) 74:13-75:2; Ex. 6 (Tekulve Depo.) 94:6-95:1.]

55.     The headline on the earnings press release was "**Revenues Increase to $3.7 Million, Gross Profit Increase [sic] to $1.1 Million**."  [Ex. 3 (Tekulve Answer) ¶ 25; Ex. 30 at 01645481]  In the release, it is represented that:

> Revenues increased 311% to $3.7 million for the first quarter of 2006 as compared to $0.9 million for the same period of 2005. Revenues from both system sales and contract revenues continue to grow compared to the prior year quarter.

1

2      Gross profit increased for the quarter by 267% to $1.1 million

3      compared to $0.3 million for 2005 as a result of the increased

4      volume in system sales.  Gross profit as a percentage of revenues

5      was 31%. . .

6  [*Id.*; Ex. 30 at 1645481.]

7      56.    Additionally, Jensen is quoted in the press release as saying: "[W]e

8  are pleased with our first quarter results. . . . We anticipate that our revenues will

9  continue to grow during the next several quarters. . . ."  [Ex. 30 at 01645481.]

10  Jensen's practice was to review quotations attributed to him in Basin earnings

11  releases.  [Ex. 5 (Jensen Depo.) 75:3-76:3.]

12      57.    These representations were materially false and misleading because

13  $1.5 million – over half – of Basin's system sales revenues consisted of the

14  improperly recognized revenue from the Opus Trust transaction.

15      58.    The press release also stated that the company would provide more

16  detail regarding its first quarter results in a conference call and webcast to be held

17  at 1:30 p.m. Pacific Time that same day.  [Ex. 30 at 01645481.]  Tekulve had

18  prepared the script and approved the final version of it for that call earlier that day.

19  [*See* Ex. 3 (Tekulve Answer) ¶ 25 (Tekulve admits he drafted "part of" the script);

20  Ex. 6 (Tekulve Depo.) 95:2-95:24.]

21          **(2)    The Defendants Caused The Filing Of A False**

22                  **First Quarter 2006 10-Q, And Falsely Certified**

23                  **Its Accuracy**

24      59.    That same day, Jensen and Tekulve caused Basin to file with the

25  Commission its first quarterly report on Form 10-Q, for its first quarter 2006 ("Q1

26  2006") ended March 31, 2006.  [*See* Ex. 1 (Complaint) ¶ 26; Ex. 2 (Jensen

27  Answer) ¶ 26; Ex. 3 (Tekulve Answer) ¶ 26; Ex. 31 (Depo Ex. 628 (Q1 2006 Form

28  10-Q)).]  Jensen read the Form 10-Q before it was filed, and Tekulve signed the

Form 10-Q as Basin's CFO.  [Ex. 1 (Complaint) ¶ ; Ex. 2 (Jensen Answer) ¶ 26; Ex. 3 (Tekulve Answer) ¶ 26; Ex. 5 (Jensen Depo.) 72:4-72:23 (Jensen's practice was to review and sign).]

60.    Among other results, Basin's Form 10-Q reported system sales of $3,091,000 and total revenues of $3,703,000.  [Ex. 3 (Tekulve Answer) ¶ 26.] These system sales and revenues included the $1,500,000 in revenue purportedly earned from a sale of systems to Opus Trust.  [Ex. 3 (Tekulve Answer) ¶ 26; *see also* Ex. 5 (Jensen Depo.) 73:19-74:5; Ex 30 (10-Q) at 01645443.]  Additionally, the Form 10-Q states that its revenue increased "by $2.8 million, or 313%" from its first quarter of the prior year "occurred primarily as a result of growth in sales of our groundwater treatment systems."  [Ex. 3 (Tekulve Answer) ¶ 26; Ex.30 (10-Q) at 01645452.]  Basin's Form 10-Q does not disclose that 41% of its purported revenues were derived from a purported sale to a single customer for which revenues were not in fact properly recognized.  [*See* Ex. 3 (Tekulve Answer) ¶ 26.] As a result of the improper recognition of revenue, Basin's quarterly revenues were overstated by 68%, its system sales were overstated by 94%, and its gross profits were overstated by 313%.  [*See* Boudreau Declaration ¶ 3 (chart).]

61.    On or about June 26, 2006, Jensen and Tekulve each certified, among other things, with regard to the Form 10-Q, that:

      a.    He had reviewed the Form 10-Q;

      b.    Based on his knowledge, the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

      c.    Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of

operations and cash flows of Basin as of and for the periods presented in the report; and

d.   He had disclosed to Basin's auditors and the audit committee of Basin's Board of Directors any fraud that involved company management.

[Ex. 1 (Complaint) ¶ 27; Ex. 2 (Jensen Answer) ¶ 27; *see also* Ex. 3 (Tekulve Answer) ¶ 27; Ex. 30 (10-Q) at 01645474-77; Ex. 5 (Jensen Depo.) 72:9-72:23; Ex. 6 (Tekulve Depo.) 93:9-93:13.]

62.   Tekulve participated in drafting the Form 10-Q and "absolutely" reviewed the document before signing it.  [Ex. 6 (Tekulve Depo.) 93:14-93:19.] Tekulve understood that he was certifying that the statements were accurate and that they disclosed properly the activities for the quarter.  [Ex. 6 (Tekulve Depo.) 93:20-93:22, 93:24-94:5.]

63.   Jensen understood that he was representing that he had reviewed the entire document when he signed the certifications.  [Ex. 5 (Jensen Depo.) 72:24-73:10.]

64.   These certifications were false in that the Form 10-Q contained material misrepresentations and omissions of material fact regarding Basin's quarterly revenues, and did not fairly represent Basin's financial condition, and Jensen and Tekulve had not disclosed to either Basin's auditors or its audit committee their fraud in causing the improper revenue recognition.

### (3)   The Defendants Made False And Misleading Statements In The Q1 2006 Analyst Conference Call

65.   At about 1:30 p.m. Pacific Time on June 26, 2006, Jensen and Tekulve participated on behalf of Basin in an analyst conference call, for which Tekulve had drafted the script and approved the final version.  [Ex. 32 (Depo. Ex. 976, call transcript ("Tr.")); Ex. 5 (Jensen Depo.) 79:1-79:10; Ex. 6 (Tekulve Depo.) 95:17-95:24.]  Tekulve understood that analysts would rely on statements

made by Basin management during analyst conference calls, and further understood that members of the public could listen to the calls . [Ex. 6 (Tekulve Depo.) 95:25-97:10.]  Among other representations, Jensen stated that:

> Our first quarter 2006 Form 10-Q filed today with the SEC was the first official quarterly filing since the public offering.  We have seen a 311% increase in revenues this quarter, a total of $3.7 million, reflecting a growth both in system sales and contract revenues.
>
> System sales for the quarter grew by over 450% from the same quarter in the prior year.

[Ex. 32 at 01202646.  *See also* Ex. 5 (Jensen Depo.) 79:15-80:1, 80:3-80:5.]

66.    Jensen reviewed the text of his remarks, which were partially prepared and then approved by Tekulve, before each earnings conference call in which he participated.  [Ex. 5 (Jensen Depo.) 80:6-80:23; Ex. 6 (Tekulve Depo.) 95:7-95:9, 95:17-95:24.]  Jensen's above statement was materially false and misleading because $1.5 million of the revenues, or 41%, were revenues that were improperly recognized pursuant to the transaction with Opus Trust.  Jensen similarly falsely represented that "Our gross profits grew significantly, about 267% over the prior year quarter," when in fact gross profits for the period had significantly declined, if the revenue improperly recognized from the Opus Trust transaction was excluded, and gross profits were overstated by 313%.  [Boudreau Declaration ¶ 3 (chart).]

### 3.    The Defendants Materially Overstated Basin's Year-To-Date Financial Results In Basin's Second Quarter 2006 Form 10-Q

#### a)    Jensen And Tekulve Continued To Make Misrepresentations And Omissions Of Material Fact Regarding The Opus Deal To Basin's Auditors

67.    On August 14, 2006, Jensen and Tekulve each signed a management representation letter to SingerLewak, Basin's auditors in connection with

26

SingerLewak's review of Basin's second quarter and year-to-date 2006 financial statements.  [Ex. 5 (Jensen Depo.) 86:20-87:10; Ex. 6 (Tekulve Depo.) 97:22-98:1; Ex. 34 (Depo. Ex. 637 (letter) at 5.]  Hansen also signed the letter.  [Ex. 34 (letter) at 6.]

68.   Jensen and Tekulve confirmed in the letter "that we are responsible for the fair presentation of the interim financial information in conformity with accounting principles generally accepted in the United States of America and Rule 10-01(a)-(c) of Regulation S-X."  [Ex. 3 (Tekulve Answer) ¶ 30; Ex. 34 (Depo. Ex. 637 (letter)) at 1.]  They further represented in this management representation letter, among other things, that:

a.   The interim financial information was presented in accordance with GAAP applicable to interim financial information applied on a basis substantially consistent with the same period in the prior year, the immediately preceding quarter and the prior fiscal year [Ex. 34 at 1 ¶ 1];

b.   They had made available to SingerLewak all financial records and related data [Ex. 34 at 1 ¶ 2.a.];

c.   They had no knowledge of any fraud or suspected fraud affecting the Company involving management [Ex. 34 at 2 ¶ 6.a.];

d.   There were no material transactions that had not been properly recorded in the accounting records underlying the interim financial information [Ex. 34 at 2 ¶ 12]; and

e.   No events or transactions other than those disclosed in the interim financial information had occurred subsequent to June 30, 2006 that would require adjustment to, or disclosure in, the interim financial information [Ex. 34 at 3].

[*See also* Ex. 3 (Tekulve Answer) ¶ 30.]  Each of these representations was false because recognition of revenue from the Opus Trust transaction did not comply with GAAP, and these revenues, constituting 17% of Basin's year-to-date

revenues, were material to Basin's financial statements included in its second quarter financial statements.

### b)   The Defendants Issued A False Earnings Release

69.   On August 14, 2006, Tekulve caused Basin to issue its second quarter 2006 earnings release.  [Ex. 1 (Complaint) ¶ 29; Ex. 2 (Jensen Answer) ¶ 29; Ex. 3 (Tekulve Answer) ¶ 29; Ex. 6 (Tekulve Depo.) 98:6-98:14.]  Tekulve caused it to be filed with the Commission on Form 8-K and signed the filing.  [Ex. 3 (Tekulve Answer) ¶ 29; Ex. 33 (Depo. Ex. 977) Form 8-K; Ex. 6 (Tekulve Depo.) 98:6-98:14).]

70.   The headline on the earnings press release stated in relevant part: "**Quarterly Revenues Increase to $5 Million, Gross Profit to $1.4 Million**."  [Ex. 3 (Tekulve Answer) ¶ 29; Ex. 33 (8-K) at 01645538.]  In the press release, it is represented that:

> Revenues increased by 200% to $8.7 million for the six months
> ended June 30, 2006 compared to $2.9 million for the same period
> in 2005.  Revenue from . . . system sales. . . continue to increase
> compared to the prior year as a result of growth in placement of
> our groundwater treatment systems.
>
> Gross profit for the six months ended June 30, 2006 was $2.5
> million compared to $0.9 million for the same period in 2005.

[Ex. 33 (8-K) at 01645538; Ex. 3 (Tekulve Answer) ¶ 29]

71.   Jensen is quoted in the release as saying "We are pleased with our second quarter results which reflect continued growth in all areas of our business. . . ."  [Ex. 33 (8-K) at 01645539; Ex. 3 (Tekulve Answer) ¶ 29.]  It was Jensen's practice to review his comments set forth in the earnings release before the release was issued.  [Ex. 5 (Jensen Depo.) 87:15-88:9]

72.   The representations in the release were false and misleading because they did not disclose that $1.5 million of the $8.7 million in revenues for the first

six months of 2006 was the revenue that was improperly recognized from the Opus
Trust transaction.

              c)      **The Defendants Caused The Filing Of A False Second
Quarter 2006 10-Q, And Falsely Certified Its
Accuracy**

73.    Also on August 14, 2006, Jensen and Tekulve caused Basin to file
with the Commission its quarterly report on Form 10-Q, for its second quarter
2006 ("Q2 2006") ended June 30, 2006.  [Ex. 1 (Complaint) ¶ 31; Ex. 2 (Jensen
Answer) ¶ 31; Ex. 3 (Tekulve Answer) ¶ 31; Ex. 35 (Depo. Ex. 978 (Form 10-Q)).]
Jensen read and signed the Form 10-Q before it was filed, and Tekulve signed the
Form 10-Q as Basin's CFO.  [Ex. 1 (Complaint) ¶ 31; Ex. 2 (Jensen Answer) ¶ 31;
Ex. 3 (Tekulve Answer) ¶ 31; Ex. 5 (Jensen Depo.) 88:14-88:20.]  Among other
results, Basin's Form 10-Q reported system sales of $7,258,000 for the first six
months of 2006 and total revenues of $8,666,000 for that period.  [Ex. 3 (Tekulve
Answer) ¶ 31.]  These system sales and revenues included the $1,500,000 in
revenue purportedly earned from a sale of systems to Opus Trust.  [Ex. 3 (Tekulve
Answer) ¶ 31.]  Basin's Form 10-Q does not disclose that 17% of its purported
revenues were derived from a purported sale to a single customer for which
revenues were not in fact properly recognized.  [Ex. 3 (Tekulve Answer) ¶ 31.]  As
a result of the improper recognition of the revenue, Basin's year-to-date revenues
were overstated by 18%, its system sales were overstated by 23%, and its gross
profits were overstated by 44%.  [*See* Boudreau Declaration ¶ 3 (chart).]

74.    Jensen understood that the Q2 2006 Form 10-Q, to the extent it
discussed revenues for the year-to-date, included revenues from the transaction
with Benowitz and Opus Trust.  [Ex. 5 (Jensen Depo.) 89:7-89:12.]

75.    On or about August 14, 2006, Jensen and Tekulve each certified,
among other things, with regard to the Form 10-Q, that:

           a.      He had reviewed the Form 10-Q;

b.    Based on his knowledge, the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

c.    Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Basin as of and for the periods presented in the report; and

d.    He had disclosed to Basin's auditors and the audit committee of Basin's Board of Directors any fraud that involved company management.

[Ex. 1 (Complaint) ¶ 32; Ex. 2 (Jensen Answer) ¶ 32; Ex. 3 (Tekulve Answer) ¶ 32; Ex. 35 (10-Q) at 01645531-34; Ex. 5 (Jensen Depo.) 88:21-89:4 & 89:6; Ex. 6 (Tekulve Depo.) 99:2-99:9.]  These certifications were false in that the Form 10-Q contained material misrepresentations and omissions of material fact regarding Basin's year-to-date revenues, and did not fairly represent Basin's financial condition, and Jensen and Tekulve had not disclosed to either Basin's auditors or its audit committee their fraud in causing the improper revenue recognition.

**d)    The Defendants Made False And Misleading Statements In The Q2 2006 Analyst Conference Call**

76.    At about 1:30 p.m. Pacific Time on August 14, 2006, Jensen and Tekulve participated on behalf of Basin in an analyst conference call, for which Tekulve had drafted the script that morning and approved the final version of it. [Ex. 1 (Complaint) ¶ 33; Ex. 2 (Jensen Answer) ¶ 33; Ex. 3 (Tekulve Answer) ¶ 33 (admitting he drafted "some of" the script); Ex. 36 (Depo. Ex. 979 (call Tr.); Ex. 5 (Jensen Depo.) 89:17-89:23; Ex. 6 (Tekulve Depo.) 95:2-95:24, 99:10-99:28.]

77.     When Jensen made statements about revenues in earnings conference
calls, he understood that revenues were "one of the standard metrics to mention in
an earnings call." [Ex. 5 (Jensen Depo.) 90:15-90:17, 90:20-90:22.] In the Q2
2006 analyst conference call, Jensen represented that: "for the six months of 2006,
revenues grew to $8.7 million compared to $2.9 million for the same period in
2005, a 200% increase." [Ex. 3 (Tekulve Answer) ¶ 33; Ex. 5 (Jensen Depo.)
89:24-90:14; Ex. 36 (Tr.) at 00622637.] This statement was materially false and
misleading because $1.5 million of the revenues, or 17%, were revenues that were
improperly recognized pursuant to the transaction with Opus Trust and Opus year-
to-date revenues were overstated by 18%. [Boudreau Declaration ¶ 3 (chart).]

78.     Jensen similarly falsely represented that "Gross profits for the six
month period grew by 177% to 2.5 million compared to 0.9 million in the same
period '05," when in fact gross profits were overstated by 44%. [*See* Ex. 36 (Tr.) at
00622638; Boudreau Declaration ¶ 3 (chart).] Jensen understood that gross profits
were also a standard metric he discussed in earnings conference calls. [Ex. 5 (Jensen
Depo.) 90:25-91:7] He also understood that the revenues and gross profits for the
six month period ended June 30, 2006, discussed in the conference call included the
transaction with Benowitz and Opus Trust. [Ex. 5 (Jensen Depo.) 91:8-91:13.]

**4.      The Defendants Materially Overstated Basin's Q3 2006
Revenues By Recognizing $451,000 On A Contingent Sale
Of Systems Basin Never Shipped And Continued To
Overstate Basin's Year-To-Date Results**

**a)      Jensen Negotiated A Purported Deal With Thermax
Improperly Based On A Conditional Purchase Order
Of Which Tekulve Was Aware**

79.     In 2005, James Sabzali ("Sabzali"), general manager of the chemical
division of Thermax, Inc., contacted Jensen on behalf of Thermax. [Ex. 1
(Complaint) ¶ 34; Ex. 2 (Jensen Answer) ¶ 34.] Sabzali told Jensen that Thermax

1   had a client in Venezuela, PDVSA, for which Thermax was interested in

2   purchasing Basin units.  [Ex. 1 (Complaint) ¶ 34; Ex. 2 (Jensen Answer) ¶ 34.]

3       80.    After protracted negotiations during which Jensen repeatedly pressed

4   Sabzali for Thermax to send him a purchase order, on July 5, 2006, Sabzali sent an

5   email to Jensen and others at Basin stating that PDVSA had verbally committed to

6   buying a softening system from Thermax; that once Thermax received a purchase

7   order and first partial payment from PDVSA which was expected in late August, it

8   would issue a purchase order to Basin, which it expected to do in late September;

9   and that it anticipated shipment by Basin would be needed in early January 2007.

10  [Ex. 37 (Sabzali Depo.) 53:4-53:22; Ex. 38 (Depo. Ex. 26 (email chain); *see also*

11  Ex. 14 (Jensen Test.) 85:13-86:2.]

12      81.    On July 7, 2006, Jensen forwarded the July 5 email from Thermax to

13  Tekulve, whom he had periodically informed regarding the negotiations with

14  Thermax.  [Ex. 38 (email); Ex. 14 (Jensen Test.) 87:18-88:10; *see also* Ex. 1

15  (Complaint) ¶ 34; Ex. 2 (Jensen Answer) ¶ 34.]  Jensen did so because he typically

16  tried to keep Tekulve aware of what was going on as Thermax was an unusual

17  project for Basin, and "it was an endless string of communications from [Sabzali],

18  promises that he did not keep."  [Ex. 14 (Jensen Test.) 87:22-88:10; Ex. 6 (Tekulve

19  Depo.) 101:25-102:6 (Tekulve was aware of Jensen's discussions with Thermax).]

20      82.    On August 18, 2006, Patrick Kelly ("Kelly"), Basin's head of

21  manufacturing, reminded Jensen in an email that, with regard to the potential order

22  from Thermax, Basin had done no engineering work on modifying its units for

23  ocean travel, that "At best all we would be able to accomplish in the way of

24  revenue recognition in Q3, if an order came in Q3, would be parts delivery and

25  some subassembly efforts."  [Ex. 1 (Complaint) ¶ 35; Ex. 2 (Jensen Answer) ¶ 35;

26  *see also* Ex. 3 (Tekulve Answer) ¶ 35.]

27      83.    Jensen repeatedly pressed Thermax for a purchase order, informing

28  Sabzali that Basin needed the purchase order in September before the end of the

quarter because it would be a significant component to Basin's quarterly reported financial information.  [Ex. 1 (Complaint) ¶ 36; Ex. 2 (Jensen Answer) ¶ 36 (admitting Jensen asked Thermax to submit a purchase order); Ex. 14 (Jensen Test.) 83:1-84:5.]

84.    On or about September 25, 2006, Sabzali emailed a memorandum on behalf of Thermax to Jensen "RE: Purchase Order for PDVSA Softening System," which set forth several "caveats" that would apply to the purchase order Thermax "will be sending Basin Water later this month."  [Ex. 1 (Complaint) ¶ 37; Ex. 2 (Jensen Answer) ¶ 37 (admitting Sabzali sent Jensen a document with the above title in September); Ex. 5 (Jensen Depo.) 97:10-98:4; Ex. 39 (Depo. Ex. 512, email and memo).]  These caveats included that the purchase order from Thermax "is predicated on Thermax Inc. receiving a similar purchase order from PDVSA," and that if PDVSA failed to issue a purchase order to Thermax by November 30, Thermax's purchase order to Basin would be canceled.  [Ex. 39 at 01642153 ¶¶ 1 & 2.]

85.    Jensen was angered by the "caveat" that Thermax would have to receive a purchase order from PDVSA before issuing a purchase order to Basin; he therefore called Sabzali and told him this caveat was "unacceptable" and that such a purchase order is "absolutely not valid at all," and that he expected Thermax to send a purchase order without that contingency.  [Ex. 1 (Complaint) ¶ 38; Ex. 2 (Jensen Answer) ¶ 38 (admitting that Jensen informed Sabzali that Basin "would not accept the proposed caveats to Thermax' purchase order and that [Basin] would not agree to a purchase order containing such contingent terms"); Ex. 14 (Jensen Test.) 83:10-84:5; *see also* Ex. 5 (Jensen Depo.) 101:4-101:16, 101:22-102:13.]

86.    Jensen's concern was that the letter from Thermax wasn't valid until Thermax received a purchase order from someone else (PDVSA).  [Ex. 5 (Jensen Depo.) 12:21-13:6, 101:4-101:16, 101:22-102:13.]  It was "clear" to Jensen that the Thermax letter "wasn't something that would do us any good, because we certainly wouldn't do anything without a valid purchase order.  And I didn't believe that [it] was valid,"

1    because he understood "it was not a valid order if it was contingent." [*Id.* 13:6-13:13.]

2    87.    On September 28, 2006, Jensen received by email a purchase order

3    from Thermax. [Ex. 1 (Complaint) ¶ 39; Ex. 2 (Jensen Answer) ¶ 39; *see also* Ex. 3

4    (Tekulve Answer) ¶ 39; Ex. 5 (Jensen Depo.) 102:14-102:22; Ex. 40 (Depo. Ex. 500

5    (purchase order).] The purchase order stated that it was subject to terms and

6    conditions stated on Addendum "A." [Ex. 1 (Complaint) ¶ 39; Ex. 2 (Jensen

7    Answer) ¶ 39; *see also* Ex. 3 (Tekulve Answer) ¶ 39; Ex. 500 at 01643053.] That

8    Addendum contained the provision that the date of shipment and terms and

9    conditions were "TBA," which Jensen understood meant "to be advised." [Ex. 14

10   (Jensen Test.) 101:12-101:17.] Additionally, with respect to the terms and

11   conditions, the purchase order provided that it was "Agreed that the T&C to Basin

12   will reflect the T&Cs on PDVSA's PO [Purchase Order] to Thermax Inc.," which

13   Jensen understood to be similar, if not identical, to the prior memorandum he had

14   rejected. [Ex. 14 (Jensen Test.) 109:25-110:5; Ex. 40 (purchase order); Ex. 41

15   (Depo. Ex. 30) (email and purchase order).]

16   88.    Jensen nevertheless had no discussions and raised no concerns about

17   the purchase order with anyone at Basin; nor did he further discuss this condition

18   with Thermax. [Ex. 14 (Jensen Test.) 110:10-110:14.] Nor did Jensen ask to see the

19   PDVSA purchase order, even though he understood that the terms and conditions

20   were part of the deal, and that those terms and conditions were reflected in a

21   purchase order from PDVSA. [Ex. 5 (Jensen Depo.) 103:23-104:8, 104:18-105:6.]

22   Nor did Jensen, or anyone else to his knowledge at Basin, ever communicate directly

23   with PDVSA. [Ex. 5 (Jensen Depo.) 127:16-127:19.] Indeed, Jensen did not know

24   if the PDVSA purchase order had been issued. [Ex. 5 (Jensen Depo.) 104:23-105:2

25   ("if [the purchase order] was issued, I [Jensen] haven't seen it.").]

26   89.    Also on September 28, 2006, Tekulve received the Thermax purchase

27   order including Addendum A, and forwarded it by email to Hansen, understanding

28   that it was subject to the terms and conditions set forth in Addendum A. [*See* Ex. 3

(Tekulve Answer) ¶ 40; Ex. 6 (Tekulve Depo.) 101:10-101:24; Ex. 15 (Tekulve Test.) 95:12-96:2, 96:23-97:1; Ex. 41 (email and purchase order).]

90.     Notwithstanding that the Thermax purchase order stated that the terms and conditions were reflected on a purchase order from PDVSA, Tekulve never asked Thermax for a copy of the PDVSA purchase order.  [Ex. 6 (Tekulve Depo.) 106:1-106:3]  Tekulve was aware, however, that Kelly was asking for this information from him and/or Jensen, so that he could prepare the unit, including for shipping.  [Ex. 6 (Tekulve Depo.) 106:4-107:8, 107:24.]

91.     Subsequently, Tekulve spoke with Sabzali, and Sabzali told him that he had not received a purchase order yet from PDVSA.  [Ex. 6 (Tekulve Depo.) 107:25-108:13.]  Sabzali told Tekulve he had not received the PDVSA purchase order prior to Basin filing its Form 10-Q for the third quarter of 2006, ended September 30, 2006.  [Ex. 6 (Tekulve Depo.) 108:14-108:16.]  Tekulve never saw a purchase order from PDVSA.  [Ex. 6 (Tekulve Depo.) 105:5-105:7.]

### b)     Jensen And Tekulve Cause Revenue To Be Improperly Recognized On The Thermax Deal

92.     Notwithstanding their understanding that: (1) revenue could not be recognized on a conditional purchase order; and (2) the Thermax purchase order was conditioned on the terms and conditions of a PDVSA order, and Tekulve's additional understanding that the PDVSA order had not been issued at the time that the Thermax order was presented to Basin, $451,000 in revenue was recognized by Basin for the Thermax transaction.  [Ex. 3 (Tekulve Answer) ¶ 42 (admitting figures included $451,000 in revenue from the Thermax transaction); Ex. 5 (Jensen Depo.) 106:17-106:21 (Jensen was aware that about $400,000 in revenue was recognized on the Thermax purchase order).]

93.     Thermax never received a purchase order from PDVSA, and never made any payments to Basin, and Basin never in fact shipped any units to Thermax pursuant to the September 28, 2006, purchase order, notwithstanding that Jensen

was responsible for keeping in contact with Thermax in order to obtain a shipping date from them.  [Ex. 3 (Tekulve Answer) ¶ 46 (admitting that Basin did not receive any payments from Thermax, and did not ship any units to Thermax pursuant to the September 28, 2006, purchase order; Ex. 5 (Jensen Depo.) 130:10-130:13; 132:15-132:19 (admitting Thermax never made any payments on the purchase order, and Basin never shipped any units to Thermax).]

94.    As a result, in addition to there being no persuasive evidence of an arrangement between the parties or reasonable assurance of collectability, no delivery occurred.  Three of the four requirements for revenue recognition were accordingly not met.  [*See* Boudreau Declaration, Ex. 2 (SAB 104).]

**c)**    **Jensen And Tekulve Made Misrepresentations And Omissions Of Material Fact Regarding The Thermax Deal To Basin's Auditors**

95.    On November 14, 2006, Jensen and Tekulve each reviewed and signed a management representation letter to SingerLewak, Basin's auditors.  [Ex. 5 (Jensen Depo.) 132:22-133:9; Ex. 6 (Tekulve Depo.) 118:20-119:3, Ex. 42 (Depo. Ex. 638 (letter)) at 4.]  Hansen also signed the letter.  [Ex. 42 (letter) at 5.]

96.    In the letter, Jensen and Tekulve confirmed "that we are responsible for the fair presentation of the interim financial information in conformity with accounting principles generally accepted in the United States of America and Rule 10-01(a)-(c) of Regulation S-X."  [Ex. 42 at 1.]  They further represented in this management representation letter, among other things, that:

a.    The interim financial information was presented in accordance with GAAP applicable to interim financial information applied on a basis substantially consistent with the same period in the prior year, the immediately preceding quarter and the prior fiscal year [Ex. 42 at 1 ¶ 1];

b.    They had made available to SingerLewak all financial records

1    and related data [Ex. 42 at 1 ¶ 2.a.];

2    c.    They had no knowledge of any fraud or suspected fraud

3          affecting the Company [Ex.42 at 2 ¶ 7.];

4    d.    There were no material transactions that had not been properly

5          recorded in the accounting records underlying the interim

6          financial information [Ex. 42 at 2 ¶ 12]; and

7    e.    No events or transactions had occurred subsequent to

8          September 30, 2006 that would require adjustment to, or

9          disclosure in, the interim financial information [Ex. 42 at 3].

10   Each of these representations was false because recognition of revenue from the

11   Opus Trust and Thermax transactions did not comply with GAAP, and these

12   revenues were material to Basin's year-to-date financial statements included in its

13   third quarter financial statements.

14   **d)    Jensen And Tekulve Caused Basin's Materially False**

15   **Financial Results To Be Disseminated To The**

16   **Investing Public**

17   **(1)    The Defendants Issued A False Earnings Release**

18   97.    On November 14, 2006, Tekulve caused Basin to issue its third

19   quarter 2006 earnings release.  [Ex. 1 (Complaint) ¶ 41; Ex. 2 (Jensen Answer) ¶

20   41; Ex. 3 (Tekulve Answer) ¶ 41; Ex. 43 (Depo Ex. 981 (8-K)).]  Tekulve caused it

21   to be filed with the Commission on Form 8-K and signed the filing.  [*See* Ex. 3

22   (Tekulve Answer) ¶ 41.]

23   98.    The headline on the earnings press release stated in relevant part:

24   "**Quarterly Revenues at $4.8 Million, Nine-Month Revenues Increase 75%**

25   **from 2005 to $13.5 Million.**"  [Ex. 3 (Tekulve Answer) ¶ 41; Ex. 43.]  In the press

26   release, it is represented that:

27   For the third quarter of 2006, revenues of $4.8 million were a slight

28   improvement over the third quarter of 2005.  Meanwhile 2006 nine-

37

month revenues increased by 75% to $13.5 million compared to $7.7
million for the first nine months of 2005.  System sales revenues for
the third quarter 2006 were $3.9 million compared to $4.2 million in
the same period in 2005.

[Ex. 3 (Tekulve Answer) ¶ 41; Ex. 43.]  The above representations were false and
misleading because they did not disclose that $451,000, or 9%, of the $4.8 million
in third quarter revenue was revenue improperly recognized from the Thermax
transaction, and that almost $2 million of the $13.5 million in revenues for the first
nine months of 2006 was revenue that was improperly recognized from the Opus
Trust and Thermax transactions ($1.5 million and $451,000 respectively).  Indeed,
if just the Thermax revenues had not been included, third quarter revenues would
not have been a "slight improvement" over the third quarter of 2005, as falsely
suggested by the headline on the release; instead, they would have been less than
the same period for the prior year.  [Ex. 6 (Tekulve Depo.) 122:1-123:7.]

**(2)      The Defendants Caused The Filing Of A False
Third Quarter 2006 10-Q, And Falsely Certified
Its Accuracy**

99.     Also on November 14, 2006, Jensen and Tekulve caused Basin to file
with the Commission its quarterly report on Form 10-Q, for its third quarter 2006
("Q3 2006") ended September 30, 2006.  [Ex. 1 (Complaint) ¶ 42; Ex. 2 (Jensen
Answer) ¶ 42; Ex. 3 (Tekulve Answer) ¶ 42; Ex. 44 (Depo. Ex. 627 (10-Q)).]
Jensen read the Form 10-Q before it was filed, and Tekulve reviewed it at length
and signed the Form 10-Q as Basin's CFO.  [Ex. 1 (Complaint) ¶ 42; Ex. 2 (Jensen
Answer) ¶ 42; Ex. 6 (Tekulve Depo.) 120:1-120:8.]  Among other results, Basin's
Form 10-Q reported quarterly system sales of $3,936,000 and total revenues of
$4,846,000.  [Ex. 3 (Tekulve Answer) ¶ 42.]  These system sales and revenues
included recognition of $451,000 in revenue purportedly earned from the sale of
systems to Thermax which was not in fact properly recognized.  [Ex. 3 (Tekulve

Answer) ¶ 42 (admitting figures included $451,000 in revenue from the Thermax transaction); Ex. 5 (Jensen Depo.) 106:17-106:21 (Jensen was aware that about $400,000 in revenue was recognized on the Thermax purchase order).]

100.    Additionally, the Form 10-Q reports $11,194,000 in system sales and $13,512,000 in total revenue for the first nine months of 2006.  [Ex. 3 (Tekulve Answer) ¶ 43.]  These systems sales and revenues included almost $2 million in revenues improperly recognized from the Opus Trust ($1.5 million) and Thermax ($451,000) transactions.  [*See* Ex. 3 (Tekulve Answer) ¶ 43.]

101.    On or about November 14, 2006, Jensen and Tekulve each certified, among other things, with regard to the Form 10-Q, that:

   a.    He had reviewed the Form 10-Q;

   b.    Based on his knowledge, the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

   c.    Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Basin as of and for the periods presented in the report; and

   d.    He had disclosed to Basin's auditors and the audit committee of Basin's Board of Directors any fraud that involved company management.

[Ex. 1 (Complaint) ¶ 44; Ex. 2 (Jensen Answer) ¶ 44; Ex. 3 (Tekulve Answer) ¶ 44; Ex. 44 at 01645607-10.]  These certifications were false in that the Form 10-Q contained material misrepresentations and omissions of material fact regarding Basin's quarterly and year-to-date revenues, and did not fairly represent Basin's

financial condition, and Jensen and Tekulve had not disclosed to either Basin's auditors or its audit committee their fraud in causing the improper revenue recognition in connection with the Opus Trust and Thermax transactions.

(3)    **The Defendants Made False And Misleading Statements In The Q3 2006 Analyst Conference Call**

102.    At about 1:30 p.m. Pacific Time on November 14, 2006, Jensen and Tekulve participated on behalf of Basin in an analyst conference call, for which Tekulve had drafted the script that morning, the final version of which he approved. [Ex. 1 (Complaint) ¶ 45; Ex. 2 (Jensen Answer) ¶ 45; Ex. 3 (Tekulve Answer) ¶ 45 (admitting he drafted "some of" the script; Ex. 6 (Tekulve Depo.) 95:2-95:24.]

103.    Among other representations, Jensen represented that "our revenues of $4.8 million were a slight improvement over the prior quarter.  Meanwhile, nine months 2006 revenues increased by 75% to $13.5 million compared to $7.7 million for the nine months of 2005."  [Ex. 5 (Jensen Depo.) 138:11-139:4, 139:7-139:10; Ex. 6 (Tekulve Depo.) 123:8-123:21; Ex. 45 (Depo. Ex. 982 (call Tr.)) at 00248747.] This statement was materially false and misleading because $1.5 million of the revenues and $451,000, totaling 13%, were revenues that were improperly recognized pursuant to the transactions with Opus Trust and Thermax, respectively, and the company's third quarter revenues had, in fact, declined, rather than made a slight improvement over the prior year third quarter.  In fact, the Defendants had caused Basin's quarterly and year-to-date revenues to be overstated by 10% and 15%, respectively; its quarterly and year-to-date system sales to be overstated by 13% and 19%, respectively; and its quarterly and year-to-date gross profits to be overstated by 260% and 128%, respectively.  [*See* Boudreau Declaration ¶ 3 (chart).]

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**5.**      **The Defendants Materially Overstated Basin's FY 2006 Revenues**

     **a)**      **Jensen And Tekulve Continued To Make Misrepresentations And Omissions Of Material Fact Regarding The Opus Trust And Thermax Deals To Basin's Auditors**

104.    On or about March 6, 2007, Tekulve transmitted to the auditors for inclusion in their 2006 audit file, a memorandum entitled "Analysis of Bad Debt Reserve as of 12/31/06," which he had prepared. [Ex. 15 (Tekulve Test.) 121:13-121:21; Ex. 54 (Depo. Ex. 206 (Draft Memo)); Ex. 29 (Moore Depo.) 81:8-81:14, 82:13-82:14, 82:17, 82:25-83:3; Ex. 74 (Depo. Ex. 867) (memo and cover email to SingerLewak)] That memorandum represented that, with regard to the purported Thermax transaction, "Management expects full collection of the entire contract amount. Accordingly, management does not believe that any specific bad debt reserve is necessary as of 12/31/06." [Ex. 54 at 0002640; Ex. 74 at 00080051.] Tekulve made this representation notwithstanding that he knew that the Thermax order was contingent upon the terms and conditions of an order to Thermax from PDVSA, which order he had never seen, and notwithstanding that no payments or shipping instructions had been received by Basin since it received the purported purchase order from Thermax over five months before, on September 28, 2006.

105.    On March 30, 2007, Jensen and Tekulve each signed a management representation letter to SingerLewak, Basin's auditors. [Ex. 1 (Complaint) ¶ 50; Ex. 3 (Tekulve Answer) ¶ 50; *see also* Ex. 2 (Jensen Answer) ¶ 50; Ex. 46 (Depo. Ex. 639 (letter)) at 7 & 8.] Hansen also signed this letter. [Ex. 46 at 9.]

106.    In the letter, Jensen and Tekulve confirmed "that we are responsible for the fair presentation of the interim financial information in conformity with accounting principles generally accepted in the United States of America and Rule 10-01(a)-(c) of Regulation S-X." [Ex. 1 (Complaint) ¶ 50; Ex. 3 (Tekulve Answer)

¶ 50; Ex. 46 at 1.]  They further represented in this Management Representation Letter, among other things, that:

    a.    The financial statements were fairly presented in conformity with GAAP [Ex. 46 at 1 ¶ 1];

    b.    They had made available to SingerLewak all financial records and related data [Ex. 46 at 1 ¶ 2.a.];

    c.    They had no knowledge of any fraud or suspected fraud affecting the Company involving management [Ex. 46 at 1 ¶ 3.a.];

    d.    There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements [Ex. 46 at 3 ¶ 10.r.]; and

    e.    The Company had properly recorded all revenue transactions in accordance with revenue recognition policies, including under the percentage-of-completion method [Ex. 46 at 4 ¶ 20].

[*See also* Ex. 3 (Tekulve Answer) ¶ 50.]

107.   Each of these representations was false because recognition of revenue from the Opus Trust and Thermax transactions did not comply with GAAP, and these revenues were material to Basin's financial statements.

### b)    <u>The Defendants Issued A False Earnings Release</u>

108.   On the morning of March 29, 2007, Tekulve caused Basin to issue its Fiscal Year 2006 earnings release.  [Ex. 1 (Complaint) ¶ 47; Ex. 2 (Jensen Answer) ¶ 47; Ex. 3 (Tekulve Answer) ¶ 47; Ex. 47 (Depo. Ex. 983 (Form 8-K)).]  Tekulve caused it to be filed with the Commission on Form 8-K and signed the filing.  [Ex. 3 (Tekulve Answer) ¶ 47 (admitting he signed the filing); Ex. 6 (Tekulve Depo.) 125:3-125:8 (admitting he caused it to be filed).]

109.   The headline on the earnings press release stated in relevant part: "**Twelve Month Revenues Increase 40% from 2005 to $17.1 Million**"  [Ex. 3

(Tekulve Answer) ¶ 47.]  In the press release, it is represented that:

> For the year ended 2006, revenues increased by 40% to $17.1 million compared to $12.2 million for the year 2005.  For the year, system sales revenues were $13.9 million, compared to $10.0 million in the same twelve-month period in 2005.

[Ex. 3 (Tekulve Answer) ¶ 47; Ex. 6 (Tekulve Depo.) 124:2-124:21.]  Jensen and Tekulve knew these revenues included revenues from the improperly recorded Opus Trust and Thermax transactions.  [Ex. 5 (Jensen Depo.) 142:24-143:17; Ex. 6 (Tekulve Depo.) 124:2-124:18.]  These items, also reported in the annual Form 10-K discussed below, constituted material amounts of the revenue in 2006.  [Ex. 6 (Tekulve Depo.) 124:19-124:21.]

110.   In the release, Jensen is quoted as saying, among other things, that "We have grown our revenues significantly this year."  [Ex. 3 (Tekulve Answer) ¶ 47; Ex. 5 (Jensen Depo.) 142:6-142:12; Ex. 47 at 01645654.]  These statements were false and misleading in light of the fact that almost $2 million – a material portion – of the $17.1 million in revenues was improperly recognized as a result of the Opus Trust ($1.5 million) and Thermax ($451,000) transactions.

c)   **The Defendants Made False And Misleading Statements In The FY 2006 Analyst Conference Call**

111.   At about 1:30 Pacific Time on March 29, 2007, that same day, Jensen and Tekulve participated on behalf of Basin in an analyst conference call, together with Stark, for which call Tekulve had drafted the script that morning, the final version of which he approved.  [Ex. 1 (Complaint) ¶ 48; Ex. 2 (Jensen Answer) ¶ 48; Ex. 3 (Tekulve Answer) ¶ 48; Ex. 6 (Tekulve Depo.) 95:2-95:24.]  Among other representations, Jensen represented that "For the full year 2006, revenues increased by 40% to 17.1 million in 2006 compared to $12.2 million in 2005."  [Ex. 3 (Tekulve Answer) ¶ 48; Ex. 5 (Jensen Depo.) 142:20-143:10; Ex. 6 (Tekulve Depo.) 125:9-125:15; Ex. 60 (Depo. Ex. 984 (call Tr.) 00248655.]  This statement

was materially false and misleading because $1.5 million and $451,000, totaling 11% of Basin's FY 2006 revenue, were revenues that were improperly recognized pursuant to the transactions with Opus Trust and Thermax, respectively.

112.   Jensen also stated in the earnings conference call that "On our sales for standard systems, we recorded revenues of $8 million with a gross margin of 3.5 million, a gross profit margin of 44%.  This is in line with our typical margins." [Ex. 3 (Tekulve Answer) ¶ 49; Ex. 60 (Tr.) at 00248655.]  This statement was materially false and misleading because $1.5 million and $451,000, totaling 11% of Basin's FY 2006 systems revenue, were revenues that were improperly recognized pursuant to the transactions with Opus Trust and Thermax, respectively. Accordingly, Basin's annual revenues were overstated by 13%, its annual system sales were overstated by 16%, and its annual gross profits were overstated by 21%. [*See* Boudreau Declaration ¶ 3 (chart).]

**d)**   **The Defendants Caused To Be Filed A False And Misleading Annual Report On Form 10-K**

113.   On April 2, 2007, Jensen and Tekulve caused Basin to file with the Commission its annual report on Form 10-K, for its fiscal year 2006 ("FY 2006") ended December 31, 2006.  [Ex. 1 (Complaint) ¶ 52; Ex. 2 (Jensen Answer) ¶ 52; Ex. 3 (Tekulve Answer) ¶ 52.]  Jensen read the Form 10-K before it was filed, and Jensen and Tekulve signed the Form 10-K.  [Ex. 1 (Complaint) ¶ 52; Ex. 2 (Jensen Answer) ¶ 52; *see also* Ex. 3 (Tekulve Answer) ¶ 52 (Tekulve admits he signed the Form 10-K.]

114.   Basin's FY 2006 Form 10-K reported system sales of $13,861,000 for the year and $17,114,000 in total revenues for the year.  [Ex. 3 (Tekulve Answer) ¶ 53; Ex. 48 (Depo. Ex. 630 (2006 Form 10-K) at 01645995.]  The Form 10-K represents that "Revenues increased by $4.9 million, or 40%, from 12.2 million in 2005 to $17.1 million in 2006."  [*See* Ex. 48 at 01645995.]  However, Basin's reported system sales and total revenues included the $1,500,000 in revenue purportedly earned from a sale of systems to Opus Trust in Q1 and $451,000 in

revenue purportedly earned from a sale to Thermax in Q3, which amounts were material to Basin's annual revenues.  [Ex. 3 (Tekulve Answer) ¶ 53; Ex. 6 (Tekulve Depo.) 124:5-124:21.]  Basin's Form 10-K does not disclose that 13% of its purported system sales and 11% of its revenues were derived from the sales to Opus Trust and Thermax, for which revenues were not in fact properly recognized. [*See* Ex. 3 (Tekulve Answer) ¶ 53.]  These amounts were material to Basin's annual revenues.  [Ex. 6 (Tekulve Depo.) 124:12-124:21.]

115.   On or about April 2, 2007, Jensen and Tekulve each certified, among other things, with regard to the Form 10-K, that:

    a.    He had reviewed the Form 10-K;

    b.    Based on his knowledge, the Form 10-K did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

    c.    Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Basin as of and for the periods presented in the report; and

    d.    He had disclosed to Basin's auditors and the audit committee of Basin's Board of Directors any fraud that involved company management.

[Ex. 1 (Complaint) ¶ 54; Ex. 2 (Jensen Answer) ¶ 54; Ex. 3 (Tekulve Answer) ¶ 54; Ex. 48 (Form 10-K) at 01646050-53.]  These certifications were false in that the Form 10-K contained material misrepresentations and omissions of material fact regarding Basin's quarterly revenues, and did not fairly represent Basin's financial condition, and Jensen and Tekulve had not disclosed to either Basin's

auditors or its audit committee their fraud in causing the improper revenue recognition in connection with the Opus Trust and Thermax transactions.

**6.      The Defendants Materially Overstated Basin's Q2 2007 And Year-To-Date Revenues By Engaging In A Sham $3.8 Million Sale To A Special Purpose Entity They Directly Or Indirectly Caused To Be Created**

        **a)      The Defendants Caused Basin To Recognize Revenue On A Sham Transaction**

116.   Initially, in most cases Basin was placing units on customer sites and signing long-term leases with those customers.  [Ex. 1 (Complaint) ¶ 55; Ex. 2 (Jensen Answer) ¶ 55; *see also* Ex. 3 (Tekulve Answer) ¶ 55.]  In or about early 2007, Basin began to engage in transactions pursuant to which it recognized additional revenue by purporting to sell the systems rather than by leasing them. Tekulve was primarily responsible for carrying out Basin's plan.  [*See* Ex. 14 (Jensen Test.) 144:23-145:1; Ex. 15 (Tekulve Test.) 164:17-165:2.]

117.   Basin paid a consultant, Charles Litt ("Litt"), to obtain financial partners to facilitate purchase of units from Basin.  [Ex. 3 (Tekulve Answer) ¶ 56 (admitting Litt, a consultant, helped facilitate transactions between Basin and other companies); Ex. 15 (Tekulve Test.) 164:17-165:6.]  Litt introduced Basin to CCH Netherlands and its related companies ("CCH"), and to Lloyd Ward ("Ward"), a Dallas, Texas attorney.  [Ex. 15 (Tekulve Test.) 166:23-167-15.]  Because CCH did not want to do a transaction with Basin in its own name, Ward created VL Capital, LLC ("VL Capital").  [Ex. 15 (Tekulve Test.) 167:16-167:25]  Tekulve understood that Ward was creating VL Capital solely for the transaction with CCH. [Ex. 15 (Tekulve Test.) 168:1-168:3.]  Tekulve was Ward's sole contact at Basin; Ward spoke with Tekulve regularly on the telephone from June 2007 through January 2008.  [Ex. 49 (Ward Test.) 34:14-35:18.]

118.   VL Capital was registered in Delaware as an LLC on June 29, 2007,

one day before the end of Basin's Q2 2007 on June 30, 2007, and Ward was its Managing Member, and sole member.  [Ex. 3 (Tekulve Answer) ¶ 57 (Tekulve admits VL Capital was registered in Delaware on June 29, 2007.]  VL Capital was created to purchase units from Basin.  [Ex. 15 (Tekulve Test.) 168:1-168:3; Ex. 49 (Ward Test.) 34:5-34:7.]  It had no other business.  Accordingly, it was a "special purpose entity" ("SPE").  [*See* Ex. 51 (Depo. Ex. 108 (Agreements and Commitment Letter ("VL Letter") between Basin and VL Capital) at 00002226 (VL Letter) defining the buyer as VL Capital, LLC, "a "Special Purpose bankruptcy remote entity."]  Tekulve received the invoices from Ward relating to formation of VL Capital and drafting of documents relating to the agreements between Basin and VL Capital and VL Capital and CCH; Basin agreed to pay and paid these fees. [Ex. 50 (Test. Ex. 129); Ex. 15 (Tekulve Test.) 239:1-240:16.]

119.   Tekulve knew that VL Capital was a newly formed entity with no assets, and hence no financial statements. [Ex. 6 (Tekulve Depo.) 140:12-140:21.]  Tekulve also knew that absent Basin wanting to sell certain of its systems, VL Capital would not have been created.  [Ex. 6 (Tekulve Depo.) 141:13-141:25 & 141:4.]

120.   Jensen participated with Tekulve in internal Basin discussions about engaging in transactions with VL Capital.   [*See* Ex. 1 (Complaint) ¶ 58; Ex. 2 (Jensen Answer) ¶ 58 (Jensen admits he "may have been present" at internal Basin discussions regarding VL Capital); Ex. 3 (Tekulve Answer) ¶ 58 (Tekulve admits that he participated in internal Basin discussions "together with Mr. Jensen about VL Capital"); Ex. 15 (Tekulve Test.) 185:16-185:18, 187:19-188:16.]

121.   Just before the end of Basin's Q2 2007, Basin purportedly sold and delivered ten operating treatment systems to VL Capital.  [*See* Ex. 3 (Tekulve Answer) ¶ 59.]  Tekulve caused Basin to record $3.8 million in revenue from the sale of these systems, which revenue represented the majority of its quarterly revenues.  [*See* Ex. 3 (Tekulve Answer) ¶ 59.]

122.   Jensen was aware that revenue was recognized in Q2 2007 from the

purported transaction with VL Capital.  [Ex. 14 (Jensen Test.). 150:10-150:15.]

123.    Recognition of the $3.8 million in revenue was improper under GAAP for four reasons:

(1)    **Basin did not have a definitive agreement with VL Capital in Q2 2007.**  Indeed, the purported arrangement between the parties changed several times.

(a)    In a letter dated June 27, 2007, (the "VL Letter"), two days before VL Capital was even legally formed, VL Capital purported to advise Tekulve that it had approved the purchase of treatment systems from Basin, but that such purchase was subject to:  (1) the negotiation and preparation of documentation acceptable to VL Capital and its counsel; (2) the nonoccurrence of any material adverse changes with respect to the financial or business condition of Basin or the parties to any water service agreement; and (3) the final acceptance of the financing terms by VL Capital and its lender, CCH.  [Ex. 51(Depo. Ex. 108) at 00002226.]

(b)    The VL Letter further provided that the "closing" at which VL Capital would deposit a $500,000 down payment and deliver 72 monthly deferred notes of $62,500 each to Basin, would take place "no later than June 30, 2007."  [Ex. 51 at 00002227.]  Tekulve signed this letter as "Acknowledged and Agreed" on or about June 28, 2007.  [Ex. 51 at 00002228; Ex. 15 (Tekulve Test.) 188:25-189:7.]  As set forth below, Basin and VL did not in fact sign agreements (the "VL Agreements") until well after June 30, 2007, the latest possible date for the "closing" and the last day of Basin's second quarter, after $3.8 million had been recognized in revenue.  Nor was the required $500,000 deposit by VL Capital made on or before June 30, 2007, as required by the VL Letter.

(c)    The VL Agreements were signed by Tekulve on behalf of Basin on or about September 14, 2007, and October 19, 2007.  These agreements were the Security Agreement [Ex. 51 at 00002198-2211] and Agreement to Sell & Purchase [Ex. 51 at 00002212-21], each "dated [on the first page] as of September 14, 2007 and effective as of June 30, 2007"; the Escrow Agreement dated on the first page "as of

48

September 14 2007"[Ex 51 at 00002230-42]; and the First Amendment to Escrow Agreement stating on the first page it was "made as of October 19, 2007."  [Ex. 51 at 00002222-25].  The terms of the VL Agreements ultimately signed in fact did differ from the terms set forth in the VL Letter, as explained below.

(2)    **Basin's sale to VL Capital had no economic substance as, under both the VL Letter and the subsequent VL Agreements, all signed by Tekulve, Basin essentially paid VL Capital to purchase the systems.**  Specifically:

(a)    Under the June 27, 2007, VL Letter, VL Capital (which had no assets) was to pay Basin the $5 million purchase price for the ten systems by making a $500,000 cash down payment at the June 30, 2007, closing and 72 monthly "deferred note" payments of $62,500 which would come due beginning April 1, 2008.  [Ex. 51 at 00002227 ]  The source of the $5,000,000, including the $500,000 down payment, was to be the ultimate purchaser of the equipment, CCH, which on June 29, 2007, entered into a separate "Equipment Purchase Facility Commitment" with VL Capital.  [Ex. 52 (Depo. Ex. 112) (CCH Commitment Letter).]  The VL Letter provided that Basin assigned all of its rights to payments from its customers to VL Capital at $69,250 per month, which was not deferred, for 80 months*,* resulting in Basin having paid $500,000 in eight monthly payments beginning in July 2007 prior to the monthly payments owed by VL Capital to Basin commencing on April 1, 2008.  Additionally, once VL Capital began making the monthly payments of $62,500 to Basin, Basin would nevertheless continue to pay VL Capital "for varying amounts, initially at $69,250 per month," which would result in a $6,750 monthly deficit to Basin [*see* Ex. 51 at 00002227];

(b)    Under the Agreement to Sell and Purchase, "made as of the 14th of September, 2007 and effective as of June 30, 2007," VL Capital was to pay Basin $56,250 per month (rather than $62,500) for 72 months beginning April 1, 2008 [Ex. 51 at 00002214 ¶ 5.c.], and, pursuant to the First Amendment to Escrow Agreement, "made as of October 19, 2007," [Ex. 51 at 00002222] no later

1  than "the Closing Date (as defined in the Purchase Agreement)," which new

2  closing date, September 7, 2007 [Ex. 51 at 00002214 ¶ 5], had already passed,

3  Basin itself was to round-trip its cash by depositing $189,000 into an escrow

4  account as part of the $500,000 down payment [Ex. 51 at 00002222 ¶ (3)(a)],

5  which VL Capital was purporting to pay to Basin [Ex. 51 at 00002214 ¶ 5].  The

6  escrow deposits of $189,000 and $311,000 were made on October 19, 2007 by

7  Basin and VL Capital respectively.  [See Ex. 49 (Ward Test.)  92:10-94:2; Ex. 53

8  (Test. Ex. 239) at 00003310.]

9       (3)   **The Agreement to Sell and Purchase made "as of"**

10  **September 14, 2007, contained an added contingency for payment of the**

11  **$500,000 down payment to become due from VL Capital.**

12       (a)   Specifically, Basin had to obtain within 90 days from the

13  new September 7, 2007, date of closing, written consent to the sale of the systems

14  from each of the ten customers who had leased them.  [Ex. 51 at 00002213-14 ¶¶

15  4.b. & 5].  The First Amendment to the Escrow Agreement made "as of October

16  19, 2007" similarly included a provision that, for each Basin client from whom

17  such a consent had been obtained, the escrow agent "shall disburse to an account

18  designated in writing by" Basin from the purchase down payment an amount equal

19  to $50,000, and that the standby fees of those entities that would be paid to Basin

20  would be disbursed by the escrow agent to VL Capital.  [Ex. 51 at 00002222-23 ¶¶

21  (3)(a), (d) & (e); Ex. 49 (Ward Test.) 97:22-98:16.]

22       (b)   Tekulve understood that without the consents by Basin's

23  municipal clients, Basin would not collect the income of $500,000.  [Ex. 15

24  (Tekulve Test.) 198:1-198:12; Ex. 49 (Ward Test.) 98:9-98:16.]  Basin in fact

25  never satisfied this contingency, as Tekulve, who was responsible for obtaining the

26  consents, only obtained four of them.  [Ex. 49 (Ward Test.) 105:17-106:2; Ex. 15

27  (Tekulve Test.) 200:16-201:8 & 202:11-203:24 (four or five of municipalities

28  signed off while Tekulve was employed at Basin, as of early October 2008)]. ;

50

1       (4)   **Collectability was not reasonably assured.**  VL Capital was a

2   newly formed SPE with no operations, and absent each of Basin's customers

3   making payments that Basin had assigned to VL Capital, VL Capital would have

4   been unable in turn to make payments to Basin.

5       124.   Because of these facts, revenue recognition did not comply with

6   GAAP, including SAB 104 and ARB 43, which require that collectability be

7   reasonably assured.  Additionally, because Basin retained a majority of the risk

8   from the transaction, VL Capital's financial statements should have been

9   consolidated with Basin's financial statements under GAAP, specifically Financial

10  Accounting Standards Board Interpretation No. 46 (revised December 2003)

11  ("FIN46R").  [*See* Boudreau Declaration ¶ 19 & Ex. 4 (FIN46R) at 57, ¶ 5, 60, ¶¶

12  12-15, 79, ¶ D.19.]  Ultimately, Basin did determine that such consolidation should

13  occur, and restated its 2007 financial statements to do so, reversing the revenue

14  recognized on this and other SPE transactions.  [*See* Ex. 12 (Depo. Ex. 845

15  (Restatement)) at 01648603, Item 1.]

16      125.   Tekulve understood that Basin, rather than CCH, was "obviously"

17  financing the majority of the transaction, including because "a half million dollars in

18  cash [] was put into the transaction" by Basin.  [Ex. 15 (Tekulve Test.) 196:18-196:23.]

19      126.   Even though Basin was in fact financing the transaction with VL

20  Capital, VL Capital entered into a purported agreement with CCH dated June 29,

21  2007, which described the "transaction structure" as:  "[Basin] will sell the

22  equipment used to perform the WSA [water services] agreements to VL C[apital]

23  and VLC will purchase said equipment utilizing funding from CCH."  [*See* Ex. 3

24  (Tekulve Answer) ¶ 61.]  Tekulve saw or was otherwise aware of this letter.  [Ex.

25  15 (Tekulve Test.) 193:19-194-11; Ex. 52 (CCH Letter) at 00002280.]  Like the

26  original VL Letter, the CCH letter stated that "The initial closing shall take place no

27  later than June 30th 2007," the final day of Basin's second quarter.  [Ex. 52 (CCH

28  Letter) at 00002280.]  This letter was materially misleading, including to Basin's

1   auditors, as the $500,000 deposit payable to Basin was not made by the end of

2   Basin's second quarter on June 30, 2007, and as Basin, not CCH, was, as Tekulve

3   admits, "obviously" financing the majority of the transaction.

### b)   The Defendants Made False Representations To Basin's Auditor About The VL Transaction

6   127.   On or about August 8, 2007, pursuant to a request by Basin's auditor,

7   Hansen prepared a memorandum, or "white paper," which, after being reviewed

8   and approved by Tekulve, was provided to Basin's auditors and discussed with

9   Basin's Audit Committee on or about August 9, 2007.  [*See* Ex. 3 (Tekulve

10  Answer) ¶ 62; Ex. 6 (Tekulve Depo.) 144:21-144:25; Ex. 55 (Depo. Ex. 210 (white

11  paper).]  The "white paper" purported to justify recognition of revenue based on

12  the June 27, 2007, VL Letter signed by Tekulve on June 28.  [Ex. 55 at 1-2.]

13  128.   The memorandum was materially misleading in part because it failed

14  to disclose that VL Capital was an SPE with no operations which Basin caused to

15  be created for the sole purpose of creating purported revenues.  The memorandum

16  was also materially misleading because it failed to explain the timing of the

17  respective payments by Basin and VL Capital to each other, which resulted in

18  Basin effectively financing the transaction.  Specifically, the memorandum does

19  not explain that Basin would be making payments commencing immediately, in

20  July 2007, which payments totaled the $500,000 down payment payable by VL

21  Capital to Basin on April 1, 2008.  Additionally, the memorandum misleadingly

22  states that "collectability is reasonably assured" because VL Capital had "already

23  placed $500,000 in escrow" "as of" June 30, 2007.  [*See* Ex. 3 (Tekulve Answer) ¶

24  62.]  In fact, no monies had yet been deposited into escrow.  Indeed, as set forth

25  above, no monies were deposited until October 19, 2007, almost four months after

26  Basin's second quarter ended, and two months after the white paper was submitted

27  to the auditors.  As explained above, when monies were subsequently deposited on

28  October 19, 2007, pursuant to the VL Agreements rather than the VL Letter,

$189,000 of the funds were deposited by Basin itself, rather than VL Capital.

129.   On August 13, 2007, Tekulve signed a management representation letter to SingerLewak, Basin's auditors.  [Ex. 6 (Tekulve Depo.) 156:16-156:22; Ex. 56 (Depo. Ex. 641 (letter)) at 4.]  Hansen also signed the letter.  [Ex. 56 at 5.] In the letter, Tekulve confirmed "that we are responsible for the fair presentation of the interim financial information in conformity with accounting principles generally accepted in the United States of America and Rule 10-01(a)-(c) of Regulation S-X."  [Ex. 56 at 1.]  He further represented in this management representation letter, among other things, that:

a.   The interim financial information was presented in accordance with GAAP applicable to interim financial information applied on a basis substantially consistent with the same period in the prior year, the immediately preceding quarter and the prior fiscal year [Ex. 56 at 1 ¶ 1];

b.   He had made available to SingerLewak all financial records and related data [Ex. 56 at 1 ¶ 2.a.];

c.   He had no knowledge of any fraud or suspected fraud affecting the Company involving management [Ex. 56 at 1 ¶ 6.a.];

d.   There were no material transactions that have not been properly recorded in the accounting records underlying the interim financial information [Ex. 56 at 2 ¶ 12];

e.   He had responded fully to all inquiries made by the auditors [Ex. 56 at 2 ¶ 15];

f.   "[T]he transaction with VL Capital on June 28, 2007 for the sale of 10 water treatment units is recorded in the proper period and the valuation of the transaction is proper in accordance with [GAAP]" [Ex. 56 at 3 ¶ 18]; and

g.   No events or transactions other than those disclosed in the

interim financial information had occurred subsequent to June 30, 2007, that would require adjustment to, or disclosure in, the interim financial information [Ex. 56 at 3].

Each of these representations was false because recognition of revenue from the VL Capital transaction did not comply with GAAP, and these $3.8 million in revenues constituted over half of Basin's second quarter revenues and were material to Basin's financial statements.

        **c)**     **<u>Jensen And Tekulve Caused Basin's Materially False Financial Results To Be Disseminated To The Investing Public</u>**

        **(1)**     **<u>Tekulve Issued A False Earnings Release</u>**

130.   On August 13, 2007, Tekulve caused Basin to issue its Q2 2007 earnings release for release the next day.  [Ex. 1 (Complaint) ¶ 64; Ex. 2 (Jensen Answer) ¶ 64; Ex. 3 (Tekulve Answer) ¶ 64.]  Tekulve caused it to be filed August 14, 2007, with the Commission on Form 8-K and signed the filing.  [Ex. 3 (Tekulve Answer) ¶ 64; Ex. 6 (Tekulve Depo.)159:19-159:95; Ex. 57 (Depo. Ex. 985 (8-K).]

131.   The headline on the earnings press release stated in part: "**Quarterly Revenues at $6.4 Million**"  [Ex. 3 (Tekulve Answer) ¶ 64.]  In the press release, it is represented that:

For the second quarter of 2007, revenues of $6.4 million increased $1.4 million when compared to revenues of $5.0 million in the second quarter of 2006, a 28% increase.  System sales revenues were $5.2 million for the second quarter of 2007, compared to $4.2 million in the same period in 2006.  As anticipated, the increase in system sales revenue this quarter was due primarily to a third party financing arrangement whereby Basin Water sold 10 water treatment systems of various capacities which had previously been placed with customers.

[Ex. 3 (Tekulve Answer) ¶ 64; Ex. 57 at 01646188.]  The release also reported that six

1  month results included revenues of $8 million.  [Ex. 3 (Tekulve Answer) ¶ 64; Ex. 57

2  at 01646188.]  All of these representations were materially false and misleading as the

3  $3.8 million in revenue recognized from the VL Capital transaction was not, in fact,

4  the result of a "third party financing arrangement," had no economic substance, and

5  was material to both the quarterly and year to date revenues.

6          **(2)**     **The Defendants Caused The Filing Of A False**

7                 **Second Quarter 2007 10-Q, And Falsely**

8                 **Certified Its Accuracy**

9       132.   On or about August 14, 2007, Tekulve also caused Basin to file with

10  the Commission its quarterly report on Form 10-Q, for its second quarter 2007

11  ("Q2 2007") ended June 30, 2007.  [Ex. 1 (Complaint) ¶ 65; Ex. 2 (Jensen Answer)

12  ¶ 65; Ex. 3 (Tekulve Answer) ¶ 65; Ex. 58 (Depo. Ex. 211(10-Q)).]  Jensen read

13  the Form 10-Q before it was filed, and Tekulve signed the Form 10-Q as Basin's

14  CFO.  [Ex. 1 (Complaint) ¶ 65; Ex. 2 (Jensen Answer) ¶ 65; Ex. 3 (Tekulve

15  Answer) ¶ 65.]  Among other results, Basin's Form 10-Q reported second quarter

16  system sales of $5,199,000 and total revenues of $6,414,000, and year to date

17  system sales of $6,128,000 and total revenues of $8,666,000.  [Ex. 1 (Complaint) ¶

18  65; Ex. 3 (Tekulve Answer) ¶ 65; Ex. 58 at 00002948.]  These system sales and

19  revenues included the $3.8 million in revenue purportedly earned from the sale of

20  systems to VL Capital.  [Ex. 3 (Tekulve Answer) ¶ 65.]

21       133.   In describing Basin's revenues, the Form 10-Q states that:

22       Revenues from system sales increased $1.0 million, or 24%, in the

23       second quarter of 2007 when compared to the same period in 2006.

24       This was due to the previously announced third party financing

25       arrangement whereby we sold 10 water treatment systems of various

26       capacities for $3.8 million which had previously been placed with

27       customers to a third party affiliate of a bank.

28  [Ex. 3 (Tekulve Answer) ¶ 65; Ex. 58 at 00002963.]  This statement is false and

misleading as the "third party" to which Basin claims to have sold the systems was in fact an SPE created solely for making the purchase of these systems and substantially increasing Basin's quarterly revenues, and the "financing" was, in fact, substantially provided by Basin.  As a result of the improper recording of the $3.8 million in revenue, Basin's Q2 and year-to-date revenues were overstated by 162% and 98%, respectively; its Q2 and year-to-date system sales were overstated by 321% and 183%, respectively; and its Q2 and year-to-date gross profits were overstated by 105% and 67%, respectively.

134.    On or about August 14, 2007, Jensen and Tekulve each certified, among other things, with regard to the Form 10-Q, that:

a.    He had reviewed the Form 10-Q;

b.    Based on his knowledge, the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

c.    Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Basin as of and for the periods presented in the report; and

d.    He had disclosed to Basin's auditors and the audit committee of Basin's Board of Directors any fraud that involved company management.

[Ex. 1 (Complaint) ¶ 66; Ex. 2 (Jensen Answer) ¶ 66; Ex. 3 (Tekulve Answer) ¶ 66; Ex. 58 at 00002977-80.]

135.    Jensen was, at a minimum, reckless in certifying the Form 10-Q, as he claims he asked no questions about note 6 to the financial statements, regarding the

VL Capital transaction [Ex. 58 at 00002958]; nor did he ask any questions about the transaction in light of its size to Tekulve, Stark, the auditors or Basin's counsel.  [*See* Ex. 5 (Jensen Depo.) 145:3-148:7, 148:9-15; Ex. 6 (Tekulve Depo.) 158:25-159:18.] The certifications by both Jensen and Tekulve were false in that the Form 10-Q contained material misrepresentations and omissions of material fact regarding Basin's quarterly and year to date revenues, and did not fairly represent Basin's financial condition, and Jensen and Tekulve had not disclosed to either Basin's auditors or its audit committee the fraud in causing the improper revenue recognition.

### (3)  Tekulve Made False And Misleading Statements In The Q2 2007 Analyst Conference Call Which Neither He Nor Jensen Corrected

136.   At about 1:30 p.m. Pacific Time on August 14, 2007, Jensen and Tekulve participated on behalf of Basin in an analyst conference call, together with Stark, for which call Tekulve had drafted the script the previous day.  [Ex. 1 (Complaint) ¶ 67; Ex. 2 (Jensen Answer) ¶ 67; Ex. 3 (Tekulve Answer) ¶ 67 (admitting he drafted "some of" the script; Ex. 5 (Jensen Depo.) 150:5-151:10; Ex. 6 (Tekulve Depo.) at 160:12-160:17; Ex. 59 (Depo. Ex. 832 (call Tr.)).]

137.   Among other representations, in response to a specific question by an analyst asking "[H]ow many [systems] have been third-party financed?" Tekulve represented that Basin had "third party financed" thirteen systems, including "today's 10," and that "there is a total of 10 systems that were sold."  [Ex. 3 (Tekulve Answer) ¶ 67; Ex. 59 at 6.]  This representation, which was misleading because the "third party financing" was in fact substantially provided by Basin itself, was not corrected by either Jensen or Tekulve to disclose the material facts surrounding the purported sales to VL Capital, or that the revenue from these purported sales was, in fact, improperly recognized.  [*See* Ex. 3 (Tekulve Answer) ¶ 67; Ex. 59.]

///

///

7.    **The Defendants Materially Overstated Basin's Q3 2007 And Year-To-Date Revenues By Engaging In A Sham $2.1 Million Sale To Another Special Purpose Entity Tekulve Caused To Be Created**

    a)    **Tekulve Caused Basin To Recognize Revenue On A Second Sham Transaction**

138.   Water Services Solutions, LLC ("WSS") was registered as an LLC on September 27, 2007, three days before the end of Basin's Q3 2007 on September 30, 2007.  [Ex. 3 (Tekulve Answer) ¶ 68.]  Ward was its Managing Member, and sole member.  Like VL Capital, WSS was created solely to purchase units from Basin.  It had no other business.  Accordingly, like VL Capital, it was an SPE.

139.   Seventeen days before it was legally formed, on September 10, 2007, WSS purportedly transmitted a letter to Tekulve signed by Ward, which proposed that WSS purchase systems then being manufactured by Basin for lease to the City of Cottonwood for $4.4 million less the present value of expected costs of insurance and property taxes related to the purchase (the "WSS Letter").  [*See* Ex. 1 (Complaint) ¶ 69; Ex. 3 (Tekulve Answer) ¶ 69 (admitting receiving the letter); Ex. 15 (Tekulve Test.) 257:12-258:4; Ex. 61 (Depo. Ex. 731 (WSS Letter)); Ex. 67 (Ward Depo.) at 211:18-212:8.]  Tekulve signed the WSS Letter as "acceptable and agreed to" on or about September 24, 2007. [Ex. 61 at 01425650.]

140.   Tekulve caused Basin to recognize $2.1 million in revenue in Q3 2007 relating to the purported sale of the units to WSS based on the "percentage of completion method" for recognizing revenue.  [*See* Ex. 3 (Tekulve Answer) ¶ 70 (admitting Basin recognized $2.1 million in revenue in Q3 2007 for the WSS transaction).]  Recognition of this revenue was improper, however, because:

    a.    **Basin did not have a definitive agreement with WSS, as required by the WSS letter.**  Such agreement (the WSS Agreement") was not prepared and signed by Tekulve until the end of the next quarter, December 2007,

and was made "as of December 27, 2007 and effective as of September 24, 2007" [Ex. 15 (Tekulve Test.) 272:7-272:19; Ex. 62 (Test. Ex. 214 (WSS Agreement)) at 00002997]; additionally, the WSS Agreement contained materially different terms, such as a lower purchase price of $3,845,073, and payment of the $25,000 down payment at the December 27, 2007, closing date [Ex. 62 at 00002997 ¶ 2 & 00002999 ¶ 5 & 5.b.];

b. **WSS had not made the initial down payment of $25,000 required by the WSS Letter "to be held in escrow pending execution of definitive documentation" and in fact, never paid it.** [Ex. 15 (Tekulve Test.) 261:1-261:9; Ward Depo. (Ex 67) at 211:20-211:24 & 214:2-214:6];

c. **Collectability was not probable.** WSS had no assets and was dependent on a $2.1 million loan from a third party, National City Energy Capital, LLC based in Cincinnati, Ohio. The initial closing date of the loan was December 31, 2007, as set forth in the September 28, 2007, correspondence from National City to WSS which Tekulve received that same day; however, that loan was never finalized or funded. [Ward Depo. (Ex 67) at 211:20-211:24 & 214:2-214:6, 214:18-215:1; *see also* Ex. 15 (Tekulve Test.) 265:8-265:10, 266:10-266:22, 277:13-277:20 (National City "walked away" from the transaction in the summer of 2008)]; and

d. **Delivery by Basin of the systems, which were being manufactured, had not occurred.** [Ex. 15 (Tekulve Test.) 265:11-266:9].

b) <u>**Tekulve Made False Representations To Basin's Auditor About The WSS Transaction**</u>

141. On or about October 31, 2007, pursuant to a request by Basin's auditor, Hansen, prepared a second memorandum, or "white paper," regarding the WSS transaction, which, after being reviewed and approved by Tekulve on or about November 1, was provided to Basin's auditors. [*See* Ex. 3 (Tekulve Answer) ¶ 71; Ex. 15 (Tekulve Test.) 283:8-284:1; Ex. 63 (Depo. Ex. 215 (white paper)).] The memorandum purported to justify recognition of revenue based on the September

59

10, 2007, WSS Letter signed by Tekulve on September 24.  The memorandum was materially misleading in part because it failed to disclose that WSS was an SPE with no operations which Basin caused to be created for the sole purpose of creating purported revenues.  Additionally, the memorandum misleadingly states that "collectability is reasonably assured" because WSS "is backed by National City, a large Chicago bank."  [*See* Ex. 3 (Tekulve Answer) ¶ 71 (admitting the memorandum makes these statements); Ex. 63 at 4.]  In fact, "National City" was National City Energy Capital LLC, based in Cincinnati, Ohio.  Additionally, the memorandum falsely states the $25,000 deposit had been made into an escrow account when in fact no such deposit had been made.  [Ex. 63 at 4.]  Tekulve made this representation to the auditors without, in fact, knowing if the deposit had been made.  [Ex. 6 (Tekulve Depo.) at 166:17-166:24.]  In fact, as stated above, the National City financing and $25,000 escrow deposit never occurred.

142.   On November 13, 2007, Tekulve signed a management representation letter to SingerLewak, Basin's auditors.  [Ex. 1 (Complaint) ¶ 72; Ex. 3 (Tekulve Answer) ¶ 72; Ex. 6 (Tekulve Depo.) 170:3-170:7; Ex. 64 (Depo. Ex. 642 (letter).] Hansen also signed the letter.

143.   Tekulve confirmed "that we are responsible for the fair presentation of the interim financial information in conformity with accounting principles generally accepted in the United States of America and Rule 10-01(a)-(c) of Regulation S-X." [Ex. 1 (Complaint) ¶ 72; Ex. 3 (Tekulve Answer) ¶ 72; Ex. 64 at 1.]  He further represented in this management representation letter, among other things, that:

a.   The interim financial information was presented in accordance with GAAP applicable to interim financial information applied on an basis substantially consistent with the same period in the prior year, the immediately preceding quarter and the prior fiscal year [Ex. 64 at 1 ¶ 1];

b.   He had made available to SingerLewak all financial records and

related data [Ex. 64 at 1 ¶ 2.a.];

    c.    He had no knowledge of any fraud or suspected fraud affecting the Company involving management [Ex. 64 at 2 ¶ 6.a.];

    d.    There are no material transactions that have not been properly recorded in the accounting records underlying the interim financial information [Ex. 64 at 2 ¶ 12];

    e.    He had responded fully to all inquiries made by the auditors [Ex. 64 at 2 ¶ 15];

    f.    "[T]he transaction with Water Services Solutions, LLC (WSS) on September 24, 2007 of [sic] water treatment units is recorded in the proper period and the valuation of the transaction is proper in accordance with [GAAP]" [Ex. 64 at 3 ¶ 18]; and

    g.    No events or transactions other than those disclosed in the interim financial information have occurred subsequent to September 30, 2007, that would require adjustment to, or disclosure in, the interim financial information [Ex. 64 at 3].

[*See also* Ex. 1 (Complaint) ¶ 72; Ex. 3 (Tekulve Answer) ¶ 72.]  Each of these representations was false because recognition of revenue from the WSS transaction did not comply with GAAP, and these revenues were material to both Basin's third quarter 2007 and year-to-date financial statements.

    c)    **Jensen And Tekulve Caused Basin's Materially False Financial Results To Be Disseminated To The Investing Public**

        (1)    **The Defendants Caused The Filing Of A False Third Quarter 2007 10-Q, And Falsely Certified Its Accuracy**

144.   On or about November 13, 2007, Tekulve caused Basin to file with

the Commission its quarterly report on Form 10-Q, for its third quarter 2007 ("Q3 2007") ended September 30, 2007.  [Ex. 1 (Complaint) ¶ 73; Ex. 2 (Jensen Answer) ¶ 73; Ex. 3 (Tekulve Answer) ¶ 73; Ex. 65 (Depo. Ex. 235 (10-Q)).] Jensen read and signed the Form 10-Q before it was filed, and Tekulve signed the Form 10-Q as Basin's CFO.  [Ex. 1 (Complaint) ¶ 73; Ex. 2 (Jensen Answer) ¶ 73; Ex. 3 (Tekulve Answer) ¶ 73.]

145.   Among other results, Basin's Form 10-Q reported system sales of $3,773,000 and total revenues of $5,346,000.  [Ex. 3 (Tekulve Answer) ¶ 73; Ex. 65 at 00003133.]  These system sales and revenues included the $2.1 million in revenue purportedly earned from the sale of systems to WSS.  [Ex. 3 (Tekulve Answer) ¶ 73.]  This resulted in material overstatements of Basin's quarterly system sales and total revenues of 104%, and 56%, respectively.  [Boudreau Declaration ¶ 3 (chart).]

146.   Additionally, the Form 10-Q reports for the nine months ended September 30, 2007, $9,901,000 in system sales and $13,367,000 in total revenues [Ex. 65 at 00003133.], which revenues include both the $3.8 million in revenue purportedly earned from the sale of systems to VL Capital, and the $2.1 million in revenue from the purported sales to WSS.  This resulted in material overstatements of Basin's year-to-date system sales, total revenues and gross profits of 147%, 79% and 10%, respectively.  [*See* Ex. 3 (Tekulve Answer) ¶ 73 (admitting the VL and WSS revenues were 44% of year-to-date revenues); Boudreau Declaration ¶ 3 (chart).]

147.   The Q3 Form 10-Q also included only the specific disclosure regarding the revenues recognized from the transaction with VL Capital in the second quarter, and no similar or other disclosure regarding the transaction that quarter with WSS pursuant to which $2.1 million in revenue was recognized.  [*See* Ex. 65 at 00003145 Note 7 & 00003155 (describing revenues for the nine month period ended September 30, 2007).]

148.   On or about November 13, 2007, Jensen and Tekulve each certified,

among other things, with regard to the Form 10-Q, that:

      a.     He had reviewed the Form 10-Q;

      b.     Based on his knowledge, the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by the report;

      c.     Based on his knowledge, the financial statements, and other financial information included in the report fairly presented in all material respects the financial condition, results of operations and cash flows of Basin as of and for the periods presented in the report; and

      d.     He had disclosed to Basin's auditors and the audit committee of Basin's Board of Directors any fraud that involved company management.

[Ex. 1 (Complaint) ¶ 74; Ex. 2 (Jensen Answer) ¶ 74; Ex. 3 (Tekulve Answer) ¶ 74.] These certifications were false in that the Form 10-Q contained material misrepresentations and omissions of material fact regarding Basin's quarterly revenues, and did not fairly represent Basin's financial condition, and Jensen and Tekulve had not disclosed to either Basin's auditors or its audit committee their fraud in causing the improper revenue recognition.

     149.   Jensen certified the Form 10-Q knowing that WSS "was one of these financing deals," not knowing whether the disclosures regarding the $3.8 million in revenue recognized for a "third party financing arrangement" related to the VL Capital transaction for the prior quarter, and not having had any discussions with anyone about whether or not specific disclosure should be made of the WSS transaction. [Ex. 5 (Jensen Depo.) 151:11-152:20 & 152:24-153:9.]

///

(2)    **Tekulve Caused Basin To Issue A False**
**Earnings Release**

150.   On the morning of November 14, 2007, Tekulve caused Basin to issue its Q3 2007 earnings release.  [Ex. 1 (Complaint) ¶ 75; Ex. 2 (Jensen Answer) ¶ 75; Ex. 3 (Tekulve Answer) ¶ 75.]  Tekulve caused it to be filed with the Commission that day on Form 8-K and signed the filing.  [Ex. 3 (Tekulve Answer) ¶ 75 (admits he signed the filing), Ex. 65 (Depo. Ex. 986 (8-K).]

151.   The headline on the earnings press release stated in part: "**Quarterly Revenues Increase 10% to $5.3 Million Over Prior Quarter**"  [Ex. 1 (Complaint) ¶ 75; Ex. 3 (Tekulve Answer) ¶ 75.]  In the earnings press release, it is represented that:

> For the third quarter of 2007, revenues of $5.3 million increased $0.5
> million when compared to revenues of $4.8 million in the third quarter
> of 2006, a 10% increase.  System sales revenues were $3.8 million. . .

[Ex. 1 (Complaint) ¶ 75; Ex. 3 (Tekulve Answer) ¶75.]  The release also reported that nine month results included revenues of $13.4 million.  [Ex. 1 (Complaint) ¶ 75; Ex. 3 (Tekulve Answer) ¶ 75.]  All of these representations were materially false and misleading as the $5.3 million in quarterly revenue included $2.1 million recognized from the WSS transaction, and the $13.4 million year-to-date revenue included both the $2.1 million in revenue from the WSS transaction and the $3.8 million from the VL Capital transaction, none of which was properly recognized.

(3)    **Tekulve Made False And Misleading**
**Statements In The Q3 2007 Analyst Conference**
**Call Which Neither He Nor Jensen Corrected**

152.   At about 1:30 p.m. Pacific Time on November 14, 2007, Jensen and Tekulve participated on behalf of Basin in an analyst conference call, together with Stark, for which call Tekulve had drafted the script earlier that day, making changes together with Jensen and Stark.  [Ex. 1 (Complaint) ¶ 76; Ex. 3 (Tekulve Answer ¶ 76 (admitting he "helped draft some of the script"; Ex. 2 (Jensen Answer) ¶ 76 (Jensen

admits participating in the conference call); Ex. 66 (Depo. Ex. 987 (call Tr.).]

153.   During this call, in response to an analyst's question as to whether all of Basin's $3.8 million in systems sales were all "new" revenues or "do we have any of those third party financings we had in the last quarter?", Tekulve represented that "They're all new sales.  There's a piece coming in from the prior quarter that's just part of your normal percent completion.  And there is a single third party financing but that's on a new sale.  It simply was a lease arrangement that we third party financed."  [Ex. 66 (call Tr.) at 01642844.]  These representations were materially false and misleading because Tekulve and Jensen did not disclose that over half of the systems revenue, $2.1 million, constituted that "single third party financing"; that the financing had not in fact yet occurred; that the transaction had not been finalized; and that revenue should not in fact have been recognized on it.  Nor did Tekulve disclose that the transaction was with a "third party," WSS, which was in fact an SPE with no assets, created by Basin for no other purpose than to purchase the Cottonwood systems to boost Basin's revenue.  [*See* Ex. 3 (Tekulve Answer) ¶ 76; Ex. 66 (Tr.).]

### 8.   **Tekulve Materially Overstated Basin's FY 2007 Revenues**

### a)   **Tekulve Caused Basin To Recognize Revenues On Two Additional Sham SPE Transactions**

154.   On or about December 26, 2007, five days before the end of Basin's fiscal year, Tekulve initiated documentation of two additional purported sales to SPEs, one with VL Capital and one with WSS.  [*See* Ex. 3 (Tekulve Answer) ¶ 77 (admitting existence of a document dated December 26, 2007, that includes terms of a sale between Basin and WSS).]  Although, as he noted in his calendar on December 28, 2007, Tekulve found it to be "a pain" to prepare the documentation, he further noted "but we need the revenues."  [*See* Ex. 3 (Tekulve Answer) ¶ 77 (admitting language of calendar entry).]

155.   Tekulve caused Basin to enter into an agreement with WSS "as of the

26th day of December 2007 and effective as of the same date" which purported to sell an existing system in the East Valley Water District to WSS for $1,353,079. [Ex. 3 (Tekulve Answer) ¶ 78; *see also* Ex. 68 (Depo. Ex. 121 (Agreement to Sell and Purchase EVWD)).]  Tekulve signed this agreement on behalf of Basin.  [Ex. 3 (Tekulve Answer) ¶ 78.]

156.   Tekulve also caused Basin to enter into an agreement with VL Capital "as of the 31st day of December 2007 and on [sic] that same date" which purported to sell an existing system to VL Capital for $763,330.  [*See* Ex. 3 (Tekulve Answer) ¶ 79; *see also* Ex. 69 (Depo. Ex. 145(Agreement to Purchase and Sell CW 65)).] Tekulve signed this agreement on behalf of Basin.  [Ex. 3 (Tekulve Answer) ¶ 79.]

157.   Tekulve caused Basin to recognize the full amount of revenue of $1,353,079 on the second WSS agreement and $489,000 on the second VL Capital agreement, purporting to use the "percentage of completion" method for recognizing revenue, recognizing a total of $1,842,079 in revenue.  [Ex. 1 (Complaint) ¶ 80; Ex. 3 (Tekulve Answer) ¶ 80.]

158.   Recognition of revenue on these purported sales was improper for several reasons, including that collectability was not reasonably assured.  In particular:

a.   **The payment terms only required small down payments of $5,000 by WSS and $10,000 by VL Capital.**  [Ex. 68 (WSS) at 00002330 ¶ 5.(d) (deposit into escrow accounts); Ex. 69 (VL Capital) at 00002529 ¶ 5.(b) (deposit into trust account).]

b.   **These payments were conditioned on customer notification and/or acceptance of the assignment to the purchaser (WSS or VL Capital), which never occurred.**  [Ex. 68 at 00002329 ¶ 4.(b) (requiring Basin to promptly send to the client (EVWD) "a written letter to acknowledge the assignment" of certain rights to WSS); Ex. 69 at 00002528-29 ¶ 4.(b)(i) & 5.(c) (requiring Basin to send a written notification to the client (Cal Water) of the assignment of the standby fees and ownership, and execution by the client of the Notice of Assignment)].

1

2

3

4

5

6

    (i)  This condition was never met with regard to the WSS transaction because the EVWD was never notified of the assignment, and Robert Martin, the EVWD general manager who dealt with Basin, would have been concerned if the units were sold to a third party because the units could, among other things, potentially be repossessed by that third party.  [Ex. 70 (Martin Depo.) at 10:21-10:24, 97:14-98:13, 98:20-99:4, 99:7-99:8, 99:11-99:18, 99:20-100:4.]

7

8

9

10

    (ii)  Similarly, the condition was never met with regard to the transaction with VL Capital involving Cal Water Well 65, because Tekulve had no conversations with anyone at Cal Water to obtain consent to the transaction, and did not speak to National City about it.  [Ex. 6 (Tekulve Depo.) at 171:2-172:9].

11

12

13

14

15

  **c.**  **National City had not in fact financed the earlier Q3 2007 transaction with WSS.**  There was accordingly no basis for believing it would finance a second transaction with that same entity, or a transaction with VL Capital, which was purportedly controlled by Ward, the same person who controlled WSS.

16

17

18

19

20

21

  **d.**  **Basin was financing the transaction.**  The contracts provided for larger payments of $561,606 by WSS and $30,568 by VL Capital after customer acceptance; and a long-term loan by Basin for the balance (ten year repayment by WSS with no payment due for the first five years, and no payment due at all if the lessee purchased the system within five years; and nine year repayment by VL Capital).  [Ex. 68 (WSS) at 00002330 ¶ 5.(d); Ex. 69 (VL Capital) at 00002529 ¶ 5.(c) & (d)]

22

23

24

  **b)**  **<u>Tekulve Made False Representations To Basin's Auditor About The Second VL Capital And WSS Transactions</u>**

25

26

27

28

  159. On March 17, 2008, Tekulve signed a letter to SingerLewak, Basin's auditors.  Hansen also signed this letter.  Tekulve confirmed "that we [Basin management] are responsible for the fair presentation of the interim financial information in conformity with accounting principles generally accepted in the United

States of America." [Ex. 1 (Complaint) ¶ 82; Ex. 3 (Tekulve Answer) ¶ 82; *see also* Ex. 71 (Depo. Ex. 219 (letter) at 1.] He further represented in this Management Representation Letter, among other things, that:

      a.    The financial statements were fairly presented in conformity with GAAP [Ex. 71 at 1 ¶ 1];

      b.    He had made available to SingerLewak all financial records and related data [Ex. 71 at 1 ¶ 2.a.];

      c.    He had no knowledge of any fraud or suspected fraud affecting the Company involving senior management or management [Ex. 71 at 1 ¶ 3.a.];

      d.    There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements [Ex. 71 at 2 ¶ 15.a.]; and

      e.    The Company has properly recorded all revenue transactions in accordance with revenue recognition policies, including under the percentage-of-completion method [Ex. 71 at 4 ¶ 24].

[Ex. 1 (Complaint) ¶ 82; Ex. 3 (Tekulve Answer) ¶ 82.] Each of these representations was false because recognition of revenue from the two WSS and two VL Capital transactions did not comply with GAAP, and these revenues, totaling $7.7 million, or 41 % of Basin's 2007 annual revenues, were material to Basin's financial statements. [*See* Ex. 3 (Tekulve Answer) ¶ 83 (admitting $7.7 million constituted 41% of Basin's revenue).]

      c)    **Jensen And Tekulve Caused Basin's Materially False Financial Results To Be Disseminated To The Investing Public**

          (1)    **Tekulve Caused Issuance Of A False Earnings Release**

160.  At or about 1:01 p.m. on March 17, 2008, Tekulve caused Basin to

issue its FY 2007 earnings release.  [Ex. 1 (Complaint) ¶ 83; Ex. 2 (Jensen

Answer) ¶ 83; Ex. 3 (Tekulve Answer) ¶ 83.]  Tekulve caused it to be filed with

the Commission that day on Form 8-K and signed the filing.  [Ex. 1 (Complaint) ¶

83; Ex. 2 (Jensen Answer) ¶ 83; Ex. 3 (Tekulve Answer) ¶ 83.]  The headline on

the press release stated in part: "**Twelve Month Revenues Increase 10% to $18.8**

**Million**" [Ex.1 (Complaint) ¶ 83; Ex. 3 (Tekulve Answer) ¶ 83.]  In the press

release, it is represented that:

> For the year ended 2007, revenues increased by 10% to $18.8 million
>
> compared to $17.1 million for the year 2006.  For the year, system
>
> sales revenues were $13.5 million. . . .
>
> For the fourth quarter of 2007, revenues of $5.4 million were
>
> approximately 50% higher than our revenues for the fourth quarter of
>
> 2006.  For the fourth quarter of 2007, system sales revenues were $3.6
>
> million. . . .

[Ex. 1 (Complaint) ¶ 83; Ex. 3 (Tekulve Answer) ¶ 83.]

161.   All of these representations were materially false and misleading as

(1) the quarterly revenue included the $1,353,079 in revenue recognized on the

second WSS agreement and the $489,000 recognized on the second VL Capital

agreement, purporting to use the "percentage of completion" method for

recognizing revenue – a total of $1,842,079 in revenue; and (2) the annual revenue

included both the improperly recognized $1,842,079 in fourth quarter revenues, but

also $2.1 million in revenue from the third quarter WSS transaction and the $3.8

million from the second VL Capital transaction, none of which was properly

recognized.  These $7.7 million in revenues were material, constituting 42% of

Basin's reported annual revenue.  [*See* Ex. 3 (Tekulve Answer) ¶ 83 (admitting

$7.7 million constituted 41% of Basin's revenue).]

///

///

**(2)**      **Tekulve Caused The Filing Of A False 2007**
             **Form 10-K, And Falsely Certified Its Accuracy**

162.   Also on March 17, 2008, Tekulve caused Basin to file with the Commission its annual report on Form 10-K, for its fiscal year 2007 ("FY 2007") ended December 31, 2007.  [Ex. 1 (Complaint) ¶ 84; Ex. 2 (Jensen Answer) ¶ 84; Ex. 3 (Tekulve Answer) ¶ 84; Ex. 72 (Depo. Ex. 236 (2007 10-K).]  Tekulve signed the Form 10-K as Basin's CFO.  [Ex. 1 (Complaint) ¶ 84; Ex. 3 (Tekulve Answer) ¶ 84.]  Basin's FY 2007 Form 10-K reported total revenues of $18,784,000, and system sales of $13,477,000.  [Ex. 3 (Tekulve Answer) ¶ 84.]  As a result of the improper recording of revenue on the SPE transactions, Basin's Q4 and annual revenues were overstated by 63% and 74%, respectively; its Q4 and annual system sales were overstated by 143% and 145%, respectively; and its gross profits were overstated by 387% and 19%, respectively.  [Boudreau Declaration ¶ 3 (chart).]

163.   Although the Form 10-K does disclose that VL Capital and WSS accounted for 26% and 14% of Basin's annual revenues respectively, it does not disclose that VL Capital and WSS were SPEs created by Basin for the sole purpose of Basin "selling" them systems on which Basin would then recognize revenue, and that Basin itself would be "lending" its own monies to these entities in order to purchase that revenue.  [*See* Ex. 3 (Tekulve Answer) ¶ 84.]  The Form 10-K further failed to disclose that none of the revenues purportedly received from transactions with VL Capital and WSS were properly recognized.  [Ex. 3 (Tekulve Answer) ¶ 84.]

164.   On or about March 17, 2008, Tekulve certified, among other things, with regard to the Form 10-K, that:

       a.      He had reviewed the Form 10-K;

       b.      Based on his knowledge, the Form 10-K did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading

70

1          with respect to the period covered by the report;

2          c.      Based on his knowledge, the financial statements, and other

3                  financial information included in the report fairly presented in

4                  all material respects the financial condition, results of

5                  operations and cash flows of Basin as of and for the periods

6                  presented in the report; and

7          d.      He had disclosed to Basin's auditors and the audit committee of

8                  Basin's Board of Directors any fraud that involved company

9                  management.

10   [Ex. 1 (Complaint)¶ 85; Ex. 3 (Tekulve Answer) ¶ 85; Ex. 72 at 00003286 &

11   00003288.]  These certifications were false in that the Form 10-K contained

12   material misrepresentations and omissions of material fact regarding Basin's

13   quarterly and annual revenues, and did not fairly represent Basin's financial

14   condition, and Tekulve had not disclosed to either Basin's auditors or its audit

15   committee his and Jensen's fraud in causing the improper revenue recognition in

16   connection with the SPE transactions.

17              **(3)   Tekulve Made False And Misleading Statements**

18              **In The 2007 Analyst Conference Call**

19          165.   At about 1:30 p.m. Pacific Time on March 17, 2008, Tekulve and

20   Stark participated on behalf of Basin in an analyst conference call, for which

21   Tekulve had edited the script earlier that day.  [*See* Ex. 1 (Complaint) ¶ 86; Ex. 3

22   (Tekulve Answer) ¶ 86.]  Among other representations, Tekulve represented that

23   "Our annual revenues were $18.8 million, an increase of $1.7 million or 10%

24   growth over the prior year. . . . We also achieved nearly similar levels of system

25   sales as we did in 2006."  [Ex. 1 (Complaint) ¶ 86; Ex. 3 (Tekulve Answer) ¶ 86;

26   Ex. 73 (Depo. Ex. 754 (call. Tr.)) at 01642906.]  This statement was materially

27   false and misleading because it failed to disclose that 42% of Basin's annual

28   revenues, and 58% of its system sales, were improperly recognized pursuant to the

1    transactions with the SPEs.

2    166.  Moreover, when an analyst asked "who is VL Capital?  And then,

3    who is Water Services Solutions?  Are those metropolitans or municipalities?" the

4    analyst was told VL Capital was "a financing group," and regarding VL Capital

5    and WSS, "They're the owners of the assets," when in fact, the purported

6    transactions with VL and WSS were financed by Basin itself, and VL Capital and

7    WSS in fact did not own the assets.  [*See* Ex. 73 at 01642916.]  Finally, when

8    asked about "The issuance of $3.4 million of notes receivable? What was that in

9    connection with?", Tekulve responded "That was actually in connection with the V

10   LC transaction.  It was a combination – the sale to V LC was a combination of

11   cash and a long term note receivable," without explaining that the transactions with

12   VL Capital in fact had no economic substance and revenue should not have been

13   recognized from them.  [*See* Ex. 73 at 01642917.]

14   **E.    Defendant Jensen Engaged In Insider Trading, Gaining And**
15   **Realized Over $9 Million From Selling Basin Stock And Taking**
16   **Charitable Tax Deductions Of $763,345, And Failed To**
17   **Reimburse Basin For His Realized Profits**

18   167.  Defendant Jensen sold Basin stock and donated shares of Basin stock

19   to his *alma mater*, MIT, taking charitable tax deductions:

20              a.    During 2006 and 2007, after becoming aware of material

21                    nonpublic information about the true financial condition of

22                    Basin described in detail above, while he was CEO, Chairman

23                    of the Board and/or a member of the Board, through brokerage

24                    accounts he controlled in his own name at Charles Schwab &

25                    Co., Inc. ("CS"), and in his and his wife's names jointly with

26                    right of survivorship at Canaccord Adams, Inc. ("CA").  [*See*

27                    Ex. 5 (Jensen Depo.) at 172:18-173:1 (in 2006 and 2007, Jensen

28                    had brokerage accounts at CCA and CS).]

b.   During 2008, within twelve months of certifying the false Q3 2007 Form 10-Q in his capacity as CEO no November 13, 2007, through a brokerage account at Albert Fried & Company, LLC ("AF").  [*See* Ex. 5 (Jensen Depo.) at 172:24-173:25 (Jensen had a brokerage account at AF).]

Jensen's proceeds from these sales and tax deductions are set forth below:

### Jensen's Sales and Gifts of Basin Stock

| Date | Sale or Gift | Number of Shares | Price | Proceeds | Account | Tax Deduction |
|------|------|------|------|------|------|------|
| 6/26/06 | *Q1 2006 Form 10-Q filed including improper Opus Trust revenue* | | | | | |
| 11/14/06 | *Q3 2006 Form 10-Q filed including improper Thermax revenue* | | | | | |
| 12/12/06 | Sale | 50,000 | $6.41 | $320,500 | CA | |
| 12/29/06 | Gift | 5,000 | | | | $35,000 |
| **2006 TOTAL** | | **55,000** | | **$320,500** | | **$35,000** |
| | | | | | | |
| 2/20/07 | Sale | 57,281 | $8.00 | $458,248 | CA | |
| 2/21/07 | Sale | 42,719 | $8.00 | $341,752 | CA | |
| 4/2/07 | *2006 Form 10-K filed including improper Opus and Thermax Revenue* | | | | | |
| 7/2/07 | Sale | 15,400 | $9.00 | $138,600 | CA | |
| 7/3/07 | Sale | 14,951 | $9.01 | $134,709 | CA | |
| 7/5/07 | Sale | 69,649 | $9.03 | $628,930 | CA | |
| 7/16/07 | Sale | 32,110 | $10.00 | $321,100 | CA | |
| 7/17/07 | Sale | 7,890 | $10.00 | $78,900 | CA | |
| 7/19/07 | Sale | 40,000 | $12.72 | $508,800 | CA | |
| 8/14/07 | *Q2 2007 Form 10-Q filed including improper VL revenue* | | | | | |
| 10/25/07 | Gift | 85,000 | | | | $371,803 |
| 11/14/07 | *Q3 2007 Form 10-Q filed including improper WSS revenue* | | | | | |

| Date | Sale or Gift | Number of Shares | Price | Proceeds | Account | Tax Deduction |
|------|------|------|------|------|------|------|
| **2007 TOTAL** | | **365,000** | | **$2,611,039** | | **$371,803** |
| | | | | | | |
| 3/17/08 | *2007 Form 10-K filed including improper VL and WSS revenue* | | | | | |
| 4/10/08 | Gift | 200,000 | | | | $356,542 |
| 5/15/08 | Sale | 78,129 | $5.01 | $391,426 | CA | |
| 5/16/08 | Sale | 2,607 | $5.00 | $13,035 | CA | |
| 5/20/08 | Sale | 169,264 | $5.00 | $846,320 | CA | |
| 6/10/08 | Sale | 1,092 | $4.20 | $4,586 | CS | |
| 6/11/08 | Sale | 23,908 | $4.20 | $100,414 | CS | |
| 6/13/08 | Sale | 4,100 | $4.25 | $17,425 | CS | |
| 6/16/08 | Sale | 20,900 | $4.25 | $88,825 | CS | |
| 6/20/08 | Sale | 20,000 | $4.39 | $87,800 | CS | |
| 6/24/08 | Sale | 2,696 | $4.50 | $12,132 | CS | |
| 6/26/08 | Sale | 3,968 | $4.50 | $17,856 | CS | |
| 6/27/08 | Sale | 13,336 | $4.50 | $60,012 | CS | |
| 7/10/08 | Sale | 30,000 | $4.43 | $132,900 | AF | |
| 7/11/08 | Sale | 30,000 | $4.32 | $129,600 | AF | |
| 7/14/08 | Sale | 88,000 | $4.34 | $381,920 | AF | |
| 7/15/08 | Sale | 500 | $4.21 | $2,105 | AF | |
| 7/17/08 | Sale | 5,000 | $4.24 | $21,200 | AF | |
| 7/18/08 | Sale | 693 | $4.20 | $2,911 | AF | |
| 7/21/08 | Sale | 81,500 | $4.21 | $343,115 | AF | |
| 7/23/08 | Sale | 500 | $4.20 | $2,100 | AF | |
| 7/28/08 | Sale | 4,000 | $4.00 | $16,000 | AF | |
| 7/29/08 | Sale | 5,100 | $3.94 | $20,094 | AF | |

| Date | Sale or Gift | Number of Shares | Price | Proceeds | Account | Tax Deduction |
|---|---|---|---|---|---|---|
| 7/30/08 | Sale | 6,000 | $3.89 | $23,340 | AF | |
| 7/31/08 | Sale | 15,000 | $3.82 | $57,300 | AF | |
| 8/1/08 | Sale | 12,000 | $3.85 | $46,200 | AF | |
| 8/4/08 | Sale | 9,300 | $3.77 | $35,061 | AF | |
| 8/6/08 | Sale | 20,850 | $3.75 | $78,188 | AF | |
| 8/7/08 | Sale | 882,500 | $3.75 | $3,309,375 | AF | |
| **2008 TOTAL** | | **1,730,943** | | **$6,241,240** | | **$356,542** |
| | | | | | | |
| **GRAND TOTAL** | | **2,150,943** | | **$9,145,779** | | **$763,345** |

[Declaration of Roberto Tercero ¶ 8, 76 (chart); *see also* Ex. 1 (Complaint) ¶ 87; Ex. 2 (Jensen Answer) ¶ 87 (Jensen admits he sold Basin stock from December 12, 2006, through August 7, 2008.]

168.   Jensen entered into his 10b5-1 plan for automatic sale of his Basin stock on December 13, 2006, which plan was effective on December 15, 2006, and which plan expired on January 15, 2008.  [Ex. 5 (Jensen Depo.) at 168:12-169:14.] When Jensen entered into the plan, he was aware of the material nonpublic information described in detail above that Basin's revenues were materially overstated for the first and third quarters of 2006 and 2006 year to date, as a result of recognition of revenue on the Opus Trust and Thermax transactions, which he negotiated on behalf of Basin.

169.   When Jensen entered into his 10b5-1 plan, he understood that he was only permitted to enter into such a trading plan when he was not in possession of material nonpublic information.  [Ex. 5 (Jensen Depo.) at 160:15-160:21.]

170.   Jensen has not reimbursed Basin for any of the profits realized from the above sales and gifts of Basin securities.

**F.** **Basin Announced It Intended To Restate Its Financial Statements For Each Of The Relevant Periods, And Its Stock Price Collapsed**

171.   On August 11, 2008, four days after Jensen made his final sale described above, profiting by over $3.3 million on that sale alone, Basin issued a press release, announcing that Basin believed "that it may be necessary to restate previously issued financial statements for certain periods as a result of the Company's revenue recognition relating to certain specific transactions." [Ex. 1 (Complaint) ¶ 89; Ex. 2 (Jensen Answer) ¶ 89 (Jensen admits that he sold Basin stock on or about August 7, 2008, and that Basin filed a Form 8-K and issued a press release on or about August 7, 2008); Ex. 3 (Tekulve Answer) ¶ 89 (admitting all but trade by Jensen).]  Basin also announced that it would not timely file its report on Form 10-Q for the quarter ending June 30, 2008.  [*Id.*]  Basin further announced that it no longer believed that it would achieve analysts' revenue estimates and did not intend to provide any further revenue guidance for the year.  [*Id.*]  On August 11, 2008, Basin also filed its report on Form 8-K regarding the August 11 press release and its contents and attaching a copy of it as an exhibit.  [*Id.*]

172.   On August 11, 2008, Basin's stock price closed at $2.36 per share, down from the previous day's close of $3.62, a 35% decline. [Ex. 1 (Complaint) ¶ 90; Ex. 3 (Tekulve Answer) ¶ 90.]

173.   On February 10, 2009, Basin filed a restatement on Form 10-K/A ("Restatement") with the Commission.  [Ex. 1 (Complaint) ¶ 91; Ex. 3 (Tekulve Answer) ¶ 91; Ex. 2 (Jensen Answer) ¶ 91 (Jensen admits Basin restated its financials for 2006 and 2007).]  The Restatement amended the annual report on Form 10-K for the year ended December 31, 2007, filed with the Commission on March 17, 2008.  [Ex. 1 (Complaint) ¶ 91; Ex. 3 (Tekulve Answer) ¶ 91.]  The Restatement also included amended and restated consolidated financial statements and related financial information for the years ended December 31, 2006 and 2007, including the financial results in each of the quarterly periods in 2006 and 2007.

[Ex. 1 (Complaint) ¶ 91; Ex. 3 (Tekulve Answer) ¶ 91.]  The Restatement contained a list of "significant determinations" including conclusions that

    a.    Basin improperly recognized $1.5 million in revenues with respect to the Opus Trust transaction in Q1 2006.  Instead, Basin should have recognized the down payment, "$0.2 million," that it received in Q2 2006 "when the transaction documentation was completed and executed" and "the remaining $1.3 million as revenues upon collection."  [Ex. 12 (Restatement) at 01648603, Item 2, "third transaction."]

    b.    Basin improperly recognized revenues with respect to the Thermax transaction because there was no shipping date for the units purportedly sold, no shipping date ever specified, and the units were never shipped.  Basin conceded that Thermax claimed a right of return but also stated that Basin disputed that claim.  Basin reversed the revenues "in the amount of $0.1 million and $0.6 million in 2007 and 2006, respectively."  [Ex. 12 (Restatement) at 01648603, Item 2, "fourth transaction."]

    c.    Basin improperly recognized revenues on the VL Capital and WSS transactions because "the financial statements of VLC and WSS should be consolidated with those of the Company in accordance with FIN 46(R).  This analysis is based on the fact that the structure of the transactions with VLC and WSS did not effectively transfer sufficient risk to the other parties to the transactions, leaving the Company [Basin] with the majority of the risks.  In addition, in the transactions with WSS, the contract conditions of the transactions were not fulfilled.  As a result, the Company incorrectly recognized revenues from these transactions."  [Ex. 12 (Restatement) at 01648603, Item 1.]

[*See also* Ex. 1 (Complaint) ¶ 91; Ex. 3 (Tekulve Answer) ¶ 91.]

III.   **CONCLUSIONS OF LAW**

    A.   **Jurisdiction And Venue**

    1.   This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), 21A(a)(1)(A) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), 78u-1(a)(1)(A)  & 78aa(a).  [Ex. 1 (Complaint) ¶ 1; Ex. 2 (Jensen Answer) ¶ 1 (admitting this Court has jurisdiction).]  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business in which they engaged.

    2.   Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), because the defendants reside in and/or transact business in this district and certain of the transactions, practices, and courses of business constituting violations of the federal securities laws occurred within this district.  [*See* Ex. 1 (Complaint) ¶ 2; Ex. 2 (Jensen Answer) ¶ 2 (admitting venue is proper in this district); Ex. 3 (Tekulve Answer) ¶ 2 (admitting he resides in and/or transacts business in this District).]

    B.   **The Defendants Violated The Antifraud, Issuer Reporting, And Record Keeping Provisions, And Tekulve Additionally Lied To Basin's Auditors**

        1.   **The Defendants Violated The Antifraud Provisions Of Section 17(a) Of The Securities Act**

    3.   The Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a.  with scienter, employed devices, schemes, or artifices to defraud;

b.  obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

## 2. **The Defendants Violated The Antifraud Provisions Of Section 10(b) Of The Exchange Act And Rule 10b-5 Thereunder, Both As Primary Violators And As Control Persons**

4.  The Defendants and Basin, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

a.  employed devices, schemes, or artifices to defraud;

b.  made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

5.  By engaging in the conduct described above, the defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

6.  The Defendants were control persons of Basin because each possessed, directly or indirectly, the power to direct or cause the direction of the

management and policies of Basin.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), each Defendant is liable to the Commission same extent as Basin would be.

### 3.   Jensen Engaged In Insider Trading

7.    Under the "traditional" or "classical" theory of insider trading liability, Section 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material nonpublic information. *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).   A purchase or sale of securities is made "on the basis of" material nonpublic information "if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale."  Exchange Act Rule 10b5-1(b), 17 C.F.R. § 240.10b5-1(b).

8.    Here, Jensen was not only aware of the material nonpublic information that Basin's financial condition was being materially misrepresented to the public – he created and disseminated false information regarding Basin's financial condition.  He then sold large amounts of Basin stock, profiting by millions of dollars.

9.    Jensen does not have a valid defense that his sales of stock were made pursuant to a 10b5-1 plan, because he entered into his plan December 13, 2006, after the false Q3 2006 10-Q which he certified was filed with the Commission on November 14, 2006.  (Facts ¶ 168.)[3]  That 10-Q included the revenue fraudulently recognized for the Opus Trust and Thermax transactions Jensen had negotiated. Rule 10b5-1(c)(1)(ii).  *See SEC v. Mozilo*, 2010 U.S. Dist. LEXIS 98203 * 63-67 (C.D. Cal. September 16, 2010).

///

---

[3]     The plan was entered into one day after Jensen made his sole trade in 2006, whereby he profited by $320,000.  (*See* Facts ¶ 167 (chart).)  For this threshold reason, Jensen cannot use the existence of the plan as a defense for his 2006 sale.

**4.     The Defendants Are Liable For Violations By Basin Of The Issuer Reporting Provisions, Both As Aiders And Abettors And As Control Persons Of Basin**

10.     Basin violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-13, by filing with the Commission required periodic reports for the first through third quarters of its fiscal years 2006 and 2007, and annual reports for its fiscal years 2006 and 2007 which failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

11.     The Defendants knowingly provided substantial assistance to Basin's violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

12.     By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), the Defendants aided and abetted Basin's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-13.

13.     The Defendants were control persons of Basin because each possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Basin.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), each Defendant is liable to the Commission same extent as Basin would be.

**5.     The Defendants Violated The Record-Keeping Provisions**

14.     By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), by knowingly falsifying books, records and

accounts issuers are required to make and keep, in reasonable detail, accurately and fairly reflecting the issuer's transactions and dispositions of its assets; and Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1, by, directly or indirectly, falsifying or causing to be falsified issuer books, records, and accounts.

**6.    Defendant Tekulve Violated The Prohibition Against Making Misrepresentations And Omissions Of Material Fact To Auditors**

15.    Defendant Tekulve, by engaging in the conduct described above, including by signing false management representation letters, and submitting the 2006 "Analysis of Bad Debt" memorandum and "white papers" regarding the SPEs to the auditors, and failing to disclose Hansen's history to the auditors, directly or indirectly violated Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2 by:

    a.    making or causing to be made materially false or misleading statements to accountants in connection with; or

    b.    omitting to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to accountants in connection with:

        i.    an audit, review or examination of the financial statements of the issuer required to be made; or

        ii.    the preparation or filing of a document or report required to be filed with the Commission.

**7.    The Defendants Falsely Certified Basin's Forms 10-K And 10-Q**

16.    The Defendants, by engaging in the conduct described above, violated Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14, by falsely certifying, among other things, that Basin's 2006 and 2007 Forms 10-Q and 10-K fully complied with the requirements of the Exchange Act and fairly presented, in all material

respects, the financial condition and results of operations of the company, when, in fact, the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading.

**8.      The Defendants Failed To Reimburse Basin For Any Bonus Or Other Incentive-Based Or Equity Based Compensation Received From Basin In Violation Of Section 304 Of The Sarbanes-Oxley Act**

17.     The Defendants, by engaging in the conduct described above, failed to reimburse the issuer, Basin, for any bonus or other incentive based or equity-based compensation received by them from Basin during the twelve-month period following each of the public filings of the Forms 10-K and 10-Q alleged herein, which filings required restatement due to the material noncompliance of Basin, as a result of misconduct, with financial reporting requirements under the securities laws.

18.     Defendant Jensen, by engaging in the conduct described above, failed to reimburse the issuer, Basin, for any profits realized from the sale of Basin securities during the twelve-month period following each of the public filings of the Forms 10-K and 10-Q alleged herein, which filings required restatement due to the material noncompliance of Basin, as a result of misconduct, with financial reporting requirements under the securities laws.

19.     By engaging in the conduct described above, the Defendants violated Section 304(a)(1) of the Sarbanes-Oxley Act, 15 U.S.C. § 7243(a)(1), and defendant Jensen violated Section 304(a)(2) of the Sarbanes-Oxley Act, 15 U.S.C. § 7243(a)(2).

**C.      The Commission Is Entitled To Relief**

**1.      The Commission Is Entitled To Permanent Injunctive Relief**

20.     To obtain an injunction, the Commission must establish that there is a reasonable likelihood of future violations.  *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  Whether a likelihood of future violations exists depends upon the

1    totality of the circumstances.  *Id.*  The existence of past violations may give rise to

2    an inference that there will be future violations.  *See id.*  Courts also consider

3    factors such as the degree of scienter involved, the isolated or recurrent nature of

4    the violative conduct, the defendant's recognition of the wrongful nature of the

5    conduct, the likelihood that, because of the defendant's occupation, future

6    violations may occur, and the sincerity of defendant's assurances (if any) against

7    future violations.  *SEC v. Murphy*, 626 F.2d at 655.  Because all of the above

8    factors are present, permanent injunctions are appropriate.

9                 **2.**    **Disgorgement Should Be Ordered**

10        21.    Disgorgement is designed to deprive a wrongdoer of unjust

11    enrichment, and to deter others from violating securities laws by making violations

12    unprofitable; a district court has broad equity powers to order the disgorgement of

13    ill-gotten gains obtained through violation of the securities laws.  *SEC v. Platforms*

14    *Wireless*, 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. First Pacific Bancorp*, 142

15    F.3d 1186, 1191 (9th Cir. 1998).  "The amount of disgorgement should include all

16    gains flowing from the illegal activities."  *See SEC v. Platforms Wireless*, 617 F.3d

17    at 1096, *quoting  SEC v. JT Wallenbrock*, 440 F.3d 1109, 1114 (9th Cir. 2006).

18        22.    The Commission need only present evidence of a "reasonable

19    approximation" of the defendant's ill-gotten gains.  *See SEC v. Platforms Wireless*,

20    617 F.3d at 1096; *SEC v. JT Wallenbrock*, 440 F.3d at 1113-14.  The burden then

21    shifts to the defendant to "demonstrate that the disgorgement figure was not a

22    reasonable approximation."  *SEC v. Platforms Wireless*, 617 F.3d at 1096, *quoting*

23    *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989).

24        23.    In this case, the Commission seeks disgorgement of salaries, bonuses

25    and stock compensation, and with respect to Jensen, his insider trading profits for

26    2006 and 2007 and a reasonable approximation of his tax deductions.  These

27    amounts total $3,771,214 for Jensen and $721,424 for Tekulve.  (Tercero

28    Declaration ¶ 93.)

1    24.    Additionally, disgorgement normally includes prejudgment interest to

2  insure that wrongdoers do not profit from their illegal conduct, which may be

3  calculated based on the rate provided in 26 U.S.C. § 6621 for tax underpayments.

4  *SEC v. Platforms Wireless*, 617 F.3d at 1099.  Jensen and Tekulve thus owe

5  $856,033.59 and $152,078.52 respectively in prejudgment interest.  (Tercero

6  Declaration ¶ 95.)

7                  **3.    Reimbursement Should Be Ordered**

8    25.    SOX Section 304, 15 U.S.C. § 7243 provides that:

9      If an issuer is required to prepare an accounting restatement due to the

10     material noncompliance of the issuer, as a result of misconduct, with any

11     financial reporting requirement under the securities laws, the chief executive

12     officer and chief financial officer of the issuer shall reimburse the issuer for –

13         (1)    any bonus or other incentive-based or equity-based

14     compensation received by that person from the issuer during the 12-

15     month period following the first public issuance or filing with the

16     Commission (whichever occurs first) of the financial document

17     embodying such financial reporting requirement; and

18         (2)    any profits realized from the sale of securities of the

19     issuer during that 12-month period.

20 Section 304 does not require personal misconduct by the CEO or CFO; it merely

21 requires misconduct by the issuer, Basin.  *See SEC v. Jenkins*, 2010 U.S. Dist.

22 LEXIS 57023 * 6-8 (D. Az. 2010).  As explained, Basin's financial statements

23 were repeatedly and materially misstated, as a result of violations of very basic

24 GAAP provisions governing revenue recognition.  This resulted in restatement of

25 Basin's 2006 and 2007 financial statements.  (Facts ¶ 173.)  The Defendants should

26 accordingly be required to disgorge as reimbursement their equity-based

27 compensation and bonuses; Jensen should further be ordered to reimburse his

28 trading profits, including from 2008.  Jensen should reimburse $9,533,617;

Tekulve should reimburse $396,280.  (Tercero Declaration ¶ 93.)

### 4.   Remedies Act Civil Penalties Should Be Imposed

26.   If the violation "involved fraud, deceit, manipulation, or deliberate or
reckless disregard of a regulatory requirement" and "such violation directly or
indirectly resulted in substantial losses or created a significant risk of substantial
losses to other persons" a third tier penalty may be imposed.  *See* Section
21(d)(3)(B)(iii) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(B)(iii).  Plaintiff
Commission recommends that two $130,000 maximum third tier civil money
penalties totaling $260,000 be imposed against each Defendant representing two
violations.[4]  The assessment of a penalty in this amount is appropriate because
these Defendants not only violated the antifraud provisions, but their conduct
directly or indirectly created a risk of substantial losses to other persons, as
evidenced by the dramatic 35% drop in share price following the announcement
that Basin might have to restate its revenues.  (Facts ¶ 171.)

27.   The proposed penalties reflect, in the case of Jensen, his involvement
in the Benowitz and Thermax transactions.  In the case of Tekulve, a double
penalty is appropriate in light of his continued involvement in the fraudulent
scheme for a period of two years.

28.   The factors used to determine the appropriateness of an injunction are
helpful when assessing penalties.  *SEC v. Abacus International Holding Corp.*,
[2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 91,542, 2001 U.S. Dist. LEXIS
12635, 2001 WL 940913, *5 (N.D. Cal. August 16, 2001).  Evaluation of these

---

[4]     The statutory amounts found in the Exchange Act have been amended by the
Debt Collection Improvement Act of 1996, Pub L. No. 104-134, Section 31001(s),
April 26, 1996.  The amendments authorize the Commission to adjust the civil
penalties for inflation by rulemaking.  The Commission has done so.  *See* 17
C.F.R. §§ 201.1003 & 201.1004 & Tables III & IV (2011).  For conduct occurring
subsequent to February 14, 2005, but prior to March 3, 2009, the third tier imposes
maximum limits for each violation of the greater of $130,000 for natural persons
respectively, or the "gross amount of pecuniary gain" to the defendant, rather than
the $100,000 set forth in the statute.  (*Id.*)

factors indicates that imposition of the requested $260,000 penalties against each defendant is appropriate.

### 5.   <u>Jensen Should Be Ordered To Pay A Triple ITSA Penalty</u>

29.   In addition to Remedies Act penalties for his financial fraud, Jensen should be ordered to pay penalties under the Insider Trading Sanctions Act ("ITSA").  Section 21A(a)(1)(A) of the Exchange Act, 15 U.S.C. § 78u-1(a)(1)(A), provides that the Court has jurisdiction to impose a civil penalty of up to "three times the profit gained . . . as a result of such unlawful . . . sale."  17 U.S.C. § 78u-1(a)(1)(A)(2).  Here, Jensen created a false picture of the company's finances, negotiating the Opus and Thermax deals for which it was clear little, if any, revenue would flow to Basin; he nevertheless caused $2 million in revenue to be recognized on these transactions, disseminated that false revenue information to the public, and benefited significantly from selling Basin shares while the true financial information remained nonpublic.  The Commission seeks a triple ITSA penalty on Jensen's trades in 2006 and 2007, made before he signed and certified his final Basin filing with the Commission, the Q2 Form 10-Q on November 14, 2007, and before he left his position as Basin CEO on February 19, 2008.  (*See* Facts ¶¶ 1 &167(chart).)  Jensen's profits gained in 2006 and 2007 totaled $2,845,034.  A triple ITSA penalty would total $8,535,102.

### 6.   <u>Permanent Officer And Director Bars Are Appropriate</u>

30.   The Court is authorized to prohibit any person who violates Section 10(b) from acting as an officer or director of any public company if the person's conduct demonstrates unfitness to serve as an officer or director.  *See* Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).  Previously, the statute required proof of "substantial unfitness," in 2002 Congress lowered the Commission's burden, merely requiring it to establish the defendant's "unfitness."  *See SEC v. Indigenous Global Development Corp.*, 2008 U.S. Dist. LEXIS 50434 at ** 53-54.  Under the older, more stringent standard, the Ninth Circuit held that,

in determining whether to order such a bar, a court may consider: (1) the
egregiousness of the underlying violation; (2) the defendant's "repeat offender"
status; (3) the defendant's role or position when he engaged in the fraud; (4) the
defendant's degree of scienter; (5) the defendant's economic stake in the violation;
and (6) the likelihood that misconduct will recur. *SEC v. First Pacific Bancorp*,
142 F.3d at 1193 (upholding permanent bar).  Each of these factors favors
imposition of a permanent bar against both defendants.


DATED:                                    _____
                                          HONORABLE MANUEL L. REAL
                                          UNITED STATES DISTRICT JUDGE

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On July 23, 2012, I caused to be served the document entitled **[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW BY PLAINTIFF SECURITIES AND EXCHANGE COMMISSION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT THOMAS C. TEKULVE, JR., AND FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT PETER L. JENSEN** on all the parties to this action addressed as stated on the attached service list:

[ ]   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

   [ ]   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

   [ ]   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]   **HAND DELIVERY:**  I caused to be hand delivered each such document to the office of the addressee as stated on the attached service list.

[ ]   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

[ ]   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[X]   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

[ ]   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 23, 2012                          /s/ Karen Matteson
                                             Karen Matteson

1
2
3

**<u>SEC v. Peter L. Jensen, et al.</u>**
**United States District Court – Central District of California**
**Case No. CV 11-05316 R (AGRx)**
**(LA-3478)**

4

**<u>MASTER SERVICE LIST</u>**

5
6
7
8
9
10
11

David Scheper, Esq.
William H. Forman, Esq.
Jean M. Nelson, Esq.
Scheper Kim & Harris LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
T/213-613-4655
F/213-613-4656
dscheper@scheperkim.com
wforman@scheperkim.com
jnelson@scheperkim.com
***Attorneys for Defendant, Peter L. Jensen***

12
13
14
15
16
17
18

Seth Aronson, Esq.
Carolyn Kubota, Esq.
Tamar Braz, Esq.
O'Melveny & Myers, LLP
400 S. Hope Street
Los Angeles, CA  90071
T/(213) 430-6000
F/(213) 430-6407
saronson@omm.com
ckubota@omm.com
tbraz@omm.com
***Attorneys for Defendant, Thomas C. Tekulve, Jr.***

19
20
21
22
23
24
25
26
27
28