KAREN MATTESON, Cal. Bar No. 102103
Email: mattesonk@sec.gov
ROBERTO A. TERCERO, Cal. Bar No. 143760
Email: terceror@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John M. McCoy III, Associate Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISON

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>PETER L. JENSEN and THOMAS C. TEKULVE, JR.,<br><br>          Defendants. | Case No. CV 11-05316 R (AGRx)<br><br>**DECLARATION OF ROGER D. BOUDREAU IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT THOMAS C. TEKULVE, JR., AND FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT PETER L. JENSEN**<br><br>Date:     August 20, 2012<br>Time:     10:00 a.m.<br>Place:    Courtroom 8<br>          (Honorable Manuel L. Real) |

1    I, Roger Boudreau, pursuant to 28 U.S.C. § 1746, declare as follows:

2    1.    I have personal knowledge of each of the matters set forth below, and

3    if called upon as a witness I could and would competently testify as to the facts

4    stated herein.

5    2.    I am a certified public accountant and have been licensed with the

6    State of California since 1989.  I am a Senior Accountant with the Enforcement

7    Division of the U.S. Securities and Exchange Commission (the "Commission"), in

8    its Los Angeles Regional Office.

9    3.    During the Commission's litigation in the above referenced matter, I

10   calculated the effect that certain transactions had on the 2006 and 2007 financial

11   statements of Basin Water, Inc. ("Basin").  The charts I created that summarize my

12   calculations appear below.

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**Basin's Overstated Financial Results – 2006**

|  | Q1 2006 | Year-To-Date Q2 2006 | Q3 2006 | Year-To-Date Q3 2006 | FY 2006 |
|---|---|---|---|---|---|
| **Reported System Sales** | $3,091,000 | $7,258,000 | $3,936,000 | $11,194,000 | $13,861,000 |
| **Adjusted System Sales** | $1,591,000 | $5,908,000 | $3,484,533 | $9,392,533 | $11,930,283 |
| **Percentage Overstatement of System Sales** | 94% | 23% | 13% | 19% | 16% |
| **Reported Total Revenue** | $3,703,000 | $8,666,000 | $4,846,000 | $13,512,000 | $17,114,000 |
| **Adjusted Total Revenue** | $2,203,000 | $7,316,000 | $4,394,533 | $11,710,533 | $15,183,283 |
| **Percentage Overstatement of Total Revenue** | 68% | 18% | 10% | 15% | 13% |
| **Reported Gross Profit** | $1,147,000 | $2,545,000 | $309,000 | $2,805,000 | $(2,992,000) |
| **Adjusted Gross Profit** | $277,479 | $1,762,431 | $85,765 | $1,231,765 | $(3,789,492) |
| **Percentage Overstatement of Gross Profit** | 313% | 44% | 260% | 128% | 21% |

///
///
///
///
///
///
///
///
///

2

**Basin's Overstated Financial Results – 2007**

| | Q2 2007 | YTD Q2 2007 | Q3 2007 | YTD Q3 2007 | Q4 2007 | FY 2007 |
|---|---|---|---|---|---|---|
| **Reported System Sales** | $5,199,0000 | $6,128,000 | $3,773,000 | $9,901,000 | $3,576,000 | $13,477,000 |
| **Adjusted System Sales** | $1,234,746 | $2,163,746 | $1,852,490 | $4,016,236 | $1,474,064 | $5,490,297 |
| **Percentage Overstate-ment of System Sales** | 321% | 183% | 104% | 147% | 143% | 145% |
| **Reported Total Revenue** | $6,414,000 | $8,021,000 | $5,346,000 | $13,367,000 | $5,417,000 | $18,784,000 |
| **Adjusted Total Revenue** | $2,449,746 | $4,056,746 | $3,425,490 | $7,482,236 | $3,315,064 | $10,797,297 |
| **Percentage Overstate-ment of Total Revenue** | 162% | 98% | 56% | 79% | 63% | 74% |
| **Reported Gross Profit** | $25,000 | $(262,000) | $(6,779,000) | $(7,041,000) | $894,000 | $(6,147,000) |
| **Adjusted Gross Profit** | $(515,161) | $(802,161) | $(6,995,399) | $(7,797,560) | $183,706 | $(7,613,857) |
| **Percentage Overstate-ment Gross Profit** | 105% | 67% | 3% | 10% | 387% | 19% |

4.    I reviewed certain documents to prepare the above charts including Basin's periodic reports with the Commission on Forms 10-Q and 10-K, as well as documents produced by Basin in the investigation that preceded the filing of this

3

1    action.  In addition to Basin's periodic filings with the Commission, I used a

2    schedule produced voluntarily by Basin in November 2008 which sets forth the

3    effects of certain transactions on Basin's financial reports.  A true and correct copy

4    of this schedule is attached as **Exhibit 1**.

5         5.     In the first column of my summary charts, I use the following

6    headings: "Reported System Sales"; "Adjusted System Sales"; Percentage

7    Overstatement of System Sales"; "Reported Total Revenue"; "Adjusted Total

8    Revenue"; "Percentage Overstatement of Total Revenue"; "Reported Gross

9    Profit"; "Adjusted Gross Profit"; and "Percentage Overstatement of Gross Profit."

10   The first row of the charts refers to the particular time period.

11        6.     "Reported System Sales" means the amount of revenue from the sale

12   of water treatment systems ("system sales") that Basin reported for a given fiscal

13   period in its corresponding 10-Q or 10-K filing with the Commission.

14        7.     "Adjusted System Sales" means the amount of revenue from Reported

15   System Sales, less the amount of improperly recorded revenue ("Purported

16   Revenue") from the purported system sales ("Purported Sales") that are identified

17   in the Complaint in a given fiscal period.

18        8.     "Percentage Overstatement of System Sales" means the proportion of

19   Purported Revenue to Adjusted System Sales.  I calculated the Percentage

20   Overstatement of System Sales by dividing Purported Revenue by the Adjusted

21   System Sales.

22        9.     "Reported Total Revenue" means the revenue from Basin's two

23   revenue sources, system sales and contract revenues, that Basin reported for a

24   given fiscal period in its corresponding filing with the Commission.

25        10.     "Adjusted Total Revenue" is an amount that I calculated by starting

26   with the reported total revenue, and then subtracting Purported Revenue.

27        11.     "Percentage Overstatement of Total Revenue" is the proportion of

28   Purported Revenue to Adjusted Total Revenue.  I calculated Percentage

4

1  Overstatement of Total Revenue by dividing the Purported Revenue by the

2  Adjusted Total Revenue.

3      12.    "Reported Gross Profit" means the gross profit that Basin reported in

4  its quarterly and annual filings with the Commission.

5      13.    "Adjusted Gross Profit" means the amount of Reported Gross Profit

6  less the gross profit from Purported Sales.  I calculated gross profit from Purported

7  Sales by subtracting the "cost of revenue effect" as set forth in Basin's schedule

8  (Exhibit 1) from the relevant Purported Sale.

9      14.    "Percentage Overstatement of Gross Profit" is the proportion of gross

10  profit from the Purported Sales to the Adjusted Gross Profit.  I calculated

11  Percentage Overstatement of Gross Profit by dividing the gross profit from the

12  Purported Sale by the Adjusted Gross Profit.

13      15.    In the calculation of Adjusted Gross Profit for the periods Q3 2007,

14  Year-To-Date Q3 2007, and Q4 2007, I reduced the cost of revenue effect amounts

15  by $48,000, representing the "Depreciation Expense VLC" set forth in Basin's

16  schedule (Exhibit 1).  In the calculation of Adjusted Gross Profit for the Period FY

17  2007, I reduced the cost of sales amount by $96,000, which is the total of the

18  $48,000 Depreciation Expense VLC for Q3, 2007 and Q4 2007.

19      16.    In the calculation of Adjusted System Sales and Adjusted Total

20  Revenue for the periods Q3 2007 and Q4 2007, I reduced the amount of Purported

21  Sales by $207,500 for each of the periods for "Standby Fees-Sale to VLC" as set

22  forth in Basin's schedule (Exhibit 1).  In my calculation of Adjusted System Sales

23  and Adjusted Total Revenue for the period FY 2007, I reduced the amount of

24  Purported Sales by $415,500, which is the total of the Standby Fees-Sale to VLC

25  for Q3, 2007 and Q4 2007.

26      17.    Attached as **Exhibit 2** is a true and correct copy of Staff Accounting

27  Bulletin No. 104 printed from LexisNexis.  Staff Accounting Bulletins represent

28  interpretations and practices followed by the Commission staff in administering the

disclosure requirements of the Federal securities laws.

18.    Attached as **Exhibit 3** is a true and correct copy of Accounting Research Bulletin No. 43 ¶1 A., a Generally Accepted Accounting Principle ("GAAP") provision included in Financial Accounting Standards Board Original Pronouncements as of June 1, 2008, that sets the criteria that collectiblity must be reasonably assured before recognizing revenue.

19.    Attached as **Exhibit 4** is a true and correct copy of Financial Accounting Standards Board Interpretation No. 46 (revised December 2003) ("FIN 46R"), printed from the website of the Financial Accounting Standards Board. FIN 46R is the GAAP accounting literature concerning the consolidation of Special Purpose Entities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 18, 2012, in Los Angeles, California.

Roger D. Boudreau, CPA

6

# EXHIBIT 1

FOIA CONFIDENTIAL
TREATMENT REQUESTED
BW 001134

Exhibit 1 Page 7

SEC-LA3478-00004671

# EXHIBIT 2



FOCUS - 1 of 1 DOCUMENT

Staff Accounting Bulletin No. 104

SECURITIES AND EXCHANGE COMMISSION

Release No. SAB 104; 17 CFR Part 211

*2003 SEC LEXIS 2981*

December 17, 2003

**ACTION:**

[*1]   Publication of Staff Accounting Bulletin.

**TEXT:** SUMMARY: This staff accounting bulletin revises or rescinds portions of the interpretative guidance included in Topic 13 of the codification of staff accounting bulletins in order to make this interpretive guidance consistent with current authoritative accounting and auditing guidance and SEC rules and regulations. The principal revisions relate to the rescission of material no longer necessary because of private sector developments in U.S. generally accepted accounting principles.

This staff accounting bulletin also rescinds the Revenue Recognition in Financial Statements Frequently Asked Questions and Answers document issued in conjunction with Topic 13. Selected portions of that document have been incorporated into Topic 13.

DATE: December 17, 2003

FOR FURTHER INFORMATION CONTACT: Chad Kokenge or Shelly Luisi in the Office of the Chief Accountant (202) 942-4400, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549-1103.

SUPPLEMENTARY INFORMATION: The statements in staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's approval. They represent [*2]   interpretations and practices followed by the Division of Corporation Finance and the Office of Chief Accountant in administering the disclosure requirements of the Federal securities laws.

Part 211 - (AMEND)

Accordingly, Part 211 of Title 17 of the Code of Federal Regulations is amended by adding Staff Accounting Bulletin No. 104 to the table found in Subpart B.

STAFF ACCOUNTING BULLETIN NO. 104

[Note: The text of SAB 104 will not appear in the Code of Federal Regulations.]

Exhibit 2 Page 8

The staff hereby revises Topic 13 of the Staff Accounting Bulletin Series as follows:

1. Topic 13.A.1 is modified as follows:

a. The examples of existing literature referenced in the first paragraph are deleted.

b. The last paragraph, including footnote 7, is added to make reference to EITF Issue 00-21, *"Revenue Arrangements with Multiple Deliverables,"* which governs how to determine if revenue arrangements contain more than one unit of accounting.

2. Topic 13.A.2 is modified as follows:

a. Question 3 (formerly Question 1 of the staff's Revenue Recognition in Financial Statements Frequently Asked Questions and Answers document (FAQ)) is added.

3. Topic 13.A.3 is modified as follows:

a. The subheading [*3]   Bill and hold arrangements is added.

b. Topic 13.A.3(a) Question is formerly Question 3.

c. The subheading Customer acceptance is added.

d. Topic 13.A.3(b) Question 1 (formerly Question 5 of the FAQ) is added. The question format is conformed.

e. Topic 13.A.3(b) Question 2 (formerly Question 6 of the FAQ) is added. The facts, question and interpretive response are modified to reflect the evaluation of the arrangement in the context of separate units of accounting. In addition, the last paragraph of the interpretive response is deleted due to the issuance of EITF Issue 00-21.

f. Footnote 29 is added to highlight that the changes to Topic 13.A.3(b) Question 2 are to facilitate an analysis of revenue recognition, not interpret EITF Issue 00-21.

g. Topic 13.A.3(b) Question 3 (formerly Exhibit A Example 1 Scenario A of the FAQ) is added.

h. Topic 13.A.3(b) Question 4 (formerly Exhibit A Example 1 Scenario B of the FAQ) is added.

i. Topic 13.A.3(b) Question 5 (formerly Exhibit A Example 1 Scenario C of the FAQ) is added.

j. The subheading Inconsequential or perfunctory performance obligations is added.

k. Topic 13.A.3(c) Question 1 (formerly Question 2 of the FAQ) is added.   [*4]   The question and interpretive response are modified from the FAQ to reflect the evaluation of the arrangement in the context of a single unit of accounting. The question format is conformed.

l. Topic 13.A.3(c) Question 2 (formerly Question 3 of the FAQ) is added. The question and interpretive response are modified from the FAQ to reflect the evaluation in the context of a single unit of accounting.

m. Topic 13.A.3(c) Question 3 (formerly Question 7 of the FAQ) is added. The facts, question and interpretive response are modified to reflect the evaluation of the arrangement in the context of combined deliverables, which result in a single unit of accounting. In addition, the interpretive response is modified to delete the last four sentences as this guidance is no longer necessary due to the issuance of EITF 00-21.

Exhibit 2 Page 9

n. The segue sentence and related footnote discussing delivery or performance of multiple deliverables is deleted to eliminate redundancy.

o. The subheading License fee revenue is added.

p. Topic 13.A.3(d) Question (formerly Question 9 of the FAQ) is added. The interpretive response is modified to eliminate redundancy.

q. The subheading Layaway sales arrangements is [*5] added.

r. Topic 13.A.3(e) Question is formerly Question 4.

s. The subheading Nonrefundable up-front fees is added.

t. The examples in Topic 13.A.3(f) Question 1 (formerly Question 5) are modified to include the examples from what was formerly Question 10 of the FAQ. Guidance in the interpretive response is added and conformed from Question 10 of the FAQ which clarifies the incurrence of substantive costs does not necessarily indicate there is a separate earnings event, and that the determination of a separate earnings event should be evaluated on a case-by-case basis.

u. Footnote 36 is added to clarify the staff's view regarding the vendor activities associated with up-front fees.

v. Topic 13.A.3(f) Question 2 (formerly Question 6) is modified to reflect the evaluation in the context of a single unit of accounting.

w. Footnote 14 is deleted. The subject matter of footnote 14 is conformed and included in Topic 13.A.3(f) Question 3; accordingly, Topic 13.A.3(f) Question 3 reflects the guidance formerly located in footnote 14.

x. Topic 13.A.3(f) Question 4 (formerly Question 15 of the FAQ) is added. The question format is conformed.

y. Topic 13.A.3(f) Question 5 (formerly Question [*6] 16 of the FAQ) is added. The question format is conformed.

z. The subheading Deliverables within an arrangement is added.

aa. Topic 13.A.3(g) Question (formerly Question 8 of the FAQ) is added and is modified to reflect the evaluation of the question under EITF Issue 00-21.

bb. Footnote 45 is added to clarify the staff's view of the obligation described in Topic 13.A.3(g) Question under FIN 45.

4. Topic 13.A.4 is modified as follows:

a. The subheading Refundable fees for services is added.

b. Topic 13.A.4(a) Question 1 is formerly Question 7.

c. Footnote 56 is added to include guidance from Question 23 of the FAQ.

d. Topic 13.A.4(a) Question 2 (formerly Question 18 of the FAQ) is added.

e. Topic 13.A.4(a) Question 3 (formerly Question 19 of the FAQ) is added. The question format is conformed.

f. Topic 13.A.4(a) Question 4 (formerly Question 20 of the FAQ) is added.

Exhibit 2 Page 10

g. Topic 13.A.4(a) Question 5 (formerly Question 21 of the FAQ) is added. The question format is conformed.

h. Topic 13.A.4(a) Question 6 (formerly Question 22 of the FAQ) is added.

i. The subheading Estimates and changes in estimates is added.

j. Topic 13.A.4(b) Question 1 is formerly Question 9.

k. Topic 13.A.4(b)   [*7]   Question 2 (formerly Question 24 of the FAQ) is added.

l. Topic 13.A.4(b) Question 3 (formerly Question 25 of the FAQ) is added. The question format is conformed. The last two sentences of the interpretive response are deleted to eliminate redundancy.

m. Topic 13.A.4(b) Question 4 (formerly Question 26 of the FAQ) is added.

n. Topic 13.A.4(b) Question 5 (formerly Question 27 of the FAQ) is added.

o. The subheading Contingent rental income is added.

p. Topic 13.A.4(c) Question is formerly Question 8.

q. The subheading Claims processing and billing services is added.

r. Topic 13.A.4(d) Question (formerly Question 28 of the FAQ) is added. The facts are modified to reflect to evaluation in the context of a single unit of accounting.

5. Topic 13.A.5 is deleted. This topic provided guidance on income statement presentation and whether transactions should be presented on a gross as a principal or net as an agent basis. EITF Issue 99-19, "*Reporting Revenue Gross as a Principal versus Net as an Agent*", which was issued subsequent to SAB 101, provides such guidance. Therefore, this guidance is no longer necessary.

6. Topic 13.B is modified as follows:

a. The interpretive response [*8]   to Question 1 is modified to reference multiple units of accounting in lieu of multiple elements.

b. Question 2 is modified to delete the reference to Question 10 of Topic 13.A and Topic 8.A, which are deleted.

c. Question 3 (formerly Question 29 of the FAQ) is added.

d. Question 4 (formerly Question 30 of the FAQ) is added.

e. Question 5 (formerly Question 31 of the FAQ) is added.

## Topic 13: REVENUE RECOGNITION

### A. Selected Revenue Recognition Issues

### 1. Revenue recognition - general

The accounting literature on revenue recognition includes both broad conceptual discussions as well as certain industry-specific guidance. n1 If a transaction is within the scope of specific authoritative literature that provides revenue recognition guidance, that literature should be applied. However, in the absence of authoritative literature addressing a specific arrangement or a specific industry, the staff will consider the existing authoritative accounting standards as well as the broad reve-

Exhibit 2 Page 11

2003 SEC LEXIS 2981, *

nue recognition criteria specified in the FASB's conceptual framework that contain basic guidelines for revenue recognition.

> n1 The February 1999 AICPA publication "Audit Issues in Revenue Recognition" provides an overview of the authoritative accounting literature and auditing procedures for revenue recognition and identifies indicators of improper revenue recognition.

[*9]

Based on these guidelines, revenue should not be recognized until it is realized or realizable and earned. n2 Concepts Statement 5, paragraph 83(b) states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its on-going major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues" [footnote reference omitted]. Paragraph 84(a) continues "the two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)" [footnote reference omitted]. In addition, paragraph 84(d) states that "If services are rendered or rights to use assets extend continuously over time (for example, interest or rent), reliable measures based on contractual prices established in advance are commonly available, and revenues may   [*10]   be recognized as earned as time passes."

> n2 Concepts Statement 5, paragraphs 83-84; ARB 43, Chapter 1A, paragraph 1; Opinion 10, paragraph 12. The citations provided herein are not intended to present the complete population of citations where a particular criterion is relevant. Rather, the citations are intended to provide the reader with additional reference material.

The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met

. Persuasive evidence of an arrangement exists, n3

> n3 Concepts Statement 2, paragraph 63 states "Representational faithfulness is correspondence or agreement between a measure or description and the phenomenon it purports to represent." The staff believes that evidence of an exchange arrangement must exist to determine if the accounting treatment represents faithfully the transaction. See also SOP 97-2, paragraph 8. The use of the term "arrangement" in this SAB Topic is meant to identify the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction.

[*11]

. Delivery has occurred or services have been rendered. n4

Exhibit 2 Page 12

2003 SEC LEXIS 2981, *

n4 Concepts Statement 5, paragraph 84(a), (b), and (d). Revenue should not be recognized until the seller has substantially accomplished what it must do pursuant to the terms of the arrangement, which usually occurs upon delivery or performance of the services.

. The seller's price to the buyer is fixed or determinable, n5 and

n5 Concepts Statement 5, paragraph 83(a); Statement 48, paragraph 6(a); SOP 97-2, paragraph 8. SOP 97-2 defines a "fixed fee" as a "fee required to be paid at a set amount that is not subject to refund or adjustment. A fixed fee includes amounts designated as minimum royalties." Paragraphs 26-33 of SOP 97-2 discuss how to apply the fixed or determinable fee criterion in software transactions. The staff believes that the guidance in paragraphs 26 and 30-33 is appropriate for other sales transactions where authoritative guidance does not otherwise exist. The staff notes that paragraphs 27 through 29 specifically consider software transactions, however, the staff believes that guidance should be considered in other sales transactions in which the risk of technological obsolescence is high.

[*12]

. Collectibility is reasonably assured. n6

n6 ARB 43, Chapter 1A, paragraph 1 and Opinion 10, paragraph 12. See also Concepts Statement 5, paragraph 84(g) and SOP 97-2, paragraph 8.

Some revenue arrangements contain multiple revenue-generating activities. The staff believes that the determination of the units of accounting within an arrangement should be made prior to the application of the guidance in this SAB Topic by reference to the applicable accounting literature. n7

n7 See EITF Issue 00-21 paragraph 4 for additional discussion.

**2. Persuasive evidence of an arrangement**

Question 1

Facts: Company A has product available to ship to customers prior to the end of its current fiscal quarter Customer Beta places an order for the product, and Company A delivers the product prior to the end of its current fiscal quarter. Company A's normal and [*13]   customary business practice for this class of customer is to enter into a written sales agreement that requires the signatures of the authorized representatives of the Company and its customer to be binding. Company A prepares a written sales agreement, and its authorized representative signs the agreement before the end of the quarter. However, Customer Beta does not sign the agreement because Customer Beta is awaiting the requisite approval by its legal department. Customer Beta's purchasing department has orally agreed to the sale and stated that it is highly likely that the contract will be approved the first week of Company A's next fiscal quarter.

Exhibit 2 Page 13

Question: May Company A recognize the revenue in the current fiscal quarter for the sale of the product to Customer Beta when (1) the product is delivered by the end of its current fiscal quarter and (2) the final written sales agreement is executed by Customer Beta's authorized representative within a few days after the end of the current fiscal quarter?

Interpretive Response: No. Generally the staff believes that, in view of Company A's business practice of requiring a written sales agreement for this class of customer. persuasive [*14]  evidence of an arrangement would require a final agreement that has been executed by the properly authorized personnel of the customer. In the staff's view, Customer Beta's execution of the sales agreement after the end of the quarter causes the transaction to be considered a transaction of the subsequent period. n8 Further, if an arrangement is subject to subsequent approval (e.g., by the management committee or board of directors) or execution of another agreement, revenue recognition would be inappropriate until that subsequent approval or agreement is complete.

n8 AU Section 560.05.

Customary business practices and processes for documenting sales transactions vary among companies and industries. Business practices and processes may also vary within individual companies (e.g., based on the class of customer, nature of product or service, or other distinguishable factors). If a company does not have a standard or customary business practice of relying on written contracts to document a sales arrangement, it [*15]  usually would be expected to have other forms of written or electronic evidence to document the transaction. For example, a company may not use written contracts but instead may rely on binding purchase orders from third parties or on-line authorizations that include the terms of the sale and that are binding on the customer. In that situation, that documentation could represent persuasive evidence of an arrangement.

The staff is aware that sometimes a customer and seller enter into "side" agreements to a master contract that effectively amend the master contract. Registrants should ensure that appropriate policies, procedures, and internal controls exist and are properly documented so as to provide reasonable assurances that sales transactions, including those affected by side agreements, are properly accounted for in accordance with GAAP and to ensure compliance with Section 13 of the Securities Exchange Act of 1934 (i.e., the Foreign Corrupt Practices Act). Side agreements could include cancellation, termination, or other provisions that affect revenue recognition. The existence of a subsequently executed side agreement may be an indicator that the original agreement was not [*16]  final and revenue recognition was not appropriate.

Question 2

Facts: Company Z enters into an arrangement with Customer A to deliver Company Z's products to Customer A on a consignment basis. Pursuant to the terms of the arrangement, Customer A is a consignee, and title to the products does not pass from Company Z to Customer A until Customer A consumes the products in its operations. Company Z delivers product to Customer A under the terms of their arrangement.

Question: May Company Z recognize revenue upon delivery of its product to Customer A?

Interpretive Response: No. Products delivered to a consignee pursuant to a consignment arrangement are not sales and do not qualify for revenue recognition until a sale occurs. The staff be-

Exhibit 2 Page 14

2003 SEC LEXIS 2981, *

lieves that revenue recognition is not appropriate because the seller retains the risks and rewards of ownership of the product and title usually does not pass to the consignee.

Other situations may exist where title to delivered products passes to a buyer, but the substance of the transaction is that of a consignment or a financing. Such arrangements require a careful analysis of the facts and circumstances of the transaction, as well as an [*17]   understanding of the rights and obligations of the parties, and the seller's customary business practices in such arrangements. The staff believes that the presence of one or more of the following characteristics in a transaction precludes revenue recognition even if title to the product has passed to the buyer:

1. The buyer has the right to return the product and:

(a) the buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates. n9

(b) the buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product or subsequently consumes or uses the product, n10

(c) the buyer's obligation to the seller would be changed (e.g., the seller would forgive the obligation or grant a refund) in the event of theft or physical destruction or damage of the product, n11

(d) the buyer acquiring the product for resale does not have economic substance apart from that provided by the seller, n12 or

(e) the seller has significant obligations for future performance to directly bring [*18]   about resale of the product by the buyer. n13

2. The seller is required to repurchase the product (or a substantially identical product or processed goods of which the product is a component) at specified prices that are not subject to change except for fluctuations due to finance and holding costs, n14 and the amounts to be paid by the seller will be adjusted, as necessary, to cover substantially all fluctuations in costs incurred by the buyer in purchasing and holding the product (including interest). n15 The staff believes that indicators of the latter condition include:

(a) the seller provides interest-free or significantly below market financing to the buyer beyond the seller's customary sales terms and until the products are resold,

(b) the seller pays interest costs on behalf of the buyer under a third-party financing arrangement, or

(c) the seller has a practice of refunding (or intends to refund) a portion of the original sales price representative of interest expense for the period from when the buyer paid the seller until the buyer resells the product.

3. The transaction possesses the characteristics set forth in EITF Issue 95-1 and does not qualify for sales-type lease [*19]   accounting.

4. The product is delivered for demonstration purposes. n16

n9 Statement 4S, paragraphs 6(b) and 22.

Exhibit 2 Page 15

n10 Statement 48, paragraphs 6(b) and 22. The arrangement may not specify that payment is contingent upon subsequent resale or consumption. However, if the seller has an established business practice permitting customers to defer payment beyond the specified due date(s) until the products are resold or consumed, then the staff believes that the seller's right to receive cash representing the sales price is contingent.

n11 Statement 48, paragraph 6(c).

n12 Statement 48, paragraph 6(d).

n13 Statement 48, paragraph 6(e).

n14 Statement 49, paragraph 5(a) Paragraph 5(a) provides examples of circumstances that meet this requirement. As discussed further therein, this condition is present if (a) a resale price guarantee exists, (b) the seller has an option to purchase the product, the economic effect of which compels the seller to purchase the product, or (c) the buyer has an option whereby it can require the seller to purchase the product.

n15 Statement 49, paragraph 5(b).

[*20]

n16 See SOP 97-2, paragraph 25.

This list is not meant to be a checklist of all characteristics of a consignment or a financing arrangement, and other characteristics may exist. Accordingly, the staff believes that judgment is necessary in assessing whether the substance of a transaction is a consignment, a financing, or other arrangement for which revenue recognition is not appropriate. If title to the goods has passed but the substance of the arrangement is not a sale, the consigned inventory should be reported separately from other inventory in the consignor's financial statements as "inventory consigned to others" or another appropriate caption.

Question 3

Facts: The laws of some countries do not provide for a seller's retention of a security interest in goods in the same manner as established in the U.S. Uniform Commercial Code (UCC). In these countries, it is common for a seller to retain a form of title to goods delivered to customers until the customer makes payment so that the seller can recover the goods in the event of customer default on payment.

Question: Is it acceptable to   [*21]   recognize revenue in these transactions before payment is made and title has transferred?

Interpretive Response: Presuming all other revenue recognition criteria have been met, the staff would not object to revenue recognition at delivery if the only rights that a seller retains with the title are those enabling recovery of the goods in the event of customer default on payment. This limited form of ownership may exist in some foreign jurisdictions where, despite technically holding title, the seller is not entitled to direct the disposition of the goods, cannot rescind the transaction, cannot prohibit its customer from moving, selling, or otherwise using the goods in the ordinary course of business, and has no other rights that rest with a titleholder of property that is subject to a

Exhibit 2 Page 16

lien under the U.S. UCC. On the other hand, if retaining title results in the seller retaining rights normally held by an owner of goods, the situation is not sufficiently different from a delivery of goods on consignment. In this particular case, revenue should not be recognized until payment is received. Registrants and their auditors may wish to consult legal counsel knowledgeable of the local law [*22]   and customs outside the U.S. to determine the seller's rights.

### 3. Delivery and performance

### a. Bill and hold arrangements

Facts: Company A receives purchase orders for products it manufactures. At the end of its fiscal quarters, customers may not yet be ready to take delivery of the products for various reasons. These reasons may include, but are not limited to, a lack of available space for inventory, having more than sufficient inventory in their distribution channel, or delays in customers' production schedules.

Question: May Company A recognize revenue for the sale of its products once it has completed manufacturing if it segregates the inventory of the products in its own warehouse from its own products?

May Company A recognize revenue for the sale if it ships the products to a third-party warehouse but (1) Company A retains title to the product and (2) payment by the customer is dependent upon ultimate delivery to a customer-specified site?

Interpretative Response: Generally, no. The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified [*23]   in the customer's purchase order or sales agreement. Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

The Commission has set forth criteria to be met in order to recognize revenue when delivery has not occurred. n17 These include:

n17 See In the Matter of Stewart Parness, AAER 108 (August 5, 1986); SEC v. Bollinger Industries, Inc., et al, LR 15093 (September 30, 1996); In the Matter of Laser Photonics, Inc., AAER 971 (September 30, 1997); In the Matter of Cypress Bioscience Inc., AAER 817 (September 19, 1996). Also see Concepts Statement 5, paragraph 84(a), and SOP 97-2, paragraph 22.

1. The risks of ownership must have passed to the buyer;

2. The customer must have made a fixed commitment to purchase the goods, preferably in written documentation;

3. The buyer, not the seller, must request that the transaction be on a bill and hold basis. n18 The buyer [*24]   must have a substantial business purpose for ordering the goods on a bill and hold basis;

n18 Such requests typically should be set forth in writing by the buyer.

Exhibit 2 Page 17

2003 SEC LEXIS 2981, *

4. There must be a fixed schedule for delivery of the goods. The date for delivery must be reasonable and must be consistent with the buyer's business purpose (e.g., storage periods are customary in the industry);

5. The seller must not have retained any specific performance obligations such that the earning process is not complete;

6. The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

7. The equipment [product] must be complete and ready for shipment.

The above listed conditions are the important conceptual criteria that should be used in evaluating any purported bill and hold sale. This listing is not intended as a checklist. In some circumstances, a transaction may meet all factors listed above but not meet the requirements for revenue recognition. The Commission also has [*25]  noted that in applying the above criteria to a purported bill and hold sale, the individuals responsible for the preparation and filing of financial statements also should consider the following factors: n19

n19 See Note 17, supra.

1. The date by which the seller expects payment, and whether the seller has modified its normal billing and credit terms for this buyer; n20

n20 Such individuals should consider whether Opinion 21 pertaining to the need for discounting the related receivable, is applicable. Opinion 21, paragraph 3(a), indicates that the requirements of that Opinion to record receivables at a discounted value are not intended to apply to "receivables and payables arising from transactions with customers or suppliers in the normal course of business which are due in customary trade terms not exceeding approximately one year" (emphasis added).

[*26]

2. The seller's past experiences with and pattern of bill and hold transactions;

3. Whether the buyer has the expected risk of loss in the event of a decline in the market value of goods;

4. Whether the seller's custodial risks are insurable and insured;

5. Whether extended procedures are necessary in order to assure that there are no exceptions to the buyer's commitment to accept and pay for the goods sold (i.e., that the business reasons for the bill and hold have not introduced a contingency to the buyer's commitment).

Delivery generally is not considered to have occurred unless the product has been delivered to the customer's place of business or another site specified by the customer. If the customer specifies an intermediate site but a substantial portion of the sales price is not payable until delivery is made to a final site, then revenue should not be recognized until final delivery has occurred. n21

Exhibit 2 Page 18

n21 SOP 97-2, paragraph 22.

**b. Customer acceptance**

After delivery of a product or performance of a service, [*27] if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs. n22 Customer acceptance provisions may be included in a contract, among other reasons, to enforce a customer's rights to (1) test the delivered product, (2) require the seller to perform additional services subsequent to delivery of an initial product or performance of an initial service (e.g., a seller is required to install or activate delivered equipment), or (3) identify other work necessary to be done before accepting the product. The staff presumes that such contractual customer acceptance provisions are substantive, bargained-for terms of an arrangement. Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse.

n22 SOP 97-2, paragraph 20. Also, Concepts Statement 5, paragraph 83(b) states "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." If an arrangement expressly requires customer acceptance, the staff generally believes that customer acceptance should occur before the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues, especially when the seller is obligated to perform additional steps.

[*28]

Question 1

Question: Do circumstances exist in which formal customer sign-off (that a contractual customer acceptance provision is met) is unnecessary to meet the requirements to recognize revenue?

Interpretive Response:

Yes. Formal customer sign-off is not always necessary to recognize revenue provided that the seller objectively demonstrates that the criteria specified in the acceptance provisions are satisfied. Customer acceptance provisions generally allow the customer to cancel the arrangement when a seller delivers a product that the customer has not yet agreed to purchase or delivers a product that does not meet the specifications of the customer's order. In those cases, revenue should not be recognized because a sale has not occurred. In applying this concept, the staff observes that customer acceptance provisions normally take one of four general forms. Those forms, and how the staff generally assesses whether customer acceptance provisions should result in revenue deferral, are described below:

(a) *Acceptance provisions in arrangements that purport to be for trial or evaluation purposes.* n23 In these arrangements, the seller delivers a product to a customer, [*29] and the customer agrees to receive the product, solely to give the customer the ability to evaluate the delivered product prior to acceptance. The customer does not agree to purchase the delivered product until it accepts the product. In some cases, the acceptance provisions lapse by the passage of time without the customer rejecting the delivered product, and in other cases affirmative acceptance from the cus-

Exhibit 2 Page 19

tomer is necessary to trigger a sales transaction. Frequently, the title to the product does not transfer and payment terms are not established prior to customer acceptance. These arrangements are, in substance, consignment arrangements until the customer accepts the product as set forth in the contract with the seller. Accordingly, in arrangements where products are delivered for trial or evaluation purposes, revenue should not be recognized until the earlier of when acceptance occurs or the acceptance provisions lapse.

       n23 See, for example, SOP 97-2, paragraph 25.

In contrast, other arrangements do not purport [*30] to be for trial or evaluation purposes. In these instances, the seller delivers a specified product pursuant to a customer's order, establishes payment terms, and transfers title to the delivered product to the customer. However, customer acceptance provisions may be included in the arrangement to give the purchaser the ability to ensure the delivered product meets the criteria set forth in its order. The staff evaluates these provisions as follows:

(b) *Acceptance provisions that grant a right of return or exchange on the basis of subjective matters.* An example of such a provision is one that allows the customer to return a product if the customer is dissatisfied with the product. n24 The staff believes these provisions are not different from general rights of return and should be accounted for in accordance with Statement 48. Statement 48 requires that the amount of future returns must be reasonably estimable in order for revenue to be recognized prior to the expiration of return rights. n25 That estimate may not be made in the absence of a large volume of homogeneous transactions or if customer acceptance is likely to depend on conditions for which sufficient historical [*31] experience is absent. n26 Satisfaction of these requirements may vary from product-to-product, location-to-location, customer-to-customer, and vendor-to-vendor.

       n24 Statement 48, paragraph 13.

       n25 Statement 48, paragraph 6(f).

       n26 Statement 48, paragraphs 8(c) and 8(d).

(c) *Acceptance provisions based on seller-specified objective criteria.* An example of such a provision is one that gives the customer a right of return or replacement if the delivered product is defective or fails to meet the vendor's published specifications for the product. n27 Such rights are generally identical to those granted to all others within the same class of customer and for which satisfaction can be generally assured without consideration of conditions specific to the customer. Provided the seller has previously demonstrated that the product meets the specified criteria, the staff believes that these provisions are not different from general or specific warranties and should be accounted for as warranties in accordance with [*32] Statement 5. In this case, the cost of potentially defective goods must be reliably estimable based on a demonstrated history of substantially similar transactions. n28 However, if the seller has not previously demonstrated that the delivered product meets the seller's specifications, the staff believes that revenue should be deferred until the specifications have been objectively achieved.

Exhibit 2 Page 20

n27 Statement 5, paragraph 24 and Statement 48, paragraph 4(c).

n28 Statement 5, paragraph 25.

(d) *Acceptance provisions based on customer-specified objective criteria.* These provisions are referred to in this document as "customer-specific acceptance provisions" against which substantial completion and contract fulfillment must be evaluated. While formal customer sign-off provides the best evidence that these acceptance criteria have been met, revenue recognition also would be appropriate, presuming all other revenue recognition criteria have been met, if the seller reliably demonstrates that the delivered products or [*33]   services meet all of the specified criteria prior to customer acceptance. For example, if a seller reliably demonstrates that a delivered product meets the customer-specified objective criteria set forth in the arrangement, the delivery criterion would generally be satisfied when title and the risks and rewards of ownership transfers unless product performance may reasonably be different under the customer's testing conditions specified by the acceptance provisions. Further, the seller should consider whether it would be successful in enforcing a claim for payment even in the absence of formal sign-off. Whether the vendor has fulfilled the terms of the contract before customer acceptance is a matter of contract law, and depending on the facts and circumstances, an opinion of counsel may be necessary to reach a conclusion.

Question 2

Facts: Consider an arrangement that calls for the transfer of title to equipment upon delivery to a customer's site. However, customer-specific acceptance provisions permit the customer to return the equipment unless the equipment satisfies certain performance tests. The arrangement calls for the vendor to perform the installation. Assume the equipment [*34]   and the installation are separate units of accounting under EITF Issue 00-21. n29

n29 This fact is provided as an assumption to facilitate an analysis of revenue recognition in this fact pattern. No interpretation of Issue 00-21 is intended.

Question: Must revenue allocated to the equipment always be deferred until installation and on-site testing are successfully completed?

Interpretive Response: No. The staff would not object to revenue recognition for the equipment upon delivery (presuming all other revenue recognition criteria have been met for the equipment) if the seller demonstrates that, at the time of delivery, the equipment already meets all of the criteria and specifications in the customer-specific acceptance provisions. This may be demonstrated if conditions under which the customer intends to operate the equipment are replicated in pre-shipment testing, unless the performance of the equipment, once installed and operated at the customer's facility, may reasonably be different from that tested prior [*35]   to shipment.

Determining whether the delivered equipment meets all of a product's criteria and specifications is a matter of judgment that must be evaluated in light of the facts and circumstances of a particular transaction. Consultation with knowledgeable project managers or engineers may be necessary in such circumstances.

For example, if the customer acceptance provisions were based on meeting certain size and weight characteristics, it should be possible to determine whether those criteria have been met be-

Exhibit 2 Page 21

fore shipment. Historical experience with the same specifications and functionality of a particular machine that demonstrates that the equipment meets the customer's specifications also may provide sufficient evidence that the currently shipped equipment satisfies the customer-specific acceptance provisions.

If an arrangement includes customer acceptance criteria or specifications that cannot be effectively tested before delivery or installation at the customer's site, the staff believes that revenue recognition should be deferred until it can be demonstrated that the criteria are met. This situation usually will exist when equipment performance can vary based on how the equipment [*36]   works in combination with the customer's other equipment, software, or environmental conditions. In these situations, testing to determine whether the criteria are met cannot be reasonably performed until the products are installed or integrated at the customer's facility.

Although the following questions provide several examples illustrating how the staff evaluates customer acceptance, the determination of when customer-specific acceptance provisions of an arrangement are met in the absence of the customer's formal notification of acceptance depends on the weight of the evidence in the particular circumstances. Different conclusions could be reached in similar circumstances that vary only with respect to a single variable, such as complexity of the equipment, nature of the interface with the customer's environment, extent of the seller's experience with the same type of transactions, or a particular clause in the agreement. The staff believes management and auditors are uniquely positioned to evaluate the facts and arrive at a reasoned conclusion. The staff will not object to a determination that is well reasoned on the basis of this guidance.

Question 3

Facts: Company E is an [*37]   equipment manufacturer whose main product is generally sold in a standard model. The contracts for sale of that model provide for customer acceptance to occur after the equipment is received and tested by the customer. The acceptance provisions state that if the equipment does not perform to Company E's published specifications, the customer may return the equipment for a full refund or a replacement unit, or may require Company E to repair the equipment so that it performs up to published specifications. Customer acceptance is indicated by either a formal sign-off by the customer or by the passage of 90 days without a claim under the acceptance provisions. Title to the equipment passes upon delivery to the customer. Company E does not perform any installation or other services on the equipment it sells and tests each piece of equipment against its specifications before shipment. Payment is due under Company E's normal payment terms for that product 30 days after customer acceptance.

Company E receives an order from a new customer for a standard model of its main product. Based on the customer's intended use of the product, location and other factors, there is no reason that the equipment [*38]   would operate differently in the customer's environment than it does in Company E's facility.

Question: Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

Interpretive Response: While the staff presumes that customer acceptance provisions are substantive provisions that generally result in revenue deferral, that presumption can be overcome as discussed above. Although the contract includes a customer acceptance clause, acceptance is based on meeting Company E's published specifications for a standard model. Company E demonstrates

Exhibit 2 Page 22

that the equipment shipped meets the specifications before shipment, and the equipment is expected to operate the same in the customer's environment as it does in Company E's. In this situation, Company E should evaluate the customer acceptance provision as a warranty under Statement 5. If Company E can reasonably and reliably estimate the amount of warranty obligations, the staff believes that it should recognize revenue upon delivery of the equipment, with an appropriate liability for probable [*39]   warranty obligations.

Question 4

Facts: Assume the same facts about Company E's equipment, contract terms and customary practices as in Question 3 above. Company E enters into an arrangement with a new customer to deliver a version of its standard product modified as necessary to fit into a space of specific dimensions while still meeting all of the published vendor specifications with regard to performance. In addition to the customer acceptance provisions relating to the standard performance specifications, the customer may reject the equipment if it does not conform to the specified dimensions. Company E creates a testing chamber of the exact same dimensions as specified by the customer and makes simple design changes to the product so that it fits into the testing chamber. The equipment still meets all of the standard performance specifications.

Question: Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

Interpretive Response: Although the contract includes a customer acceptance clause that is based, in part,   [*40]  on a customer specific criterion, Company E demonstrates that the equipment shipped meets that objective criterion, as well as the published specifications. before shipment. The staff believes that the customer acceptance provisions related to the standard performance specifications should be evaluated as a warranty under Statement 5. If Company E can reasonably and reliably estimate the amount of warranty obligations, it should recognize revenue upon delivery of the equipment, with an appropriate liability for probable warranty obligations.

Question 5

Facts: Assume the same facts about Company E's equipment, contract terms and customary practices as in Question 3 above. Company E enters into an arrangement with a new customer to deliver a version of its standard product modified as necessary to be integrated into the customer's new assembly line while still meeting all of the standard published vendor specifications with regard to performance. The customer may reject the equipment if it fails to meet the standard published performance specifications or cannot be satisfactorily integrated into the new line. Company E has never modified its equipment to work on an integrated basis [*41]   in the type of assembly line the customer has proposed. In response to the request, Company E designs a version of its standard equipment that is modified as believed necessary to operate in the new assembly line. The modified equipment still meets all of the standard published performance specifications, and Company E believes the equipment will meet the requested specifications when integrated into the new assembly line. However, Company E is unable to replicate the new assembly line conditions in its testing.

Question: Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

Exhibit 2 Page 23

Interpretive Response: This contract includes a customer acceptance clause that is based, in part, on a customer specific criterion, and Company E cannot demonstrate that the equipment shipped meets that criterion before shipment. Accordingly, the staff believes that the contractual customer acceptance provision has not been met at shipment. Therefore, the staff believes that Company E should wait until the product is successfully integrated at its   [*42]   customer's location and meets the customer-specific criteria before recognizing revenue. While this is best evidenced by formal customer acceptance, other objective evidence that the equipment has met the customer-specific criteria may also exist (e.g., confirmation from the customer that the specifications were met).

## c. Inconsequential or perfunctory performance obligations

Question 1

Question: Does the failure to complete all activities related to a unit of accounting preclude recognition of revenue for that unit of accounting?

Interpretive Response: No. Assuming all other recognition criteria are met, revenue for the unit of accounting may be recognized in its entirety if the seller's remaining obligation is inconsequential or perfunctory.

A seller should substantially complete or fulfill the terms specified in the arrangement related to the unit of accounting at issue in order for delivery or performance to have occurred. n30 When applying the substantially complete notion, the staff believes that only inconsequential or perfunctory actions may remain incomplete such that the failure to complete the actions would not result in the customer receiving a refund or   [*43]   rejecting the delivered products or services performed to date. In addition, the seller should have a demonstrated history of completing the remaining tasks in a timely manner and reliably estimating the remaining costs. If revenue is recognized upon substantial completion of the terms specified in the arrangement related to the unit of accounting at issue, all related costs of performance or delivery should be accrued.

n30 Concepts Statement 5, paragraph 83(b) states "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled the benefits represented by the revenues."

Question 2

Question: What factors should be considered in the evaluation of whether a remaining obligation related to a unit of accounting is inconsequential or perfunctory?

Interpretive Response: A remaining performance obligation is not inconsequential or perfunctory if it is essential to the functionality of the delivered products or services. In addition, remaining activities are [*44]   not inconsequential or perfunctory if failure to complete the activities would result in the customer receiving a full or partial refund or rejecting (or a right to a refund or to reject) the products delivered or services performed to date. The terms of the sales contract regarding both the right to a full or partial refund and the right of return or rejection should be considered when evaluating whether a portion of the purchase price would be refundable. If the company has a historical pattern of granting such rights, that historical pattern should also be considered even if the current contract expressly precludes such rights. Further, other factors should be considered in assessing whether remaining obligations are inconsequential or perfunctory. For example, the staff

Exhibit 2 Page 24

also considers the following factors, which are not all-inclusive, to be indicators that a remaining performance obligation is substantive rather than inconsequential or perfunctory:

. The seller does not have a demonstrated history of completing the remaining tasks in a timely manner and reliably estimating their costs.

. The cost or time to perform the remaining obligations for similar contracts historically   [*45] has varied significantly from one instance to another.

. The skills or equipment required to complete the remaining activity are specialized or are not readily available in the marketplace.

. The cost of completing the obligation, or the fair value of that obligation, is more than insignificant in relation to such items as the contract fee, gross profit, and operating income allocable to the unit of accounting.

. The period before the remaining obligation will be extinguished is lengthy. Registrants should consider whether reasonably possible variations in the period to complete performance affect the certainty that the remaining obligations will be completed successfully and on budget.

. The timing of payment of a portion of the sales price is coincident with completing performance of the remaining activity.

Registrants' determinations of whether remaining obligations are inconsequential or perfunctory should be consistently applied.

Question 3

Facts: Consider a unit of accounting that includes both equipment and installation because the two deliverables do not meet the separation criteria under EITF Issue 00-21. This may be because the equipment does not have value to the customer [*46]   on a standalone basis, there is no objective and reliable evidence of fair value for the installation or there is a general right of return when the installation is not considered probable and in control of the vendor.

Question: In this situation, must all revenue be deferred until installation is performed?

Interpretive Response: Yes, if installation is essential to the functionality of the equipment. n31 Examples of indicators that installation is essential to the functionality of equipment include.

n31 See SOP 97-2, paragraph 13.

. The installation involves significant changes to the features or capabilities of the equipment or building complex interfaces or connections:

. The installation services are unavailable from other vendors. n32 Conversely, examples of indicators that installation is not essential to the functionality of the equipment include:

n32 See SOP 97-2, paragraphs 68-71 for analogous guidance.

[*47]

. The equipment is a standard product;

Exhibit 2 Page 25

2003 SEC LEXIS 2981, *

. Installation does not significantly alter the equipment's capabilities;

. Other companies are available to perform the installation. n33

n33 Ibid.

If it is determined that the undelivered service is not essential to the functionality of the deli-vered product but a portion of the contract fee is not payable until the undelivered service is deli-vered, the staff would not consider that obligation to be inconsequential or perfunctory. Generally, the portion of the contract price that is withheld or refundable should be deferred until the outstand-ing service is delivered because that portion would not be realized or realizable. n34

n34 Concepts Statement 5, paragraph 83(a) and Statement 48, paragraph 6(b).

## d. License fee revenue

Facts: Assume that intellectual property is physically delivered and payment is  [*48]  received on December 20, upon the registrant's consummation of an agreement granting its customer a li-cense to use the intellectual property for a term beginning on the following January 1.

Question: Should the license fee be recognized in the period ending December 31?

Interpretive Response: No. In licensing and similar arrangements (e.g., licenses of motion pic-tures, software, technology, and other intangibles), the staff believes that delivery does not occur for revenue recognition purposes until the license term begins. n35 Accordingly, if a licensed product or technology is physically delivered to the customer, but the license term has not yet begun, reve-nue should not be recognized prior to inception of the license term. Upon inception of the license term, revenue should be recognized in a manner consistent with the nature of the transaction and the earnings process.

n35 SOP 00-2, paragraph 7.

## e. Layaway sales arrangements

Facts: Company R is a retailer that offers "layaway" sales to its customers. [*49]   Company R retains the merchandise, sets it aside in its inventory, and collects a cash deposit from the customer. Although Company R may set a time period within which the customer must finalize the purchase, Company R does not require the customer to enter into an installment note or other fixed payment commitment or agreement when the initial deposit is received. The merchandise generally is not released to the customer until the customer pays the full purchase price. In the event that the cus-tomer fails to pay the remaining purchase price, the customer forfeits its cash deposit. In the event the merchandise is lost, damaged, or destroyed, Company R either must refund the cash deposit to the customer or provide replacement merchandise.

Question: In the staff's view, when may Company R recognize revenue for merchandise sold under its layaway program?

Exhibit 2 Page 26

Interpretive Response: Provided that the other criteria for revenue recognition are met, the staff believes that Company R should recognize revenue from sales made under its layaway program upon delivery of the merchandise to the customer. Until then, the amount of cash received should be recognized as a liability entitled such [*50]   as "deposits received from customers for layaway sales" or a similarly descriptive caption. Because Company R retains the risks of ownership of the merchandise, receives only a deposit from the customer, and does not have an enforceable right to the remainder of the purchase price, the staff would object to Company R recognizing any revenue upon receipt of the cash deposit. This is consistent with item two (2) in the Commission's criteria for bill-and-hold transactions which states "the customer must have made a fixed commitment to purchase the goods."

### f. Nonrefundable up-front fees

Question 1

Facts: Registrants may negotiate arrangements pursuant to which they may receive nonrefundable fees upon entering into arrangements or on certain specified dates. The fees may ostensibly be received for conveyance of a license or other intangible right or for delivery of particular products or services. Various business factors may influence how the registrant and customer structure the payment terms. For example, in exchange for a greater up-front fee for an intangible right, the registrant may be willing to receive lower unit prices for related products to be delivered in the future. [*51]   In some circumstances, the right, product, or service conveyed in conjunction with the nonrefundable fee has no utility to the purchaser separate and independent of the registrant's performance of the other elements of the arrangement. Therefore, in the absence of the registrant's continuing involvement under the arrangement, the customer would not have paid the fee. Examples of this type of arrangement include the following:

. A registrant sells a lifetime membership in a health club. After paying a nonrefundable "initiation fee," the customer is permitted to use the health club indefinitely, so long as the customer also pays an additional usage fee each month. The monthly usage fees collected from all customers are adequate to cover the operating costs of the health club.

. A registrant in the biotechnology industry agrees to provide research and development activities for a customer for a specified term. The customer needs to use certain technology owned by the registrant for use in the research and development activities. The technology is not sold or licensed separately without the research and development activities. Under the terms of the arrangement, the customer is required [*52]   to pay a nonrefundable "technology access fee" in addition to periodic payments for research and development activities over the term of the contract.

. A registrant requires a customer to pay a nonrefundable "activation fee" when entering into an arrangement to provide telecommunications services. The terms of the arrangement require the customer to pay a monthly usage fee that is adequate to recover the registrant's operating costs. The costs incurred to activate the telecommunications service are nominal.

. A registrant charges users a fee for non-exclusive access to its web site that contains proprietary databases. The fee allows access to the web site for a one-year period. After the customer is provided with an identification number and trained in the use of the database, there are no incremental costs that will be incurred in serving this customer.

Exhibit 2 Page 27

. A registrant charges a fee to users for advertising a product for sale or auction on certain pages of its web site. The company agrees to maintain the listing for a period of time. The cost of maintaining the advertisement on the web site for the stated period is minimal.

. A registrant charges a fee for hosting another company's [*53]  web site for one year. The arrangement does not involve exclusive use of any of the hosting company's servers or other equipment. Almost all of the projected costs to be incurred will be incurred in the initial loading of information on the host company's internet server and setting up appropriate links and network connections.

Question: Assuming these arrangements qualify as single units of accounting under EITF Issue 00-21 n36, when should the revenue relating to nonrefundable, up-front fees in these types of arrangements be recognized?

n36 The staff believes that the vendor activities associated with the up-front fee, even if considered a deliverable to be evaluated under EITF Issue 00-21, will rarely provide value to the customer on a standalone basis.

Interpretive Response: The staff believes that registrants should consider the specific facts and circumstances to determine the appropriate accounting for nonrefundable, up-front fees. Unless the up-front fee is in exchange for products delivered or services [*54]  performed that represent the culmination of a separate earnings process, n37 the deferral of revenue is appropriate.

n37 See Concepts Statement 5, footnote 51, for a description of the "earning process."

In the situations described above, the staff does not view the activities completed by the registrants (i.e., selling the membership, signing the contract, enrolling the customer, activating telecommunications services or providing initial set-up services) as discrete earnings events. n38 The terms, conditions, and amounts of these fees typically are negotiated in conjunction with the pricing of all the elements of the arrangement, and the customer would ascribe a significantly lower, and perhaps no, value to elements ostensibly associated with the up-front fee in the absence of the registrant's performance of other contract elements. The fact that the registrants do not sell the initial rights, products, or services separately (i.e., without the registrants' continuing involvement) supports the staff's view.  [*55]  The staff believes that the customers are purchasing the on-going rights, products, or services being provided through the registrants' continuing involvement. Further, the staff believes that the earnings process is completed by performing under the terms of the arrangements, not simply by originating a revenue-generating arrangement.

n38 In a similar situation, lenders may collect nonrefundable loan origination fees in connection with lending activities. The FASB concluded in Statement 91 that loan origination is not a separate revenue-producing activity of a lender, and therefore, those nonrefundable fees collected at the outset of the loan arrangement are not recognized as revenue upon receipt but are deferred and recognized over the life of the loan (paragraphs 5 and 37).

Exhibit 2 Page 28

2003 SEC LEXIS 2981, *

While the incurrence of nominal up-front costs helps make it clear that there is not a separate earnings event in the telecommunications example above, incurrence of substantive costs, such as in the web hosting example above, does not necessarily [*56]   indicate that there is a separate earnings event. Whether there is a separate earnings event should be evaluated on a case-by-case basis. Some have questioned whether revenue may be recognized in these transactions to the extent of the incremental direct costs incurred in the activation. Because there is no separable deliverable or earnings event, the staff would generally object to that approach, except where it is provided for in the authoritative literature (e.g., Statement 51).

Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services. The initial fees may, in substance, be wholly or partly an advance payment for future products or services. In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment. Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, the staff believes that up-front fees, even if nonrefundable, are [*57]   earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance n39 and generally should be deferred and recognized systematically over the periods that the fees are earned. n40

> n39 The revenue recognition period should extend beyond the initial contractual period if the relationship with the customer is expected to extend beyond the initial term and the customer continues to benefit from the payment of the up-front fee (e.g., if subsequent renewals are priced at a bargain to the initial up-front fee).

> n40 A systematic method would be on a straight-line basis, unless evidence suggests that revenue is earned or obligations are fulfilled in a different pattern, in which case that pattern should be followed.

Some propose that revenue should be recognized when the initial set-up is completed in cases where the on-going obligation involves minimal or no cost or effort and should, therefore, be considered perfunctory or inconsequential. However,  [*58]   the staff believes that the substance of each of these transactions indicates that the purchaser is paying for a service that is delivered over time. Therefore, revenue recognition should occur over time, reflecting the provision of service. n41

> n41 Concepts Statement 5, paragraph 84(d).

Question 2

Facts: Company A provides its customers with activity tracking or similar services (e.g., tracking of property tax payment activity, sending delinquency letters on overdue accounts, etc.) for a ten-year period. Company A requires customers to prepay for all the services for the term specified in the arrangement. The on-going services to be provided are generally automated after the initial customer set-up. At the outset of the arrangement, Company A performs set-up procedures to facilitate delivery of its on-going services to the customers. Such procedures consist primarily of establishing the necessary records and files in Company A's pre-existing computer systems in order to

Exhibit 2 Page 29

2003 SEC LEXIS 2981, *

provide the services. Once the initial [*59]   customer set-up activities are complete. Company A provides its services in accordance with the arrangement. Company A is not required to refund any portion of the fee if the customer terminates the services or does not utilize all of the services to which it is entitled. However, Company A is required to provide a refund if Company A terminates the arrangement early. Assume Company A's activities are not within the scope of Statement 91 and that this arrangement qualifies as a single unit of accounting under EITF Issue 00-21. n42

n42 See Note 36, supra.

Question: When should Company A recognize the service revenue?

Interpretive Response: The staff believes that, provided all other revenue recognition criteria are met, service revenue should be recognized on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, n43 [*60]   whichever is longer. In this case, the customer contracted for the on-going activity tracking service, not for the set-up activities. The staff notes that the customer could not, and would not, separately purchase the set-up services without the on-going services. The services specified in the arrangement are performed continuously over the contractual term of the arrangement (and any subsequent renewals). Therefore, the staff believes that Company A should recognize revenue on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer.

n43 See Note 39, supra.

In this situation, the staff would object to Company A recognizing revenue in proportion to the costs incurred because the set-up costs incurred bear no direct relationship to the performance of services specified in the arrangement. The staff also believes [*61]   that it is inappropriate to recognize the entire amount of the prepayment as revenue at the outset of the arrangement by accruing the remaining costs because the services required by the contract have not been performed.

**Question 3**

Facts: Assume the same facts as in Question 2 above.

Question: Are the initial customer set-up costs incurred by Company A within the scope of SOP 98-5?

Interpretive Response: Footnote 1 of SOP 98-5 states that "this SOP does not address the financial reporting of costs incurred related to ongoing customer acquisition, such as policy acquisition costs in Statement 60 ... and loan origination costs in Statement 91 ... The SOP addresses the more substantive one-time efforts to establish business with an entirely new class of customers (for example, a manufacturer who does all of its business with retailers attempts to sell merchandise directly to the public)." As such, the set-up costs incurred in this example are not within the scope of SOP 98-5.

Exhibit 2 Page 30

The staff believes that the incremental direct costs (Statement 91 provides an analogous defini-tion) incurred related to the acquisition or origination of a customer contract in a transaction that [*62]   results in the deferral of revenue, unless specifically provided for in the authoritative litera-ture, may be either expensed as incurred or accounted for in accordance with paragraph 4 of Tech-nical Bulletin 90-1 or paragraph 5 of Statement 91. The staff believes the accounting policy chosen for these costs should be disclosed and applied consistently.

Question 4

Facts: Assume the same facts as in Question 2 above.

Question: What is the staff's view of the pool of contract acquisition and origination costs that are eligible for capitalization?

Interpretive Response: As noted in Question 3 above. Statement 91 includes a definition of in-cremental direct costs in its glossary. Paragraph 6 of Statement 91 provides further guidance on the types of costs eligible for capitalization as customer acquisition costs indicating that only costs that result from successful loan origination efforts are capitalized. The FASB staff has published an Im-plementation Guide on Statement 91 that provides additional guidance on the costs that qualify for capitalization as customer acquisition costs. Further, Technical Bulletin 90-1 also requires capitali-zation of incremental direct customer acquisition [*63]   costs and requires that those costs be "identified consistent with the guidance in paragraph 6 of Statement 91." Although the facts of a particular situation should be analyzed closely to capture those costs that are truly direct and incre-mental, the staff generally would not object to an accounting policy that results in the capitalization of costs in accordance with paragraph 6(a) and (b) of Statement 91 or Technical Bulletin 90-1. Re-gistrants should disclose their policies for determining which costs to capitalize as contract acquisi-tion and origination costs.

Question 5

Facts: Assume the same facts as in Question 2 above. Based on the guidance in Questions 2, 3 and 4 above, Company A has capitalized certain direct and incremental customer set-up costs asso-ciated with the deferred revenue.

Question: Over what period should Company A amortize these costs?

Interpretive Response: When both costs and revenue (in an amount equal to or greater than the costs) are deferred, the staff believes that the capitalized costs should be charged to expense propor-tionally and over the same period that deferred revenue is recognized as revenue. n44

n44 Technical Bulletin 90-1, paragraph 4.

[*64]

### g. Deliverables within an arrangement

Question: If a company (the seller) has a patent to its intellectual property which it licenses to customers, the seller may represent and warrant to its licensees that it has a valid patent, and will defend and maintain that patent. Does that obligation to maintain and defend patent rights, in and of itself, constitute a deliverable to be evaluated under EITF Issue 00-21?

Exhibit 2 Page 31

Interpretive Response: No. Provided the seller has legal and valid patents upon entering the license arrangement, existing GAAP on licenses of intellectual property (e.g., SOP 97-2, SOP 00-2, and SFAS No. 50) does not indicate that an obligation to defend valid patents represents an additional deliverable to which a portion of an arrangement fee should be allocated in an arrangement that otherwise qualifies for sales-type accounting. While this clause may obligate the licenser to incur costs in the defense and maintenance of the patent, that obligation does not involve an additional deliverable to the customer. Defending the patent is generally consistent with the seller's representation in the license that such patent is legal and valid. Therefore, the staff [*65] would not consider a clause like this to represent an additional deliverable in the arrangement. n45

n45 Note, however, the staff believes that this obligation qualifies as a guarantee within the scope of FIN 45, subject to a scope exception from the initial recognition and measurement provisions.

**4. Fixed or determinable sales price**

**a. Refundable fees for services**

A company's contracts may include customer cancellation or termination clauses. Cancellation or termination provisions may be indicative of a demonstration period or an otherwise incomplete transaction. Examples of transactions that financial management and auditors should be aware of and where such provisions may exist include "side" agreements and significant transactions with unusual terms and conditions. These contractual provisions raise questions as to whether the sales price is fixed or determinable. The sales price in arrangements that are cancelable by the customer is neither fixed nor determinable until the cancellation privileges lapse. [*66] n46 If the cancellation privileges expire ratably over a stated contractual term, the sales price is considered to become determinable ratably over the stated term. n47 Short-term rights of return, such as thirty-day money-back guarantees, and other customary rights to return products are not considered to be cancellation privileges, but should be accounted for in accordance with Statement 48. n48

n46 SOP 97-2, paragraph 31.

n47 Ibid.

n48 Ibid.

Question 1

Facts: Company M is a discount retailer. It generates revenue from annual membership fees it charges customers to shop at its stores and from the sale of products at a discount price to those customers. The membership arrangements with retail customers require the customer to pay the entire membership fee (e.g., $ 35) at the outset of the arrangement. However, the customer has the unilateral right to cancel the arrangement at any time during its term and receive a full refund of the initial fee. Based on historical data collected over time for a large [*67] number of homogeneous transactions. Company M estimates that approximately 40% of the customers will request a refund before the end of the membership contract term. Company M's data for the past five years indicates

Exhibit 2 Page 32

that significant variations between actual and estimated cancellations have not occurred, and Company M does not expect significant variations to occur in the foreseeable future.

Question: May Company M recognize in earnings the revenue for the membership fees and accrue the costs to provide membership services at the outset of the arrangement?

Interpretive Response: No. In the staff's view, it would be inappropriate for Company M to recognize the membership fees as earned revenue upon billing or receipt of the initial fee with a corresponding accrual for estimated costs to provide the membership services. This conclusion is based on Company M's remaining and unfulfilled contractual obligation to perform services (i.e., make available and offer products for sale at a discounted price) throughout the membership period. Therefore, the earnings process, irrespective of whether a cancellation clause exists, is not complete.

In addition, the ability of the member [*68]   to receive a full refund of the membership fee up to the last day of the membership term raises an uncertainty as to whether the fee is fixed or determinable at any point before the end of the term. Generally, the staff believes that a sales price is not fixed or determinable when a customer has the unilateral right to terminate or cancel the contract and receive a cash refund. A sales price or fee that is variable until the occurrence of future events (other than product returns that are within the scope of Statement 48) generally is not fixed or determinable until the future event occurs. The revenue from such transactions should not be recognized in earnings until the sales price or fee becomes fixed or determinable. Moreover, revenue should not be recognized in earnings by assessing the probability that significant, but unfulfilled, terms of a contract will be fulfilled at some point in the future. Accordingly, the revenue from such transactions should not be recognized in earnings prior to the refund privileges expiring. The amounts received from customers or subscribers (i.e., the $ 35 fee mentioned above) should be credited to a monetary liability account such as "customers' [*69]   refundable fees."

The staff believes that if a customer has the unilateral right to receive both (1) the seller's substantial performance under an arrangement (e.g., providing services or delivering product) and (2) a cash refund of prepaid fees, then the prepaid fees should be accounted for as a monetary liability. In consideration of whether the monetary liability can be derecognized, Statement 140 provides that liabilities may be derecognized only if (1) the debtor pays the creditor and is relieved of its obligation for the liability (paying the creditor includes delivery of cash, other financial assets, goods, or services or reacquisition by the debtor of its outstanding debt securities) or (2) the debtor is legally released from being the primary obligor under the liability. n49 If a customer has the unilateral right to receive both (1) the seller's substantial performance under the arrangement and (2) a cash refund of prepaid fees, then the refund obligation is not relieved upon performance of the service or delivery of the products. Rather, the seller's refund obligation is relieved only upon refunding the cash or expiration of the refund privilege.

n49 Statement 140, paragraph 16.

[*70]

Some have argued that there may be a limited exception to the general rule that revenue from membership or other service transaction fees should not be recognized in earnings prior to the refund privileges expiring. Despite the fact that Statement 48 expressly does not apply to the accounting for service revenue if part or all of the service fee is refundable under cancellation privi-

Exhibit 2 Page 33

leges granted to the buyer. n50 they believe that in certain circumstances a potential refund of a membership fee may be seen as being similar to a right of return of products under Statement 48. They argue that revenue from membership fees, net of estimated refunds, may be recognized ratably over the period the services are performed whenever pertinent conditions of Statement 48 are met, namely, there is a large population of transactions that grant customers the same unilateral termination or cancellation rights and reasonable estimates can be made of how many customers likely will exercise those rights.

n50 Statement 48, paragraph 4.

[*71]

The staff believes that, because service arrangements are specifically excluded from the scope of Statement 48, the most direct authoritative literature to be applied to the extinguishment of obligations under such contracts is Statement 140. As noted above, because the refund privilege extends to the end of the contract term irrespective of the amount of the service performed, Statement 140 indicates that the liability would not be extinguished (and therefore no revenue would be recognized in earnings) until the cancellation or termination and related refund privileges expire. Nonetheless, the staff recognizes that over the years the accounting for membership refunds evolved based on analogy to Statement 48 and that practice did not change when Statement 140 became effective. Reasonable people held, and continue to hold, different views about the application of the accounting literature.

Pending further action in this area by the FASB, the staff will not object to the recognition of refundable membership fees, net of estimated refunds, as earned revenue over the membership term in the limited circumstances where all of the following criteria have been met: n51

n51 The staff will question further analogies to the guidance in Statement 48 for transactions expressly excluded from its scope.

[*72]

. The estimates of terminations or cancellations and refunded revenues are being made for a large pool of homogeneous items (e.g., membership or other service transactions with the same characteristics such as terms, periods, class of customers, nature of service, etc.).

. Reliable estimates of the expected refunds can be made on a timely basis. n52 Either of the following two items would be considered indicative of an inability to make reliable estimates: (1) recurring, significant differences between actual experience and estimated cancellation or termination rates (e.g., an actual cancellation rate of 40% versus an estimated rate of 25%) even if the impact of the difference on the amount of estimated refunds is not material to the consolidated financial statements n53 or (2) recurring variances between the actual and estimated amount of refunds that are material to either revenue or net income in quarterly or annual financial statements. In addition, the staff believes that an estimate, for purposes of meeting this criterion, would not be reliable unless it is remote n54 that material adjustments (both individually and in the aggregate) to previously recognized revenue  [*73]  would be required. The staff presumes that reliable estimates cannot be made if the customer's termination or cancellation and refund privileges exceed one year.

Exhibit 2 Page 34

n52 Reliability is defined in Concepts Statement 2 as "the quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent." Paragraph 63 of Concepts Statement 5 reiterates the definition of reliability, requiring that "the information is representationally faithful, verifiable, and neutral."

n53 For example, if an estimate of the expected cancellation rate varies from the actual cancellation rate by 100% but the dollar amount of the error is immaterial to the consolidated financial statements, some would argue that the estimate could still be viewed as reliable. The staff disagrees with that argument.

n54 The term "remote" is used here with the same definition as used in Statement 5.

. There is a sufficient company-specific historical basis upon which to estimate the [*74]   refunds, n55 and the company believes that such historical experience is predictive of future events. In assessing these items, the staff believes that estimates of future refunds should take into consideration, among other things, such factors as historical experience by service type and class of customer, changing trends in historical experience and the basis thereof (e.g., economic conditions), the impact or introduction of competing services or products, and changes in the customer's "accessibility" to the refund (i.e., how easy it is for customers to obtain the refund).

n55 Paragraph 8 of Statement 48 notes various factors that may impair the ability to make a reasonable estimate of returns, including the lack of sufficient historical experience. The staff typically expects that the historical experience be based on the particular registrant's historical experience for a service and/or class of customer. In general, the staff typically expects a start-up company, a company introducing new services, or a company introducing services to a new class of customer to have at least two years of experience to be able to make reasonable and reliable estimates.

[*75]

. The amount of the membership fee specified in the agreement at the outset of the arrangement is fixed, other than the customer's right to request a refund.

If Company M does not meet all of the foregoing criteria, the staff believes that Company M should not recognize in earnings any revenue for the membership fee until the cancellation privileges and refund rights expire.

If revenue is recognized in earnings over the membership period pursuant to the above criteria, the initial amounts received from customer or subscribers (i.e., the $ 35 fee mentioned above) should be allocated to two liability accounts. The amount of the fee representing estimated refunds should be credited to a monetary liability account, such as "customers' refundable fees," and the remaining amount of the fee representing unearned revenue should be credited to a nonmonetary liability account, such as "unearned revenues." For each income statement presented, registrants should disclose in the footnotes to the financial statements the amounts of (1) the unearned revenue and (2) refund obligations as of the beginning of each period, the amount of cash received from customers, the amount of revenue recognized [*76]   in earnings, the amount of refunds paid, other

Exhibit 2 Page 35

2003 SEC LEXIS 2981, *

adjustments (with an explanation thereof), and the ending balance of (1) unearned revenue and (2) refund obligations.

If revenue is recognized in earnings over the membership period pursuant to the above criteria, the staff believes that adjustments for changes in estimated refunds should be recorded using a retrospective approach whereby the unearned revenue and refund obligations are remeasured and adjusted at each balance sheet date with the offset being recorded as earned revenue. n56

> n56 The staff believes deferred costs being amortized on a basis consistent with the deferred revenue should be similarly adjusted. Such an approach is generally consistent with the amortization methodology in Statement 91, paragraph 19.

Companies offering memberships often distribute membership packets describing and discussing the terms, conditions, and benefits of membership. Packets may include vouchers, for example, that provide new members with discounts or other benefits from third [*77]  parties. The costs associated with the vouchers should be expensed when distributed. Advertising costs to solicit members should be accounted for in accordance with SOP 93-7. Incremental direct costs incurred in connection with enrolling customers (e.g., commissions paid to agents) should be accounted for as follows: (1) if revenue is deferred until the cancellation or termination privileges expire, incremental direct costs should be either(a) charged to expense when incurred if the costs are not refundable to the company in the event the customer obtains a refund of the membership fee, or (b) if the costs are refundable to the company in the event the customer obtains a refund of the membership fee, recorded as an asset until the earlier of termination or cancellation or refund; or(2) if revenue, net of estimated refunds, is recognized in earnings over the membership period, a like percentage of incremental direct costs should be deferred and recognized in earnings in the same pattern as revenue is recognized, and the remaining portion should be either (a) charged to expense when incurred if the costs are not refundable to the company in the event the customer obtains a refund [*78]   of the membership fee, or (b) if the costs are refundable to the company in the event the customer obtains a refund of the membership fee, recorded as an asset until the refund occurs. n57 All costs other than incremental direct costs (e.g., indirect costs) should be expensed as incurred.

> n57 Statement 91, paragraph 5 and Technical Bulletin 90-1, paragraph 4 both provide for the deferral of incremental direct costs associated with acquiring a revenue-producing contract. Even though the revenue discussed in this example is refundable, if a registrant meets the aforementioned criteria for revenue recognition over the membership period, the staff would analogize to this guidance. However, if neither a nonrefundable contract nor a reliable basis for estimating net cash inflows under refundable contracts exists to provide a basis for recovery of incremental direct costs, the staff believes that such costs should be expensed as incurred. See SAB Topic 13.A.3.f. Question 3.

Question 2

Question: Will the staff accept [*79]   an analogy to Statement 48 for service transactions subject to customer cancellation privileges other than those specifically addressed in the previous question?

Exhibit 2 Page 36

2003 SEC LEXIS 2981, *

Interpretive Response: The staff has accepted the analogy in limited circumstances due to the existence of a large pool of homogeneous transactions and satisfaction of the criteria in the previous question. Examples of other arrangements involving customer cancellation privileges and refundable service fees that the staff has addressed include the following:

. a leasing broker whose commission from the lessor upon a commercial tenant's signing of a lease agreement is refundable (or in some cases, is not due) under lessor cancellation privileges if the tenant fails to move into the leased premises by a specified date.

. a talent agent whose fee receivable from its principal (i.e., a celebrity) for arranging a celebrity endorsement for a five-year term is cancelable by the celebrity if the celebrity breaches the endorsement contract with its customer.

. an insurance agent whose commission received from the insurer upon selling an insurance policy is refundable in whole for the 30-day period that state law permits the [*80] consumer to repudiate the contract and then refundable on a declining pro rata basis until the consumer has made six monthly payments.

In the first two of these cases, the staff advised the registrants that the portion of revenue subject to customer cancellation and refund must be deferred until no longer subject to that contingency because the registrants did not have an ability to make reliable estimates of customer cancellations due to the lack of a large pool of homogeneous transactions. In the case of the insurance agent, however, the particular registrant demonstrated that it had a sufficient history of homogeneous transactions with the same characteristics from which to reliably estimate contract cancellations and satisfy all the criteria specified in the previous question. Accordingly, the staff did not object to that registrant's policy of recognizing its sales commission as revenue when its performance was complete, with an appropriate allowance for estimated cancellations.

Question 3

Question: Must a registrant analogize to Statement 48, or may it choose to defer all revenue until the refund period lapses as suggested by Statement 140 even if the criteria above for   [*81] analogy to Statement 48 are met?

Interpretive Response: The analogy to Statement 48 is presented as an alternative that would be acceptable to the staff when the listed conditions are met. However, a registrant may choose to defer all revenue until the refund period lapses. The policy chosen should be disclosed and applied consistently.

Question 4

Question: May a registrant that meets the above criteria for reliable estimates of cancellations choose at some point in the future to change from the Statement 48 method to the Statement 140 method of accounting for these refundable fees? May a registrant change from the Statement 140 method to the Statement 48 method?

Interpretive Response: The staff believes that Statement 140 provides a preferable accounting model for service transactions subject to potential refunds. Therefore, the staff would not object to a change from the Statement 48 method to the Statement 140 method. However, if a registrant had previously chosen the Statement 140 method, the staff would object to a change to the Statement 48 method.

Exhibit 2 Page 37

2003 SEC LEXIS 2981, *

Question 5

Question: Is there a minimum level of customers that must be projected not to cancel before use of Statement [*82]  48 type accounting is appropriate?

Interpretive Response: Statement 48 does not include any such minimum. Therefore, the staff does not believe that a minimum must apply in service transactions either. However, as the refund rate increases, it may be increasingly difficult to make reasonable and reliable estimates of cancellation rates.

Question 6

Question: When a registrant first determines that reliable estimates of cancellations of service contracts can be made (e.g., two years of historical evidence becomes available), how should the change from the complete deferral method to the method of recognizing revenue, net of estimated cancellations, over time be reflected?

Interpretive Response: Changes in the ability to meet the criteria set forth above should be accounted for in the manner described in paragraph 6 of Statement 48, which addresses the accounting when a company experiences a change in the ability to make reasonable estimates of future product returns.

**b. Estimates and changes in estimates**

Accounting for revenues and costs of revenues requires estimates in many cases: those estimates sometimes change. Registrants should ensure that they have appropriate [*83]  internal controls and adequate books and records that will result in timely identification of necessary changes in estimates that should be reflected in the financial statements and notes thereto.

Question 1

Facts: Paragraph 8 of Statement 48 lists a number of factors that may impair the ability to make a reasonable estimate of product returns in sales transactions when a right of return exists. n58 The paragraph concludes by stating "other factors may preclude a reasonable estimate."

> n58 These factors include "a) the susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand, b) relatively long periods in which a particular product may be returned, c) absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies and relationships with its customers, and d) absence of a large volume of relatively homogeneous transactions."

[*84]

Question: What "other factors," in addition to those listed in paragraph 8 of Statement 48, has the staff identified that may preclude a registrant from making a reasonable and reliable estimate of product returns?

Interpretive Response: The staff believes that the following additional factors, among others, may affect or preclude the ability to make reasonable and reliable estimates of product returns: (1) significant increases in or excess levels of inventory in a distribution channel (sometimes referred to

Exhibit 2 Page 38

as "channel stuffing"), (2) lack of "visibility" into or the inability to determine or observe the levels of inventory in a distribution channel and the current level of sales to end users, (3) expected introductions of new products that may result in the technological obsolescence of and larger than expected returns of current products, (4) the significance of a particular distributor to the registrant's (or a reporting segment's) business, sales and marketing, (5) the newness of a product, (6) the introduction of competitors' products with superior technology or greater expected market acceptance, and (7) other factors that affect market demand and changing trends in [*85]   that demand for the registrant's products. Registrants and their auditors should carefully analyze all factors, including trends in historical data, which may affect registrants' ability to make reasonable and reliable estimates of product returns.

The staff reminds registrants that if a transaction fails to meet all of the conditions of paragraphs 6 and 8 in Statement 48, no revenue may be recognized until those conditions are subsequently met or the return privilege has substantially expired, whichever occurs first. n59 Simply deferring recognition of the gross margin on the transaction is not appropriate.

n59 Statement 48, paragraph 6.

Question 2

Question: Is the requirement cited in the previous question for "reliable" estimates meant to imply a new, higher requirement than the "reasonable" estimates discussed in Statement 48?

Interpretive Response: No. "Reliability" of financial information is one of the qualities of accounting information discussed in Concepts Statement 2. The staff's expectation that  [*86]   estimates be reliable does not change the existing requirement of Statement 48. If management cannot develop an estimate that is sufficiently reliable for use by investors, the staff believes it cannot make a reasonable estimate meeting the requirements of that standard.

Question 3

Question: Does the staff expect registrants to apply the guidance in Question 1 of Topic 13.A.4(a) above to sales of tangible goods and other transactions specifically within the scope of Statement 48?

Interpretive Response: The specific guidance above does not apply to transactions within the scope of Statement 48. The views set forth in Question 1 of Topic 13.A.4(a) are applicable to the service transactions discussed in that Question. Service transactions are explicitly outside the scope of Statement 48.

Question 4

Question: Question 1 of Topic 13.A.4(a) above states that the staff would expect a two-year history of selling a new service in order to be able to make reliable estimates of cancellations. How long a history does the staff believe is necessary to estimate returns in a product sale transaction that is within the scope of Statement 48?

Interpretive Response: The staff does not [*87]   believe there is any specific length of time necessary in a product transaction. However, Statement 48 states that returns must be subject to reasonable estimation. Preparers and auditors should be skeptical of estimates of product returns when

Exhibit 2 Page 39

little history with a particular product line exists, when there is inadequate verifiable evidence of historical experience, or when there are inadequate internal controls that ensure the reliability and timeliness of the reporting of the appropriate historical information. Start-up companies and companies selling new or significantly modified products are frequently unable to develop the requisite historical data on which to base estimates of returns.

Question 5

Question: If a company selling products subject to a right of return concludes that it cannot reasonably estimate the actual return rate due to its limited history, but it can conservatively estimate the maximum possible returns, does the staff believe that the company may recognize revenue for the portion of the sales that exceeds the maximum estimated return rate?

Interpretive Response: No. If a reasonable estimate of future returns cannot be made, Statement 48 requires that [*88]  revenue not be recognized until the return period lapses or a reasonable estimate can be made. n60 Deferring revenue recognition based on the upper end of a wide range of potential return rates is inconsistent with the provisions of Statement 48.

n60 Statement 48, paragraph 6(f).

## c. Contingent rental income

Facts: Company A owns and leases retail space to retailers. Company A (lessor) renews a lease with a customer (lessee) that is classified as an operating lease. The lease term is one year and provides that the lease payments are $ 1.2 million, payable in equal monthly installments on the first day of each month, plus one percent of the lessee's net sales in excess of $ 25 million if the net sales exceed $ 25 million during the lease term (i.e., contingent rental). The lessee has historically experienced annual net sales in excess of $ 25 million in the particular space being leased, and it is probable that the lessee will generate in excess of $ 25 million net sales during the term of the lease.

Question: [*89]  In the staff's view, should the lessor recognize any rental income attributable to the one percent of the lessee's net sales exceeding $ 25 million before the lessee actually achieves the $ 25 million net sales threshold?

Interpretive Response: No. The staff believes that contingent rental income "accrues" (i.e., it should be recognized as revenue) when the changes in the factor(s) on which the contingent lease payments is (are) based actually occur. n61

n61 Lessees should follow the guidance established in EITF Issue 98-9.

Statement 13 paragraph 19(b) states that lessors should account for operating leases as follows: "Rent shall be reported in income over the lease term as it becomes receivable according to the provisions of the lease. However, if the rentals vary from a straight-line basis, the income shall be recognized on a straight-line basis unless another systematic and rational basis is more representative of the time pattern in which use benefit from the leased property is diminished, in which case [*90] that basis shall be used."

Exhibit 2 Page 40

Statement 29 amended Statement 13 and clarifies that "lease payments that depend on a factor that does not exist or is not measurable at the inception of the lease, such as future sales volume, would be contingent rentals in their entirety and, accordingly, would be excluded from minimum lease payments and included in the determination of income as they accrue." [Summary] Paragraph 17 of Statement 29 provides the following example of determining contingent rentals:

A lease agreement for retail store space could stipulate a monthly base rental of $ 200 and a monthly supplemental rental of one-fourth of one percent of monthly sales volume during the lease term. Even if the lease agreement is a renewal for store space that had averaged monthly sales of $ 25,000 for the past 2 years, minimum lease payments would include only the $ 200 monthly base rental; the supplemental rental is a contingent rental that is excluded from minimum lease payments. The future sales for the lease term do not exist at the inception of the lease, and future rentals would be limited to $ 200 per month if the store were subsequently closed and no sales were made thereafter.

Technical [*91]   Bulletin 85-3 addresses whether it is appropriate for lessors in operating leases to recognize scheduled rent increases on a basis other than as required in Statement 13, paragraph 19(b). Paragraph 2 of Technical Bulletin 85-3 states "using factors such as the time value of money, anticipated inflation, or expected future revenues [emphasis added] to allocate scheduled rent increases is inappropriate because these factors do not relate to the time pattern of the physical usage of the leased property. However, such factors may affect the periodic reported rental income or expense if the lease agreement involves contingent rentals, which are excluded from minimum lease payments and accounted for separately under Statement 13, as amended by Statement 29." In developing the basis for why scheduled rent increases should be recognized on a straight-line basis, the FASB distinguishes the accounting for scheduled rent increases from contingent rentals. Paragraph 13 states "There is an important substantive difference between lease rentals that are contingent upon some specified future event and scheduled rent increases that are unaffected by future events; the accounting under Statement [*92]   13 reflects that difference. If the lessor and lessee eliminate the risk of variable payments by agreeing to scheduled rent increases, the accounting should reflect those different circumstances."

The example provided in Statement 29 implies that contingent rental income in leases classified as sales-type or direct-financing leases becomes "accruable" when the changes in the factors on which the contingent lease payments are based actually occur. Technical Bulletin 85-3 indicates that contingent rental income in operating leases should not be recognized in a manner consistent with scheduled rent increases (i.e., on a straight-line basis over the lease term or another systematic and rational allocation basis if it is more representative of the time pattern in which the leased property is physically employed) because the risk of variable payments inherent in contingent rentals is substantively different than scheduled rent increases. The staff believes that the reasoning in Technical Bulletin 85-3 supports the conclusion that the risks inherent in variable payments associated with contingent rentals should be reflected in financial statements on a basis different than rental payments [*93]   that adjust on a scheduled basis and, therefore, operating lease income associated with contingent rents would not be recognized as time passes or as the leased property is physically employed. Furthermore, prior to the lessee's achievement of the target upon which contingent rentals are based, the lessor has no legal claims on the contingent amounts. Consequently, the staff believes that it is inappropriate to anticipate changes in the factors on which contingent rental income in operating leases is based and recognize rental income prior to the resolution of the lease contingencies.

Exhibit 2 Page 41

2003 SEC LEXIS 2981, *

Because Company A's contingent rental income is based upon whether the customer achieves net sales of $ 25 million, the contingent rentals, which may not materialize, should not be recognized until the customer's net sales actually exceed $ 25 million. Once the $ 25 million threshold is met, Company A would recognize the contingent rental income as it becomes accruable, in this case, as the customer recognizes net sales. The staff does not believe that it is appropriate to recognize revenue based upon the probability of a factor being achieved. The contingent revenue should be recorded in the period   [*94]   in which the contingency is resolved.

### d. Claims processing and billing services

Facts: Company M performs claims processing and medical billing services for healthcare providers. In this role. Company M is responsible for preparing and submitting claims to third-party payers, tracking outstanding billings, and collecting amounts billed. Company M's fee is a fixed percentage (e.g., five percent) of the amount collected. If no collections are made, no fee is due to Company M. Company M has historical evidence indicating that the third-party payers pay 85 percent of the billings submitted with no further effort by Company M. Company M has determined that the services performed under the arrangement are a single unit of accounting.

Question: May Company M recognize as revenue its five percent fee on 85 percent of the gross billings at the time it prepares and submits billings, or should it wait until collections occur to recognize any revenue?

Interpretive Response: The staff believes that Company M must wait until collections occur before recognizing revenue. Before the third-party payer has remitted payment to Company M's customers for the services billed. Company [*95]   M is not entitled to any revenue. That is, its revenue is not yet realized or realizable. n62 Until Company M's customers collect on the billings. Company M has not performed the requisite activity under its contract to be entitled to a fee. n63 Further, no amount of the fee is fixed or determinable or collectible until Company Ms' customers collect on the billings.

n62 Concepts Statement 5, paragraph 83(a).

n63 Concepts Statement 5, paragraph 83(b).

### B. Disclosures

Question 1

Question: What disclosures are required with respect to the recognition of revenue?

Interpretive Response: A registrant should disclose its accounting policy for the recognition of revenue pursuant to Opinion 22. Paragraph 12 thereof states that "the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue ...." Because revenue recognition generally involves some level of judgment, the staff believes that a registrant should always disclose its revenue recognition policy.   [*96]   If a company has different policies for different types of revenue transactions, including barter sales, the policy for each material type of transaction should be disclosed. If sales transactions have multiple units of accounting, such as a product and service, the accounting policy should clearly state the accounting policy for each unit of accounting as well as how units of accounting are determined and valued. In addition, the staff believes that changes in estimated returns recognized in accordance with Statement 48

Exhibit 2 Page 42

should be disclosed, if material (e.g., a change in estimate from two percent of sales to one percent of sales).

Regulation S-X requires that revenue from the sales of products, services, and other products each be separately disclosed on the face of the income statement. n64 The staff believes that costs relating to each type of revenue similarly should be reported separately on the face of the income statement.

n64 See Regulation S-X, Article 5-03(b)(1) and (2).

MD&A requires a discussion of liquidity, [*97] capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations. n65 This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in FRR 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future." n66

n65 See Regulation S-K, Article 303 and FRR 36.

n66 FRR 36, also see In the Matter of Caterpillar Inc., AAER 363 (March 31, 1992).

[*98]

Examples of such revenue transactions or events that the staff has asked to be disclosed and discussed in accordance with FRR 36 are:

. Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.

. Granting of extended payment terms that will result in a longer collection period for accounts receivable (regardless of whether revenue has been recognized) and slower cash inflows from operations, and the effect on liquidity and capital resources. (The fair value of trade receivables should be disclosed in the footnotes to the financial statements when the fair value does not approximate the carrying amount.) n67

n67 Statement 107.

. Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns.

Exhibit 2 Page 43

. An increasing trend toward sales to a different class of customer, such  [*99]  as a reseller distribution channel that has a lower gross profit margin than existing sales that are principally made to end users. Also, increasing service revenue that has a higher profit margin than product sales.

. Seasonal trends or variations in sales.

. A gain or loss from the sale of an asset(s). n68

> n68 Gains or losses from the sale of assets should be reported as "other general expenses" pursuant to Regulation S-X, Article 5-03(b)(6). Any material item should be stated separately.

Question 2

Question: Will the staff expect retroactive changes by registrants to comply with the accounting described in this bulletin?

Interpretive Response: All registrants are expected to apply the accounting and disclosures described in this bulletin. The staff, however, will not object if registrants that have not applied this accounting do not restate prior financial statements provided they report a change in accounting principle in accordance with Opinion 20 and Statement 3 no later than the fourth fiscal quarter of [*100]  the fiscal year beginning after December 15, 1999. In periods subsequent to transition, registrants should disclose the amount of revenue (if material to income before income taxes) recognized in those periods that was included in the cumulative effect adjustment. If a registrant files financial statements with the Commission before applying the guidance in this bulletin, disclosures similar to those described in SAB Topic 11 M should be provided.

However, if registrants have not previously complied with GAAP, for example, by recording revenue for products prior to delivery that did not comply with the applicable bill-and-hold guidance, those registrants should apply the guidance in Opinion 20 for the correction of an error. n69 In addition, registrants should be aware that the Commission may take enforcement action where a registrant in prior financial statements has violated the antifraud or disclosure provisions of the securities laws with respect to revenue recognition.

> n69 Opinion 20, paragraph 13 and paragraphs 36-37 describe and provide the accounting and disclosure requirements applicable to the correction of an error in previously issued financial statements. Because the term "error" as used in Opinion 20 includes "oversight or misuse of facts that existed at the time that the financial statements were prepared," that term includes both unintentional errors as well as intentional fraudulent financial reporting and misappropriation of assets as described in SAS 99.

[*101]

Question 3

Question: The previous question indicates that the staff will not object to cumulative effect-type transition so long as the prior accounting does not represent an error. Could a company whose prior accounting does not represent an error voluntarily adopt a new method consistent with this SAB Topic by restatement of prior periods, rather than through a cumulative catch-up adjustment?

Exhibit 2 Page 44

Interpretive Response: In most instances, no. Opinion 20 does not permit restatement of financial statements for a change in accounting principle that does not represent correction of an error, except in very rare circumstances. n70 An exception is a company that is filing publicly for the first time. As stated in paragraph 29 of Opinion 20, those companies are permitted to reflect the adoption of the new policy via a restatement, and the staff believes that approach is usually necessary to avoid confusing investors in an initial public offering.

n70 See, for example, Opinion 20, paragraph 27.

Question 4

Question: [*102]   Should a registrant reporting a change in accounting principle as a result of this SAB Topic file a preferability letter?

Interpretive Response: No preferability letter is required if an accounting change is made in response to a newly issued Staff Accounting Bulletin.

Question 5

Question: If a company had not previously adjusted sales revenues, but deferred recognition of the gross margin of estimated returns for a transaction subject to Statement 48, how should it present a current change in accounting to reduce revenue and cost of sales for estimated returns?

Interpretive Response: Paragraph 7 of Statement 48 states that "sales revenue and cost of sales reported in the income statement *shall be reduced* to reflect estimated returns." Statement 48 does not provide for recognition of sales and costs of sales while deferring gross margin under any circumstance. This SAB Topic provides no new guidance on this point. If a registrant has failed to comply with GAAP, the registrant should retroactively revise prior financial statements in the manner set forth in Opinion 20 and Statement 16.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil ProcedurePleading & PracticePleadingsTime LimitationsExtensionsCriminal Law & ProcedureCriminal OffensesCrimes Against PersonsBriberyPublic OfficialsElementsSecurities LawAdditional Offerings & the Securities Exchange Act of 1934Issuer Recordkeeping & ReportingForeign Corrupt Practices Act

Exhibit 2 Page 45

# EXHIBIT 3



## Financial Accounting Standards Board

# ORIGINAL PRONOUNCEMENTS

### As Amended
### 2008/2009 Edition

## ACCOUNTING STANDARDS
### as of June 1, 2008

### VOLUME III
AICPA PRONOUNCEMENTS
FASB INTERPRETATIONS
FASB TECHNICAL BULLETINS
FASB STAFF POSITIONS
FASB CONCEPTS STATEMENTS
TOPICAL INDEX/APPENDIXES

Exhibit 3 Page 46

**ARB43**

# Accounting Research Bulletin No. 43
## Restatement and Revision of Accounting Research Bulletins

### STATUS

Issued:  June 1953

Effective Date:  June 1953 (replaced ARBs issued September 1939–January 1953)

Affects:  No other pronouncements

Affected by:  Chapter 1A, paragraph 1 amended by FAS 111, paragraph 8(a)
   Chapter 1A, paragraph 3 deleted by FAS 141(R), paragraph E5
   Chapter 1A, paragraph 4 deleted by FAS 135, paragraph 4(a)
   Chapter 1B; Chapter 5, paragraph 7; Chapter 7B, paragraph 6; Chapter 9C; Chapter 10B;
    Chapter 12, paragraphs 12 and 18; and Chapter 15, paragraph 12 amended by APB 6,
    paragraphs 13, 15, 16, 23, 23, 18, and 19, respectively
   Chapter 1B, paragraph 7 amended by APB 6, paragraph 12; APB 16, paragraph 7; and FAS 135,
    paragraph 4(b)
   Chapter 2A, paragraph 3 amended by APB 20, paragraph 5(a), and FAS 154, paragraph C2
   Chapter 2B and Chapter 8 deleted by APB 9, paragraph 2
   Chapter 3A, paragraph 4 amended by FAS 158, paragraph F2(a)
   Chapter 3A, paragraph 4(f) amended by FAS 115, paragraph 125
   Chapter 3A, paragraph 6(g) amended by APB 21, paragraph 5, and FAS 111, paragraph 8(a)
   Chapter 3A, paragraph 7 amended by FAS 78, paragraph 5, and FAS 158, paragraph F2(b)
   Chapter 3A, paragraph 8 amended by FAS 6, paragraph 16
   Chapter 3A, paragraph 9 amended by FAS 135, paragraph 4(a)
   Chapter 3A, paragraph 10 added by APB 6, paragraph 14
   Chapter 3A, footnote 4 deleted by FAS 6, paragraph 16
   Chapter 3B replaced by APB 10, paragraph 7
   Chapter 4, paragraph 5 and footnote 2 amended by FAS 151, paragraph 2
   Chapter 4, paragraph 5A added by FAS 151, paragraph 2
   Chapter 4, paragraph 8 amended by FAS 133, paragraph 526
   Chapter 5, paragraphs 1 through 9 deleted prospectively by APB 17, paragraph 8
   Chapter 5, paragraphs 5, 6, 8, and 9, and footnote 1; Chapter 10B, paragraphs 15 and 17;
    Chapter 12, paragraph 21; and Chapter 15, paragraphs 7 and 17 amended by APB 9,
    paragraph 2
   Chapter 5, paragraphs 8 and 10 amended by FAS 44, paragraphs 3 and 4
   Chapter 5, paragraph 10 deleted prospectively by APB 16, paragraph 7
   Chapter 5 deleted by FAS 142, paragraph D1
   Chapter 6 deleted by FAS 5, paragraph 7
   Chapter 7A, paragraph 10 amended by FAS 111, paragraph 8(a)
   Chapter 7C deleted by ARB 48
   Chapter 9B replaced by APB 6, paragraph 17
   Chapter 9C, paragraph 5 amended by FAS 96, paragraph 205(a), and FAS 109, paragraph 288(a)
   Chapter 9C, paragraphs 11 through 13 amended by APB 11, paragraph 2(a)
   Chapter 9C, paragraphs 11 through 13 replaced by FAS 96, paragraph 205(a), and FAS 109,
    paragraph 288(a)
   Chapter 10A, paragraph 19 amended by APB 9, paragraph 2, and FAS 111, paragraph 8(a)
   Chapter 10B deleted by APB 11, paragraph 1(a), and FAS 109, paragraph 288(a)
   Chapter 11B, paragraph 8 amended by APB 11, paragraph 2(b)
   Chapter 11B, paragraph 8 deleted by FAS 96, paragraph 205(a), and FAS 109, paragraph 288(a)
   Chapter 11B, paragraph 9 amended by APB 9, paragraph 2, and FAS 111, paragraph 8(a)
   Chapter 11B, footnotes 3 and 4 amended by APB 9, paragraph 2

Exhibit 3 Page 47

**ARB43**                    *Accounting Research Bulletins*

authority of opinions reached by the committee rests upon their general acceptability. The committee recognizes that in extraordinary cases fair presentation and justice to all parties at interest may require exceptional treatment. But the burden of justifying departure from accepted procedures, to the extent that they are evidenced in committee opinions, must be assumed by those who adopt another treatment.

9. The committee contemplates that its opinions will have application only to items material and significant in the relative circumstances. It considers that items of little or no consequence may be dealt with as expediency may suggest. However, freedom to deal expediently with immaterial items should not extend to a group of items whose cumulative effect in any one financial statement may be material and significant.

**Opinions Not Retroactive**

10. No opinion issued by the committee is intended to have a retroactive effect unless it contains a statement of such intention. Thus an opinion will ordinarily have no application to a transaction arising prior to its publication, nor to transactions in process of completion at the time of publication. But while the committee considers it inequitable to make its statements retroactive, it does not wish to discourage the revision of past accounts in an individual case if it appears to be desirable in the circumstances.

**The Company and Its Auditors**

11. Underlying all committee opinions is the fact that the accounts of a company are primarily the responsibility of management. The responsibility of the auditor is to express his opinion concerning the financial statements and to state clearly such explanations, amplifications, disagreement, or disapproval as he deems appropriate. While opinions of the committee are addressed particularly to certified public accountants whose problem it is to decide what they may properly report, the committee recommends similar application of the procedures mentioned herein by those who prepare the accounts and financial statements.

**Chapter 1**

**PRIOR OPINIONS**

**Section A—Rules Adopted by Membership**

Below are reprinted the six rules adopted by the membership of the Institute in 1934, the first five of which had been recommended in 1933 to the New York Stock Exchange by the Institute's committee on cooperation with stock exchanges.

1. Unrealized profit should not be credited to income account of the corporation either directly or indirectly, through the medium of charging against such unrealized profits amounts which would ordinarily fall to be charged against income account. Profit is deemed to be realized when a sale in the ordinary course of business is effected, unless the circumstances are such that the collection of the sale price is not reasonably assured. In the absence of the circumstances referred to above or other specific guidance, such as in FASB Statement No. 66, *Accounting for Sales of Real Estate*, the installment method is not acceptable. An exception to the general rule may be made in respect of inventories in industries (such as packing-house industry) in which owing to the impossibility of determining costs it is a trade custom to take inventories at net selling prices, which may exceed cost.

2. Capital surplus, however created, should not be used to relieve the income account of the current or future years of charges which would otherwise fall to be made thereagainst. This rule might be subject to the exception that where, upon reorganization, a reorganized company would be relieved of charges which would require to be made against income if the existing corporation were continued, it might be regarded as permissible to accomplish the same result without reorganization provided the facts were as fully revealed to and the action as formally approved by the shareholders as in reorganization.

**[Note: After the adoption of FASB Statement No. 141 (revised 2007), *Business Combinations* (effective for business combinations with an acquisition date on or after the beginning of the first annual reporting period beginning on or after 12/15/08), paragraph 3 is deleted.]**

3. Earned surplus of a subsidiary company created prior to acquisition does not form a part of the consolidated earned surplus of the parent company and subsidiaries; nor can any dividend declared out of such surplus properly be credited to the income account of the parent company.

4. [This paragraph has been deleted. See Status page.]

5. Notes or accounts receivable due from officers, employees, or affiliated companies must be shown separately and not included under a general heading such as notes receivable or accounts receivable.

6. If capital stock is issued nominally for the acquisition of property and it appears that at about the same time, and pursuant to a previous agreement or understanding, some portion of the stock so issued is donated to the corporation, it is not permissible to treat

Exhibit 3 Page 48

# EXHIBIT 4



Financial Accounting Standards Board

# ORIGINAL PRONOUNCEMENTS

### AS AMENDED

## FASB Interpretation No. 46 (revised December 2003)

Consolidation of Variable Interest Entities

an interpretation of ARB No. 51

Copyright © 2008 by Financial Accounting Standards Board. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the Financial Accounting Standards Board.

Exhibit 4 Page 49

FIN46(R)

FASB Interpretation No. 46
(revised December 2003)
Consolidation of Variable Interest Entities

an interpretation of ARB No. 51

## STATUS

Issued: December 2003

Effective Date: For public entities (enterprises), either Interpretation 46 or this Interpretation shall be applied to variable interest entities or potential variable interest entities commonly referred to as special-purpose entities by the end of the first reporting period ending after December 15, 2003. This Interpretation shall be applied to all variable interest entities by the end of the first reporting period ending after:
- March 15, 2004, for enterprises that are not small business issuers
- December 15, 2004, for enterprises that are small business issuers.

For nonpublic entities (enterprises), this Interpretation shall be applied:
- Immediately to variable interest entities or potential variable interest entities created after December 31, 2003
- By the beginning of the first annual period beginning after December 15, 2004, to all other entities.

For enterprises that have fully or partially applied Interpretation 46 prior to December 24, 2003, special transition provisions apply.

For investments reported in accordance with the AICPA Audit and Accounting Guide, *Audits of Investment Companies,* and held by investment companies that are not subject to SEC Regulation S-X, Rule 6-03(c)(1), the effective date is deferred.

Affects: Supersedes FIN 46

Affected by: Paragraph 4(e) replaced by FSP FIN 46(R)-7, paragraph 6
Paragraphs 4(h) and 23 amended by FAS 141(R), paragraphs E34(a) and E34(c), respectively
Paragraphs 18 through 21 and footnote 16 replaced by FAS 141(R), paragraph E34(b)
Paragraph 22 amended by FAS 160, paragraph C12
Paragraph 36 amended by FSP FIN 46(R)-7, paragraph 7
Paragraph B26 effectively amended by FAS 156, paragraph A10
Paragraphs C1 through C8 deleted by FAS 141(R), paragraph E34(d)
Paragraph F2(b) amended by FSP FIN 46(R)-4
Footnotes 18 and 23 amended by FAS 123(R), paragraph D17

Other Interpretive Releases: FASB Staff Positions FIN 46(R)-1 through FIN 46(R)-7

Issues Discussed by FASB Emerging Issues Task Force (EITF)

Affects: Nullifies EITF Issues No. 84-40 and 90-15 and Topic No. D-14
Partially nullifies EITF Issues No. 95-6, 96-21, 97-1, and 97-2
Resolves EITF Issue No. 84-30

Interpreted by: No EITF Issues

Related Issues: EITF Issues No. 96-16, 97-1, 04-5, and 04-7

Exhibit 4 Page 50

**FIN46(R)**                    *FASB Interpretations*

# SUMMARY

This Interpretation of Accounting Research Bulletin No. 51, *Consolidated Financial Statements,* which replaces FASB Interpretation No. 46, *Consolidation of Variable Interest Entities,* addresses consolidation by business enterprises of variable interest entities, which have one or more of the following characteristics:

1. The equity investment at risk is not sufficient to permit the entity to finance its activities without additional subordinated financial support provided by any parties, including the equity holders.
2. The equity investors lack one or more of the following essential characteristics of a controlling financial interest:
   a. The direct or indirect ability to make decisions about the entity's activities through voting rights or similar rights
   b. The obligation to absorb the expected losses of the entity
   c. The right to receive the expected residual returns of the entity.
3. The equity investors have voting rights that are not proportionate to their economic interests, and the activities of the entity involve or are conducted on behalf of an investor with a disproportionately small voting interest.

The following are exceptions to the scope of this Interpretation:

1. Not-for-profit organizations are not subject to this Interpretation unless they are used by business enterprises in an attempt to circumvent the provisions of this Interpretation.
2. Employee benefit plans subject to specific accounting requirements in existing FASB Statements are not subject to this Interpretation.
3. Registered investment companies are not required to consolidate a variable interest entity unless the variable interest entity is a registered investment company.
4. Transferors to qualifying special-purpose entities and "grandfathered" qualifying special-purpose entities subject to the reporting requirements of FASB Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* do not consolidate those entities.
5. No other enterprise consolidates a qualifying special-purpose entity or a "grandfathered" qualifying special-purpose entity unless the enterprise has the unilateral ability to cause the entity to liquidate or to change the entity in such a way that it no longer meets the requirements to be a qualifying special-purpose entity or "grandfathered" qualifying special-purpose entity.
6. Separate accounts of life insurance enterprises as described in the AICPA Auditing and Accounting Guide, *Life and Health Insurance Entities,* are not subject to this Interpretation.
7. An enterprise with an interest in a variable interest entity or potential variable interest entity created before December 31, 2003, is not required to apply this Interpretation to that entity if the enterprise, after making an exhaustive effort, is unable to obtain the necessary information.
8. An entity that is deemed to be a business (as defined in this Interpretation) need not be evaluated to determine if it is a variable interest entity unless one of the following conditions exists:
   a. The reporting enterprise, its related parties, or both participated significantly in the design or redesign of the entity, and the entity is neither a joint venture nor a franchisee.
   b. The entity is designed so that substantially all of its activities either involve or are conducted on behalf of the reporting enterprise and its related parties.
   c. The reporting enterprise and its related parties provide more than half of the total of the equity, subordinated debt, and other forms of subordinated financial support to the entity based on an analysis of the fair values of the interests in the entity.
   d. The activities of the entity are primarily related to securitizations, other forms of asset-backed financings, or single-lessee leasing arrangements.
9. An enterprise is not required to consolidate a governmental organization and is not required to consolidate a financing entity established by a governmental organization unless the financing entity (a) is not a governmental organization and (b) is used by the business enterprise in a manner similar to a variable interest entity in an effort to circumvent the provisions of this Interpretation.

Exhibit 4 Page 51

*Consolidation of Variable Interest Entities*     **FIN46(R)**

**Reason for Issuing This Interpretation**

Transactions involving variable interest entities have become increasingly common, and the relevant accounting literature is fragmented and incomplete. ARB 51 requires that an enterprise's consolidated financial statements include subsidiaries in which the enterprise has a controlling financial interest. That requirement usually has been applied to subsidiaries in which an enterprise has a majority voting interest, but in many circumstances the enterprise's consolidated financial statements do not include variable interest entities with which it has similar relationships. The voting interest approach is not effective in identifying controlling financial interests in entities that are not controllable through voting interests or in which the equity investors do not bear the residual economic risks.

The objective of this Interpretation is not to restrict the use of variable interest entities but to improve financial reporting by enterprises involved with variable interest entities. The Board believes that if a business enterprise has a controlling financial interest in a variable interest entity, the assets, liabilities, and results of the activities of the variable interest entity should be included in consolidated financial statements with those of the business enterprise.

**Differences between This Interpretation and Current Practice**

Under current practice, two enterprises generally have been included in consolidated financial statements because one enterprise controls the other through voting interests. This Interpretation explains how to identify variable interest entities and how an enterprise assesses its interests in a variable interest entity to decide whether to consolidate that entity. This Interpretation requires existing unconsolidated variable interest entities to be consolidated by their primary beneficiaries if the entities do not effectively disperse risks among parties involved. Variable interest entities that effectively disperse risks will not be consolidated unless a single party holds an interest or combination of interests that effectively recombines risks that were previously dispersed.

An enterprise that consolidates a variable interest entity is the primary beneficiary of the variable interest entity. The primary beneficiary of a variable interest entity is the party that absorbs a majority of the entity's expected losses, receives a majority of its expected residual returns, or both, as a result of holding variable interests, which are the ownership, contractual, or other pecuniary interests in an entity that change with changes in the fair value of the entity's net assets excluding variable interests. An enterprise with a variable interest in a variable interest entity must consider variable interests of related parties and de facto agents as its own in determining whether it is the primary beneficiary of the entity.

Assets, liabilities, and noncontrolling interests of newly consolidated variable interest entities generally will be initially measured at their fair values except for assets and liabilities transferred to a variable interest entity by its primary beneficiary, which will continue to be measured as if they had not been transferred. However, assets, liabilities, and noncontrolling interests of newly consolidated variable interest entities that are under common control with the primary beneficiary are measured at the amounts at which they are carried in the consolidated financial statements of the enterprise that controls them (or would be carried if the controlling entity prepared financial statements) at the date the enterprise becomes the primary beneficiary. Goodwill is recognized only if the variable interest entity is a business as defined in this Interpretation. Otherwise, the reporting enterprise will report an extraordinary loss for that amount. After initial measurement, the assets, liabilities, and noncontrolling interests of a consolidated variable interest entity will be accounted for as if the entity was consolidated based on voting interests. In some circumstances, earnings of the variable interest entity attributed to the primary beneficiary arise from sources other than investments in equity of the entity.

An enterprise that holds significant variable interests in a variable interest entity but is not the primary beneficiary is required to disclose (1) the nature, purpose, size, and activities of the variable interest entity, (2) its exposure to loss as a result of the variable interest holder's involvement with the entity, and (3) the nature of its involvement with the entity and date when the involvement began. The primary beneficiary of a variable interest entity is required to disclose (a) the nature, purpose, size, and activities of the variable interest entity, (b) the carrying amount and classification of consolidated assets that are collateral for the variable interest entity's obligations, and (c) any lack of recourse by creditors (or beneficial interest holders) of a consolidated variable interest entity to the general credit of the primary beneficiary.

FIN46(R)–3

Exhibit 4 Page 52

**FIN46(R)**  *FASB Interpretations*

**How This Interpretation Will Improve Financial Reporting**

This Interpretation is intended to achieve more consistent application of consolidation policies to variable interest entities and, thus, to improve comparability between enterprises engaged in similar activities even if some of those activities are conducted through variable interest entities. Including the assets, liabilities, and results of activities of variable interest entities in the consolidated financial statements of their primary beneficiaries will provide more complete information about the resources, obligations, risks, and opportunities of the consolidated enterprise. Disclosures about variable interest entities in which an enterprise has a significant variable interest but does not consolidate will help financial statement users assess the enterprise's risks.

**How the Conclusions in This Interpretation Relate to the Conceptual Framework**

FASB Concepts Statement No. 1, *Objectives of Financial Reporting by Business Enterprises*, states that financial reporting should provide information that is useful in making business and economic decisions. Including variable interest entities in consolidated financial statements with the primary beneficiary will help achieve that objective by providing information that helps in assessing the amounts, timing, and uncertainty of prospective net cash flows of the consolidated entity.

Completeness is identified in FASB Concepts Statement No. 2, *Qualitative Characteristics of Accounting Information*, as an essential element of representational faithfulness and relevance. Thus, to represent faithfully the total assets that an enterprise controls and liabilities for which an enterprise is responsible, assets and liabilities of variable interest entities for which the enterprise is the primary beneficiary must be included in the enterprise's consolidated financial statements.

FASB Concepts Statement No. 6, *Elements of Financial Statements*, defines *assets*, in part, as probable future economic benefits obtained or controlled by a particular entity and defines *liabilities*, in part, as obligations of a particular entity to make probable future sacrifices of economic benefits. The relationship between a variable interest entity and its primary beneficiary results in control by the primary beneficiary of future benefits from the assets of the variable interest entity even though the primary beneficiary may not have the direct ability to make decisions about the uses of the assets. Because the liabilities of the variable interest entity will require sacrificing consolidated assets, those liabilities are obligations of the primary beneficiary even though the creditors of the variable interest entity may have no recourse to the general credit of the primary beneficiary.

**The Effective Date of This Interpretation**

Special provisions apply to enterprises that have fully or partially applied Interpretation 46 prior to issuance of this Interpretation. Otherwise, application of this Interpretation (or Interpretation 46) is required in financial statements of public entities that have interests in variable interest entities or potential variable interest entities commonly referred to as special-purpose entities for periods ending after December 15, 2003. Application by public entities (other than small business issuers) for all other types of entities is required in financial statements for periods ending after March 15, 2004. Application by small business issuers to entities other than special-purpose entities and by nonpublic entities to all types of entities is required at various dates in 2004 and 2005. In some instances, enterprises have the option of applying or continuing to apply Interpretation 46 for a short period of time before applying this Interpretation.

FIN46(R)–4

Exhibit 4 Page 53

**FASB Interpretation No. 46 (revised December 2003)**
**Consolidation of Variable Interest Entities**

**an interpretation of ARB No. 51**

## CONTENTS

|  | Paragraph Numbers |
|---|---|

| Introduction | 1 |
| Interpretation | 2– 22 |
|   Definition of Terms | 2– 3 |
|     Use of the Term *Entity* | 3 |
|   Scope | 4 |
|   Variable Interest Entities | 5– 11 |
|     Expected Losses and Expected Residual Returns | 8– 10 |
|     Development Stage Enterprises | 11 |
|   Variable Interests and Interests in Specified Assets of a Variable Interest Entity | 12– 13 |
|   Consolidation Based on Variable Interests | 14– 17 |
|     Related Parties | 16– 17 |
|   Initial Measurement | 18– 21 |
|   Accounting after Initial Measurement | 22 |
| Disclosure | 23– 26 |
| Effective Date and Transition | 27– 41 |
|   Public Entity That Is Not a Small Business Issuer | 29– 31 |
|   Public Entity That Is a Small Business Issuer | 32– 34 |
|   Nonpublic Entities | 35 |
|   Investment Companies | 36 |
|   Transition | 37– 41 |
| Appendix A: Expected Losses, Expected Residual Returns, and Expected Variability | A1– A5 |
| Appendix B: Variable Interests | B1–B26 |
| Appendix C: Definition of a Business | C1– C8 |
| Appendix D: Interpretation 46(R) Background Information and Basis for Conclusions | D1–D66 |
| Appendix E: Interpretation 46 Background Information and Basis for Conclusions | E1–E50 |
| Appendix F: Effect of This Interpretation on EITF Issues | F1– F4 |

## INTRODUCTION

1. This Interpretation, which replaces FASB Interpretation No. 46, *Consolidation of Variable Interest Entities*, clarifies the application of Accounting Research Bulletin No. 51, *Consolidated Financial Statements*, to certain entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support. Paragraph 1 of ARB 51 states that consolidated financial statements are "usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies." Paragraph 2 states that "the usual condition for a controlling financial interest is ownership of a majority voting interest. . . ." However, application of the majority voting interest requirement in ARB 51 to certain types of entities may not identify the party with a controlling financial interest because the controlling financial interest may be achieved through arrangements that do not involve voting interests.

Exhibit 4 Page 54

**FIN46(R)**          *FASB Interpretations*

## INTERPRETATION

### Definition of Terms

2. Certain terms are defined for use in this Interpretation as follows:

a. *Variable interest entity* refers to an entity subject to consolidation according to the provisions of this Interpretation.

b. *Expected losses* and *expected residual returns* refer to amounts derived from expected cash flows as described in FASB Concepts Statement No. 7, *Using Cash Flow Information and Present Value in Accounting Measurements.* However, expected losses and expected residual returns refer to amounts discounted and otherwise adjusted for market factors and assumptions rather than to undiscounted cash flow estimates. Paragraph 8 specifies which amounts are to be considered in determining expected losses and expected residual returns of a variable interest entity. *Expected variability* is the sum of the absolute values of the expected residual return and the expected loss. All three concepts are illustrated in Appendix A.

c. *Variable interests* in a variable interest entity are contractual, ownership, or other pecuniary interests in an entity that change with changes in the fair value of the entity's net assets exclusive of variable interests. Equity interests with or without voting rights are considered variable interests if the entity is a variable interest entity and to the extent that the investment is at risk as described in paragraph 5. Paragraph 12 explains how to determine whether a variable interest in specified assets of an entity is a variable interest in the entity. Appendix B describes various types of variable interests and explains in general how they may affect the determination of the primary beneficiary of a variable interest entity.

d. *Primary beneficiary* refers to an enterprise that consolidates a variable interest entity under the provisions of this Interpretation.

e. *Subordinated financial support* refers to variable interests that will absorb some or all of an entity's expected losses.

### *Use of the Term* Entity

3. For convenience, this Interpretation uses the term *entity* to refer to any legal structure used to conduct activities or to hold assets. Some examples of such structures are corporations, partnerships, limited liability companies, grantor trusts, and other trusts.

Portions of entities or aggregations of assets within an entity shall not be treated as separate entities for purposes of applying this Interpretation unless the entire entity is a variable interest entity. Some examples are divisions, departments, branches, and pools of assets subject to liabilities that give the creditor no recourse to other assets of the entity. Majority-owned subsidiaries are entities separate from their parents that are subject to this Interpretation and may be variable interest entities.

### Scope

4. This Interpretation clarifies the application of ARB 51 and replaces Interpretation 46. With the following exceptions, this Interpretation applies to all entities:

a. Not-for-profit organizations as defined in paragraph 168 of FASB Statement No. 117, *Financial Statements of Not-for-Profit Organizations,* are not subject to this Interpretation, except that they may be related parties for purposes of applying paragraphs 16 and 17 of this Interpretation. In addition, if a not-for-profit entity is used by business enterprises in a manner similar to a variable interest entity in an effort to circumvent the provisions of this Interpretation, that not-for-profit entity shall be subject to this Interpretation.

b. An employer shall not consolidate an employee benefit plan subject to the provisions of FASB Statements No. 87, *Employers' Accounting for Pensions,* No. 106, *Employers' Accounting for Postretirement Benefits Other Than Pensions,* and No. 112, *Employers' Accounting for Postemployment Benefits.*

c. Neither a transferor of financial assets nor its affiliates shall consolidate a qualifying special-purpose entity as described in paragraph 35 of FASB Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* or a "formerly qualifying SPE" as described in paragraph 25 of Statement 140. A transferor reports its rights and obligations related to the qualifying special-purpose entity according to the requirements of Statement 140.

d. An enterprise that holds variable interests in a qualifying special-purpose entity or a "formerly qualifying SPE," as described in paragraph 25 of Statement 140, shall not consolidate that entity unless that enterprise has the unilateral ability to cause the entity to liquidate or to change the entity so that it no longer meets the conditions in

FIN46(R)–6

Exhibit 4 Page 55

*Consolidation of Variable Interest Entities*      **FIN46(R)**

paragraph 25 or 35 of Statement 140. If the entity is not consolidated, the enterprise reports its rights and obligations related to the entity.

e. Investments accounted for at fair value in accordance with the specialized accounting guidance in the AICPA Audit and Accounting Guide, *Investment Companies,* are not subject to consolidation according to the requirements of this Interpretation.[a]

f. Separate accounts of life insurance entities as described in the AICPA Audit and Accounting Guide, *Life and Health Insurance Entities,* are not subject to consolidation according to the requirements of this Interpretation.

g. An enterprise with an interest in a variable interest entity or potential variable interest entity created before December 31, 2003, is not required to apply this Interpretation to that entity if the enterprise, after making an exhaustive effort, is unable to obtain the information[1] necessary to (1) determine whether the entity is a variable interest entity, (2) determine whether the enterprise is the variable interest entity's primary beneficiary, or (3) perform the accounting required to consolidate the variable interest entity for which it is determined to be the primary beneficiary. The scope exception in this provision applies only as long as the reporting enterprise continues to be unable to obtain the necessary information. Paragraph 26 requires certain disclosures to be made about interests in entities subject to this provision. Paragraph 41 provides transition guidance for an enterprise that subsequently obtains the information necessary to apply this Interpretation to an entity subject to this exception.

**[Note: Prior to the adoption of FASB Statement No. 141 (revised 2007), *Business Combinations* (effective for business combinations with an acquisition date on or after the beginning of the first annual reporting period beginning on or after 12/15/08), subparagraph (h) should read as follows:]**

h. An entity that is deemed to be a business under the definition in Appendix C need not be evaluated by a reporting enterprise to determine if the entity is a variable interest entity under the requirements of this Interpretation unless one or more of the following conditions exist (however, for entities that are excluded by this provision of this Interpretation, other generally accepted accounting principles should be applied):[2]

(1) The reporting enterprise, its related parties,[3] or both participated significantly in the design or redesign of the entity. However, this condition does not apply if the entity is an operating joint venture under joint control of the reporting enterprise and one or more independent parties or a franchisee.[4]

(2) The entity is designed so that substantially all of its activities either involve or are conducted on behalf of the reporting enterprise and its related parties.

(3) The reporting enterprise and its related parties provide more than half of the total of the equity, subordinated debt, and other forms of subordinated financial support to the entity based on an analysis of the fair values of the interests in the entity.

(4) The activities of the entity are primarily related to securitizations or other forms of asset-backed financings or single-lessee leasing arrangements.

**[Note: After the adoption of Statement 141(R), subparagraph (h) and footnotes 2 through 4 should read as follows:]**

h. An entity that is deemed to be a business under the definition in FASB Statement No. 141 (revised 2007), *Business Combinations,* need not be evaluated by a reporting enterprise to determine if the entity is a variable interest entity under the

---

[a] AICPA Statement of Position 07-1, *Clarification of the Scope of the Audit and Accounting Guide* Investment Companies *and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies,* discusses the circumstances in which the specialized accounting in the Audit Guide shall not be retained by a noninvestment company parent or equity method investor of an investment company. In those cases, Interpretation 46(R) applies to the investments held by the investment company subsidiary or equity method investee for the purposes of the parent or equity method investor's financial statements.

[1] This inability to obtain the necessary information is expected to be infrequent, especially if the enterprise participated significantly in the design or redesign of the entity.

[2] An entity that previously was not evaluated to determine if it was a variable interest entity because of this provision need not be evaluated in future periods as long as the entity continues to meet the conditions in this paragraph.

[3] The term *related parties* as used in this list of conditions refers to all parties identified in paragraph 16, except for de facto agents under item 16(d)(1).

[4] The term *franchisee* is defined in paragraph 26 of FASB Statement No. 45, *Accounting for Franchise Fee Revenue.*

FIN46(R)–7

Exhibit 4 Page 56

**FIN46(R)**          *FASB Interpretations*

requirements of this Interpretation unless one or more of the following conditions exist (however, for entities that are excluded by this provision of this Interpretation, other generally accepted accounting principles should be applied):[2]

(1) The reporting enterprise, its related parties,[3] or both participated significantly in the design or redesign of the entity. However, this condition does not apply if the entity is an operating joint venture under joint control of the reporting enterprise and one or more independent parties or a franchisee.[4]

(2) The entity is designed so that substantially all of its activities either involve or are conducted on behalf of the reporting enterprise and its related parties.

(3) The reporting enterprise and its related parties provide more than half of the total of the equity, subordinated debt, and other forms of subordinated financial support to the entity based on an analysis of the fair values of the interests in the entity.

(4) The activities of the entity are primarily related to securitizations or other forms of asset-backed financings or single-lessee leasing arrangements.

---

[2]An entity that previously was not evaluated to determine if it was a variable interest entity because of this provision need not be evaluated in future periods as long as the entity continues to meet the conditions in this paragraph.

[3]The term *related parties* as used in this list of conditions refers to all parties identified in paragraph 16, except for de facto agents under item 16(d)(1).

[4]The term *franchisee* is defined in paragraph 26 of FASB Statement No. 45, *Accounting for Franchise Fee Revenue.*

i.   An enterprise shall not consolidate a governmental organization and shall not consolidate a financing entity established by a governmental organization unless the financing entity (1) is not a governmental organization and (2) is used by the business enterprise in a manner similar to a vari-

able interest entity in an effort to circumvent the provisions of this Interpretation.

**Variable Interest Entities**

5. An entity shall be subject to consolidation according to the provisions of this Interpretation if, by design,[5] the conditions in *a, b,* or *c* exist:

a. The total equity investment[6] at risk is not sufficient to permit the entity to finance its activities without additional subordinated financial support provided by any parties, including equity holders. For this purpose, the total equity investment at risk:

(1) Includes only equity investments in the entity that participate significantly in profits and losses even if those investments do not carry voting rights

(2) Does not include equity interests that the entity issued in exchange for subordinated interests in other variable interest entities

(3) Does not include amounts provided to the equity investor directly or indirectly by the entity or by other parties involved with the entity (for example, by fees, charitable contributions, or other payments), unless the provider is a parent, subsidiary, or affiliate of the investor that is required to be included in the same set of consolidated financial statements as the investor

(4) Does not include amounts financed for the equity investor (for example, by loans or guarantees of loans) directly by the entity or by other parties involved with the entity, unless that party is a parent, subsidiary, or affiliate of the investor that is required to be included in the same set of consolidated financial statements as the investor.

Paragraphs 9 and 10 discuss the amount of the total equity investment at risk that is necessary to permit an entity to finance its activities without additional subordinated financial support.

---

[5]The phrase *by design* refers to entities that meet the conditions in this paragraph because of the way they are structured. For example, an enterprise under the control of its equity investors that originally was not a variable interest entity does not become one because of operating losses.

[6]Equity investments in an entity are interests that are required to be reported as equity in that entity's financial statements.

Exhibit 4 Page 57

*Consolidation of Variable Interest Entities*    **FIN46(R)**

b.  As a group the holders of the equity investment at risk lack any one of the following three characteristics[7] of a controlling financial interest:

(1)  The direct or indirect ability through voting rights or similar rights to make decisions about an entity's activities that have a significant effect on the success of the entity. The investors do not have that ability through voting rights or similar rights if no owners hold voting rights or similar rights (such as those of a common shareholder in a corporation or a general partner in a partnership).[8]

(2)  The obligation to absorb the expected losses of the entity.[9] The investor or investors do not have that obligation if they are directly or indirectly protected from the expected losses or are guaranteed a return by the entity itself or by other parties involved with the entity.

(3)  The right to receive the expected residual returns of the entity. The investors do not have that right if their return is capped by the entity's governing documents or arrangements with other variable interest holders or the entity.[10]

c.  The equity investors as a group also are considered to lack characteristic (b)(1) if (i) the voting rights of some investors are not proportional to their obligations to absorb the expected losses of the entity, their rights to receive the expected residual returns of the entity, or both and (ii) substantially all of the entity's activities (for example, providing financing or buying assets) either involve or are conducted on behalf of an investor that has disproportionately few voting rights.[11] For purposes of applying this requirement, enterprises shall consider each party's obligations to absorb expected losses and rights to receive expected residual returns related to all of that party's interests in the entity and not only to its equity investment at risk.

6.  An entity subject to this Interpretation is called a variable interest entity. The investments or other interests that will absorb portions of a variable interest entity's expected losses or receive portions of the entity's expected residual returns are called variable interests. The initial determination of whether an entity is a variable interest entity shall be made on the date at which an enterprise becomes involved[12] with the entity. That determination shall be based on the circumstances on that date including future changes that are required in existing governing documents and existing contractual arrangements. An enterprise is not required to determine whether an entity with which it is involved is a variable interest entity if it is apparent that the enterprise's interest would not be a significant variable interest and if the enterprise, its related parties, and its de facto agents (as described in paragraph 16) did not participate significantly in the design or redesign of the entity.

7.  An entity that previously was not subject to this Interpretation shall not become subject to it simply because of losses in excess of its expected losses that reduce the equity investment. The initial determination of whether an entity is a variable interest entity shall be reconsidered if one or more of the following occur:

a.  The entity's governing documents or contractual arrangements are changed in a manner that changes the characteristics or adequacy of the entity's equity investment at risk.

b.  The equity investment or some part thereof is returned to the equity investors, and other interests become exposed to expected losses of the entity.

---

[7]The objective of this provision is to identify as variable interest entities those entities in which the total equity investment at risk does not provide the holders of that investment with the characteristics of a controlling financial interest. If interests other than the equity investment at risk provide the holders of that investment with the characteristics of a controlling financial interest or if interests other than the equity investment at risk prevent the equity holders from having the necessary characteristics, the entity is a variable interest entity.

[8]Enterprises that are not controlled by the holder of a majority voting interest because of minority veto rights as discussed in EITF Issue No. 96-16, "Investor's Accounting for an Investee When the Investor Has a Majority of the Voting Interest but the Minority Shareholder or Shareholders Have Certain Approval or Veto Rights," are not variable interest entities if the shareholders as a group have the power to control the enterprise and the equity investment meets the other requirements of this Interpretation.

[9]Refer to paragraphs 8 and 12 and Appendix A for discussion of expected losses.

[10]For this purpose, the return to equity investors is not considered to be capped by the existence of outstanding stock options, convertible debt, or similar interests because if the options in those instruments are exercised, the holders will become additional equity investors.

[11]This provision is necessary to prevent a primary beneficiary from avoiding consolidation of a variable interest entity by organizing the entity with nonsubstantive voting interests. Activities that involve or are conducted on behalf of the related parties of an investor with disproportionately few voting rights shall be treated as if they involve or are conducted on behalf of that investor. The term *related parties* in this footnote refers to all parties identified in paragraph 16, except for de facto agents under item 16(d)(1).

[12]For purposes of this Interpretation, *involvement with an entity* refers to ownership, contractual, or other pecuniary interests that may be determined to be variable interests.

Exhibit 4 Page 58

**FIN46(R)**          *FASB Interpretations*

c. The entity undertakes additional activities or acquires additional assets, beyond those that were anticipated at the later of the inception of the entity or the latest reconsideration event, that increase the entity's expected losses.

d. The entity receives an additional equity investment that is at risk, or the entity curtails or modifies its activities in a way that decreases its expected losses.

A troubled debt restructuring, as defined in paragraph 2 of FASB Statement No. 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings*, as amended, shall be accounted for in accordance with that Statement and is not an event that requires the reconsideration of whether the entity involved is a variable interest entity.

### *Expected Losses and Expected Residual Returns*

8. A variable interest entity's expected losses are the expected negative variability in the fair value of its net assets exclusive of variable interests. A variable interest entity's expected residual returns are the expected positive variability in the fair value of its net assets exclusive of variable interests. Expected variability in the fair value of net assets includes expected variability resulting from the operating results of the entity.

9. An equity investment at risk of less than 10 percent of the entity's total assets shall not be considered sufficient to permit the entity to finance its activities without subordinated financial support in addition to the equity investment unless the equity investment can be demonstrated to be sufficient. The demonstration that equity is sufficient may be based on either qualitative analysis or quantitative analysis or a combination of both. Qualitative assessments, including but not limited to the qualitative assessments described in paragraphs 9(a) and 9(b), will in some cases be conclusive in determining that the entity's equity at risk is sufficient. If, after diligent effort, a reasonable conclusion about the sufficiency of the entity's equity at risk cannot be reached based solely on qualitative considerations, the quantitative analyses implied by paragraph 9(c) should be made. In instances in which neither a qualitative assessment nor a quantitative assessment, taken alone, is conclusive, the determination of whether the equity at risk is suf-

ficient shall be based on a combination of qualitative and quantitative analyses.

a. The entity has demonstrated that it can finance its activities without additional subordinated financial support.

b. The entity has at least as much equity invested as other entities that hold only similar assets of similar quality in similar amounts and operate with no additional subordinated financial support.

c. The amount of equity invested in the entity exceeds the estimate of the entity's expected losses based on reasonable quantitative evidence.

10. Some entities may require an equity investment at risk greater than 10 percent of their assets to finance their activities, especially if they engage in high-risk activities, hold high-risk assets, or have exposure to risks that are not reflected in the reported amounts of the entities' assets or liabilities. The presumption in paragraph 9 does not relieve an enterprise of its responsibility to determine whether a particular entity with which the enterprise is involved needs an equity investment at risk greater than 10 percent of its assets in order to finance its activities without subordinated financial support in addition to the equity investment.

### *Development Stage Enterprises*

11. Because reconsideration of whether an entity is subject to this Interpretation is required only in certain circumstances, the initial application to an entity that is in the development stage[13] is very important. A development stage entity is a variable interest entity if it meets one of the conditions in paragraph 5. A development stage entity does not meet the condition in paragraph 5(a) if it can be demonstrated that the equity invested in the entity is sufficient to permit it to finance the activities it is currently engaged in (for example, if the entity has already obtained financing without additional subordinated financial support) and provisions in the entity's governing documents and contractual arrangements allow additional equity investments. However, sufficiency of the equity investment should be reconsidered as required by paragraph 7, for example, when the entity undertakes additional activities or acquires additional assets.

---

[13]Guidelines for identifying a development stage enterprise appear in paragraphs 8 and 9 of FASB Statement No. 7, *Accounting and Reporting by Development Stage Enterprises.*

FIN46(R)–10

Exhibit 4 Page 59

*Consolidation of Variable Interest Entities*        **FIN46(R)**

**Variable Interests and Interests in Specified Assets of a Variable Interest Entity**

12. A variable interest in specified assets of a variable interest entity (such as a guarantee or subordinated residual interest) shall be deemed to be a variable interest in the entity only if the fair value of the specified assets is more than half of the total fair value of the entity's assets or if the holder has another variable interest in the entity as a whole (except interests that are insignificant or have little or no variability).[14] The expected losses and expected residual returns applicable to variable interests in specified assets of a variable interest entity shall be deemed to be expected losses and expected residual returns of the entity only if that variable interest is deemed to be a variable interest in the entity. Expected losses related to variable interests in specified assets are not considered part of the expected losses of the entity for purposes of determining the adequacy of the equity at risk in the entity or for identifying the primary beneficiary unless the specified assets constitute a majority of the assets of the entity. For example, expected losses absorbed by a guarantor of the residual value of leased property are not considered expected losses of a variable interest entity if the fair value of the leased property is not a majority of the fair value of the entity's total assets.

13. An enterprise with a variable interest in specified assets of a variable interest entity shall treat a portion of the entity as a separate variable interest entity if the specified assets (and related credit enhancements, if any) are essentially the only source of payment for specified liabilities or specified other interests.[15] That requirement does not apply unless the entity has been determined to be a variable interest entity. If one enterprise is required to consolidate a discrete portion of a variable interest entity, other variable interest holders shall not consider that portion to be part of the larger variable interest entity.

**Consolidation Based on Variable Interests**

14. An enterprise shall consolidate a variable interest entity if that enterprise has a variable interest (or combination of variable interests) that will absorb a majority of the entity's expected losses, receive a majority of the entity's expected residual returns, or both. An enterprise shall consider the rights and obligations conveyed by its variable interests and the relationship of its variable interests with variable interests held by other parties to determine whether its variable interests will absorb a majority of a variable interest entity's expected losses, receive a majority of the entity's expected residual returns, or both. If one enterprise will absorb a majority of a variable interest entity's expected losses and another enterprise will receive a majority of that entity's expected residual returns, the enterprise absorbing a majority of the losses shall consolidate the variable interest entity.

15. The enterprise that consolidates a variable interest entity is called the primary beneficiary of that entity. An enterprise shall determine whether it is the primary beneficiary of a variable interest entity at the time the enterprise becomes involved with the entity. An enterprise with an interest in a variable interest entity shall reconsider whether it is the primary beneficiary of the entity if the entity's governing documents or contractual arrangements are changed in a manner that reallocates between the existing primary beneficiary and other unrelated parties (a) the obligation to absorb the expected losses of the variable interest entity or (b) the right to receive the expected residual returns of the variable interest entity. The primary beneficiary also shall reconsider its initial decision to consolidate a variable interest entity if the primary beneficiary sells or otherwise disposes of all or part of its variable interests to unrelated parties or if the variable interest entity issues new variable interests to parties other than the primary beneficiary or the primary beneficiary's related parties. A holder of a variable interest that is not the primary beneficiary also shall reconsider whether it is the primary beneficiary of a variable interest entity if that enterprise acquires additional variable interests in the variable interest entity. A troubled debt restructuring, as defined in paragraph 2 of Statement 15, as amended, shall be accounted for in accordance with that Statement and is not an event that requires the reconsideration of whether an enterprise is the primary beneficiary of the variable interest entity.

---

[14]This exception is necessary to prevent an enterprise that would otherwise be the primary beneficiary of a variable interest entity from circumventing the requirement for consolidation simply by arranging for other parties with interests in certain assets to hold small or inconsequential interests in the entity as a whole.

[15]The portions of a variable interest entity referred to in this paragraph have sometimes been called silos.

Exhibit 4 Page 60

**FIN46(R)**          *FASB Interpretations*

*Related Parties*

16. For purposes of determining whether it is the primary beneficiary of a variable interest entity, an enterprise with a variable interest shall treat variable interests in that same entity held by its related parties as its own interests. For purposes of this Interpretation, the term *related parties* includes those parties identified in FASB Statement No. 57, *Related Party Disclosures*, and certain other parties that are acting as de facto agents or de facto principals of the variable interest holder. The following are considered to be de facto agents of an enterprise:

a. A party that cannot finance its operations without subordinated financial support from the enterprise, for example, another variable interest entity of which the enterprise is the primary beneficiary

b. A party that received its interests as a contribution or a loan from the enterprise

c. An officer, employee, or member of the governing board of the enterprise

d. A party that has (1) an agreement that it cannot sell, transfer, or encumber its interests in the entity without the prior approval of the enterprise or (2) a close business relationship like the relationship between a professional service provider and one of its significant clients. The right of prior approval creates a de facto agency relationship only if that right could constrain the other party's ability to manage the economic risks or realize the economic rewards from its interests in a variable interest entity through the sale, transfer, or encumbrance of those interests.

17. If two or more related parties (including the de facto agents described in paragraph 16) hold variable interests in the same variable interest entity, and the aggregate variable interest held by those parties would, if held by a single party, identify that party as the primary beneficiary, then the party, within the related party group, that is most closely associated with the variable interest entity is the primary beneficiary. The determination of which party within the related party group is most closely associated with the variable interest entity requires judgment and shall be based on an analysis of all relevant facts and circumstances, including:

a. The existence of a principal-agency relationship between parties within the related party group

b. The relationship and significance of the activities of the variable interest entity to the various parties within the related party group

c. A party's exposure to the expected losses of the variable interest entity

d. The design of the variable interest entity.

*Initial Measurement*

**[Note: Prior to the adoption of Statement 141(R) (effective for business combinations with an acquisition date on or after the beginning of the first annual reporting period beginning on or after 12/15/08), paragraphs 18 through 21 and footnote 16 should read as follows:]**

18. Except for enterprises under common control and assets and liabilities that are consolidated shortly after transfer from a primary beneficiary to a variable interest entity, the primary beneficiary of a variable interest entity shall initially measure the assets, liabilities, and noncontrolling interests of the newly consolidated entity at their fair values at the date the enterprise first becomes the primary beneficiary. That date is the first date on which, if the enterprise issued financial statements, it would report the entity in its consolidated financial statements.

19. If the primary beneficiary of a variable interest entity is under common control with the variable interest entity, the primary beneficiary shall initially measure the assets, liabilities, and noncontrolling interests of the variable interest entity at the amounts at which they are carried in the accounts of the enterprise that controls the variable interest entity (or would be carried if the enterprise issued financial statements prepared in conformity with generally accepted accounting principles).

20. The primary beneficiary of a variable interest entity shall initially measure assets and liabilities that it has transferred to that variable interest entity at, after, or shortly before the date that the enterprise became the primary beneficiary at the same amounts at which the assets and liabilities would have been measured if they had not been transferred. No gain or loss shall be recognized because of such transfers.

21. The excess, if any, of (a) the fair value of the newly consolidated assets and (b) the reported amount of assets transferred by the primary beneficiary to the variable interest entity over (1) the sum of the fair value of the consideration paid, (2) the reported amount of any previously held interests, and (3) the fair value of the newly consolidated liabilities and noncontrolling interests shall be allocated and reported as a pro rata adjustment of the amounts that

Exhibit 4 Page 61

*Consolidation of Variable Interest Entities*   **FIN46(R)**

would have been assigned to all of the newly consolidated assets as specified in paragraphs 44 and 45 of FASB Statement No. 141, *Business Combinations*, as if the initial consolidation had resulted from a business combination. The excess, if any, of (a) the sum of the fair value of the consideration paid, (b) the reported amount of any previously held interests, and (c) the fair value of the newly consolidated liabilities and noncontrolling interests over (1) the fair value of the newly consolidated identifiable assets and (2) the reported amount of identifiable assets transferred by the primary beneficiary to the variable interest entity shall be reported in the period in which the enterprise becomes the primary beneficiary as:

a. Goodwill, if the variable interest entity is a business[16]

b. An extraordinary loss, if the variable interest entity is not a business.

**[Note: After the adoption of Statement 141(R), paragraphs 18 through 21 and footnotes 16 and 16a should read as follows:]**

18. If the primary beneficiary of a variable interest entity and the variable interest entity are under common control, the primary beneficiary shall initially measure the assets, liabilities, and *noncontrolling interests*[16] of the variable interest entity at the amounts at which they are carried in the accounts of the enterprise that controls the variable interest entity (or would be carried if the enterprise issued financial statements prepared in conformity with generally accepted accounting principles).

19. Paragraphs 20 and 21 provide guidance if the primary beneficiary and variable interest entity are not under common control.

20. The initial consolidation of a variable interest entity that is a *business*[16a] is a business combination and shall be accounted for in accordance with the provisions of FASB Statement No. 141 (revised 2007), *Business Combinations*.

21. If an entity becomes the primary beneficiary of a variable interest entity that is *not* a business:

a. The primary beneficiary initially shall measure and recognize the assets (except for goodwill) and liabilities of the variable interest entity in accordance with paragraphs 12–33 of State-

ment 141(R). However, the primary beneficiary shall initially measure assets and liabilities that it has transferred to that variable interest entity at, after, or shortly before the date that the entity became the primary beneficiary at the same amounts at which the assets and liabilities would have been measured if they had not been transferred. No gain or loss shall be recognized because of such transfers.

b. The primary beneficiary shall recognize a gain or loss for the difference between (1) the fair value of any consideration paid, the fair value of any noncontrolling interests, and the reported amount of any previously held interests and (2) the net amount of the variable interest entity's identifiable assets and liabilities recognized and measured in accordance with Statement 141(R). No goodwill shall be recognized if the variable interest entity is not a business.

---

[16]The term *noncontrolling interests* is used in this Interpretation with the same meaning as in FASB Statement No. 160, *Noncontrolling Interests in Consolidated Financial Statements*. That Statement defines a noncontrolling interest as "the portion of equity (net assets) in a subsidiary not attributable, directly or indirectly, to a parent."

[16a]Statement 141(R) provides guidance on determining whether an entity is a business.

**Accounting after Initial Measurement**

**[Note: For not-for-profit organizations and all other entities that prepare consolidated financial statements prior to the adoption of FASB Statement No. 160, *Noncontrolling Interests in Consolidated Financial Statements* (effective for fiscal years, and interim periods within those fiscal years, beginning on or after 12/15/08), paragraph 22 should read as follows:]**

22. The principles of consolidated financial statements in ARB 51 apply to primary beneficiaries' accounting for consolidated variable interest entities. After the initial measurement, the assets, liabilities, and noncontrolling interests of a consolidated variable interest entity shall be accounted for in consolidated financial statements as if the entity were consolidated based on voting interests. Any specialized accounting requirements applicable to the type of business in which the variable interest entity operates shall be applied as they would be applied to a consolidated subsidiary. The consolidated enterprise shall follow the requirements for elimination of intercompany balances and transactions and other matters

---

[16]Appendix C provides guidance on determining whether an entity constitutes a business.

Exhibit 4 Page 62

**FIN46(R)**        *FASB Interpretations*

described in paragraphs 6–15 of ARB 51 and existing practices for consolidated subsidiaries. Fees or other sources of income or expense between a primary beneficiary and a consolidated variable interest entity shall be eliminated against the related expense or income of the variable interest entity. The resulting effect of that elimination on the net income or expense of the variable interest entity shall be attributed to the primary beneficiary (and not to noncontrolling interests) in the consolidated financial statements.

**[Note: After the adoption of Statement 160, for all entities that prepare consolidated financial statements (except for not-for-profit organizations), paragraph 22 should read as follows:]**

22. The principles of consolidated financial statements in ARB 51 apply to primary beneficiaries' accounting for consolidated variable interest entities. After the initial measurement, the assets, liabilities, and noncontrolling interests of a consolidated variable interest entity shall be accounted for in consolidated financial statements as if the entity were consolidated based on voting interests. Any specialized accounting requirements applicable to the type of business in which the variable interest entity operates shall be applied as they would be applied to a consolidated subsidiary. The consolidated enterprise shall follow the requirements for elimination of intercompany balances and transactions and other matters described in paragraphs 6–39 of ARB 51 and existing practices for consolidated subsidiaries. Fees or other sources of income or expense between a primary beneficiary and a consolidated variable interest entity shall be eliminated against the related expense or income of the variable interest entity. The resulting effect of that elimination on the net income or expense of the variable interest entity shall be attributed to the primary beneficiary (and not to noncontrolling interests) in the consolidated financial statements.

## DISCLOSURE

**[Note: Prior to the adoption of Statement 141(R) (effective for business combinations with an acquisition date on or after the beginning of the first annual reporting period beginning on or after 12/15/08), paragraph 23 should read as follows:]**

23. In addition to disclosures required by other standards, the primary beneficiary of a variable

interest entity shall disclose the following (unless the primary beneficiary also holds a majority voting interest):[17]

a. The nature, purpose, size, and activities of the variable interest entity

b. The carrying amount and classification of consolidated assets that are collateral for the variable interest entity's obligations

c. Lack of recourse if creditors (or beneficial interest holders) of a consolidated variable interest entity have no recourse to the general credit of the primary beneficiary.

**[Note: After the adoption of Statement 141(R), paragraph 23 and footnote 17 should read as follows:]**

23. The primary beneficiary of a variable interest entity that is a business shall provide the disclosures required by Statement 141(R). The primary beneficiary of a variable interest entity that is not a business shall disclose the amount of gain or loss recognized on the initial consolidation of the variable interest entity. In addition to disclosures required by other standards, the primary beneficiary of a variable interest entity shall disclose the following (unless the primary beneficiary also holds a majority voting interest):[17]

a. The nature, purpose, size, and activities of the variable interest entity

b. The carrying amount and classification of consolidated assets that are collateral for the variable interest entity's obligations

c. Lack of recourse if creditors (or beneficial interest holders) of a consolidated variable interest entity have no recourse to the general credit of the primary beneficiary.

---

[17] A variable interest entity may issue voting equity interests, and the enterprise that holds a majority voting interest also may be the primary beneficiary of the entity. If so, the disclosures in paragraphs 23 and 27 are not required.

24. An enterprise that holds a significant variable interest in a variable interest entity but is not the primary beneficiary shall disclose:

a. The nature of its involvement with the variable interest entity and when that involvement began

b. The nature, purpose, size, and activities of the variable interest entity

---

[17] A variable interest entity may issue voting equity interests, and the enterprise that holds a majority voting interest also may be the primary beneficiary of the entity. If so, the disclosures in paragraphs 23 and 27 are not required.

Exhibit 4 Page 63

*Consolidation of Variable Interest Entities*          **FIN46(R)**

c. The enterprise's maximum exposure to loss as a result of its involvement with the variable interest entity.

25. Disclosures required by Statement 140 about a variable interest entity shall be included in the same note to the financial statements as the information required by this Interpretation. Information about variable interest entities may be reported in the aggregate for similar entities if separate reporting would not add material information.

26. An enterprise that does not apply this Interpretation to one or more variable interest entities or potential variable interest entities because of the condition described in paragraph 4(g) shall disclose the following information:

a. The number of entities to which this Interpretation is not being applied and the reason why the information required to apply this Interpretation is not available
b. The nature, purpose, size (if available), and activities of the entity(ies) and the nature of the enterprise's involvement with the entity(ies)
c. The reporting enterprise's maximum exposure to loss because of its involvement with the entity(ies)
d. The amount of income, expense, purchases, sales, or other measure of activity between the reporting enterprise and the entity(ies) for all periods presented. However, if it is not practicable to present that information for prior periods that are presented in the first set of financial statements for which this requirement applies, the information for those prior periods is not required.

**EFFECTIVE DATE AND TRANSITION**

27. If it is reasonably possible that an enterprise will initially consolidate or disclose information about a variable interest entity when this Interpretation be-

comes effective, the enterprise shall disclose the following information in all financial statements initially issued after December 31, 2003, regardless of the date on which the variable interest entity was created:

a. The nature, purpose, size, and activities of the variable interest entity
b. The enterprise's maximum exposure to loss as a result of its involvement with the variable interest entity.

28. An enterprise with an interest in an entity to which the provisions of Interpretation 46 have not been applied as of December 24, 2003, shall apply Interpretation 46 or this Interpretation to that entity in accordance with paragraphs 29–41.

**Public Entity That Is Not a Small Business Issuer**

29. A public entity[18] (enterprise) that is not a small business issuer[19] shall apply this Interpretation to all entities subject to this Interpretation no later than the end of the first reporting period that ends after March 15, 2004 (as of March 31, 2004, for calendar-year enterprises). This effective date includes those entities to which Interpretation 46 was previously applied.

30. However, prior to the required application of this Interpretation, a public entity (enterprise) that is not a small business issuer shall apply Interpretation 46 or this Interpretation to those entities that are considered to be special-purpose entities[20] no later than as of the end of the first reporting period that ends after December 15, 2003 (as of December 31, 2003, for calendar-year enterprises).

31. A public entity (enterprise) that is not a small business issuer that has applied Interpretation 46 to an entity prior to the effective date of this Interpretation shall either continue to apply Interpretation 46 until the effective date of this Interpretation or apply this Interpretation at an earlier date.

---

[18]The term *public entity* is defined in paragraph E1 of FASB Statement No. 123 (revised 2004), *Share-Based Payment.*

[19]The term *small business issuer* is defined in SEC Regulation S-B §228.10(a)(1).

[20]The term *special-purpose entity* in paragraphs 30 and 33 refers to an entity that previously would have been accounted for by applying the guidance in EITF Issues No. 90-15, "Impact of Nonsubstantive Lessors, Residual Value Guarantees, and Other Provisions in Leasing Transactions," No. 96-21, "Implementation Issues in Accounting for Leasing Transactions involving Special-Purpose Entities," and No. 97-1, "Implementation Issues in Accounting for Lease Transactions, including Those Involving Special-Purpose Entities," and EITF Topic No. D-14, "Transactions involving Special-Purpose Entities." Special-purpose entities for this provision are expected to include any entity whose activities are primarily related to securitizations or other forms of asset-backed financings or single-lessee leasing arrangements.

Exhibit 4 Page 64

**FIN46(R)**          *FASB Interpretations*

### Public Entity That Is a Small Business Issuer

32. A public entity[21] (enterprise) that is a small business issuer[22] shall apply this Interpretation to all entities subject to this Interpretation no later than the end of the first reporting period that ends after December 15, 2004 (as of December 31, 2004, for a calendar-year enterprise). This effective date includes those entities to which Interpretation 46 had previously been applied.

33. However, prior to the required application of this Interpretation, a public entity (enterprise) that is a small business issuer shall apply Interpretation 46 or this Interpretation to those entities that are considered to be special-purpose entities no later than as of the end of the first reporting period that ends after December 15, 2003 (as of December 31, 2003, for a calendar-year enterprise).

34. A public entity (enterprise) that is a small business issuer that has applied Interpretation 46 to an entity prior to the effective date of this Interpretation shall either continue to apply Interpretation 46 until the effective date of this Interpretation or apply this Interpretation at an earlier date.

### Nonpublic Entities

35. A nonpublic entity[23] (enterprise) with an interest in an entity that is subject to this Interpretation and that is created after December 31, 2003, shall apply this Interpretation to that entity immediately. A nonpublic enterprise shall apply this Interpretation to all entities that are subject to this Interpretation by the beginning of the first annual period beginning after December 15, 2004.

### Investment Companies

36. The effective date for applying the provisions of Interpretation 46 or this Interpretation is deferred for investment companies that are not subject to SEC Regulation S-X, Rule 6-03(c)(1) but are currently accounting for their investments in accordance with the specialized accounting guidance in the AICPA Audit and Accounting Guide, *Investment Companies,* until the date that the investment company initially adopts AICPA Statement of Position 07-1, *Clarification of the Scope of the Audit and Accounting Guide Invest-*ment Companies *and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies.* An entity that is required to discontinue application of the specialized accounting in the Guide as a result of adoption of SOP 07-1 is subject to the provisions of this Interpretation at that time. Paragraph 4(e) of this Interpretation states that "investments accounted for at fair value in accordance with the specialized accounting guidance in the AICPA Audit and Accounting Guide, *Investment Companies,* are not subject to consolidation according to the requirements of this Interpretation" (footnote reference omitted). Accordingly, an entity that meets the definition of an investment company after adoption of SOP 07-1 shall continue to apply the specialized accounting in the Guide to its investments.

### Transition

37. If initial application of the requirements of this Interpretation results in initial consolidation of an entity created before December 31, 2003, the consolidating enterprise shall initially measure the assets, liabilities, and noncontrolling interests of the variable interest entity at their carrying amounts at the date the requirements of this Interpretation first apply. In this context, *carrying amounts* refers to the amounts at which the assets, liabilities, and noncontrolling interests would have been carried in the consolidated financial statements if this Interpretation had been effective when the enterprise first met the conditions to be the primary beneficiary. If determining the carrying amounts is not practicable, the assets, liabilities, and noncontrolling interests of the variable interest entity shall be measured at fair value at the date this Interpretation first applies. Any difference between the net amount added to the balance sheet of the consolidating enterprise and the amount of any previously recognized interest in the newly consolidated entity shall be recognized as the cumulative effect of an accounting change.

38. The determinations of (a) whether an entity is a variable interest entity and (b) which enterprise, if any, is a variable interest entity's primary beneficiary should be made as of the date the enterprise became involved with the entity or if events requiring reconsideration of the entity's status or the status of its variable interest holders have occurred, as of the

---

[21]Refer to footnote 18.

[22]Refer to footnote 19.

[23]The term *nonpublic entity* is defined in paragraph E1 of Statement 123(R).

FIN46(R)–16

Exhibit 4 Page 65

*Consolidation of Variable Interest Entities*  **FIN46(R)**

most recent date at which Interpretation 46 or this Interpretation would have required consideration. (Refer to paragraphs 7 and 15 for discussions of reconsideration.) However, if at transition it is not practicable for an enterprise to obtain the information necessary to make the determinations as of the date the enterprise became involved with an entity or at the most recent reconsideration date, the enterprise should make the determinations as of the date on which this Interpretation is first applied. If the variable interest entity and primary beneficiary determinations are made in accordance with this paragraph, then the primary beneficiary shall measure the assets, liabilities, and noncontrolling interests of the variable interest entity at fair value as of the date on which this Interpretation is first applied.

39. The effect of applying this Interpretation to an entity to which Interpretation 46 had previously been applied shall be reported as the cumulative effect of an accounting change. Goodwill previously written off as required by Interpretation 46 shall not be reinstated.

40. This Interpretation may be applied by restating previously issued financial statements for one or more years with a cumulative-effect adjustment as of the beginning of the first year restated. Restatement is encouraged but not required.

41. An enterprise that has not applied this Interpretation to an entity because of the condition described in paragraph 4(g) and that subsequently obtains the information necessary to apply this Interpretation to that entity shall apply the provisions of this Interpretation as of the date the information is acquired in accordance with paragraph 37. Restatement in accordance with paragraph 40 is encouraged but not required.

*The revisions in this Interpretation were adopted by the affirmative votes of five members of the Financial Accounting Standards Board. Mr. Batavick and Ms. Seidman dissented.*

Mr. Batavick and Ms. Seidman object to the issuance of this Interpretation, because it does not clarify a new but critical concept underlying the variable interest model and because the effective dates for some types of entities are too soon to provide for an orderly transition.

They believe there is currently a lack of clarity surrounding the application of the expected loss-return test, which is the gateway in determining whether an entity is a variable interest entity and the key quantitative test for identifying who should consolidate an entity. The Board is aware that different approaches exist that result in different conclusions about whether an entity is a variable interest entity and also whether a reporting entity is the primary beneficiary. Mr. Batavick and Ms. Seidman find it troubling that entities with the same contractual structures could reach different conclusions about whether the entity is a variable interest entity and who should consolidate it. They believe the Board should provide more guidance for calculating expected losses and expected residual returns so that the new consolidation model will be applied with a high degree of consistency.

This Interpretation contains numerous changes from the original Interpretation 46 and from the proposed modification that was exposed in October 2003. While they generally support those changes, Mr. Batavick and Ms. Seidman believe that with an issuance date in late December 2003, the effective dates of this Interpretation do not give preparers of financial statements and their auditors a reasonable amount of time to digest the clarified provisions, analyze the effect on their organizations, implement the effect of any changes, and subject them to internal and external audit procedures. Given the large number of securitization vehicles held by institutions engaged in these activities, the nonstandard nature of their terms, the materiality of the assets and liabilities involved, and the heightened awareness of these transactions in the marketplace, they believe it is as important to delay the effective date for entities typically thought of as "special-purpose entities" as it is for other types of entities within the scope of this Interpretation (for which an additional deferral has been provided). Those Board members believe it is in the best interest of the capital markets that reporting entities have additional time to implement those accounting changes, especially in complex areas such as structured finance.

*Members of the Financial Accounting Standards Board:*

| | | |
|---|---|---|
| Robert H. Herz, | G. Michael Crooch | Leslie F. Seidman |
| *Chairman* | Gary S. Schieneman | Edward W. Trott |
| George J. Batavick | Katherine Schipper | |

FIN46(R)–17

Exhibit 4 Page 66

**FIN46(R)**          *FASB Interpretations*

*Interpretation 46 was adopted by the affirmative votes of six members of the Financial Accounting Standards Board. Mr. Foster dissented.*

Consolidation standards throughout the world, including ARB 51 and Statement 94, are based on control. ARB 51 states, "There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies." The objective of this Interpretation is to assist in determining when one entity controls another entity in circumstances where control is difficult to discern, because either the structure of the variable interest entity obviates the need for decisions or control has been disguised. Mr. Foster does not believe this Interpretation consistently achieves that objective; rather, he believes that its application will in certain circumstances fail to identify the party that controls a variable interest entity and, instead, identify as the controlling party a party that does not control it. That, in turn, has the potential to result in entities not reporting in their consolidated financial statements assets that they control and liabilities for which they are obligated and to require different entities to report in their consolidated financial statements assets they do not control and liabilities for which they have no responsibility. He believes that is inappropriate because the FASB's conceptual framework is clear that control is an essential characteristic of an asset and an obligation to sacrifice assets is an essential characteristic of a liability. Accordingly, he dissents from issuance of this Interpretation.

One concern is the Board's conclusion that interests in transferred assets held by a transferor after it transfers assets to a variable interest entity can, in certain circumstances, be variable interests in that entity. Mr. Foster believes they are never variable interests; rather, he believes that a variable interest entity and a transferor of assets to that entity hold separate and distinct interests in the assets originally held by the transferor. For example, after a transfer of financial assets to a variable interest entity, the assets held by that entity can be characterized as strips—that is, they are contracts to receive designated cash flows from the transferred assets, often the first cash flows collected up to a designated amount or percentage of the contracted amount of the underlying assets. The transferor often holds the remaining interest in the cash flows—also a strip—and neither the creditors nor beneficial interest holders of the variable interest entity have recourse to those cash flows. The asset

held by the transferor is not an interest in the variable interest entity at all; it is simply a separate and distinct interest in the same assets in which the variable interest entity has interests.

If the Board had concluded that shared interests in assets with a variable interest entity were not under any circumstances variable interests in the variable interest entity, Mr. Foster's overriding concern—that entities that control assets and owe liabilities have the potential to omit those assets and liabilities from their consolidated financial statements while other entities have the potential to report in their consolidated financial statements assets they do not control and liabilities for which they have no responsibility—would not arise. This Interpretation requires that variable interests held by a transferor of assets to a variable interest entity be considered in determining the primary beneficiary if a single transferor of assets to a variable interest entity transfers a majority of the assets held by that variable interest entity or if a transferor of assets to a variable interest entity has another variable interest in that entity as a whole. As a result, under this Interpretation, a transferor that transfers a majority of the assets held by a variable interest entity and retains an interest that will absorb virtually all of the potential losses of the original assets before they were divided likely would be required to consolidate the variable interest entity. However, if no party involved with the variable interest entity transfers a majority of the variable interest entity's assets, the interests of the transferors are not considered in determining the primary beneficiary. In that case, a party other than a transferor is likely to have the majority of the downside risk or upside potential of the variable interest entity and, thus, be the primary beneficiary. Consequently, two variable interest entities with identical structures, terms, and conditions, and that have the same entity making decisions about their activities may be consolidated by different parties, each of which has a substantially different relationship with the variable interest entity. One variable interest entity may be consolidated by a transferor with no decision-making ability if that transferor originally owned more than half of the assets in which the variable interest entity now has interests. Another essentially identical entity may be consolidated by the entity that has decision-making ability and rights and obligations related to the entity as a whole if no individual transferor holds interests in more than half of the assets in which the variable interest entity has interests. While Mr. Foster believes that an interest in assets in which a variable interest entity also has interests is not a variable interest, the Board has offered

Exhibit 4 Page 67

*Consolidation of Variable Interest Entities*     **FIN46(R)**

no rationale for ignoring transferors' variable interests in determining the primary beneficiary in circumstances in which a single transferor has not transferred a majority of the assets held by the variable interest entity. In his view, if the Board believes the interests held by a transferor of assets in which a variable interest entity also holds interests are variable interests, they should always be treated as variable interests or the Board should have a compelling rationale for why they are sometimes variable interests and sometimes not.

Mr. Foster believes that control is a matter of fact—it either exists or it does not—and that only one party can have control. The factors that result in an entity's ability to control a variable interest entity do not change simply because a majority of its assets are associated with assets originally held by a single transferor. Because this Interpretation requires that factor to have the potential of being determinative as to which party is the primary beneficiary, Mr. Foster believes its application will sometimes fail to identify the entity that controls a variable interest entity. More important, in certain circumstances, it inappropriately requires consolidation of a variable interest entity by an entity that does not control it. As a result, even if one accepts that a transferor of a majority of the assets held by a variable interest entity still controls the transferred assets, if that transferor is determined to be the entity's primary beneficiary, that transferor will report in its consolidated financial statements assets and liabilities of the variable interest entity that result from transactions with other transferors—assets and liabilities for which it has no involvement and obligation to settle, respectively. Mr. Foster believes that is inappropriate regardless of the circumstances.

*Members of the Financial Accounting Standards Board January 2003:*

Robert H. Herz,
*Chairman*
G. Michael Crooch

John M. Foster
Gary S. Schieneman
Katherine Schipper

Edward W. Trott
John K. Wulff

**Appendix A**

**EXPECTED LOSSES, EXPECTED RESIDUAL RETURNS, AND EXPECTED VARIABILITY**

A1. The following illustration of a computation of expected losses, expected residual returns, and expected variability is intended to explain the meaning of those terms. Enterprises will not necessarily be able to estimate probabilities to use a precise computation of the type illustrated, but they should use their best efforts to achieve the objective described. This illustration is based on a hypothetical pool of financial assets with total contractual cash flows of $1 bil-

lion. The following assumptions have been made to simplify the illustration:

a. A single party holds all of the beneficial interests in the entity, and the entity has no liabilities.
b. There is no decision maker because the entity's activities are completely predetermined.
c. All cash flows are expected to occur in one year or not to occur at all.
d. The appropriate discount rate (the interest rate on risk-free investments) is 5 percent.
e. No other factors affect the fair value of the assets. Thus, the present value of the expected cash flows from the pool of financial assets is assumed to be equal to the fair value of the assets.

Exhibit 4 Page 68

**FIN46(R)**             *FASB Interpretations*

A2. Table 1 shows the computation of expected cash flows using the cash flow possibilities that the variable interest holder has identified. The items to be included in expected cash flows of a variable interest entity are described in paragraph 8 of this Interpretation.

**Table 1**
**(Amounts in Thousands)**

| Estimated Cash Flows | Probability | Expected Cash Flows | Fair Value |
|---|---|---|---|
| $650,000 | 5.0% | $ 32,500 | $ 30,952 |
| 700,000 | 10.0 | 70,000 | 66,667 |
| 750,000 | 25.0 | 187,500 | 178,571 |
| 800,000 | 25.0 | 200,000 | 190,477 |
| 850,000 | 20.0 | 170,000 | 161,905 |
| 900,000 | 15.0 | 135,000 | 128,571 |
| | 100.0% | $795,000 | $757,143 |

The expected cash flows are $795,000, and the fair value of the pool of assets is $757,143.

A3. Table 2 shows how expected losses are computed once the expected cash flows are determined. Estimated cash flows (possible outcomes) are compared with the computed expected cash flows (probability weighted outcomes). Estimated cash flows that are less than the expected cash flows contribute to expected losses, and cash flow possibilities that exceed the expected cash flows contribute to expected residual returns.

**Table 2**
**(Amounts in Thousands)**

| Estimated Cash Flows[24] | Expected Cash Flows | Difference Estimated (Losses) Residual Returns | Probability | Expected Losses Based on Expected Cash Flows | Expected Losses Based on Fair Value |
|---|---|---|---|---|---|
| $650,000 | $795,000 | $(145,000) | 5.0% | $ (7,250) | $ (6,905) |
| 700,000 | 795,000 | (95,000) | 10.0 | (9,500) | (9,048) |
| 750,000 | 795,000 | (45,000) | 25.0 | (11,250) | (10,714) |
| 800,000 | 795,000 | 5,000 | 25.0 | | |
| 850,000 | 795,000 | 55,000 | 20.0 | | |
| 900,000 | 795,000 | 105,000 | 15.0 | | |
| | | | 100.0% | $(28,000) | $(26,667) |

This Interpretation uses the term *expected losses* to refer to the expected losses based on fair value (using fair value as the benchmark), which in this illustration is $26.667 million.

---

[24]The computation in this illustration uses estimated cash flows less expected cash flows times the probability and then discounts the result to arrive at fair value. The same result can be achieved by using the present value of the estimated cash flows less fair value times the probability. In situations in which the timing of the cash flows varies, that alternate form may be easier to use.

Exhibit 4 Page 69

*Consolidation of Variable Interest Entities*          **FIN46(R)**

A4. Table 3 shows how expected residual returns are computed for the same pool of assets.

**Table 3**
**(Amounts in Thousands)**

| Estimated Cash Flows | Expected Cash Flows | Difference Estimated (Losses) Residual Returns | Probability | Expected Residual Return Based on Expected Cash Flows | Expected Residual Return Based on Fair Value |
|---|---|---|---|---|---|
| $650,000 | $795,000 | $(145,000) | 5.0% | | |
| 700,000 | 795,000 | (95,000) | 10.0 | | |
| 750,000 | 795,000 | (45,000) | 25.0 | | |
| 800,000 | 795,000 | 5,000 | 25.0 | $ 1,250 | $ 1,191 |
| 850,000 | 795,000 | 55,000 | 20.0 | 11,000 | 10,476 |
| 900,000 | 795,000 | 105,000 | 15.0 | 15,750 | 15,000 |
| | | | 100.0% | $28,000 | $26,667 |

This Interpretation uses the term *expected residual returns* to refer to the expected residual returns based on fair value (using fair value as the benchmark), which in this illustration is $26.667 million. Expected variability is a measure of total variability in either direction. It is the sum of the absolute values of the expected losses and expected residual returns.

A5. This appendix uses a simple case intended to illustrate the concepts of expected losses, expected residual returns, and expected variability. Since it is assumed that there is only one party involved, the identity of the primary beneficiary is obvious.

**Appendix B**

**VARIABLE INTERESTS**

**Introduction**

B1. This Interpretation provides guidance for identifying entities for which analysis of voting interests, and the holdings of those voting interests, is not effective in determining whether a controlling financial interest exists because the entity does not have adequate equity capital or the equity instruments do not have the normal characteristics of equity that provide its holders with a potential controlling financial interest. Those entities are called variable interest entities. This Interpretation also provides guidance for determining whether an enterprise shall consolidate a variable interest entity. An enterprise that consolidates a variable interest entity is called the primary beneficiary of that variable interest entity. The guidance in this Interpretation identifies the primary beneficiary as a holder of variable interests in a variable interest entity that absorb or receive a majority of the entity's expected losses or expected residual returns. This appendix provides guidance for identifying variable interests and explains in general how they may affect the determination of the primary beneficiary.

B2. The identification of variable interests requires an economic analysis of the rights and obligations of an entity's assets, liabilities, equity, and other contracts. Variable interests are contractual, ownership, or other pecuniary interests in an entity that change with changes in the fair value of an entity's net assets exclusive of variable interests. This Interpretation uses the terms *expected losses* and *expected residual returns* to describe the expected variability in the fair value of an entity's net assets exclusive of variable interests.

B3. For an entity that is not a variable interest entity (sometimes called a voting interest entity), all of the entity's assets, liabilities, and other contracts are deemed to create variability, and the equity investment is deemed to be sufficient to absorb the expected amount of that variability. In contrast, variable interest entities are designed so that some of the entity's assets, liabilities, and other contracts create variability and some of the entity's assets, liabilities, and other contracts (as well as its equity at risk) absorb or receive that variability.

Exhibit 4 Page 70

**FIN46(R)**          *FASB Interpretations*

B4. The identification of variable interests involves determining which assets, liabilities, or contracts create the entity's variability and which assets, liabilities, equity, and other contracts absorb or receive that variability. The latter are the entity's variable interests. The labeling of an item as an asset, liability, equity, or as a contractual arrangement does not determine whether that item is a variable interest. It is the role of the item—to absorb or receive the entity's variability—that distinguishes a variable interest. That role, in turn, often depends on the design of the entity.

B5. This appendix describes examples of variable interests in entities subject to this Interpretation. The appendix is not intended to provide a complete list of all possible variable interests. In addition, the descriptions are not intended to be exhaustive of the possible roles, and the possible variability, of the assets, liabilities, equity, and other contracts. Actual instruments may play different roles and be more or less variable than the examples discussed. Finally, this appendix does not analyze the relative significance of different variable interests, because the relative significance of a variable interest will be determined by the design of the variable interest entity. The identification and analysis of variable interests must be based on all of the facts and circumstances of each entity.

B6. This appendix also does not discuss whether the variable interest is a variable interest (a) in a specified asset of a variable interest entity or (b) in the entity as a whole. Guidance for making that determination is provided in paragraph 12. Paragraph 13 provides guidance for when a variable interest entity should be separated with each part evaluated to determine if it has a primary beneficiary.

**Equity Investments, Beneficial Interests, and Debt Instruments**

B7. Equity investments in a variable interest entity are variable interests to the extent they are at risk. (Equity investments at risk are described in paragraph 5 of this Interpretation.) Some equity investments in a variable interest entity that are determined to be not at risk by the application of paragraph 5 also may be variable interests if they absorb or receive some of the entity's variability. If an entity has a contract with one of its equity investors (including a financial instrument such as a loan receivable), a reporting enterprise applying this Interpretation to that entity should consider whether that contract causes the equity investor's investment not to be at risk. If

the contract with the equity investor represents the only asset of the entity, that equity investment is not at risk.

B8. Investments in subordinated beneficial interests or subordinated debt instruments issued by a variable interest entity are likely to be variable interests. The most subordinated interest in an entity will absorb all or part of the expected losses of the entity. For a voting interest entity the most subordinated interest is the entity's equity; for a variable interest entity it could be debt, beneficial interests, equity, or some other interest. The return to the most subordinated interest usually is a high rate of return (in relation to the interest rate of an instrument with similar terms that would be considered to be "investment grade") or some form of participation in residual returns.

B9. Any of a variable interest entity's liabilities may be variable interests because a decrease in the fair value of an entity's assets could be so great that all of the liabilities would absorb that decrease. However, senior beneficial interests and senior debt instruments with fixed interest rates or other fixed returns normally would absorb little of the entity's expected variability, and therefore, a holder of *only* the most senior interests of a variable interest entity likely would not be the primary beneficiary of that entity, unless the subordinated interests of the variable interest entity are not large enough to absorb the entity's expected losses (or unless there are provisions such as embedded derivatives that expose the senior interests to losses). By definition, if a senior interest exists, interests subordinated to the senior interests will absorb losses first. The variability of a senior interest with a variable interest rate is usually not caused by changes in the value of the entity's assets and thus would usually be evaluated in the same way as a fixed-rate senior interest. Senior interests normally are not entitled to any of the residual return.

**Guarantees, Written Put Options, and Similar Obligations**

B10. Guarantees of the value of the assets or liabilities of a variable interest entity, written put options on the assets of the entity, or similar obligations such as some liquidity commitments or agreements (explicit or implicit) to replace impaired assets held by the entity are variable interests if they protect holders of other interests from suffering losses. To the extent the counterparties of guarantees, written put options, or similar arrangements will be called on to perform in the event expected losses occur, those arrangements

Exhibit 4 Page 71

are variable interests, including fees or premiums to be paid to those counterparties. The size of the premium or fee required by the counterparty to such an arrangement is one indication of the amount of risk expected to be absorbed by that counterparty.

**B11.** If the entity is the writer of a guarantee, written put option, or similar arrangement, the items usually would create variability. Thus, those items usually will not be a variable interest of the entity (but may be a variable interest in the counterparty).

**Forward Contracts**

**B12.** Forward contracts to buy assets or to sell assets that are not owned by the entity at a fixed price will usually expose the entity to risks that will increase the entity's expected variability. Thus, most forward contracts to buy assets or to sell assets that are not owned by the entity are not variable interests in the entity.

**B13.** A forward contract to sell assets that are owned by the entity at a fixed price will usually absorb the variability in the fair value of the asset that is the subject of the contract. Thus, most forward contracts to sell assets that are owned by the entity are variable interests with respect to the related assets. However, if the term of a forward contract is short or the volatility of the value of the asset is low or both, the holder of the forward contract is not likely to absorb a majority of the entity's expected losses or to receive a majority of the entity's expected residual returns. Because forward contracts to sell assets that are owned by the entity relate to specific assets of the entity, it will be necessary to apply the guidance in paragraph 12 to determine whether a forward contract to sell an asset owned by an entity is a variable interest in the entity as opposed to a variable interest in that specific asset.

**Other Derivative Instruments**

**B14.** Derivative instruments held or written by an entity should be analyzed in terms of their option-like, forward-like, or other variable characteristics. If the instrument creates variability, in the sense that it exposes the entity to risks that will increase expected variability, the instrument is not a variable interest. If the instrument absorbs or receives variability, in the sense that it reduces the exposure of the entity to risks that cause variability, the instrument is a variable interest. Rights and obligations under derivative instruments whose underlyings are market interest rates or currency exchange rates probably will not cause the holder to be a primary beneficiary unless the primary causes of variability in the entity's assets are the same or similar interest rates or currency exchange rates.

**B15.** Derivatives, including total return swaps and similar arrangements, can be used to transfer substantially all of the risk or return (or both) related to certain assets of an entity without actually transferring the assets. Derivative instruments with this characteristic should be evaluated carefully. If the arrangement effectively transfers significant risks to the counterparty, the counterparty is likely to be the entity's primary beneficiary.

**B16.** Some assets and liabilities of a variable interest entity have embedded derivatives. For the purpose of identifying variable interests, an embedded derivative that is clearly and closely related economically to its asset or liability host is not to be evaluated separately.

**Assets of the Entity**

**B17.** Assets held by an entity almost always create variability and, thus, are not variable interests. However, as discussed separately in this appendix, assets of the entity that take the form of derivatives, guarantees, or other similar contracts may be variable interests.

**Fees Paid to a Decision Maker**

**B18.** A variable interest entity's expected losses and expected residual returns shall not include the expected variability in fees paid to the decision maker (if there is a decision maker) except as discussed in the last sentence in this paragraph. Those contractual rights to receive fees are considered variable interests that absorb rather than cause variability. However, a fee paid by a variable interest entity to a decision maker is not considered a variable interest in the entity if all of the characteristics of a hired service provider or an employee relationship identified in paragraph B19 are present in an arrangement.

**B19.** Fees paid to a decision maker shall not be considered variable interests if all of the following conditions exist:

a. The fees are compensation for services provided and are commensurate with the level of effort required to provide those services. Paragraph B21 describes factors that may indicate that fees exceed the level of compensation that would be commensurate with the services provided.

b. The fees are at or above the same level of seniority as other operating liabilities of the entity that arise in the normal course of business, such as trade payables.

Exhibit 4 Page 72

**FIN46(R)**                    *FASB Interpretations*

c. Except for the fees described in conditions (a) and (b), the decision maker and the decision maker's related parties[25] do not hold interests in the variable interest entity that individually, or in the aggregate, would absorb more than a trivial amount of the entity's expected losses or receive more than a trivial amount of the entity's expected residual returns.

d. The decision maker is subject to substantive kick-out rights, as that term is described in paragraph B20.

B20. The ability of an investor or another party to remove the decision maker (that is, kick-out rights) does not affect the status of a decision maker's fees in the application of paragraphs B18 and B19 unless the rights are substantive. The determination of whether the kick-out rights are substantive should be based on a consideration of all relevant facts and circumstances. Substantive kick-out rights must have both of the following characteristics:

a. The decision maker can be removed by the vote of a simple majority of the voting interests held by parties other than the decision maker and the decision maker's related parties.[26]

b. The parties holding the kick-out rights have the ability to exercise those rights if they choose to do so; that is, there are no significant barriers to the exercise of the rights. Barriers include, but are not limited to:
   (1) Kick-out rights subject to conditions that make it unlikely they will be exercisable, for example, conditions that narrowly limit the timing of the exercise
   (2) Financial penalties or operational barriers associated with replacing the decision maker that would act as a significant disincentive for removal
   (3) The absence of an adequate number of qualified replacement decision makers or inadequate compensation to attract a qualified replacement
   (4) The absence of an explicit, reasonable mechanism in the contractual arrangement, or in the applicable laws or regulations, by which the parties holding the rights can call for and conduct a vote to exercise those rights
   (5) The inability of parties holding the rights to obtain the information necessary to exercise them.

B21. Determination of whether fees paid to a decision maker represent compensation for services provided commensurate with the level of effort required to provide those services will require judgment based on all relevant facts and circumstances. The following factors may indicate that the fees exceed the level of compensation that would be commensurate with the services provided:

a. The service arrangement includes terms, conditions, or amounts that are not customarily present in arrangements for similar services negotiated at arm's length.

b. The total amount of the expected fees is large relative to the total amount of the variable interest entity's expected return to its variable interests.

c. The expected variability in the fees is large relative to the total expected variability in the fair value of the variable interest entity's net assets exclusive of variable interests.

**Other Service Contracts**

B22. Service contracts with hired service providers other than the entity's decision maker are not variable interests if all three conditions below are met:

a. The fees are compensation for services provided and are commensurate with the level of effort required to provide those services.

b. Substantially all of the fees are at or above the same level of seniority as other operating liabilities of the entity that arise in the normal course of the entity's activities, such as trade payables.

c. The service contracts are subject to cancellation provisions that are customary for such contracts and there is an adequate number of qualified replacement service providers.

B23. Service contracts that do not have all of the features listed above may be variable interests. The counterparties to the contracts could absorb or receive some of the variability of the entity.

**Operating Leases**

B24. Receivables under an operating lease are assets of the lessor entity and provide returns to the lessor entity with respect to the leased property during that portion of the asset's life that is covered by the lease. Most operating leases do not absorb variability in the

---

[25]The term *related parties* refers to all parties identified in paragraph 16.
[26]Refer to footnote 25.

Exhibit 4 Page 73

*Consolidation of Variable Interest Entities*          **FIN46(R)**

fair value of an entity's net assets because they are a component of that variability. Guarantees of the residual values of leased assets (or similar arrangements related to leased assets) and options to acquire leased assets at the end of the lease terms at specified prices may be variable interests in the lessor entity if they meet the conditions described in paragraph 12 of this Interpretation. Alternatively, such arrangements may be variable interests in portions of a variable interest entity as described in paragraph 13 of this Interpretation. The guidance in paragraphs B8 and B9 related to debt instruments applies to creditors of lessor entities.

**Variable Interests of One Variable Interest Entity in Another Variable Interest Entity**

B25.  One variable interest entity is the primary beneficiary of another variable interest entity if it meets the conditions in paragraph 14. A variable interest entity that is the primary beneficiary of a second variable interest entity will consolidate that second variable interest entity. If another enterprise consolidates the first variable interest entity, that enterprise's consolidated financial statements include the second variable interest entity because the second entity had already been consolidated by the first. For example, if Entity X (a variable interest entity) is the primary beneficiary of Entity Y (a variable interest entity), Entity X consolidates Entity Y. If Enterprise Z is the primary beneficiary of Entity X, Enterprise Z consolidates Entity X, and Enterprise Z's consolidated financial statements include Entity Y because Entity X has consolidated Entity Y.

B26.  [An interest that continues to be held by a transferor] of financial assets to a variable interest entity is a variable interest in the transferee entity but it is not a variable interest in a second variable interest entity to which the transferee issues a beneficial interest. The following example illustrates this point.[27]

a.  Enterprise A transfers financial assets to Entity 1 (a variable interest entity that holds no other assets), retains a subordinated beneficial interest, and reports the transfer as a sale under the provisions of Statement 140.
b.  Entity 1 issues all of its senior beneficial interests in the transferred assets to Entity 2 (a variable interest entity). Entity 2 issues various types of interests in return for cash and uses the cash to pay

Entity 1. Entity 1 uses the cash received from Entity 2 to pay Enterprise A.
c.  Enterprise A's subordinated beneficial interest is a variable interest in Entity 1, but neither Entity 1 nor Enterprise A has a variable interest in Entity 2.

**Appendix C**

**[Note: After the adoption of Statement 141(R) (effective for business combinations with an acquisition date on or after the beginning of the first annual reporting period beginning on or after 12/15/08), Appendix C is deleted.]**

**DEFINITION OF A BUSINESS**

**Introduction**

C1.  EITF Issue No. 98-3, "Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business," was issued to provide guidance for evaluating whether a *business* is being exchanged in a nonmonetary exchange transaction. That guidance is also referenced in FASB Statement No. 141, *Business Combinations,* for purposes of determining whether a collection of assets constitutes a business and thus is subject to being accounted for as a business combination. The discussion in Issue 98-3 is focused on an evaluation of a collection of assets that is being transferred from one owner to another.

C2.  The need for a definition and discussion of what constitutes a business for use in this Interpretation is not related to an exchange or transfer. Therefore, the wording in the EITF's consensus has been modified, and the discussion of the transferee's intentions for using the collection of assets has been deleted. The examples that are included in *EITF Abstracts* are not reproduced herein. Those examples may assist in determining if an entity is a business but do not reflect modifications made in this appendix to exclude factors related to the exchange or transfer features of the EITF consensus.

C3.  The definition of a business for use in this Interpretation is as follows:

A business is a self-sustaining integrated set of activities and assets conducted and managed for

---

[27]This analysis describes variable interests in all variable interest entities including qualifying special-purpose entities. However, a special requirement applies to qualifying special-purpose entities. Refer to paragraphs 4(c) and 4(d).

Exhibit 4 Page 74

**FIN46(R)**      *FASB Interpretations*

the purpose of providing a return to investors. A business consists of (a) inputs, (b) processes applied to those inputs, and (c) resulting outputs that are used to generate revenues. For a set of activities and assets to be a business, it must contain all of the inputs and processes necessary for it to conduct normal operations, which include the ability to sustain a revenue stream by providing its outputs to customers.

C4. The elements necessary for a set to conduct normal operations will vary by industry and by the operating strategies of the set. An evaluation of the necessary elements should consider:

**Inputs**

a. Long-lived assets, including intangible assets, or rights to the use of long-lived assets
b. Intellectual property
c. The ability to obtain access to necessary materials or rights
d. Employees.

**Processes**

e. The existence of systems, standards, protocols, conventions, and rules that act to define the processes necessary for normal, self-sustaining operations, such as (1) strategic management processes, (2) operational processes, and (3) resource management processes.

**Outputs**

f. The ability to obtain access to the customers that purchase the outputs of the set.

C5. A set of activities and assets fails the definition of a business if it excludes one or more of the above items such that it is not possible for the set to conduct normal operations and sustain a revenue stream by providing its products or services or both to customers. However, if the excluded item or items are only minor (based on the degree of difficulty and the level of investment necessary to obtain access to or to acquire the missing item(s)), then the set is capable of conducting normal operations and is a business. The assessment of whether excluded items are only minor

should consider such factors as the uniqueness or scarcity of the missing element, the time frame, the level of effort, and the cost required to obtain the missing element. If goodwill is present in a set of activities and assets, it should be presumed that the excluded items are minor and that the set is a business.

C6. If all but a *de minimis* (say, 3 percent) amount of the fair value of the set of activities and assets is represented by a single tangible or identifiable intangible asset, the concentration of value in the single asset is an indicator that an asset rather than a business is being evaluated.

C7. The level of working capital or the adequacy of financing necessary to conduct normal operations is not an indicator either way as to whether the set meets the definition of a business. Likewise, if the planned principal operations of the set have commenced, the presence or expectation or both of continued operating losses while the entity seeks to achieve the level of market share necessary to attain profitability is not an indicator of whether the entity is a business. However, if the set is in the development stage and has not commenced planned principal operations, the set is presumed not to be a business.

C8. The determination of whether a set of assets and activities is or is not a business is a three-step process. First, one must identify the elements included in the set. Second, one must compare the identified elements in the set with the complete set of elements necessary for the set to conduct normal operations in order to identify any missing elements. Third, if there are missing elements, one must make an assessment as to whether the missing elements cause one to conclude that the set is not a business. That assessment is based on the degree of difficulty or the level of investment (relative to the fair value of the existing set) necessary to obtain access to or to acquire the missing elements. If the degree of difficulty and level of investment necessary to obtain access to or to acquire the missing elements are not significant, then the missing elements are considered minor and their absence would not cause one to conclude that the set is not a business. The determination of the degree of difficulty or level of investment necessary to obtain access to or to acquire the missing elements requires significant judgment and is dependent on the particular facts and circumstances.

FIN46(R)–26

Exhibit 4 Page 75

**Appendix D**

**INTERPRETATION 46(R): BACKGROUND INFORMATION AND BASIS FOR CONCLUSIONS**

## CONTENTS

|  | Paragraph Numbers |
|---|---|
| Introduction and Background | D1– D3 |
| Benefits and Costs | D4– D5 |
| Modifications to Interpretation 46 | D6–D61 |
|   Scope Exception for Not-for-Profit Health Care Organizations | D6– D8 |
|   Scope Exception for Certain Enterprises That Are Unable to Obtain Information | D9–D13 |
|   Proposed Scope Exception for Mutual Funds and Trusts Held by a Bank's Trust Department | D14 |
|   Scope Exception for Certain Entities That Are Businesses | D15–D16 |
|   Governments and Entities Created by Governments | D17–D18 |
|   Variable Interest Entities | D19–D25 |
|   Expected Losses and Expected Residual Returns | D26–D32 |
|   Development Stage Enterprises | D33 |
|   Consolidation Based on Variable Interests | D34 |
|   Reconsideration Events | D35–D39 |
|   De Facto Agency Relationship Created by Approval Rights | D40–D44 |
|   Related Parties | D45–D49 |
|   Initial Measurement | D50–D54 |
|   Accounting after Initial Measurement | D55 |
|   Appendix B of Interpretation 46 | D56 |
|   FASB Staff Positions | D57–D61 |
| Effective Date and Transition | D62–D66 |

**Appendix D**

**INTERPRETATION 46(R): BACKGROUND INFORMATION AND BASIS FOR CONCLUSIONS**

**Introduction and Background**

D1. This appendix summarizes considerations that Board members deemed significant in reaching the conclusions in this Interpretation. It includes reasons for accepting certain views and rejecting others. Individual Board members gave greater weight to some factors than others.

D2. FASB Interpretation No. 46, *Consolidation of Variable Interest Entities,* clarifies the application of ARB No. 51, *Consolidated Financial Statements,* to certain entities in which the equity investment at risk does not provide its holders with the characteristics of a controlling financial interest or is not sufficient for the entity to finance its activities without addi-

tional subordinated financial support. For those entities, a controlling financial interest cannot be identified based on voting interests. Since the issuance of Interpretation 46, the Board learned that certain provisions of that Interpretation were not being interpreted as the Board intended. The Board decided to modify Interpretation 46 to address certain technical corrections and implementation issues that have arisen.

D3. The Board issued an Exposure Draft of a proposed Interpretation, *Consolidation of Variable Interest Entities,* in October 2003, and received over 125 letters of comment from constituents. This Interpretation is the result of the Board's redeliberations of the issues in light of the comments received on the proposed Interpretation.

**Benefits and Costs**

D4. The mission of the FASB is to establish and improve standards of financial accounting and reporting

Exhibit 4 Page 76

**FIN46(R)**          *FASB Interpretations*

for the guidance and education of the public, including preparers, auditors, and users of financial information. In fulfilling that mission, the Board endeavors to determine that a proposed standard will fill a significant need and that the costs imposed to meet that standard, as compared with other alternatives, are justified in relation to the overall benefits of the resulting information. Although the costs to implement a new standard may not be borne evenly, investors and creditors—both present and potential—and other users of financial information benefit from improvements in financial reporting, thereby facilitating the functioning of markets for capital and credit and the efficient allocation of resources in the economy.

D5. The Board's assessment of the benefits and costs of clarifying and modifying Interpretation 46 was based on discussions with preparers and auditors of financial statements and on consideration of the needs of users for more consistent application of that Interpretation. The Board acknowledges that this Interpretation may increase the costs of initial implementation of Interpretation 46 for an enterprise that would need to reevaluate whether an entity in which the enterprise holds an interest is a variable interest entity and whether the enterprise is the primary beneficiary of that entity based on the guidance in this Interpretation. The expected benefit of these incremental costs is improved financial reporting resulting from a more consistent application of consolidation policies to variable interest entities. For an enterprise that has not yet applied the provisions of Interpretation 46, the modifications in this Interpretation are not expected to significantly increase the cost of implementing Interpretation 46, and in some cases, the clarifications and additional scope exceptions may reduce implementation costs.

**Modifications to Interpretation 46**

*Scope Exception for Not-for-Profit Health Care Organizations*

D6. Paragraph 4(a) of Interpretation 46 excludes from the scope of that Interpretation not-for-profit organizations subject to the consolidation criteria of AICPA Statement of Position 94-3, *Reporting of Related Entities by Not-for-Profit Organizations,* unless a not-for-profit organization is used by a business enterprise to circumvent that Interpretation. SOP 94-3 applies to entities following the AICPA Audit and Accounting Guide, *Not-for-Profit Organizations.* That Guide applies to all organizations that meet the definition of a not-for-profit organization in FASB

Statement No. 116, *Accounting for Contributions Received and Contributions Made,* except for entities following the AICPA Audit and Accounting Guide, *Health Care Organizations.* Thus, questions were raised as to whether not-for-profit organizations following the health care Guide were excluded from the scope of Interpretation 46.

D7. The Board's intention was clear in Interpretation 46's summary and basis for conclusions. The summary states:

> Not-for-profit organizations are not subject to this Interpretation unless they are used by business enterprises in an attempt to circumvent the provisions of this Interpretation.

Paragraph C8 of Interpretation 46 (E8 in this Interpretation) explains the Board's reason for this exclusion:

> The Board considered it inappropriate to extend the requirements of this Interpretation to not-for-profit organizations because the document being interpreted does not specifically apply to them.

D8. Consequently, the Board directed that an FASB Staff Position (FSP) be issued to explain that the scope exception provided in paragraph 4(a) of Interpretation 46 applies to all entities that meet the definition of not-for-profit organizations in FASB Statement No. 117, *Financial Statements of Not-for-Profit Organizations,* which includes not-for-profit health care organizations. FSP FIN 46-1, "Applicability of FASB Interpretation No. 46, *Consolidation of Variable Interest Entities,* to Entities Subject to the AICPA Audit and Accounting Guide, *Health Care Organizations,*" was issued on July 24, 2003. At the same time, the Board agreed that paragraph 4(a) should be modified to correspond with its original intention.

*Scope Exception for Certain Enterprises That Are Unable to Obtain Information*

D9. Some arrangements that are potential variable interest entities created before the issuance of Interpretation 46 may not have included provisions assuring that parties involved would have access to information required to apply that Interpretation. Therefore, an enterprise with an interest in an older entity may be unable to obtain information to (a) determine whether the entity is a variable interest entity,

Exhibit 4 Page 77

*Consolidation of Variable Interest Entities*          **FIN46(R)**

(b) determine whether the enterprise is the primary beneficiary of the entity, or (c) consolidate the variable interest entity for which it is determined to be the primary beneficiary.

D10.  According to paragraph 6 of this Interpretation, an enterprise is not required to determine whether the entity with which it is involved is a variable interest entity if it is apparent that the enterprise's interests would not be significant variable interests in the entity and if the enterprise, its related parties, and its de facto agents (as described in paragraph 16) did not participate significantly in the design or redesign of the entity. That paragraph provides the basis for some enterprises to avoid difficulties in obtaining information. However, the Board has been informed that the inability to obtain sufficient information exists in situations other than the one described in paragraph 6.

D11.  Consequently, the Board decided that in situations not covered by paragraph 6, an enterprise is not required to apply this Interpretation to entities created before December 31, 2003, if the enterprise is unable to obtain information necessary to (a) determine whether the entity is a variable interest entity, (b) determine whether the enterprise is the primary beneficiary, or (c) perform the accounting required to consolidate the entity. To qualify for this scope exception, the enterprise must have made and must continue to make exhaustive efforts to obtain the information. The scope exception applies to individual variable interest entities or potential variable interest entities, not to a class of entities if information is not available for some members of the class.

D12.  The Board expects the application of the scope exception in paragraph 4(g) to be infrequent, especially if the reporting enterprise was involved in the creation of the entity. An enterprise that is exposed to substantial risks of another entity would normally obtain information about that entity to monitor its exposure (even if the exposure is limited).

D13.  The proposed Interpretation would have afforded that scope exception only to entities created before February 1, 2003. Respondents to the proposed Interpretation requested that the exception apply to entities created at a later date because as of February 1, 2003, many constituents did not realize what information would be necessary to apply this Interpretation. Therefore, they entered into arrangements with entities that may be variable interest entities without arranging to obtain the necessary infor-

mation. The Board accepted that request and decided to extend the exception to entities created before December 31, 2003.

*Proposed Scope Exception for Mutual Funds and Trusts Held by a Bank's Trust Department*

D14.  The proposed Interpretation included a provision to exclude mutual funds organized as trusts and personal trusts in bank trust departments from the scope of Interpretation 46. However, that exception is unnecessary because of the Board's decision to remove the requirement to include fees to decision makers as a component of expected residual returns. (Refer to paragraph D28 for a discussion of that decision.)

*Scope Exception for Certain Entities That Are Businesses*

D15.  Respondents to the proposed Interpretation suggested that entities meeting the definition of a business in EITF Issue No. 98-3, "Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business," should not be subject to consolidation in accordance with this Interpretation. However, the Board noted that whether or not an entity is a business is not, in and of itself, relevant to the objective of this Interpretation. That objective is to provide guidance for identifying entities for which an analysis of voting interests is not effective in determining whether an enterprise has a controlling financial interest. Therefore, providing a scope exception for an entity because it is a business is not consistent with the intention of this Interpretation.

D16.  In considering the suggestion from respondents to the proposed Interpretation, the Board also noted that the last sentence of paragraph 6 of this Interpretation provides the appropriate basis for concluding that an enterprise need not apply the provisions of this Interpretation to determine if an entity is a variable interest entity. That sentence was included to aid implementation by stipulating conditions that, if met, would obviate the need for further analysis and application of this Interpretation. The Board decided to include a similar aid to implementation based on characteristics of the entity (that is, whether the entity is a business and whether its activities are primarily related to asset-backed financings or single-lessee leasing arrangements) and its relationship to the reporting enterprise (that is, the extent to which the entity receives financing from the reporting enterprise and its related parties, and the extent to

Exhibit 4 Page 78

**FIN46(R)**                    *FASB Interpretations*

which the entity's activities involve or are conducted on behalf of the reporting enterprise and its related parties). The Board reasoned that the most useful way to provide this aid to implementation would be in the form of a scope exception, that is, in a list of conditions that, if met, would obviate the need for further analysis and application of this Interpretation. The Board added paragraph 4(h) to provide that guidance.

*Governments and Entities Created by Governments*

D17. Respondents to the proposed Interpretation commented that governmental organizations should neither consolidate other entities nor be consolidated in accordance with Interpretation 46. However, those respondents believe that, in the absence of a specific scope exception, the introductory sentence in paragraph 4 of Interpretation 46 could be interpreted to require that consolidation. When a private (nongovernmental) enterprise receives financing from, or is otherwise involved with, a governmental organization or financing entity established by a governmental organization, that enterprise may currently be recording a liability for the debt or guarantee as a result of that involvement. However, the application of Interpretation 46 to such an arrangement (a) would identify the governmental organization as a variable interest entity because of the lack of any equity investment and (b) could identify the private enterprise as the primary beneficiary.

D18. The Board observed that the accounting for and by federal, state, and local governmental organizations in the United States is promulgated by the Federal Accounting Standards Advisory Board (FASAB) and the Governmental Accounting Standards Board (GASB) and not the FASB. The FASAB, the GASB, or some other organization may decide to apply an FASB standard to a governmental organization, but that is not a decision made by the FASB. Because the FASB does not have the authority to establish accounting standards for governmental organizations, it is usually unnecessary for the FASB to state whether a particular standard applies to those organizations. However, the FASB acknowledges that confusion exists as to whether Interpretation 46 should be applied by an enterprise involved with the arrangements described because of the nature of those arrangements. Therefore, the Board decided to exempt an enterprise from consolidating, in accordance with this Interpretation, a governmental organization or financing entity established by a govern-

mental organization. This provision does not apply to a financing entity created by a governmental organization that is used by a nongovernmental enterprise to circumvent this Interpretation if that entity is not itself a governmental organization.

*Variable Interest Entities*

D19. Paragraph 5(a) of Interpretation 46 identifies an entity with insufficient equity at risk as a variable interest entity. The Board decided to modify the first sentence in paragraph 5(a) to clarify that equity is insufficient if the entity cannot finance its activities without additional subordinated financial support provided by any party, including the equity holders.

D20. Some respondents to the proposed Interpretation recommended that the Board not delete the phrase *from other parties* in paragraph 5 of Interpretation 46 because that change would permit enterprises to choose whether or not an entity is a variable interest entity and to chose which investor, if any, would consolidate a joint venture or other entity by changing the form in which the investors provide financial support. The Board decided not to accept that recommendation. Structuring opportunities exist whether or not that phrase is retained, and deleting the phrase makes the paragraph more consistent with the Board's original intention to apply those requirements to entities without sufficient equity investment. As discussed in paragraph 5(a), an equity investment that is not sufficient to permit an entity to finance its own activities without additional subordinated financial support indicates that an analysis of voting rights is not an effective way to determine whether an enterprise has a controlling financial interest.

D21. Paragraph 5(b) of Interpretation 46 describes the characteristics of a controlling financial interest. If the rights and obligations of the total equity investment at risk lack any of those characteristics, then the ownership of a majority of the equity investment at risk would not provide all the characteristics of a controlling financial interest and would not be an appropriate basis for consolidating the entity. In that situation, the entity is a variable interest entity. Paragraph 5(b) might not be effective in identifying a variable interest entity if the equity holders treated the rights and obligations provided by their other interests in the entity as though those rights and obligations were derived from the equity investment at risk. Therefore, the Board decided to modify paragraph 5(b) to clarify that the objective of this provision is to identify as a variable interest entity those

FIN46(R)–30

Exhibit 4 Page 79

**Consolidation of Variable Interest Entities**          **FIN46(R)**

entities in which the total equity investment at risk does not provide the holders of that investment with the characteristics of a controlling financial interest in that entity.

D22. Some respondents to the proposed Interpretation recommended that the proposed footnote to paragraph 5(b) be deleted. They stated that if the equity investors are required to provide debt financing or hold other interests, all of those interests should be treated as equity for purposes of paragraph 5(b) because the revised paragraph 5(c) would prevent structuring an entity with disproportionate equity and voting interests while avoiding consolidation. However, the Board retained the footnote in this Interpretation because paragraph 5(c) has two conditions, only one of which pertains to disproportionate equity and voting interests. The other condition pertains to the activities of the entity. Without the footnote to paragraph 5(c), it would be possible to structure the interest disproportionately and avoid consolidation by not meeting the second condition in paragraph 5(c) related to the activities of the entity.

D23. The last sentence in paragraph 5 of Interpretation 46, as explained in footnote 7 of that Interpretation, was designed to prevent a primary beneficiary from avoiding consolidation of a variable interest entity by organizing the entity with nonsubstantive voting interests. Footnote 6 of Interpretation 46 requires that in applying the last sentence in paragraph 5, the term *investor* include the investor's related parties. The Board did not intend for footnote 6 to apply to part (i) of the last sentence in paragraph 5 of Interpretation 46. In applying footnote 6 to part (ii) of the last sentence in that paragraph, the Board intended that the investor with disproportionately few voting rights treat activities of the entity that involve or are conducted on behalf of that investor's related parties as if those activities involve or are conducted on behalf of the investor. Otherwise, the provision designed to identify disproportionate voting and economic interests would not be effective if the investors are related parties, because each investor's interests would be combined and voting and economic interests would not be disproportional. Also, footnote 6 made part (ii) of the last sentence in paragraph 5 ineffective in identifying the type of arrangement the Board intended to be considered a variable interest entity in some cases in which the investors are related by the de facto agency provisions of paragraph 16(d)(1). That is, certain entities for which the investors are considered to be related parties only because they have a de facto agency relationship under

paragraph 16(d)(1) would be inappropriately identified as variable interest entities.

D24. In applying the last sentence of paragraph 5 of Interpretation 46, the Board intended that the equity investors' obligations to absorb an entity's expected losses and rights to receive the entity's expected residual returns that are provided by interests other than equity investments should be considered in determining whether voting rights are proportional to the obligation to absorb expected losses, the rights to receive expected residual returns, or both. In order to clarify that an investor's obligation to absorb expected losses or rights to receive expected residual returns of the entity provided by *any* of the investor's interests in the entity should be considered in the analysis of disproportionate or nonsubstantive voting interests, the Board decided to modify footnote 11 and the last sentence in paragraph 5 of this Interpretation.

D25. Some respondents to the proposed Interpretation stated that the modification will substantially increase the number of entities that will be considered potential variable interest entities because it appears to identify an entity as a variable interest entity if an equity investor has contractual arrangements with that entity in addition to its equity investment. The Board acknowledged that if a contractual arrangement between an entity and its equity investor absorbs expected losses, the entity may be a variable interest entity; that is the Board's intention. Contractual arrangements that do not absorb expected losses would not cause the entity to be identified as a variable interest entity.

*Expected Losses and Expected Residual Returns*

D26. In specifying what is to be considered in determining the expected losses and expected residual returns of a variable interest entity, paragraph 8 of Interpretation 46 referred to the expected variability in the entity's net income or loss and the expected variability in the fair value of the entity's assets if it is not included in net income or loss. The Board's intention was to refer to expected variability in the fair value of the entity's net assets that are not variable interests. However, some constituents were confused by the use of the term *net income* to refer to returns of a variable interest entity because net income is conventionally understood to refer to returns to equity investors in voting interest entities. In referring to the change in fair value of assets as part of the computation of expected losses, the Board intended to refer to the net change over the life of assets to be distributed

Exhibit 4 Page 80

**FIN46(R)**                    *FASB Interpretations*

to variable interest holders in lieu of cash. To clarify its intentions, the Board decided to replace items (a) and (b) in paragraph 8 with a reference to the expected variability in the fair value of the entity's net assets excluding variable interests. (Appendix B to this Interpretation explains that for purposes of determining expected losses of a variable interest entity, certain assets and liabilities are considered variable interests, which absorb rather than create the entity's expected losses.)

D27. The proposed Interpretation used the phrase *long-term return to variable interests* to describe the basis for determining expected losses. Some respondents indicated that they did not understand that term, and others objected to the use of *long-term* because many interests in variable interest entities are short term. The Board decided that the phrase *fair value of the entity's net assets excluding variable interests* is more descriptive and is consistent with the definition of a variable interest in paragraph 2 of this Interpretation.

D28. Paragraph 8 of Interpretation 46 included a requirement that expected residual returns include the total amount of fees paid to decision makers and certain guarantors, instead of including only the variability in those fees. Many constituents objected to that requirement as an unwarranted bias toward identifying decision makers as primary beneficiaries. Few constituents commented on the guarantor fees. The Board had included that requirement in Interpretation 46 because decision-making authority is one key indicator of a controlling financial interest. However, another key indicator is an ability to benefit from the results of those decisions. Constituents expressed concern about the application of the requirement in paragraph 8 of Interpretation 46 because the requirement did not allow for a distinction to be made between a decision maker who is hired merely to provide services and is compensated commensurate with the level of effort required, and one who has the ability to reap the benefits (and suffer the risks of loss) of his decisions. The Board decided to delete that requirement primarily to address concerns about the consequences of including decision maker fees on a gross basis.

D29. Prior to making that decision, the Board issued FSP FIN 46-7, "Exclusion of Certain Decision Maker Fees from Paragraph 8(c) of FASB Interpretation No. 46, *Consolidation of Variable Interest Entities*," to provide additional guidance for determining when fees paid to a decision maker should not be considered a variable interest in a variable interest entity. However, the Board subsequently learned of other circumstances, not considered in FSP FIN 46-7, for which additional guidance would be needed to distinguish decision making of the kind performed by a hired agent or employee from decision making that is a key indicator of a controlling financial interest. The Board also decided to clarify that fees to decision makers could be a variable interest, depending on facts and circumstances. Guidance for making this determination was incorporated from FSP FIN 46-7 into paragraphs B18–B21 of this Interpretation.

D30. In paragraph 9 of Interpretation 46, the Board described the use of qualitative and quantitative evidence to determine the sufficiency of the equity invested in an entity with the expectation that computations of expected losses would not be required in many cases. However, the Board has been informed that the determination frequently begins and ends with the quantitative assessment in paragraph 9(c). Consequently, the Board decided to modify paragraphs 5 and 9 to focus first on the objective of determining whether the equity investment is sufficient to permit the entity to finance its activities without additional subordinated financial support. If qualitative analysis is not conclusive, the next step is to undertake a quantitative consideration of expected losses. If neither a qualitative assessment nor a quantitative assessment, taken alone, is conclusive, then the determination of whether the equity at risk is sufficient should be based on a combination of qualitative and quantitative analyses. Paragraph 9 of this Interpretation is intended to emphasize the importance of qualitative analysis and to illustrate the process that the Board expects enterprises to apply.

D31. The design of the entity (for example, its capital structure) and the apparent intentions of the parties that created the entity are important qualitative considerations, as are ratings of its outstanding debt (if any), the interest rates, and other terms of its financing arrangements. Often, no single factor will be conclusive and the determination will be based on the preponderance of evidence. For example, if an entity does not have a limited life and tightly constrained activities, if there are no unusual arrangements that appear designed to provide subordinated financial support, if its equity interests do not appear designed to require other subordinated financial support, and if the enterprise has been able to obtain commercial financing arrangements on customary terms, the equity would be expected to be sufficient. In contrast, if an entity has a very small equity investment relative

Exhibit 4 Page 81

to other entities with similar activities and has outstanding subordinated debt that obviously is effectively a replacement for an additional equity investment, the equity would not be expected to be sufficient.

D32. Respondents to the proposed Interpretation were divided in their views on the relative merits of qualitative and quantitative analyses. Some stated that qualitative analysis should not take precedence over quantitative analysis because the latter seems more precise. Others supported the proposals in the proposed Interpretation and stated that the preference for qualitative analysis should be strengthened. The Board agreed with the latter group for two reasons. First, qualitative analysis, which does not require detailed estimates and mathematical computations, will sometimes be sufficient to determine that an entity does or does not have the ability to finance its activities without additional subordinated financial support. Second, although quantitative analysis may seem to provide a more precise and less subjective means of making a determination, that appearance is deceptive in some cases. The lack of objective evidence on which to base the estimates and assumptions used to make the computations results in imprecision and subjectivity. Consequently, a reasoned professional judgment about whether an entity has sufficient equity to finance its own activities without additional subordinated financial support, considering all facts and circumstances, often is as good as, or even better than, mathematical computations based on estimates and assumptions that accountants have not been accustomed to making.

### Development Stage Enterprises

D33. Paragraph 11 of Interpretation 46 provides guidance on the application of the equity sufficiency conditions in paragraph 5(a) for determining whether a development stage entity is a variable interest entity. The third sentence in paragraph 11 states that a development stage entity does not meet the conditions in paragraph 5 if it can demonstrate that it has sufficient equity. The Board modified paragraph 11 to clarify that the guidance in paragraph 11 applies only to the application of paragraph 5(a). Parties involved with a development stage entity also must consider whether the equity investment held by its equity holders as a group has the characteristics of equity described in paragraph 5(b).

### Consolidation Based on Variable Interests

D34. Many constituents have found it difficult in certain situations to apply the requirement in paragraph 14 of Interpretation 46 for an enterprise to consolidate a variable interest entity if it has variable interests in that entity "that will absorb a majority of the entity's expected losses if they occur, receive a majority of the entity's expected residual returns if they occur, or both." In addition, the statement in paragraph A5 of Interpretation 46 that "each party would determine its own expected losses and expected residual returns and compare that amount with the total" can be interpreted to be inconsistent with the requirement in paragraph 14. Different techniques are being used by different enterprises. To remove possible inconsistencies, the Board decided to delete the last sentence of paragraph A5 and the phrase *if they occur* each time it appears in the body of Interpretation 46. The Board decided not to specify a single technique for analysis of variable interest entities or otherwise limit an enterprise's ability to choose the technique it believes applies in its own specific circumstances, but it may choose to do so in the future.

### Reconsideration Events

D35. Paragraph 7 of Interpretation 46 provides that an entity that previously was not subject to that Interpretation must reconsider whether it is a variable interest entity when specified events occur. The Board's intention was to provide a list of reconsideration events so that entities did not need to reconsider the nature of an entity at each reporting date. The Board was aware that paragraph 7 does not list all of the events that could change the determination of whether an entity is a variable interest entity. In addition, some constituents believed that an entity that restructures its financing arrangements as a result of operating losses automatically becomes a variable interest entity even though footnote 1 to paragraph 5 of Interpretation 46 (footnote 5 in this Interpretation) states that an entity does not become a variable interest entity because of operating losses.

D36. In the proposed Interpretation, the Board described the nature of a reconsideration event for an entity as one that could change the determination of whether the entity is a variable interest entity. The Board also proposed more specific guidance about the effects of operating losses by clarifying that neither the incurrence of losses by an entity nor consequential renegotiation of the entity's debts or other contracts would be a reconsideration event unless, by

Exhibit 4 Page 82

**FIN46(R)**          *FASB Interpretations*

design, the characteristics of the equity investment at risk in the entity or the level of subordinated financial support provided to the entity are modified. Respondents to the proposed Interpretation generally indicated that the new description potentially required continuous monitoring of transfers of ownership interests among unrelated parties and would therefore be burdensome to implement. In addition, respondents were concerned that troubled debt restructurings would still generally be considered reconsideration events under the proposed guidance.

D37. Paragraph 15 of Interpretation 46 provided that an enterprise with an interest in a variable interest entity must reconsider whether it is the primary beneficiary of that entity when specified events occur. Paragraph 15 did not list all of the events that could change the determination of which variable interest holder is the primary beneficiary. For example, the issuance of new variable interests in a variable interest entity to parties other than the primary beneficiary was not identified as a reconsideration event, although newly issued interests could change which interest holder would absorb a majority of the expected losses or receive a majority of the expected residual returns of the entity. In addition, paragraph 15 did not require reconsideration when a variable interest holder that is not the primary beneficiary acquires existing interests from parties other than the primary beneficiary. Paragraph 15 did not provide guidance on the effect of operating losses on the determination of the primary beneficiary of a variable interest entity.

D38. In the proposed Interpretation, the Board decided to describe the nature of a reconsideration event for an enterprise as one that could change the determination of whether the enterprise is the primary beneficiary because of a change in either the design of the entity or the ownership of interests in the entity. The Board also decided to be more specific about how the effects of operating losses should be treated in determining whether the primary beneficiary has changed.

D39. In its redeliberations of the proposed Interpretation, the Board decided to maintain and elaborate on the lists of events in both paragraph 7 and paragraph 15 that, unless insignificant, would require reconsideration. The Board decided that the proposed descriptive approach would impose an inappropriately burdensome implementation. The Board also decided to explicitly exempt troubled debt restructurings as a reconsideration event under this Interpretation. The Board decided that FASB Statement

No. 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings,* as amended, provides adequate guidance for the debtor and the creditor in those transactions, including circumstances in which the lender receives equity instruments in full or partial satisfaction of a loan. The Board also observed that an investor in the debt of a troubled entity would not need to assess whether the entity is a variable interest entity if the investment would not represent a significant variable interest of the entity and the investor (including any related parties and de facto agents) did not participate in the design or redesign of the entity (in accordance with paragraph 6 of this Interpretation).

### De Facto Agency Relationship Created by Approval Rights

D40. Paragraph 16(d)(1) of Interpretation 46 states that a party is a de facto agent of an enterprise if that party has an agreement that it cannot sell, transfer, or encumber its interests in a variable interest entity without the prior approval of an enterprise with a variable interest in the same entity. In that situation, the holder of the approval rights is the de facto principal of the party that is the de facto agent.

D41. Paragraph C38 of Interpretation 46 (E38 in this Interpretation) describes the purpose of paragraph 16 as follows:

> An enterprise and its affiliates, managers, agents, and other related parties may work as a group to establish and manage a variable interest entity even if no single party in the group meets the conditions in paragraph 14 of this Interpretation. Paragraph 16 includes a provision intended to prevent a variable interest holder from avoiding consolidation of a variable interest entity by arranging to protect its interest or indirectly expand its holdings through other parties.

D42. An enterprise that can restrict, through approval rights, the sale, transfer, or encumbrance of another party's interests in a variable interest entity may effectively control the economic risks and rewards of those interests. Those rights suggest that the restricted party is acting as an agent and that the enterprise with the approval rights could avoid consolidation of a variable interest entity by arranging to protect its interests or indirectly expand its holdings through other parties. The Board decided to clarify that the right of prior approval creates a de facto

Exhibit 4 Page 83

*Consolidation of Variable Interest Entities*    **FIN46(R)**

agency relationship under paragraph 16(d)(1) if the right could constrain the party's ability to manage the economic risks or realize the economic rewards from its interests in a variable interest entity.

D43. Whether a party is a de facto agent under the provisions of paragraph 16(d)(1) depends on the facts and circumstances. Judgment is required to assess the significance of conditions in an agreement providing an enterprise with the right to approve the sale, transfer, or encumbrance of a party's interests in a variable interest entity. For example, a de facto agency relationship would exist if a party's ability to realize the economic benefits of its interest could be constrained by an enterprise's exercise of its right to approve all sales, transfers, *and* encumbrances of that interest. In contrast, a de facto agency relationship presumptively is not created under paragraph 16(d)(1) if a party has the ability to realize the economic benefits of its interest by selling that interest without the enterprise's approval, even if the enterprise's prior approval is required for all other transfers or encumbrances of that interest. Also, if the right of prior approval is designed solely to prevent transfer of the interest to a competitor or to a less creditworthy, or otherwise less qualified, holder, and such parties are not the only potential purchasers of the interest, the right would not create a de facto agency relationship.

D44. Some respondents to the proposed Interpretation misinterpreted the proposed clarification to mean that the party subject to the approval rights would not be constrained if that party could manage the economic risks of its interest by hedging that risk, even if that party could not sell, transfer, or encumber that interest. The Board decided to clarify that that provision refers to a party's ability to manage its economic risks by the sale, transfer, or encumbrance of its interest, not by the hedging of those risks.

*Related Parties*

D45. Paragraph 17 of Interpretation 46 provided the following guidance for determining which of two or more related parties is the primary beneficiary of a variable interest entity:

> If two or more related parties (including the de facto agents described in paragraph 16) hold variable interests in the same variable interest entity, and the aggregate variable interest held by those parties would, if held by a single party, identify that party as the primary beneficiary, the following guidelines

shall be used for deciding which is the primary beneficiary:

> a. If two or more parties with variable interests have an agency relationship, the principal is the primary beneficiary.
> b. If the relationship is not that of a principal and an agent, the party with activities that are most closely associated with the entity is the primary beneficiary.

D46. Some constituents commented that the application of paragraph 17(a) of Interpretation 46 in certain circumstances would identify as primary beneficiary a party that is clearly not the party most closely related to the variable interest entity.

D47. The proposed Interpretation would have modified paragraph 17 to emphasize the objective of identifying the party with activities that are most closely associated with the entity as the primary beneficiary. Qualitative and quantitative factors could be considered in the application of this guidance. In addition, under the proposed Interpretation, if two or more parties with variable interests have an agency (or de facto agency) relationship, the principal (or de facto principal) would have been presumed to be the primary beneficiary unless another party within the related party group had activities that are more closely associated with the entity.

D48. Respondents to the proposed Interpretation were divided over the way in which the guidelines in paragraph 17 should be applied. Some stated that related activities should take precedence over principal-agent relationships, and others indicated that a legal agency relationship should override most-closely-related activities. Others suggested that the largest exposure to the variable interest entity's expected losses should be conclusive.

D49. The Board decided that the primary beneficiary should be the party most closely associated with the variable interest entity. The guidance includes factors to be considered but does not identify a single factor as determinative. The Board understands that the application of this guidance to specific situations requires an enterprise to make judgments based on all relevant facts and circumstances including the nature of the relationships between, and activities of, the parties involved. The Board expects that the revised guidance will put more emphasis on the need to make reasonable judgments in those circumstances.

Exhibit 4 Page 84

**FIN46(R)**                    **FASB Interpretations**

*Initial Measurement*

D50. Paragraph C45 of Interpretation 46 (paragraph E45 in this Interpretation) explains that the Board decided that many of the initial measurement requirements of FASB Statement No. 141, *Business Combinations,* are appropriate for variable interest entities. Paragraph C45 continues:

> One exception is that goodwill is not recognized. The difference, if any, between the reported amounts of the variable interest entity's assets and the reported amounts of its liabilities and noncontrolling interests is recognized in consolidated net income if that difference results in a loss. Many variable interest entities hold either financial assets or newly acquired assets, and the Board did not believe it would be appropriate to allocate a loss to increase the reported values of those assets over their fair values.

The Board continues to support the decision not to permit goodwill recognition when an enterprise becomes the primary beneficiary of a variable interest entity that is not a business.

D51. However, the Board has been informed that some enterprises might consider structuring entities they plan to acquire as variable interest entities to avoid goodwill recognition. In addition, that measurement guidance would require the write-off of previously reported goodwill for an investee accounted for using the equity method if the investee is a variable interest entity and the investor is the primary beneficiary of that entity.

D52. In light of those concerns, the Board decided that the primary beneficiary of a variable interest entity that is a business should record goodwill, if applicable, rather than an extraordinary loss. Enterprises should follow the guidance in Appendix C in determining if a variable interest entity is a business.

D53. Respondents to the proposed Interpretation requested that the Board specify a method of transition for entities that had adopted Interpretation 46 and written off goodwill. The Board chose the simplest solution and decided neither to require nor to permit reinstatement of goodwill that had been written off.

D54. The Board also clarified that the requirement in paragraph 20 of Interpretation 46 that does not permit remeasurement of assets transferred to a variable interest entity by that entity's primary beneficiary does not apply to transfers that occurred more than a short time before the variable interest entity was first consolidated.

*Accounting after Initial Measurement*

D55. Paragraph 14 of ARB 51 states, "The elimination of the intercompany profit or loss may be allocated proportionately between the majority and minority interests." Paragraph 22 of Interpretation 46 provides guidance on the treatment in consolidation of the effects of intercompany eliminations on the net income or expense of a variable interest entity. The modification to paragraph 22 is intended to clarify that any effects on income of eliminating intercompany fees or other sources of income or expense between the variable interest entity and its primary beneficiary should be attributed to the primary beneficiary in the consolidated financial statements. For example, if the primary beneficiary has no equity interest in the variable interest entity and receives a fee from the entity, the amount of the fee that is eliminated in consolidation would be attributed to the primary beneficiary even if the remainder of the entity's net income is allocated to the entity's noncontrolling interest, the equity holders.

*Appendix B of Interpretation 46*

D56. Constituents informed the Board that some of the descriptions of variable interests in paragraphs B1–B10 of Interpretation 46 were difficult to apply without additional discussion of the context in which they were intended to apply. The Board agreed that some of the statements in those paragraphs may not be as generally applicable as the phrasing would indicate and decided to modify those paragraphs to provide context and clarify some of the guidance. The Board also decided to expand Appendix B in this Interpretation to provide additional guidance for certain types of instruments.

*FASB Staff Positions*

D57. The Board decided to incorporate guidance from certain FASB Staff Positions (FSPs) in this Interpretation as described in paragraphs D58–D61.

D58. FSP FIN 46-3, "Application of Paragraph 5 of FASB Interpretation No. 46, *Consolidation of Variable Interest Entities,* When Variable Interests in Specified Assets of a Variable Interest Entity Are Not Considered Interests in the Entity under Paragraph 12

Exhibit 4 Page 85

of Interpretation 46," explains that the phrase *expected losses of the entity* has the same meaning in paragraph 5 as in paragraph 12. Paragraph 5 refers to expected losses of an entity, and paragraph 12 explains when expected losses related to specified assets are considered expected losses of the entity that holds those assets. The provisions of paragraph 12 determine whether expected losses that will be absorbed by guarantees or other variable interests in specified assets are expected losses of the entity for purposes of determining whether an entity is a variable interest entity under paragraph 5. In other words, the guidance in paragraph 12 should be applied before determining whether an entity is a variable interest entity under paragraph 5. Footnote 9 has been added to paragraph 5 in this Interpretation to clarify that paragraph 12 should be considered in determining expected losses for the application of paragraph 5.

D59. Paragraph 38 includes the guidance from FSP FIN 46-4, "Transition Requirements for Initial Application of FASB Interpretation No. 46, *Consolidation of Variable Interest Entities.*"

D60. Paragraph 36 includes the deferral of the effective date of Interpretation 46 for nonregistered investment companies provided by FSP FIN 46-6, "Effective Date of FASB Interpretation No. 46, *Consolidation of Variable Interest Entities.*"

D61. Paragraphs B18–B21 incorporate requirements modified from the guidance provided by FSP FIN 46-7 for determining when fees paid to a decision maker should not be considered a variable interest in a variable interest entity. Because this Interpretation does not include the requirements in paragraph 8(c) of Interpretation 46, the requirement in paragraphs B18–B21 refers to the expected variability in fees to decision makers instead of the total amounts of the fees as discussed in FSP FIN 46-7.

**Effective Date and Transition**

D62. In the Exposure Draft, the Board proposed that this Interpretation be effective for financial statements issued for the first period ending after December 15, 2003, for entities to which Interpretation 46 had already been applied, with a cumulative effect in the period applied. For interests and entities to which Interpretation 46 had not yet been applied, this Interpretation would have been applied in accordance with effective date and transition provisions of Interpretation 46 and FSP FIN 46-6.

D63. Some respondents to the proposed Interpretation requested a deferral of Interpretation 46 and this revision to provide sufficient time to understand and implement the guidance. Others said that no further deferrals should be provided. Still others suggested that no deferrals should be provided for entities that are commonly referred to as "special-purpose entities."

D64. To address those concerns, the Board decided to provide for multiple effective dates. The Board decided that the consolidation guidance in either Interpretation 46 or this Interpretation should be applied by public entities to variable interest entities of the type described in footnote 20 to paragraph 30, by the end of the first interim or annual period ending after December 15, 2003. Those entities had previously been applying the guidance in EITF Topic No. D-14, "Transactions involving Special-Purpose Entities," and the EITF Issues listed in footnote 20 to this Interpretation. For variable interests held by public entities in other variable interest entities, the Board decided to provide more time for the reporting entity to gain an understanding of and to apply this Interpretation. The SEC staff pointed out to the Board that small business issuers face a disproportionate challenge in implementing Interpretation 46. In light of that consideration, the Board decided that a later effective date for those public entities would be appropriate. Accordingly, public entities other than small business issuers must apply this Interpretation to all variable interest entities by the end of the first interim or annual period ending after March 15, 2004, while small business issuers will apply this Interpretation to all variable interest entities at the end of the first reporting period ending after December 15, 2004.

D65. The Board acknowledged that permitting public entities to apply either the guidance in Interpretation 46 or the guidance in this Interpretation creates potential noncomparability in the reporting for variable interest entities because this Interpretation changes some of the provisions of Interpretation 46. However, the Board reasoned that (a) the guidance that had previously been applied to entities commonly referred to as special-purpose entities was inadequate and (b) the potential noncomparability is mitigated to the extent that the changes made by this Interpretation to Interpretation 46 do not affect special-purpose entities. Further, the Board is aware that some entities have already implemented Interpretation 46, while others have not. The Board considered the advantages associated with improved financial reporting for variable interest entities, and the

Exhibit 4 Page 86

FIN46(R)                    *FASB Interpretations*

implementation difficulties associated with requiring that this Interpretation be implemented by all public entities, and concluded that a brief period of noncomparability would be tolerable.

D66. The Board wanted to provide additional time for nonpublic entities and the users of their financial statements to be educated on the application and effects of the variable interest entity consolidation model. Therefore, the Board decided that nonpublic enterprises should apply this Interpretation immediately to variable interest entities created after December 31, 2003, but have until the beginning of the first period beginning after December 15, 2004, to apply this Interpretation to all other variable interest entities in which they hold a variable interest.

## Appendix E

### INTERPRETATION 46: BACKGROUND INFORMATION AND BASIS FOR CONCLUSIONS

## CONTENTS

|  | Paragraph Numbers |
|---|---|
| Introduction | E1 |
| Background | E2– E4 |
| Objective of This Interpretation | E5– E7 |
| Scope | E8–E17 |
| Variable Interest Entities | E18–E25 |
|    Expected Losses and the 10 Percent Presumption | E21–E25 |
| Application to Selected Assets and Variable Interests in a Majority of a Variable Interest Entity's Assets | E26–E28 |
| Primary Beneficiaries | E29–E37 |
| Related Parties | E38–E41 |
| Special Provisions for Certain Entities in the Proposed Interpretation | E42–E44 |
| Initial Measurement and Subsequent Accounting | E45–E46 |
| Disclosure Requirements | E47–E48 |
| Effective Date and Transition | E49–E50 |

## Appendix E

### INTERPRETATION 46: BACKGROUND INFORMATION AND BASIS FOR CONCLUSIONS

#### Introduction

E1. This appendix summarizes considerations that Board members deemed significant in reaching the conclusions in this Interpretation. It includes reasons for accepting certain views and rejecting others. Individual Board members gave greater weight to some factors than to others.

#### Background

E2. Various EITF Issues, SEC staff announcements, and FASB pronouncements address issues that directly or indirectly relate to variable interest entities, but most are applicable only to a single type of variable interest entity. The effects of this Interpretation on EITF Issues are summarized in Appendix D. No FASB pronouncements are amended or superseded by this Interpretation.

E3. The Board issued the proposed Interpretation, *Consolidation of Certain Special-Purpose Entities,* in July 2002, and received over 140 letters of comment from constituents. On September 30, 2002, the

Exhibit 4 Page 87

Board held 2 public roundtable meetings at which approximately 40 respondents and other interested parties discussed the provisions of the proposed Interpretation with the Board. This Interpretation is the result of the Board's redeliberation of all of the issues in light of the comments received on the proposed Interpretation.

E4.  The proposed Interpretation referred to the entities subject to its requirements as special-purpose entities and used the term *substantive operating enterprises* to describe business enterprises other than special-purpose entities. However, that terminology confused many constituents apparently because the term *special-purpose entity* has been used without being clearly defined. As a result, this Interpretation refers to entities subject to its requirements as *variable interest entities.*

**Objective of This Interpretation**

E5.  The objectives of this Interpretation are to explain how to identify variable interest entities and how to determine when a business enterprise should include the assets, liabilities, noncontrolling interests, and results of activities of a variable interest entity in its consolidated financial statements. Transactions involving variable interest entities have become increasingly common, and the existing accounting literature is fragmented and incomplete. Some enterprises have entered into arrangements using variable interest entities that appear to be designed to avoid reporting assets and liabilities for which they are responsible, to delay reporting losses that have already been incurred, or to report gains that are illusory. At the same time, many enterprises have used variable interest entities for valid business purposes and have properly accounted for those entities based on guidance and accepted practice prior to this Interpretation.

E6.  The traditional reason for including two or more enterprises in consolidated financial statements, as described in ARB 51, is that consolidated financial statements are "usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies." ARB 51 states further that "the usual condition for a controlling financial interest is ownership of a majority voting interest. . . ." Prior to this Interpretation, the accounting guidance related to variable interest entities has been limited in scope and application.

E7.  Some relationships between business enterprises and variable interest entities are similar to relation-ships established by majority voting interests, but variable interest entities often are arranged without a governing board or with a governing board that has limited ability to make decisions that affect the entity's activities. A variable interest entity's activities may be limited or predetermined by the articles of incorporation, bylaws, partnership agreements, trust agreements, other establishing documents, or contractual agreements between the parties involved with the entity. An enterprise implicitly chooses at the time of its investment to accept the activities in which the variable interest entity is permitted to engage. That enterprise may not need the ability to make decisions if the activities are predetermined or limited in ways the enterprise chooses to accept. Alternatively, the enterprise may obtain an ability to make decisions that affect a variable interest entity's activities through contracts or the entity's governing documents. There may be other techniques for protecting an enterprise's interests. In any case, the enterprise may receive benefits similar to those received from a controlling financial interest and be exposed to risks similar to those received from a controlling financial interest without holding a majority voting interest (or without holding any voting interest). Risks, benefits, or both are the determinants of consolidation in this Interpretation. The ability to make decisions is considered an indication that an enterprise may have sufficient benefits and risks to require consolidation.

**Scope**

E8.  This Interpretation generally applies to business enterprises and arrangements used by business enterprises. ARB 51 refers to "companies" and FASB Statement No. 94, *Consolidation of All Majority-Owned Subsidiaries,* which amends ARB 51, refers only to "business enterprises." The Board considered it inappropriate to extend the requirements of this Interpretation to not-for-profit organizations because the document being interpreted does not specifically apply to them. The Board is aware that some of the requirements in ARB 51 are applied in modified forms to certain not-for-profit organizations and does not intend this Interpretation to cause a change in those practices.

E9.  The scope of the Interpretation also excludes certain arrangements that could be considered entities as the term is described in paragraph 3. Paragraph 46 of Statement 140 specifically prohibits consolidation by a transferor or its affiliates of qualifying

Exhibit 4 Page 88

**FIN46(R)**                    *FASB Interpretations*

special-purpose entities (including formerly qualifying SPEs described in paragraph 25 of that Statement). That prohibition was specifically intended to exclude those special-purpose entities from future Board decisions about consolidations. The derecognition requirements in Statement 140 are based on control of assets, and reporting of an enterprise's rights and obligations related to financial assets that have been transferred and derecognized is based on a financial components approach. Because a qualifying special-purpose entity has such limited decision-making abilities, the Board decided that retention of the financial components approach for parties involved with a qualifying special-purpose entity was more appropriate than consolidation based on variable interests. Therefore, this Interpretation does not change that requirement.

E10. This Interpretation also includes a special provision related to enterprises other than transferors and their affiliates that are involved with qualifying special-purpose entities and formerly qualifying SPEs. No enterprise is required to consolidate a qualifying special-purpose entity or formerly qualifying SPE unless that enterprise has the unilateral ability to cause the entity to liquidate or to change the entity so that it no longer meets the conditions in paragraph 25 or 35 of Statement 140.

E11. Separate accounts of life insurance enterprises are excluded from the scope of this Interpretation because existing accounting standards specifically require life insurance enterprises to recognize those accounts and the Board chose not to change those requirements without a broader reconsideration of accounting by insurance enterprises.

E12. Paragraph 3 of this Interpretation specifies that so-called virtual SPEs (divisions, departments, branches, or pools of assets subject to liabilities that are otherwise nonrecourse to the enterprise) are excluded from the scope of this Interpretation because they are not separate legal structures from the enterprise that holds title to the assets. That exception is narrower than the exception in the proposed Interpretation. The proposed Interpretation would have prohibited a primary beneficiary from consolidating a variable interest entity if the entity were consolidated by a substantive operating enterprise[28] with a majority voting interest in the variable interest entity. The Board included that provision to avoid treating simi-

lar arrangements differently. For example, a lessor enterprise may have a choice of how to structure a lease. It may own leased assets directly and obtain a loan with recourse only to the leased property. Alternatively, the lender may require the lessor enterprise to establish a separate legally isolated entity to hold the leased assets. That separate entity is likely to be so thinly capitalized that it would be a variable interest entity. If so, the entity might have been consolidated by a party other than the lessor enterprise, depending on the lease terms, even though a party other than the lessor enterprise would never consolidate the asset if the lessor enterprise held it directly. The so-called substantive operating enterprise exception was intended to prevent different reporting results for two arrangements with little economic difference.

E13. Some respondents supported the exception in the proposed Interpretation. Other respondents stated that the prohibition created an artificial distinction between entities based on the identity of the equity investors. Lessees would have been able to avoid consolidating an entity by finding an enterprise that is not concerned about its balance sheet and paying it to make a small investment in return for 100 percent of the stock of a lessor entity. The Board had to choose between two possible outcomes, either of which could be viewed as undesirable. One possible outcome was to permit different accounting results depending on whether a variable interest entity was used in a particular arrangement, and the other possible outcome was to permit different accounting results depending on the identity of the equity investor.

E14. The Board eliminated the substantive operating enterprise exception because proper application of the variable interest requirements in the Interpretation will identify the equity investor as the primary beneficiary if the equity investor has a majority of the exposure to expected losses and rights to residual returns. For example, if the sole equity investor in a lessor entity has an equity investment smaller than required in paragraph 5 of this Interpretation, that entity will be a variable interest entity. If the investor meets the requirements in paragraph 14, it will be the primary beneficiary. Also, the subject of this Interpretation is consolidation of entities. Attempting to deal with derecognition of assets and liabilities that are not in a separate entity is beyond the scope of the Interpretation.

---

[28] The proposed Interpretation defined a substantive operating enterprise as an entity other than an SPE.

Exhibit 4 Page 89

*Consolidation of Variable Interest Entities*    **FIN46(R)**

E15. A few respondents requested that the Board provide an exception for privately held businesses under common control. Two reasons cited were (a) users of financial statements do not consider private businesses to be special-purpose entities and (b) some enterprises under common control are already included in combined financial statements but measured on the same basis as they are measured in the separate financial statements. The proposed Interpretation would have required that they be remeasured at fair value as of the date its requirements were first applied.

E16. The Board decided not to accommodate those requests for two reasons. First, the Board believes that if privately held businesses have the characteristics of variable interest entities, the accounting and reporting requirements in this Interpretation are appropriate. Second, the Board decided not to require fair value measurement if a variable interest entity is under common control with its primary beneficiary.

E17. Several respondents requested exceptions for certain leasing arrangements, but the Board decided against making those exceptions. Although this Interpretation may change the accounting for certain leasing arrangements involving variable interest entities, it does not amend any FASB Statements or Interpretations on lease accounting. The possible changes in accounting are the result of treating a variable interest entity involved in a leasing arrangement as part of the same consolidated reporting entity as one of the other parties involved in the arrangement.

**Variable Interest Entities**

E18. Variable interest entities often are created for a single specified purpose, for example, to facilitate securitization, leasing, hedging, research and development, reinsurance, or other transactions or arrangements. The activities may be predetermined by the documents that establish the entities or by contracts or other arrangements between the parties involved. However, those characteristics do not define the scope of this Interpretation because other business enterprises may have those same characteristics. The distinction between variable interest entities and other business enterprises is based on the nature and amount of the equity investment and the rights and obligations of the equity investors.

E19. Because the equity investors in an enterprise other than a variable interest entity generally absorb losses first, they can be expected to resist arrange-

ments that give other parties the ability to significantly increase their risk or reduce their benefits. Other parties can be expected to align their interests with those of the equity investors, protect their interests contractually, or avoid any involvement with the enterprise.

E20. In contrast, either a variable interest entity does not issue voting interests (or other interests with similar rights) or the total equity investment at risk is not sufficient to permit the entity to finance its activities without additional subordinated financial support. If an entity does not issue voting or similar interests or if the equity investment is insufficient, that entity's activities probably are predetermined or decision-making ability is determined contractually. If the total equity investment at risk is not sufficient to permit the entity to finance its activities, the parties providing the necessary additional subordinated financial support will not permit an equity investor to make decisions that may be counter to their interests. That means that the usual condition for establishing a controlling financial interest—a majority voting interest—does not apply to variable interest entities. Consequently, a standard for consolidation that requires ownership of voting stock or some other form of decision-making ability is not appropriate for such entities.

*Expected Losses and the 10 Percent Presumption*

E21. The Board selected expected losses as the benchmark for determining how much equity must be invested in an entity in order to induce lenders or other investors to provide the funds necessary for the entity to conduct its activities. The Board was unable to identify a method in general use for determining when an entity's equity is sufficient to permit the entity to finance its activities. Lenders and rating agencies with which the Board and its staff discussed the matter do not all use the same methodologies, but the methodologies incorporate historical experience with similar entities or with similar assets. Many adjust the historically determined amount for expectations about the specific entity and the current economic conditions. Those methods are generally consistent with the concept of expected losses, but they may result in requiring an equity investment greater than expected losses. That is, lenders and others want to be protected in the event actual losses exceed the expected losses, and they will negotiate as much protection as possible. Consequently, sufficient equity for financing is probably greater than expected losses and is unlikely to be less.

Exhibit 4 Page 90

**FIN46(R)**         *FASB Interpretations*

E22. Some respondents to the proposed Interpretation stated that *expected losses* is not the appropriate basis for determining how much equity an enterprise needs to finance its activities. However, there was no consensus on what the appropriate basis is. Some alternatives suggested were most likely losses (a point estimate), probable losses, reasonably possible losses, and maximum possible losses, but respondents generally did not provide a rationale for any of those measures. In many cases, maximum losses would equal the total assets of the entity. Most of the other measures would be smaller in many cases than expected losses.

E23. Because precisely estimating expected losses may be difficult and an entity may need an equity investment greater than its expected losses, the Board established a presumption that an equity investment is insufficient to allow an entity to finance its activities unless the investment is equal to at least 10 percent of the entity's total assets. Another reason for that presumption is to emphasize that the requirement for 3 percent equity referred to in EITF Issue No. 90-15, "Impact of Nonsubstantive Lessors, Residual Value Guarantees, and Other Provisions in Leasing Transactions," is superseded and that an equity investment as small as 3 percent is insufficient for many variable interest entities. The Board intends that presumption to apply in one direction only. That is, an equity investment of less than 10 percent is presumed to be insufficient, but an equity investment of 10 percent is not presumed to be sufficient.

E24. The Board's preferred methods of overcoming the 10 percent presumption are to demonstrate the sufficiency of the invested equity by (a) obtaining financing without additional subordinated financial support or (b) referring to the equity invested in another similar-sized entity with similar assets, liabilities, and other interests that has financed itself without additional subordinated financial support. However, many respondents to the proposed Interpretation stated that finding comparable entities would be difficult for some variable interest entities. The Board acknowledged that concern and decided to permit comparison of an entity's equity investment to an estimate of the entity's expected losses based on objective evidence about the entity's nature and the economic conditions at the time of the estimate.

E25. Some respondents recommended that the Board use the criteria for identifying a business in EITF Issue No. 98-3, "Determining Whether a Non-

monetary Transaction Involves Receipt of Productive Assets or of a Business," to identify entities that are not subject to this Interpretation. The Board did not accept that recommendation because those criteria were designed for a different purpose—to distinguish between businesses and groups of assets. That distinction is not related to control by voting interests or sufficiency of equity investments, which are the key issues in this Interpretation.

**Application to Selected Assets and Variable Interests in a Majority of a Variable Interest Entity's Assets**

E26. Paragraph 3 of this Interpretation does not permit an enterprise to consolidate selected assets or liabilities of a business enterprise that is not a variable interest entity. The stockholders or other parties that individually or in the aggregate have a controlling financial interest in the enterprise provide the subordinated financial support for the entity as a whole. However, variable interest entities can be structured so that the rights and obligations of different parties involved are not commingled. Consequently, a single variable interest entity may hold assets transferred by more than one enterprise, leased to more than one enterprise, guaranteed by more than one enterprise, or similarly related to more than one enterprise. Those enterprises may have variable interests in selected assets instead of variable interests in the entities that hold those assets. The Board decided that if the liabilities or other interests in those assets apply only to those assets (with no recourse to the entity as a whole), it is appropriate for each enterprise to consider that discrete portion of the variable interest entity as a separate entity. That requirement is reflected in paragraph 13 of this Interpretation.

E27. Paragraph 12 addresses variable interests in specified assets of a variable interest entity that are not associated with a discrete portion of the variable interest entity's liabilities or other interests. The issues are (a) when, if ever, the expected losses of a party with a variable interest in specified assets of a variable interest entity are considered expected losses of the entity for purposes of determining whether an entity is a variable interest entity (the sufficiency of its equity) and (b) which parties hold variable interests in the entity as a whole for purposes of identifying the primary beneficiary of the entity. Some Board members concluded that any variable interest in specified assets of a variable interest entity is a variable interest in the entity regardless of the significance of those assets to the variable interest entity.

Exhibit 4 Page 91

*Consolidation of Variable Interest Entities*    **FIN46(R)**

Other Board members concluded that a variable interest in specified assets of a variable interest entity is a variable interest in the entity only if the interest applies to substantially all of the variable interest entity's assets. Board members also considered whether variable interests in specified assets of a variable interest entity might be variable interests in the entity in some circumstances and not in others.

E28.  No alternative was supported by a majority of Board members, and, consequently, the Board members accepted a compromise. If the fair value of assets in which a party has a variable interest constitutes a majority of the fair value of a variable interest entity's total assets, that interest is considered significant enough that the holder is considered to have a variable interest in the entity. If the assets are less than a majority, the party does not have a variable interest in the entity unless that party also has more than an insignificant variable interest in the entity as a whole. That majority requirement is intended to prevent a transferor from avoiding the consolidation requirements by finding or creating a variable interest entity that commingles its transferred assets with a relatively few unrelated assets. At the same time, it should not prevent a decision maker with a sufficiently large variable interest in a so-called multiseller variable interest entity from consolidating that entity because transferors of assets to a variable interest entity retain subordinated residual interests in certain of the transferred assets. The requirement to consider a variable interest in specified assets as an interest in the entity as a whole only if the holder has other interests in the entity as a whole that are not insignificant also is intended to prevent circumvention of the requirements of this document by artful allocation of variable interests.

**Primary Beneficiaries**

E29.  Under ARB 51, a majority voting interest is considered sufficient evidence of a controlling financial interest to require consolidation. However, because variable interest entities are organized differently from many other enterprises, equity investors in variable interest entities may not have the same types of rights and obligations as equity investors in other enterprises. Some other party or parties may absorb the expected losses if the entity does not generate sufficient cash flows or income to provide the expected returns to all parties or may receive expected residual returns if cash flows are more than sufficient to provide all of the expected returns. A holder of an interest or combination of interests (other than voting eq-

uity interests) that absorbs expected losses or receives expected residual returns of a variable interest entity may have a controlling financial interest in that variable interest entity (or a relationship sufficiently similar to a controlling financial interest that it requires consolidation).

E30.  The requirements in paragraph 14 of this Interpretation are intended to determine which, if any, party involved with a variable interest entity has a controlling financial interest in that entity. That paragraph focuses on three characteristics that are present in controlling financial interests achieved through majority voting interests:

a.  The ability to make decisions about an entity's activities

b.  The exposure to the expected losses of the entity if they occur

c.  The right to receive the expected residual returns of the entity if they occur.

E31.  The ability to make decisions is not a variable interest, but if the decisions significantly affect the value of the variable interests, decision making will almost certainly be directly or indirectly associated with the holder of a significant variable interest. For that reason, decision making is an indicator of the primary beneficiary of a variable interest entity. A majority of either the exposure to expected losses or the right to receive expected residual returns (or both) identifies the primary beneficiary. The Board considered the exposure to losses to be the more important of the two conditions and established it as the more important factor if one enterprise has a majority of the exposure to expected losses and another has a right to a majority of the residual returns.

E32.  The proposed Interpretation would have required identification of the primary beneficiary based primarily on financial support (exposure to expected losses through variable interests). Many respondents commented that the analogy to voting equity investments is incomplete without consideration of expected residual returns. Those comments persuaded the Board to add a requirement to consolidate if an enterprise has the right to a majority of a variable interest entity's expected residual returns.

E33.  Some respondents recommended alternatives to consolidation by a primary beneficiary. One recommendation was to require all enterprises to report interests in variable interest entities at fair value instead of requiring any enterprise to consolidate. The

Exhibit 4 Page 92

**FIN46(R)**                    *FASB Interpretations*

Board did not accept the recommendation because there are many instances in which an enterprise's interest is represented more faithfully by a gross presentation of assets and liabilities.

E34.  Many other respondents recommended that the Board accumulate the existing guidance on consolidation of variable interest entities in a single standard without changing that guidance other than to require additional disclosures. The Board decided that the existing standards are not only fragmented (which this suggestion would address) but also inadequate (which it would not address except by disclosure). Moreover, additional disclosures are not a replacement for proper recognition and measurement.

E35.  The proposed Interpretation would have required consolidation of a variable interest entity by an enterprise that provided significant financial support to that variable interest entity through a variable interest if that support was significantly more than the support provided by any other individual party. It also would have required consolidation by an enterprise that provided the majority of the financial support of a variable interest entity. Many respondents argued that an enterprise should consolidate a variable interest entity only if the enterprise provides a majority of the financial support to that entity. Some of those respondents stated that the reason was conceptual; others stated that the reason was practical, that is, it would be easier to apply a majority requirement. In some cases, the majority requirement will be applied qualitatively because the variable interests in an entity may be so different in nature that there is no common basis on which to compare them arithmetically. An enterprise may be able to determine without detailed computations that it does not have a sufficiently large variable interest to be a potential primary beneficiary or that it is the only enterprise with a sufficiently large interest. In other cases, an enterprise may know that it is one of only a few potential primary beneficiaries and may need to apply judgment to determine whether it meets the conditions to be a primary beneficiary.

E36.  The Board acknowledged in the proposed Interpretation that an entity's variable interest takes on decreased significance as its absolute size diminishes but noted that a parent has never been required to have a majority of risks or returns from activities of its subsidiary in order to consolidate that subsidiary. Thus, the significance requirement would not necessarily have been conceptually inappropriate. However, the Board was persuaded that enterprises might

not be able to apply the *significant and significantly more* requirement consistently. Consequently, that requirement has been eliminated in this Interpretation.

E37.  The proposed Interpretation also would have required each enterprise involved with a variable interest entity to reconsider at each reporting date whether it was the primary beneficiary. Many respondents stated that variable interests should not be reassessed or should be reassessed only if a triggering event occurs because the necessary information may not be available or would be burdensome to acquire. The Board agreed and decided to require reconsideration only if certain events occur that are likely to cause a change in the primary beneficiary.

**Related Parties**

E38.  An enterprise and its affiliates, managers, agents, and other related parties may work as a group to establish and manage a variable interest entity even if no single party in the group meets the conditions in paragraph 14 of this Interpretation. Paragraph 16 includes a provision intended to prevent a variable interest holder from avoiding consolidation of a variable interest entity by arranging to protect its interest or indirectly expand its holdings through other parties.

E39.  This Interpretation treats certain parties in addition to those identified in Statement 57 as related parties of a variable interest holder. Those other parties (a) are financially dependent on a variable interest holder, (b) cannot sell, transfer, or encumber their interests without the approval of a variable interest holder, (c) receive the investment or the funds to make the investment from a variable interest holder, or (d) provide significant amounts of professional services or other similar services to a variable interest holder. Those parties are considered to be acting as de facto agents of the variable interest holder.

E40.  Many respondents to the proposed Interpretation stated that either the term *de facto agency relationship* should be defined in more detail or the provision should be eliminated. The Board did not believe that was necessary because the Interpretation describes the parties that are to be considered de facto agents in sufficient detail.

E41.  Other respondents to the proposed Interpretation stated that related parties should specifically include employees and directors. The Board agreed, and those parties have been added to paragraph 16.

Exhibit 4 Page 93

**Special Provisions for Certain Entities in the Proposed Interpretation**

E42. The Board recognizes that some variable interest entities effectively disperse risks and benefits related to their assets or activities. No individual party controls the benefits of the variable interest entity's assets or is responsible for the variable interest entity's liabilities. In that case, each party involved should account for its rights and obligations related to the assets in the variable interest entity, but it is inappropriate for any party to consolidate the assets and liabilities of the variable interest entity.

E43. To emphasize that point, the proposed Interpretation included special provisions for analyzing variable interest entities that hold certain financial assets, have limits on their activities and the interests they can issue, and are legally isolated from the enterprises that hold interests in them. The Board recognized that even if an entity is designed to disperse risks and returns among different interests, a single enterprise could recombine those dispersed risks and returns by acquiring enough different variable interests. Therefore, the special provisions included requirements for consolidation by a party with any two of three characteristics—the ability to decide when a variable interest entity buys and sells assets, an obligation to absorb losses, and the right to fees that are not based on the market price of the services provided.

E44. Many respondents to the proposed Interpretation agreed that special provisions for certain variable interest entities were appropriate but stated that the criteria to qualify for the special provisions were too restrictive. Respondents also stated that the special provisions would require consolidation more frequently than the general variable interest requirements. The Board did not intend for the special provisions to conflict with the general requirements. In addition, it became apparent that the special provisions would need significant interpretation and maintenance. Consequently, the Board decided to eliminate the special provisions. The Board believes that the general requirements properly reflect the effect of risk dispersion and that special provisions for a subset of variable interest entities are unnecessary.

**Initial Measurement and Subsequent Accounting**

E45. Statement 141 specifies the initial measurement requirements for net assets that constitute a business and for assets, liabilities, and noncontrolling interests of newly acquired subsidiaries. Newly con-

solidated variable interest entities are not subject to Statement 141 because paragraph 9 of Statement 141 states, "This Statement does not address transactions in which control is obtained through means other than an acquisition of net assets or equity interests." A primary beneficiary of a variable interest entity has not obtained control through equity interests, and it has not purchased net assets. However, the Board decided that many of the initial measurement requirements of Statement 141 are appropriate for variable interest entities consolidated for the first time (except at transition). One exception is that goodwill is not recognized. The difference, if any, between the reported amounts of the variable interest entity's assets and the reported amounts of its liabilities and noncontrolling interests is recognized in consolidated net income if that difference results in a loss. Many variable interest entities hold either financial assets or newly acquired assets, and the Board did not believe it would be appropriate to allocate a loss to increase the reported values of those assets over their fair values. If recognizing the newly consolidated assets, liabilities, and noncontrolling interests would otherwise result in a gain, that amount is required to be allocated as if the consolidation resulted from a business combination. That provision is intended to prevent intentional creation of a gain by arranging to become the primary beneficiary of a carefully structured entity, especially if the entity's assets are difficult to measure.

E46. The proposed Interpretation did not include specific guidance on subsequent accounting for consolidated variable interest entities because the Board expected that enterprises would apply consolidation policies applicable to subsidiaries. Many respondents requested that the Board specify certain requirements. For example, one suggestion was to require financial assets and liabilities to be reported at fair value. However, the Board decided that the subsequent accounting for consolidated variable interest entities should be no different from the accounting that would apply to a majority-owned subsidiary engaged in the same activities.

**Disclosure Requirements**

E47. Respondents to the proposed Interpretation requested an extensive list of specific disclosures by primary beneficiaries, many of which were similar to the disclosures required by Statement 140. The Board judged that the cost to enterprises to prepare all of the requested information for disclosure would

Exhibit 4 Page 94

**FIN46(R)**        *FASB Interpretations*

have been prohibitive and that some of the information would be valuable only to a limited number of users. Consequently, after discussions with various constituents, the Board identified the disclosures it believes will be most useful to the greatest number of financial statement users without imposing too great a cost on the issuers of financial statements.

E48. The proposed Interpretation would have required certain disclosures by enterprises that provide significant administrative services to a variable interest entity. Respondents stated that the disclosure requirement should apply only to entities with significant variable interests. The Board believes that information about variable interest entities in which an enterprise has significant variable interests is of interest to users whether or not the enterprise is the administrator of the entity and decided to base the requirement on a significant variable interest.

**Effective Date and Transition**

E49. The Board believes that the requirements of this Interpretation should be effective as soon as reasonably possible. However, the Board also recognizes that some enterprises are involved with large numbers of variable interest entities and that their analyses of variable interests will require significant data gathering and qualitative and quantitative analysis. In addition, the transition period originally proposed would have included the period in which many enterprises were preparing calendar-year financial statements. Therefore, the Board decided to defer the required application date of this Interpretation to existing variable interest entities to three months later than the date in the proposed Interpretation. However, in the interest of providing financial statement users with information about existing variable interest entities as soon as possible, the Board decided to require transition disclosures to be made almost immediately.

E50. The proposed Interpretation would have required measurement of the assets, liabilities, and non-controlling interests of a newly consolidated variable interest entity at their fair values, primarily because the Board believed information about carryover bases for most entities would not be available. However, many respondents stated that they would be able to determine carryover basis and requested that the Board permit its use. Consequently, the Board decided that measurement at transition should be at car-

ryover basis unless it is impracticable, in which case fair value measurement would be required.

**Appendix F**

**EFFECT OF THIS INTERPRETATION ON EITF ISSUES**

F1. The provisions of this Interpretation nullify the consensuses in the following EITF Issues and the guidance in the following EITF Topic:

a. Issue No. 84-40, "Long-Term Debt Repayable by a Capital Stock Transaction"

> The Task Force reached a consensus that a trust formed for the sole purpose of issuing debt instruments backed by preferred stock of a parent corporation and cash received from that parent's subsidiary corporation should be consolidated by the parent corporation.

> This Interpretation nullifies that consensus because a trust of that type is a variable interest entity that is subject to the provisions of this Interpretation.

b. Issue No. 90-15, "Impact of Nonsubstantive Lessors, Residual Value Guarantees, and Other Provisions in Leasing Transactions"

> The Task Force indicated that a lessee is required to consolidate an SPE lessor at the inception of a lease if (1) substantially all of the activities of the SPE involve assets that are to be leased to a single lessee, (2) the expected substantive residual risks and substantially all the residual rewards of the leased assets and the obligation imposed by the underlying debt of the SPE reside directly or indirectly with the SPE, and (3) the owners of record of the SPE have not made an initial substantive residual equity capital investment that is at risk during the entire term of the lease. The SEC staff's answer to Question No. 3 states, in part: "The SEC staff understands from discussions with Working Group members that those members believe that 3 percent is the minimum acceptable investment. The SEC staff believes a greater investment may be necessary depending on the facts and circumstances, including the credit risk associated

Exhibit 4 Page 95

*Consolidation of Variable Interest Entities*   **FIN46(R)**

with the lessee and the market risk factors associated with the leased property."

Those requirements are nullified by this Interpretation. If a lessor entity is a variable interest entity as described in this Interpretation, it is subject to consolidation based on the provisions of this Interpretation. If a lessor entity is not a variable interest entity, it is subject to the requirements of ARB 51 as amended by FASB Statement No. 94, *Consolidation of All Majority-Owned Subsidiaries*.

c. Topic No. D-14, "Transactions involving Special-Purpose Entities"

The SEC Observer noted that the SEC staff believes that nonconsolidation and sales recognition are not appropriate by the sponsor or transferor of an SPE when the majority owner of the SPE makes only a nominal capital investment, the activities of the SPE are virtually all on the sponsor's or transferor's behalf, and the substantive risks and rewards of the assets or the debt of the SPE rest directly or indirectly on the sponsor or transferor.

That requirement is nullified by this Interpretation. If an SPE is a variable interest entity as described in this Interpretation, it is subject to consolidation based on the provisions of this Interpretation. If an SPE is not a variable interest entity, it is subject to the requirements of ARB 51 as amended by Statement 94.

F2. The provisions of this Interpretation modify or partially nullify the consensuses in the following EITF Issues:

a. Issue No. 95-6, "Accounting by a Real Estate Investment Trust for an Investment in a Service Corporation"

Task Force members agreed that the determination of whether a real estate investment trust should consolidate a service corporation should be based on the facts and circumstances.

This Interpretation nullifies that consensus for service corporations that are variable interest entities as described in this Interpretation. If a service corporation is a variable interest entity, it is subject to the requirements of this Interpretation, and the consensus in Issue 95-6 does not apply. If a service corporation is not a variable interest entity, the consensus in Issue 95-6 continues to apply.

b. Issue No. 96-21, "Implementation Issues in Accounting for Leasing Transactions involving Special-Purpose Entities"

The Task Force reached consensus on a number of issues related to implementation of the first and third conditions of Issue 90-15, which is nullified by this Interpretation. The questions that relate to implementation of those conditions are no longer necessary. Thus, this Interpretation nullifies Questions No. 1–3, 5, and 7–9 of Issue 96-21 and all but the first sentence in the response to Question No. 6. Question 12 is nullified only for a guarantor-lessee that is the primary beneficiary of a lessor that is a variable interest entity. A guarantor-lessee that is *not* the primary beneficiary of the lessor under this Interpretation should continue to apply the Question 12 guidance for the timing of the accrual for a contingent loss under the guarantee. Questions No. 4, 10, and 11 and the remaining portion of Question No. 6 relate to matters that do not necessarily involve special-purpose entities and are not affected by this Interpretation.

c. Issue No. 97-1, "Implementation Issues in Accounting for Lease Transactions, including Those involving Special-Purpose Entities"

The Task Force reached consensus on the method of calculating depreciation for the purposes of determining earnings in applying the third condition of Issue 90-15, which is nullified by this Interpretation. Question No. 3, which relates to implementation of the conditions in Issue 90-15, is nullified because that Issue has been nullified by this Interpretation.

Exhibit 4 Page 96

**FIN46(R)**                    *FASB Interpretations*

d.  Issue No. 97-2, "Application of FASB State-
ment No. 94 and APB Opinion No. 16 to Physi-
cian Practice Management Entities and Certain
Other Entities with Contractual Management
Arrangements"

    The Task Force reached consensus on a num-
ber of issues related to consolidations and
business combinations related to physician
practices and physician practice management
entities. If the physician practice is a variable
interest entity as described in this Interpreta-
tion, that entity is subject to the requirements
of this Interpretation, and the consensus in Is-
sue 97-2 does not apply. If a physician prac-
tice is not a variable interest entity, the con-
sensus in Issue 97-2 continues to apply.

F3.  The provisions of this Interpretation bring con-
clusion to EITF Issue No. 84-30, "Sales of Loans to
Special-Purpose Entities," on which the Task Force
was unable to reach consensus.

F4.  This Interpretation does not nullify EITF Issue
No. 96-16, "Investor's Accounting for an Investee
When the Investor Has a Majority of the Voting Inter-
est but the Minority Shareholder or Shareholders
Have Certain Approval or Veto Rights." Enterprises
that are not controlled by the holder of a majority vot-
ing interest because of minority veto rights described
in Issue 96-16 are not variable interest entities if the
shareholders as a group have the power to control the
enterprise and the equity investment meets the other
requirements of this Interpretation.

Exhibit 4 Page 97

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On July 23, 2012, I caused to be served the document entitled **DECLARATION OF ROGER D. BOUDREAU IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT THOMAS C. TEKULVE, JR., AND FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT PETER L. JENSEN** on all the parties to this action addressed as stated on the attached service list:

[ ]   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[ ]   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ]   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]   **HAND DELIVERY:**  I caused to be hand delivered each such document to the office of the addressee as stated on the attached service list.

[ ]   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

[ ]   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[X]   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

[ ]   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 23, 2012                              /s/ Karen Matteson
                                                 Karen Matteson

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SEC v. Peter L. Jensen, et al.**
**United States District Court – Central District of California**
**Case No. CV 11-05316 R (AGRx)**
**(LA-3478)**

**MASTER SERVICE LIST**

David Scheper, Esq.
William H. Forman, Esq.
Jean M. Nelson, Esq.
Scheper Kim & Harris LLP
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
T/213-613-4655
F/213-613-4656
dscheper@scheperkim.com
wforman@scheperkim.com
jnelson@scheperkim.com
***Attorneys for Defendant, Peter L. Jensen***

Seth Aronson, Esq.
Carolyn Kubota, Esq.
Tamar Braz, Esq.
O'Melveny & Myers, LLP
400 S. Hope Street
Los Angeles, CA  90071
T/(213) 430-6000
F/(213) 430-6407
saronson@omm.com
ckubota@omm.com
tbraz@omm.com
***Attorneys for Defendant, Thomas C. Tekulve, Jr.***