1  **SCHEPER KIM & HARRIS LLP**
   DAVID C. SCHEPER (State Bar No. 120174)
2  dscheper@scheperkim.com
   WILLIAM H. FORMAN (State Bar No. 150477)
3  wforman@scheperkim.com
   JEAN M. NELSON (State Bar No. 150856)
4  jnelson@scheperkim.com
   601 West Fifth Street, 12th Floor
5  Los Angeles, CA  90071-2025
   Telephone: (213) 613-4655
6  Facsimile:  (213) 613-4656

7  **Attorneys for Defendant**
   **Peter L. Jensen**

8

9              **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12  SECURITIES AND EXCHANGE       CASE NO. CV11-05316 R (AGRx)
    COMMISSION,
13                                **DEFENDANT PETER L. JENSEN'S**
                Plaintiff,        **OPPOSITION TO MOTION FOR**
14                                **SUMMARY ADJUDICATION**
           v.
15                                **DATE:    SEPTEMBER 4, 2012**
    PETER L. JENSEN AND THOMAS C.  **TIME:    10:00 A.M.**
16  TEKULVE, JR.,                  **PLACE:   COURTROOM 8**
                                   **(HONORABLE MANUEL L. REAL)**
17              Defendants.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page:**

I.    INTRODUCTION ..................................................................................... 1

II.   STATEMENT OF FACTS ....................................................................... 2

    A.    The Origins of Basin Water. .......................................................... 2

    B.    Opus's Purchase of Two Basin Water Systems. ............................ 4

    C.    Thermax's Purchase of Two Basin Water Systems. ...................... 5

    D.    Mike Stark Takes Control:  The VLC and WSS Transactions. .............. 8

    E.    The Restatement. ............................................................................ 9

III.  ARGUMENT ........................................................................................... 9

    A.    The Motion Fails To Present Competent, Admissible Evidence. ............ 9

    B.    There Have Been No Material Misstatements. ............................. 10

    C.    The SEC Has Not Shown (or Even Alleged) a Scheme. ............. 11

    D.    There Is No Evidence of Scienter. ............................................... 11

    E.    The SEC Has Not Established Any Negligence. .......................... 17

    F.    The SEC Has Not Established An Insider Trading Claim. ........... 17

    G.    The SEC Has Failed to Show That Jensen Was A Control Person. ........... 18

    H.    The Remedies Sought By The SEC Are Unsupportable. ............ 20

        1.    The SEC's disgorgement remedies include shares that were not even owned by Mr. Jensen. ........................................ 21

        2.    Any "Disgorgement" is Limited To Unjust Enrichment. ........... 22

    I.    No Other Civil Penalty Is Warranted. .......................................... 24

    J.    No Injunctive Relief Is Warranted. .............................................. 24

IV.   CONCLUSION ...................................................................................... 25

i

1

## TABLE OF AUTHORITIES

2

**Federal Cases**                                                                    **Page(s):**

3

*Dorn v. Burlington N. Santa Fe R.R. Co.,*
    397 F.3d 1182 (9th Cir. 2005)..................................................................11

4

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ..................................................................................12

5

6

*Estremera v. United States,*
    442 F.3d 580 (7th Cir. 2006).....................................................................10

7

*Hoffman v. Applicators Sales & Serv., Inc.,*
    439 F.3d 9 (1st Cir. 2006) .........................................................................10

8

9

*In re Citric Acid Litig.,*
    191 F.3d 1090 (9th Cir. 1999)...................................................................10

10

*In re Countrywide Fin. Corp. Derivative Litig.,*
    554 F. Supp. 2d 1044 (C.D. Cal. 2008)....................................................18

11

12

*In re Digimarc Corp. Derivative Litig.,*
    549 F.3d 1223 (9th Cir. 2008)...................................................................22

13

*In re Hansen Sec. Litig.,*
    527 F. Supp. 2d 1142 (C.D. Cal. Oct. 17, 2007).....................................19

14

15

*In re Homestore.com,*
    347 F. Supp. 2d 769 (C.D. Cal. 2004)......................................................19

16

*In re Immune Response Sec. Litig.,*
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ......................................................19

17

18

*In re Remec Inc. Sec. Litig.,*
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ....................................................15

19

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999).....................................................................12

20

21

*In re Software Tool-works Inc.,*
    50 F.3d 615 (9th Cir. 1994).......................................................................12

22

*Paracor Finance, Inc., et al. v. Gen. Electr. Capital Corp., et al.,*
    96 F.3d 1151 (9th Cir. 1996)...............................................................19, 20

23

24

*SEC v. Blatt,*
    583 F.2d 1235 (5th Cir. 1978)...................................................................22

25

*SEC v. First City Financial Corporation,*
    890 F.2d 1215 (D.C. Cir. 1989) ...............................................................23

26

27

*SEC v. JT Wallenbrock & Associates,*
    440 F.3d 1109 (9th Cir. 2006)...................................................................23

28

1

## TABLE OF AUTHORITIES – Cont'd

2

**Federal Cases**                                                                 Page(s):

3

*SEC v. Koracorp Indus., Inc.,*
    575 F. 2d 692 (9th Cir.),

4

    cert. denied, 439 U.S. 953 (1978) ...................................................................24

5

*SEC v. Leslie,*
    C 07-3444, 2010 WL 2991038 (N.D. Cal. July 29, 2010)............................11

6

*SEC v. Manor Nursing Centers, Inc.,*

7

    458 F.2d 1082 (2d Cir. 1972) ......................................................................22

8

*SEC v. Mellert,*
    2006 U.S. Dist. LEXIS 14070 (N.D. Cal. Mar. 28, 2006) ...........................24

9

*SEC v. Mozilo,*

10

    2010 U.S. Dist. Lexis 98203 (C.D. Cal. Sept. 16, 2010) ........................17, 18

11

*SEC v. McGinn,*
    752 F.Supp.2d 194 (N.D.N.Y. 2010) ...........................................................21

12

*SEC v. Murphy,*

13

    626 F. 2d 633 (9th Cir. 1980).................................................................24, 25

14

*SEC v. Platforms Wireless Int'l Corp.,*
    617 F.3d 1072 (9th Cir. 2010).......................................................................23

15

*SEC v. Ross,*

16

    504 F.3d 1130 (9th Cir. 2007).......................................................................21

17

*SEC v. Sargent,*
    329 F. 3d 34 (1st Cir. 2003) ........................................................................24

18

*SEC v. Todd,*

19

    642 F.3d 1207 (9th Cir. 2011).............................................................11, 12, 13

20

*Steadman v. SEC,*
    603 F.2d 1126 (5th Cir. 1979).......................................................................25

21

*U.S. v. O'Hagan,*

22

    521 U.S. 642 (1997) .....................................................................................17

23

*United States v. Zolp,*
    479 F.3d 715 (9th Cir. 2007).........................................................................23

24

*Wellman v. Dickinson,*

25

    682 F.2d 355 (2d Cir. 1982) .........................................................................23

26

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.,*
    655 F.3d 1039 (9th Cir. 2011).......................................................................11

27

28

## TABLE OF AUTHORITIES – Cont'd

**Federal Statutes**                                                                    **Page(s):**

Securities Exchange Act of 1933
    Section 17(a) [15 U.S.C. § 77q(a)]...........................................................Passim

Securities Exchange Act of 1934
    Section 10(b) [15 U.S.C. § 78j(b)] ..........................................................Passim

**Federal Regulations**

Rule 10b5 [17 C.F.R. § 240.10b-5] .....................................................Passim

Rule 10b5-1 [17 C.F.R. § 240.10b5-1 ................................................Passim

**Federal Rules**

Federal Rule of Civil Procedure 56 ............................................................9

Federal Rule of Civil Procedure 56(c)................................................9, 10

# I.    **INTRODUCTION**

The Motion before this Court is unique, if not unprecedented.  The SEC seeks summary judgment on the ground that Basin Water's financial statements did not conform with GAAP but has failed to submit an expert declaration on the accounting in question and ignored expert opinion to the contrary.  It moves for a judgment without trial on claims that Peter Jensen intended to defraud when Mr. Jensen has testified that he never deceived or misled anyone.  And it demands that this Court enter summary judgment against and seize the wealth of Mr. Jensen *and his wife* (who is not even a party to this action) despite the extensive evidence of Mr. Jensen's good faith reliance on professional accountants and outside auditors to make accounting determinations for which he had no expertise.   The SEC knows that not a single witness has testified that Mr. Jensen lied, that he told someone else to lie, or that he ever instructed anyone to withhold information.  It knows that Mr. Jensen never instructed anyone at Basin Water as to when or how to recognize revenue.  It knows that no third party who did business with Basin Water ever asserted that Mr. Jensen concocted fake deals or secret side agreements to recognize illusory revenue.  And yet the SEC is here asking this Court to enter a judgment of fraud without a trial.  This is a motion – and an action – brought in bad faith.

The reasons for denying the Motion are almost too numerous to state, but these are the most prominent:

- The evidentiary support for the Motion is fatally flawed, relying on inadmissible summaries of documents and conclusory declarations.

- The misrepresentations in question depend entirely on the SEC staff's interpretation of GAAP – an interpretation unsupported by any expert declaration.

- The "evidence" of scienter turns almost exclusively on the SEC's assertion that the departures from GAAP were so flagrant that Mr. Jensen must have known he was engaging in fraud – in other words, the SEC has no evidence of scienter independent of its unsupported allegations that there were GAAP violations.

1

- Of the $9 million in sales proceeds that the SEC seeks to seize from Mr. Jensen, *nearly half* of those proceeds derive from shares that were owned, controlled, and sold by Lorna Jensen – not Peter Jensen.

- Mr. and Ms. Jensen held on to nearly $50 million in shares in Basin Water when the stock was supposedly inflated by fraud, and at the end of the day realized just about 20% of their one-time wealth in proceeds from lawful sales of stock – hardly the actions of persons with inside knowledge of fraud.

- For most of the time period at issue, Mr. Jensen was not a control person of Basin Water. In October 2006, Mr. Jensen hired Mike Stark, a seasoned executive, to take over from Mr. Jensen the day-to-day operations of the company. From the moment he arrived, Mr. Stark supervised nearly every aspect of Basin's operations, including finance and deal negotiations, and directed all of the 2007 transactions alleged in the Complaint.

If this indeed is the best the SEC can do, if these are the facts that it claims entitles it to judgment, then the Court should indeed grant summary judgment – in favor of Mr. Jensen.[1]

## II.   STATEMENT OF FACTS

### A.   The Origins of Basin Water.

Peter Jensen is a chemical engineer who developed a low-cost, efficient way to provide municipalities with safe, clean drinking water by removing contaminants such as nitrate, perchlorate, arsenic, uranium, and chromium-6. (Additional Facts In Support of Opposition by Mr. Jensen in Joint Statement of Disputed Facts ("JAF") No. 1.) In late 1999, Mr. Jensen started Basin Water, Inc. ("Basin Water") with the help of his wife Lorna Jensen. (JAF No. 2.) Mr. Jensen developed an ion exchange technology that treated contaminated well-water but produced far less waste than other available technologies. Mr. Jensen holds patents relating to this technology.

---

[1] The Court may grant summary judgment for a nonmoving party pursuant to FRCP 56(f)(1).

1   (JAF No. 2.)  Basin Water technology continues to treat millions of gallons of

2   drinking water each day for municipalities in California and Arizona.  (JAF No. 3.)

3      As the company grew, Mr. Jensen realized he needed a larger and more

4   sophisticated accounting department, especially because he had little accounting

5   experience.  (JAF No. 4.)  Mr. Jensen hired Tom Tekulve in 2004 as Chief Financial

6   Officer.  Mr. Tekulve in turn hired additional experienced accountants to serve as

7   Director of Finance and Controller.  In 2005, Basin Water engaged Singer Lewak to

8   serve as its independent outside auditor.  (JAF No. 5.)  From the outset of Singer

9   Lewak's engagement, Mr. Jensen understood that Mr. Tekulve maintained a close

10  and open relationship with the outside auditors.  (JAF No. 6.)

11     In May 2006, Basin Water raised $75 million through its Initial Public

12  Offering ("IPO").  (JAF No. 7.)  At this time, Basin Water had approximately 50

13  systems under contract with various municipalities.  (JAF No. 8.)  Nonetheless,

14  Messrs. Jensen and Tekulve cautioned investors, as they did in subsequent quarters,

15  that Basin Water's revenues would be "lumpy" as it sought out new contracts and

16  sales.  (JAF No. 9.)

17     At the time of the IPO, Mr. Jensen and his wife Lorna owned approximately

18  2,777,857 shares of Basin Water, of which approximately 1,320,000 shares

19  belonged to Lorna Jensen.  (JAF No. 10.) Together, their shares had a market value

20  of approximately $47 million in the weeks following the IPO.  (JAF No. 11.)

21  Nonetheless, neither Mr. nor Mrs. Jensen sold any of their shares in the six months

22  following the IPO.  (JAF No. 11.)  In December 2006, both Mr. and Mrs. Jensen

23  placed a small portion of their respective shares into a formal 10b5-1 plan, [1]

24  _____

25  [1] (Section 10b5-1(c)(1)(i)(B)(3) creates a safe harbor for insiders to trade shares

26  where such shares are traded pursuant to a contract, instructions given to another, or

27  a written plan that does "not permit the person to exercise any subsequent influence

over how, when, or whether to effect purchases or sales" (10b5-1(c)(1)(i)(B)(3)).

28

1  effectively ending any say either of them had on the timing of the sale of those

2  shares.  That 10b5-1 plan remained in effect, unmodified, throughout their tenures at

3  Basin Water.  (JAF No. 56.)  The great majority of Mr. and Mrs. Jensen's shares

4  remained outside the 10b5-1 plan.  Neither Mr. Jensen nor his wife sold any of these

5  shares until months after Mr. Jensen resigned from Basin Water.  (JAF No. 13.)

6  **B.**      **Opus's Purchase of Two Basin Water Systems.**

7       In 2005, Mr. Jensen approached potential investors about acquiring water

8  treatment systems from Basin Water to use in possible conjunction with BION, a

9  new, proprietary technology Mr. Jensen helped to develop along with internationally

10 known experts in the field of water treatment.  (JAF No. 14.)  In December of 2005,

11 Mr. Jensen spoke with Martin Benowitz ("Benowitz"), who represented the Opus

12 Trust ("Opus"), about acquiring two systems and an interest in the BION technology

13 (JAF No. 15.)  Mr. Benowitz expressed interest in acquiring shares in a subsidiary

14 of Basin Water that would own the BION technology, and agreed that Opus would

15 buy two Basin systems if the deal included BION shares.  (JAF No. 15.)  Once Mr.

16 Jensen and Mr. Benowitz reached a basic agreement in December 2005, the Basin

17 Water Board of Directors reviewed the deal terms and approved it on December 20,

18 2005.  (JAF No. 16.)

19       On December 29, 2005, Mr. Benowitz, on behalf of Opus, executed an

20 "Agreement for purchase of two Basin Water ion exchange units" ("Opus 12/05

21 Agreement").  The Opus 12/05 Agreement provided that Opus would purchase two

22 systems from Basin Water for $1.5 million, with 10% (or $150,000) to be paid upon

23 execution, and the remainder to be paid over two years.  In exchange for payment in

24 full for the systems, Opus would receive 5% of the shares of the subsidiary that

25 would own the BION technology.  (JAF No. 17.)  Opus immediately paid Basin

26 Water $150,000.  (JAF No. 17.)  Both Mr. Jensen and Mr. Benowitz understood the

27 Opus 12/05 Agreement was binding and that the parties would more formally

28 document their agreement at a later date.  (JAF No. 18.)

4

1    Basin Water recognized $1.5 million from the Opus transaction in the first
2    quarter of 2006 (as reported in the 10-Q filed on June 26, 2006).  Mr. Jensen played
3    no role in the timing or amount of revenue recognition related to the Opus
4    transaction.  (JAF No. 19.)  Doug Hansen, the Director of Finance for Basin Water,
5    timely forwarded an executed copy of the Opus 12/05 Agreement to Gale Moore of
6    Singer Lewak, Basin Water's outside auditors.  (JAF No. 20.)

7    In March 2006, Mr. Benowitz began to arrange the next payment by Opus due
8    under the Opus 12/05 Agreement.  During this time, however, Mr. Jensen and Mr.
9    Tekulve were preparing for Basin's IPO, which occurred in May 2006.  Hence, Mr.
10   Tekulve and Mr. Benowitz did not exchange drafts of more formal documentation
11   of the agreement ("Formal Agreement") until June 2006.  (JAF No. 21.)  One of the
12   terms in the draft Formal Agreement was a liquidated damages clause that had not
13   been part of the Opus 12/05 Agreement.  (JAF No. 21.)  Mr. Benowitz never
14   requested this clause, and neither Mr. Tekulve nor Mr. Jensen discussed or
15   suggested this clause to Mr. Benowitz.  (JAF No. 22.)

16   The only change in terms in the Formal Agreement that Mr. Benowitz sought
17   was a longer term for payment and a lower interest rate.  Mr. Tekulve agreed to the
18   first and rejected the second.  Mr. Tekulve did not see the extended payment period
19   as a significant change.  (JAF No. 23.)  Singer Lewak timely received the Formal
20   Agreement and did not advise Basin Water that $1.5 million in revenue could not be
21   recognized in the First Quarter of 2006.  (JAF No. 24.)

22   **C.    Thermax's Purchase of Two Basin Water Systems.**

23   In late 2005, Mr. Jensen was contacted by James Sabzali, a salesman from
24   Thermax, Inc. ("Thermax"), a company which sold ion exchange systems, resins
25   and water treatment systems primarily in India and the Far East.  Mr. Sabzali
26   advised that Thermax wanted to sell Basin Water systems to PDVSA, a
27   government-owned company in Venezuela.  (JAF No. 25.)  As will be shown at
28   trial, Thermax had incentives to purchase systems from Basin Water regardless

1  whether PDVSA ever ordered systems from Thermax; namely, Thermax needed

2  access to Basin Water's customer base in order to access to the U.S. market.  (JAF

3  No. 26.) After Thermax failed to submit a purchase order for Basin Water systems

4  for several months, after repeated assurances from Mr. Sabzali, Mr. Jensen

5  telephoned Mr. Sabzali and informed him that Thermax must commit to purchasing

6  the systems regardless whether Thermax received an order for systems from

7  PDVSA or the deal would not go forward.  Mr. Sabzali agreed to purchase the

8  systems.  (JAF No. 27.)

9       On September 25, 2006, Mr. Sabzali emailed a letter ("September 25 Letter")

10  to Mr. Jensen, saying that Thermax would purchase the systems subject to several

11  "caveats" and "T&C's" (terms and conditions).  Attached to the email was a two-

12  page unsigned letter from Mr. Sabzali.  The "caveats" were listed on the first page

13  of the September 25 Letter and "[t]he details of the system we will be ordering are

14  on page 2."  The first caveat stated that Thermax's purchase order would be

15  "predicated on Thermax Inc. receiving a similar order from PDVSA."  (JAF No.

16  28.)

17       Without reading it, Mr. Jensen forwarded the September 25 Letter to Pat

18  Kelly, Basin Water's General Manager, for review.  Mr. Kelly read the caveats and

19  realized Mr. Sabzali was asking for a contingent order.  Mr. Kelly then discussed the

20  September 25 Letter with Mr. Jensen, pointed out the contingency caveat on page

21  one, and asserted that Basin Water could not agree to the contingency.  (JAF No.

22  29.)  Realizing that Mr. Sabzali had reneged on his promise to purchase the systems

23  regardless of PDVSA's actions, Mr. Jensen became upset and called Mr. Sabzali.

24  Mr. Jensen told Mr. Sabzali that he was tired of "messing around" with Thermax

25  and that if the company did not "step up and show their commitment to this deal,"

26  there would be no future relationship between the companies.  (JAF No. 30.)

27

28

1       On September 28, 2006, Thermax's Finance Unit, not the Sales Department,

2   "stepped up" and sent over a purchase order *that did not include any of the caveats*

3   *that had caused Pat Kelly concern*.  (JAF No. 31.)  Rather, the purchase order

4   attached as an addendum only a version of page 2 of the September 25 Letter, which

5   described "[t]he details of the system" that Thermax was ordering, such as the size

6   and type of systems to be provided, special construction needs for transportation of

7   the systems overseas, and price.  (JAF No. 32.)

8       Mr. Jensen rightly believed that the September 28 Purchase Order's omission

9   of the "caveats" set forth on page 1 of the September 25 Letter signified that

10  Thermax had abandoned the September 25 caveats as a condition to purchasing the

11  systems.  So did Mr. Kelly and William Schwartz, Basin Water's Director of

12  Engineering, who also reviewed the September 28 Purchase Order.  None of them

13  was concerned that, as stated in the addendum, the terms and conditions would

14  "reflect the T&C's on PDVSA's PO to Thermax."  They did not believe that this

15  clause referred to the contingency caveat on page one of the repudiated September

16  25 Letter.  (JAF No. 33.)  Furthermore, as he stated in his sworn testimony, Mr.

17  Sabzali did not believe this clause referred to that caveat.  (JAF No. 34.) Mr. Jensen

18  believed the "T&C"s clause in the addendum to the September 28 Purchase Order

19  referred to his agreement with Mr. Sabzali that Thermax's payment schedule could

20  mirror PDVSA's schedule.  (JAF No. 35.)

21      Based on Messrs. Jensen's, Kelly's, and Schwartz's belief that the September

22  28 Purchase Order from Thermax was a proper purchase order free of the

23  objectionable caveats, Basin Water began construction of the systems.  (JAF No.

24  36.)  Mr. Tekulve reviewed the September 28 Purchase Order (with addendum) and

25  had Basin Water recognize $451,000 from the transaction, a portion of the total

26  expected revenue, under the percentage of completion accounting model.  (JAF No.

27  37.)

28

1    The September 28 Purchase Order, including the addendum referring to the
2   "T&C"s, was provided to Basin Water's outside auditors, who did not challenge
3   Basin Water's recognition of a portion of revenue from the transaction.  (JAF No.
4   38.)  During the next six months, as Basin Water worked to complete the units, Mr.
5   Sabzali never told anyone at Basin Water that the purchase order was contingent on
6   Thermax receiving a purchase order from PDVSA.  (JAF No. 39.)

7   **D.**      **Mike Stark Takes Control:  The VLC and WSS Transactions.**

8    Soon after Basin went public in May 2006, Mr. Jensen decided that he needed
9   to replace himself with someone who had greater experience in running a national
10  service organization.  Mr. Jensen approached Mike Stark about joining Basin Water
11  because Mr. Stark recently had served as CEO of the North American division of
12  Veolia, the world's largest water utility and services company.  (JAF No. 40.)  Mr.
13  Stark was also very familiar with Basin Water, having twice attempted to invest in
14  and/or purchase the company.  Mr. Stark started at Basin Water in October 2006 as
15  President and Chief Operating Officer.  By early 2007, Mr. Stark had effectively
16  "taken over" nearly all aspects of managing Basin Water.  (JAF No. 41.)  At Mr.
17  Stark's request, Mr. Jensen did not involve himself in deal negotiations or
18  interactions with customers.  Initially, people in the industry continued to contact
19  Mr. Jensen; by the end of 2006, however, they stopped contacting Mr. Jensen and
20  dealt almost exclusively with Mr. Stark.  (JAF No. 42.)

21   Similarly, Mr. Tekulve began reporting directly to Mr. Stark.  In particular,
22  Stark directed Tekulve in early 2007 to find a way to obtain third-party financing for
23  systems already under contract with municipalities.  Mr. Stark's directive to
24  generate third-party financing led to the VLC and WSS transactions in 2007.  (JAF
25  No. 43.)  Mr. Stark arranged the hiring of a consultant to conduct these transactions,
26  oversaw the negotiation of them, participated in Basin Water meetings concerning
27  them, and informed the investing public about these transactions.  (JAF No. 44.)

28

1  Mr. Jensen had no involvement whatsoever with the negotiation, accounting or

2  announcement of any of the VLC or WSS transactions.  (JAF No. 45.)

3  **E.     The Restatement.**

4       On February 10, 2009, Basin Water filed restated financial statements for

5  years 2006 and 2007.  In the Restatement, Basin Water identified the reasons for the

6  Restatement, including:  the transactions with VLC and WSS for violations of an

7  accounting rule called FIN 46; certain transactions (including but not limited to

8  Opus and Thermax) where Basin Water restated revenue based upon contract issues

9  and customer returns; contract loss reserves; accounting for warrants; and Basin

10  Water's accounting for a December 2007 sale to Empire Water Corporation of the

11  right to purchase certain water rights and related assets of Basin Water.  **As part of**

12  **the Restatement, and after thorough investigation, Basin Water's independent**

13  **auditors specifically determined that there had been no fraud in connection**

14  **with Basin Water's recognition of revenue from the very same transactions at**

15  **issue here**.  (Tekulve Additional Facts, Nos. 105 and 109.)

16  **III.   ARGUMENT**

17  **A.     The Motion Fails To Present Competent, Admissible Evidence.**

18       As more fully discussed in the Defendants' Joint Statement of Disputed Facts,

19  the Motion should be denied on the grounds that it does not even pretend to comply

20  with Federal Rule of Civil Procedure 56, which requires the SEC to cite to

21  admissible evidence in support of its purported facts.  *See* Fed. R. of Civ. Proc. 56(c)

22  (A party may object that the material cited to support or dispute a fact cannot be

23  presented in a form that would be admissible in evidence).  The Motion is replete

24  with significant instances of inadmissible material, such as the charts set forth in the

25  Declarations of Roger Boudreau (Doc. No. 40-3) at paragraph 3 and Robert Tercero

26  (Doc. No. 41) at paragraphs 76 and 92 (collectively "SEC Charts"), which rely upon

27  documents that are not before this Court, as well as inadmissible summaries of such

28  documents.  (*See* Tercero Decl., ¶¶ 76-78, 87-88, 91-92 and 95 (purporting to

9

1  summarize documents produced in discovery) and Boudreau Decl., ¶¶ 3-4
2  (purporting to summarize documents produced in discovery and located in the
3  public record).)  *See In re Citric Acid Litig.,* 191 F.3d 1090, 1101-02 (9th Cir. 1999)
4  (court refusing to consider document where party failed to submit it in the record);
5  Fed. R. of Civ. Proc. 56(c) and Adv. Comm. Note to amended Fed. R. of Civ. Proc.
6  56(c)(4); *Estremera v. United States*, 442 F.3d 580, 584-85 (7th Cir. 2006) (stating
7  that attorney's affidavit based on the attorney's review of documents is "second-
8  hand knowledge" and noting that attorney "could have introduced into the record the
9  documents he relied on in his affidavit"); *see Hoffman v. Applicators Sales & Serv.,*
10  *Inc.*, 439 F.3d 9,15 (1st Cir. 2006).  Given the significance to the Motion of the
11  Boudreau and Tercero declarations, the Motion is clearly deficient under Rule 56
12  and should be denied for this reason alone.

13  **B.      There Have Been No Material Misstatements.**

14          Each of the SEC's causes of action rises or falls on the supposedly improper
15  recognition in Basin Water's financial statements of revenue from the Opus,
16  Thermax, VLC and WSS transactions.  The question of whether there have been any
17  misstatements thus falls purely on the application of GAAP; there are no allegations,
18  for instance, that either defendant misrepresented to the public the nature of Basin
19  Water's technology, products, customers, or the volume of water treated.  There is
20  no dispute as to the legitimacy of Basin Water as a water treatment business.

21          The application of GAAP to the transactions in question is addressed by the
22  report of Mr. Holder which is submitted with the Opposition of Mr. Tekulve.  Mr.
23  Jensen joins in that report, and in the Opposition of Mr. Tekulve addressing the
24  absence of any material misstatements.  In light of the expert opinion in support of
25  Mr. Jensen and Tekulve with respect to the accounting treatment, and the absence of
26  any expert opinion from the SEC, there can be no finding at this stage that there
27  were any actionable misrepresentations.  Accordingly, the Court must let the jury
28  decide whether there are any material misstatements based on GAAP violations.

1   *SEC v. Todd*, at 1217 (denying summary judgment where jury to determine expert

2   credibility) (citing *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1182, 1196

3   (9th Cir. 2005) ("If two contradictory expert witnesses can offer testimony that is

4   reliable and helpful, both are admissible and it is the function of the finder of fact,

5   not the trial court, to determine which is the more trustworthy and credible.").

6   **C.      The SEC Has Not Shown (or Even Alleged) a Scheme.**

7       Section 17(a)(1) requires more than just a misrepresentation:  there also must

8   be a scheme to defraud involving conduct *beyond* a misrepresentation or omission.

9   *See WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th

10  Cir. 2011) (affirming dismissal of scheme liability claims under Rule 10b-5(a) and

11  (c), stating: "Here, WPP does not allege any facts that are separate from those

12  already alleged in their Rule 10b-5(b) omission claims.  The fraudulent scheme

13  allegedly involved the Defendant-Appellees planning together to not disclose the

14  Founders' sale of securities in the secondary offering, and then not disclosing those

15  sales; fundamentally, this is an omission claim."); *SEC v. Leslie*, C 07-3444, 2010

16  WL 2991038, at * 34 (N.D. Cal. July 29, 2010) ("[T]he alleged conduct must be

17  more than a reiteration of the misrepresentations that underlie the misstatement

18  claims," citing *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 361 (D.N.J. 2009).)

19  The SEC's misrepresentation allegations and its scheme allegations are one and the

20  same.  Accordingly, the Motion must be denied with respect to the alleged

21  violations of Section 17(a)(1).

22  **D.      There Is No Evidence of Scienter.**

23      In addition to needing to prove that no triable issues exist on the accounting

24  treatment for the challenged transactions, with respect to Claims 1 (Violation of

25  Section 17(a) and 2 (Violation of Section 10(b) of the Exchange Act), the SEC must

26  also prove as a matter of law that Mr. Jensen knew that revenue from the Opus,

27  Thermax, VLC and WSS transactions was illusory and that statements attributed to

28  him regarding such revenue were made with knowledge of such falsity and the

1  intent to deceive.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re*

2  *Silicon Graphics Inc. Sec. Litig.*,¸183 F.3d 970, 979 (9th Cir. 1999).  As demonstrated

3  below, the SEC suffers from a complete failure of proof when it comes to the

4  necessary showing of bad intent on the part of Peter Jensen.

5       The Opus Transaction:  The SEC's supposed evidence of Mr. Jensen's

6  scienter as to revenue recognized from the Opus transaction rests primarily on the

7  alleged GAAP violation itself.  *See* Motion (Doc. No. 40-1) at 10:9-11:6 (material

8  misstatement due to improper application of SAB 104) and 15:3-20 (scienter

9  derived from Jensen's knowledge that "collectability was relevant to recognizing

10 revenue").  Generally, however, "a GAAP violation is insufficient, without more, to

11 support a finding of scienter."  *SEC v. Todd*, 642 F.3d 1207,  1218 (9th Cir. 2011)

12 (citing *In re Software Tool-works Inc.*, 50 F.3d 615, 627 (9th Cir. 1994).  Moreover,

13 the SEC has offered no evidence to indicate that Mr. Jensen understood how GAAP

14 should apply to this particular transaction, except to claim Mr. Jensen "knew at least

15 some of those requirements."  Motion (Doc. No. 40-1) at 9.  Furthermore, Mr.

16 Jensen's uncontradicted testimony is that he did not direct anyone on the timing or

17 amount of revenue to be recognized from the Opus transaction.  (*See* Defendants'

18 Response to SEC Fact ¶¶ 17 and 68.)

19       The entirety of the SEC's argument that Mr. Jensen "knew" that it was

20 supposedly fraudulent for Basin Water to recognize any revenue from the Opus

21 transaction rests solely on the SEC's statements that Mr. Jensen was aware that

22 certain terms of the deal changed between the time of the Opus 12/05 Agreement

23 and the Formal Agreement in June 2006, and Mr. Jensen's supposed awareness that

24 the liquidated damages clause in the Formal Agreement "prevented" Basin Water

25 from collecting.  These assertions are unfounded.  (*See* Defendants' Response to

26 SEC Fact ¶¶ 41, 44 and 49.)

27       First, the parties themselves understood that they had reached an enforceable

28 agreement long before the Opus transaction was formally memorialized in all

1   respects.  (JAF No. 18.)  Mr. Jensen believed the parties had entered into a firm

2   agreement as of  December 2005 when Mr. Benowitz signed the Opus 12/05

3   Agreement and paid $150,000.  Mr. Benowitz also understood that Opus was bound

4   by the Opus 12/05 Agreement as he indicated to Messrs. Jensen and Tekulve prior

5   to executing the Formal Agreement that he was making arrangements for the next

6   payment required by the Opus 12/05 Agreement.  (JAF No. 21.)

7        Second, there is no evidence that Mr. Jensen believed that the liquidated

8   damages clause of the Formal Agreement constituted a significant change from the

9   essential terms of the Opus 12/05 Agreement.  The SEC has offered no evidence,

10  and indeed there is none, that Mr. Jensen understood or believed that the liquidated

11  damages clause would "preclude[] Basin from collecting" all of the revenue from

12  Opus.  (*See* Defendants' Response to SEC Fact ¶¶ 46 and 49.)  Mr. Benowitz

13  certainly did not think so; Mr. Tekulve did not, and Basin Water's own auditors,

14  who reviewed the Opus agreements, did not draw the conclusion that a liquidated

15  damages clause somehow made the deal a "sham."  (JAF Nos. 21-22.)

16       The conduct of all those involved belies any inference that Mr. Jensen

17  knowingly engaged in fraud when Basin Water recognized revenue from the Opus

18  transaction.  Basin Water's Board of Directors approved the transaction in 2005.

19  (Defendants' Response to SEC Fact ¶¶ 46 and 49 (Doc. No. 40-2).)  Mr. Benowitz

20  began to perform per the terms of the Opus 12/05 Agreement.  (JAF No. 16.)  The

21  independent auditors never raised any issues about differences between the Opus

22  12/05 Agreement and the Formal Agreement or the significance of a liquidated

23  damages clause.  (JAF No. 21-22.)  No witnesses have claimed that Mr. Jensen

24  admitted problems in recognizing the Opus revenue or that he was warned of these

25  problems.  *Contrast SEC v. Mozilo*, 2010 U.S. Dist. Lexis 98203, at *59-60 (C.D.

26  Cal. Sept. 16, 2010) (finding evidence of scienter disputed where defendants

27  rejected credit risk officer's proposed disclosures for SEC filings warning of credit

28  risks) and *Todd*, 642 F.3d at 1217-18 (finding evidence of scienter disputed where

1  defendant told controller not to tell auditors revenue had been recognized following

2  controller's advice that "auditors wouldn't go for it").  Indeed, no one ever indicated

3  to Mr. Jensen or other Basin employees before the Restatement that the revenue

4  should not have been recognized for the Opus transaction.

5      The Thermax Transaction:  Nowhere in its Motion does the SEC articulate the

6  nature of the *fraud* in the Thermax transaction.  As best as can be inferred, there is

7  the implication that Mr. Jensen had some kind of "secret deal" with Sabzali to the

8  effect that Thermax would not have to purchase systems from Basin Water unless

9  Thermax received a purchase order from PDVSA.  But the very terms of that

10 supposedly "secret deal" – the Addendum to the September 28 Purchase Order –

11 were provided by Mr. Jensen to Basin Water staff and in turn to Singer Lewak.

12     As stated above, Mr. Jensen shared with Pat Kelly the Sabzali "caveats" of

13 September 25 Letter that expressly provided for a sale contingent on an order from

14 PDVSA, and then, after consulting with Mr. Kelly, explicitly rejected the

15 contingency.  (JAF No. 29; Defendants' Response to SEC Fact No. 88.)  After Mr.

16 Jensen received the purchase order of September 28, 2006 (which omitted all of the

17 "caveats" from Mr. Sabzali's September 25 communication), he shared this with

18 Mr. Kelly as well.  Mr. Kelly, like Mr. Jensen, concluded that the September 28

19 Purchase Order was "clean" even with the "T&C" phrase in the purchase order.

20 (JAF No. 33; Defendants' Response to SEC Fact Nos. 87-88.)  The September 28

21 Purchase Order – including the "T&C" language, was timely provided to Basin's

22 accountants and its independent auditors.  (JAF No. 38.)  No one drew the

23 conclusion that there was a contingency to the transaction that defeated revenue

24 recognition.  Indeed, Basin Water immediately began constructing the systems that

25 Thermax had ordered.  (JAF No. 39.)  If Mr. Jensen truly thought the transaction

26 was an unenforceable sham, it defies common sense that he would then share the

27 details of the transaction with his staff, ask for their input, and then allow Basin

28 Water to construct the systems.  Furthermore, at the same time as the Thermax

14

1   transaction, Mr. Jensen approved the hiring of Mike Stark as his eventual

2   replacement – in effect, inviting a professional CEO to review Mr. Jensen's

3   handling of the transaction.  (JAF No. 40.)  Rather than demonstrating intentional

4   wrongdoing, this conduct in fact creates a strong inference of a *lack* of scienter,

5   which must be construed at this stage in Mr. Jensen's favor.  *See In re Remec Inc.*

6   *Sec. Litig.*, 702 F. Supp. 2d 1202, 1216 (S.D. Cal. 2010) (in deciding a motion for

7   summary judgment, "The Court must construe the evidence and draw justifiable

8   inferences in favor of the non-moving party.")

9       In sum, the uncontroverted *evidence* is that Mr. Jensen withheld nothing about

10  the terms of the Thermax deal that he could reasonably have believed was material

11  to the accounting treatment for the transaction.  Based on the SEC's complete failure

12  to identify the fraud at issue, the Motion must be denied.

13  <u>The VLC and WSS Transactions</u>:  Aside from its quarrel with the accounting

14  for the VLC and WSS transactions, the SEC points to no evidence showing that Mr.

15  Jensen considered the transactions in any way suspect.  (*See* Defendants' Response

16  to SEC Facts Nos. 116-153 and SEC Statement of Facts (Doc. No. 40-2).  Indeed,

17  the SEC attempts to infer Mr. Jensen's scienter  based on unidentified "internal

18  Basin discussions," and Mr. Jensen's failure to ask "questions" about the statements

19  in the Form 10-Qs about the VLC and WSS transactions.  (Motion, at 16:4-11).

20      There is a paucity of evidence for the simple reason that, as acknowledged by

21  the SEC, **Mr. Jensen was not involved in these transactions**.  Indeed, by early

22  2007, Mr. Jensen was no longer involved in **any** Basin Water system transactions.

23  (JAF Nos. 41-45.)  As to the VLC and WSS transactions specifically, Mr. Stark

24  directed and shepherded these deals through by bringing in his friend, relative, and

25  business associate, Charles Litt, to work with Mr. Tekulve.  (JAF No. 44.)  Mr.

26  Stark, not Mr. Jensen, advised analysts before June 2007 that the first deal, VLC,

27  would generate revenues in the second quarter of 2007.  (JAF No. 44.)  Mr. Stark,

28  not Mr. Jensen, answered analyst questions about VLC before and after the deal was

completed.  (JAF No. 44.)  Finally, Mr. Stark, not Mr. Jensen, was present at the Audit Committee on August 9, 2007, when the committee and Singer Lewak reviewed the VLC transaction.  (JAF No. 44.)  Notably Mr. Stark, and not Mr. Jensen, signed the management representation letters to Singer Lewak for the second and third quarters of 2007 when revenue from the first VLC and WSS transactions was recognized.  *See*, *e.g.*, SEC Fact No. 142 (Doc. No. 40-2) at 60 and Tercero Decl., Ex. 64 (November 13, 2007 Letter (Doc. No. 41-7) at 1316; SEC Fact No. 129 (Doc. No. 40-2) at 61 and Tercero Decl., Ex. 56 (August 13, 2007 Letter (Doc No. 41-6) at 1122.)

In its Motion, the SEC identifies various aspects about the VLC and WSS transactions that the SEC claims indicated that the transactions were "shams."  The SEC claims that Mr. Jensen learned about the transactions at "internal Basin discussions," but offers no evidence as to whether any of the aspects identified by the SEC as evidencing their "sham" nature were even discussed.  The SEC cites to no testimony or documents showing that Mr. Jensen was aware of any of these aspects of the transactions.  As explained by Mr. Jensen, he reasonably believed he did not need to investigate these deals because Mr. Stark spearheaded them, and Mr. Jensen had witnessed Mr. Stark's intense attention to financial and accounting detail.  (JAF No. 45; Defendants' Response to SEC Fact ¶ 135.)  Further, Mr. Jensen knew that Mr. Tekulve was involved with the deals and that Singer Lewak and the Audit Committee would review them, as was the case here.  (JAF No. 5-6.)

In sum, *there is not single piece of evidence* submitted by the SEC indicating that Mr. Jensen ever withheld information from his staff or the auditors, ever played any role in decisions on recognizing revenue, ever formed 'secret' agreements with anyone, or ever directed anyone to make misrepresentations or withhold material information.  The entirety of the SEC's scienter argument again simply boils down to its insistence that the accounting for certain transactions was incorrect.  Given that the SEC has marshaled its best case in support of its Motion, this Court may,

1  and should, determine that there is no evidence of scienter and adjudicate the issue

2  of scienter in favor of Mr. Jensen.

3  **E.     The SEC Has Not Established Any Negligence.**

4          The SEC throughout its Motion insists that Mr. Jensen knowingly engaged in

5  fraud by signing SEC filings recognizing revenue from the Opus, Thermax, VLC,

6  and WSS transactions.  While the SEC notes that some of the causes of action it

7  asserts against Mr. Jensen might be satisfied by a showing of negligence instead of

8  fraud, the SEC utterly fails to even articulate the standard applicable for Mr. Jensen,

9  much less show why Mr. Jensen, a person with no accounting expertise, should be

10 found negligent for failing to follow certain accounting guidelines.

11 **F.     The SEC Has Not Established An Insider Trading Claim.**

12         Like its allegations of fraudulent accounting, the SEC's allegations of insider

13 trading also require the element of scienter.  Despite the fact that Mr. Jensen saw his

14 once-considerable holdings in Basin Water dwindle from a post-IPO high of $17 per

15 share to just over $3 when Basin Water announced in August 2008 that it was

16 considering restating its financial statements, the SEC asserts that Mr. Jensen

17 illegally profited from "inside information" -- namely, his alleged knowledge that

18 the accounting for the Opus and Thermax transactions was improper.

19         To establish insider trading, the SEC must show that Mr. Jensen sold Basin

20 Water shares on the basis of material non-public information.  *U.S. v. O'Hagan*, 521

21 U.S. 642, 651-52 (1997);  17 C.F.R. § 240.10b5-1(b).  The SEC must also show that

22 Mr. Jensen acted with scienter.  *Mozilo*,  2010 U.S. Dist. LEXIS 98203, at *64

23 ("Scienter remains a necessary element for liability under Section 10(b) of the

24 Exchange Act and Rule 10b-5 thereunder, and Rule 10b5-1 does not change this.")

25         The SEC relies upon *SEC v. Mozilo*, 2010 U.S. Dist. LEXIS 98203 (C.D. Cal.

26 Sept. 16, 2010), to establish that Mr. Jensen's sales through his Rule 10b5-1 account

27 should not be subject to the protections of Rule 10b5-1.  *See* Motion (Doc. No. 40-1)

28 at 20-21.  However, in *Mozilo*, the court found that Mozilo was not entitled to the

protection of the Section 10b5-1 plan because there was evidence that Mozilo was using the plans to maximize his profits and to defeat the purpose of the Rule 10b5-1 plan.  For example, Mozilo executed four separate 10b5-1 plans over the span of two months (October, November and December 2006) and amended the December 2006 plan in February 2007 to increase the number of shares he could sell through a Rule 10b5-1 plan.  *Id.* at *65-*66 (Mozilo placed over 5 million shares in these plans and received over $140 million in profit).  The court found that Mozilo was not entitled to the protection of the Section 10b5-1 plan.  *See also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) ("Mozilo's actions appear to defeat the very purpose of 10b5-1 plans, which were created to allow corporate insiders to 'passively' sell their stock based on triggers" and "Accordingly, his amendments of 10b5-1 plans at the height of the market does not support the inference 'that the sales were pre-scheduled and not suspicious'").

Unlike in *Mozilo*, Mr. Jensen only entered into one plan in December 2006 in which he deposited 200,000 shares.  Although Mr. Jensen owned over 1 million additional shares, he did not seek to increase the amount of shares available for sale in his Rule 10b5-1 plan – and he did not sell any of those additional 1 million shares while he was at Basin Water, and during this time his wife did not sell her 1 million shares either.  See Defendants' Responses to SEC Fact ¶¶ 167-169.)  In fact, Mr. Jensen further *limited* his ability to trade on material nonpublic information by handing over the operations to Michael Stark even before he entered the plan.  (*See* Defendants' Responses to SEC Fact ¶¶ 4-6.)  Accordingly, Mr. Jensen's self-imposed limitation on the number of shares available for sale through the Rule 10b5-1 plan, and the lack of amendments to the plan, defeat any supposed scienter with respect to the insider trading charges.

## G.   The SEC Has Failed to Show That Jensen Was A Control Person.

The SEC also asserts as a matter of law that Mr. Jensen is liable as a control person (Claim No. 2).  Under Section 20(a), a defendant may be liable as a control

1   person for securities violations if (1) there is a violation of the Act and (2) the

2   defendant directly or indirectly controlled the violator.  *Paracor Finance, Inc., et al.*

3   *v. Gen. Electr. Capital Corp., et al.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

4        To establish control, the SEC must demonstrate that Mr. Jensen was "active

5   in the day-to-day affairs" of the violator (Basin Water) or that he had "specific

6   control over the preparation and release of the alleged statements."  *In re Immune*

7   *Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031 (S.D. Cal. 2005).   Demonstrating

8   that a defendant is a "controlling person 'is an intensely factual question, involving

9   scrutiny of the defendant's participation in the day-to-day affairs of the corporation

10   and the defendant's power to control corporate actions.'"  *In re Homestore.com*, 347

11   F. Supp. 2d 769, 809 (C.D. Cal. 2004).

12        Here, the SEC has failed to meet its burden of proving – through facts – that

13   Mr. Jensen was involved in the day-to-day affairs of Basin Water for anywhere near

14   the period it claims.  For example, the SEC contends Jensen is liable as a control

15   person throughout the *entire* 2006-2008 time period essentially because Mr. Jensen

16   held the title of CEO until February 2008.  However, the fact that a person is a CEO,

17   director or other high ranking officer within the company does not create a

18   presumption that he or she is a "controlling person."  *Paracor*, 96 F.3d at 1163; *see*

19   *also, In re Hansen Sec. Litig.*, 527 F. Supp. 2d 1142, 1163 (C.D. Cal. Oct. 17, 2007)

20   (*In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 U.S. Dist. LEXIS

21   83443, at *49 (C.D. Cal. Aug. 21, 2009) (granting former CEO's motion to dismiss

22   with prejudice and rejecting as insufficient allegations of control based on the

23   defendant's position at the company, participation in setting underwriting guidelines

24   and loan loss reserves, and ownership of company stock).

25        *Paracor* is particularly instructive on this point.  96 F.3d 1151.  In *Paracor*,

26   investors who purchased debentures brought an action against the corporation, its

27   CEO, and several other directors and officers alleging violations of federal securities

28   laws.  Although the CEO was consulted on every major company decision, the

19

1   evidence demonstrated that other individuals "managed the company on a day-to-

2   day basis without [the CEO]."  *Id.* at 1163 (internal quotation marks omitted).  The

3   CEO was described as "the classic conceptualizer and idea man who leaves behind a

4   long swath of details for someone else to handle."  *Id.* (internal quotation marks

5   omitted).  Based on these facts and the CEO's lack of involvement in the challenged

6   transactions, the Court held the CEO was not a "controlling person" and affirmed

7   summary judgment in his favor.  *Id.* at 1164, 1167.

8        The SEC ignores *Paracor* and the facts here that are even more compelling

9   than those in *Paracor*.  Similar to the CEO in *Paracor*, while Mr. Jensen may have

10  been consulted on and participated in major transactions in the company's early

11  days, he was not involved in the day-to-day management of Basin Water after

12  Michael Stark was hired in October 2006.  *See* Defendants' Responses to SEC Fact ¶

13  4 (Mr. Stark took over the management of the Basin Water in 2006) and No. 6

14  (Stark's role in running Basin Water).  As set forth in Defendants' Responses to SEC

15  Fact ¶¶ 4-6, Mr. Stark was the primary contact for Basin Water's customers and

16  took over the primary responsibility for Basin Water's daily operations.  Further,

17  Mr. Jensen had no involvement in the VLC or WSS transactions; Mr. Stark was in

18  charge of those transactions.  *See* Defendants' Responses to SEC Fact ¶ 135

19  (reliance on Mr. Stark to handle the VLC and WSS transactions) and No. 120 (Mr.

20  Jensen's lack of involvement in those transactions).   In short, the Commission's

21  conclusory assertions of control fail to establish control person liability.

22  **H.    The Remedies Sought By The SEC Are Unsupportable.**

23       In addition to seeking an adjudication as to liability on all claims, the SEC

24  presumptuously seeks to impose remedies – without any trial whatsoever – against

25  Mr. Jensen in the staggering sum of over $17 million dollars.  Even if one assumes

26  that the SEC could establish liability, the remedies sought are based on a double

27  counting of Mr. Jensen's shares, and divorced from any attempt to prove what

28  portions of Mr. Jensen's stock sales could be characterized as "ill-gotten gains."

1     **1. The SEC's disgorgement remedies include shares that were**

2      **not even owned by Mr. Jensen.**

3    The chart submitted by the SEC purporting to show that Mr. Jensen over a

4 three-year period sold 2.15 million shares for total proceeds of 9.145 million dollars

5 has one large problem: it is a fabrication. (*See* Declaration of Roberto Tercero, ¶ 76

6 at 6-8.)  As Basin Water's SEC filings indicate over the years, half of the shares

7 reflected on the SEC's chart were in fact owned by Lorna Jensen. (*See* Defendants'

8 Response to SEC Fact ¶ 18.)  Indeed, in return for her uncompensated services in

9 assisting Mr. Jensen to create Basin Water and operate the company in its early

10 days, Mrs. Jensen had been receiving her own shares of Basin Water stock many

11 years before the IPO.  The testimony of both Peter Jensen and Lorna Jensen in this

12 matter confirm that shares belonging to both Lorna and Peter were deposited into

13 joint accounts. (*See* Defendants' Response to SEC Fact ¶¶ 18, 167.)  Mrs. Jensen

14 controlled the sale of her shares and instructed how proceeds from the sale of her

15 shares should be distributed. (*See* Defendants' Response to SEC Fact ¶¶ 18, 167.)

16    **It should go without saying, but apparently must be said, that the**

17 **government cannot simply seize the property of innocent persons who are not**

18 **even before the Court.**  Lorna Jensen is not a party to this lawsuit, and the SEC

19 cannot seek disgorgement of her property without due process.  *See, e.g., SEC v.*

20 *Ross*, 504 F.3d 1130, 1140-41 (9th Cir. 2007) (finding no jurisdiction over owner

21 and property where Receiver never filed a complaint against owner and never

22 named him as a relief defendant; receiver "failed to take steps consistent with the

23 Due Process Clause"); *SEC v. McGinn,* 752 F.Supp.2d 194, 219 (N.D.N.Y. 2010)

24 (denying asset freeze over house owned in defendant's wife's name as she was "not

25 a party to this action in any capacity") (*reversed on other grounds* by *SEC v.*

26 *Wojeski*, 752 F.Supp.2d 220 (S.D.N.Y. 2010).   All of the SEC's demands for

27 monetary remedies and penalties start from its *knowingly* flawed premise that Mr.

28 Jensen owned all of the shares at issue.  (Motion  at 21-23).  No judgment as to

1  monetary remedies and penalties can be granted when, even assuming liability, the

2  SEC begins the calculation process by inflating Mr. Jensen's shares by 100%.

3          **2.**       **Any "Disgorgement" is Limited To Unjust Enrichment.**

4         Peter Jensen founded Basin Water and created it from nothing.  Along the

5  way, Mr. Jensen sold some of his founder's shares.  In connection with its insider

6  trading claim and demand that Mr. Jensen "reimburse" Basin Water for profits

7  under Section 304, the SEC would have this Court disgorge[2] all of the proceeds he

8  realized from such sales, regardless of what portion, if any, is attributable to the

9  supposedly fraudulent accounting.  By the SEC's reasoning, if the transactions in

10  question inflated Basin Water's share value by just one penny, it is entitled to an

11  order disgorging all of the $4.5 million that Mr. Jensen received from selling his

12  founder's shares.  No court has ever consented to such overreaching by the SEC.

13         Disgorgement must be limited only to the amount by which the defendant

14  "profited from his wrong doing.  *Any further sum would constitute a penalty*

15  *assessment.*"  *SEC v. Blatt*, 583 F.2d 1235, 1335 (5th Cir. 1978) (emphasis added).

16  *See also SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972)

17  (holding that defendant could be compelled only to disgorge profits and interest

18  _____

19  [2] The SEC appears to distinguish "disgorgement" from "reimbursement" under

20  Section 304 of Sarbanes-Oxley and argues that virtually all proceeds that Mr. Jensen realized from stock sales should also be "reimbursed" to Basin Water as profits.

21  (Motion at 22-23).  But the "reimbursement" remedy under Section 304 is also limited to proceeds from ill-gotten gains.  *In re Digimarc Corp. Derivative Litig.*,

22  549 F.3d 1223, 1233 (9th Cir. 2008), the Ninth Circuit  interpreted Section 304 as a

23  disgorgement "remedy" requiring reimbursement of "*ill-gotten* gains." (emphasis added).  Furthermore, it makes no sense that Mr. Jensen's sale of stock that he

24  retained *from his founding of the Company* is subject to any provision of Section

25  304 calling for a CEO to "reimburse" the Company for incentive-based compensation or stock sale proceeds received by the CEO.  No court has held that

26  where a CEO created the company and the stock he held that Section 304 requires

27  the CEO to reimburse the company for proceeds from the sale of such stock.

28

1   wrongfully obtained).  Because disgorgement serves to prevent unjust enrichment,

2   the SEC must distinguish between legally and illegally obtained profits.  *SEC v.*

3   *First City Financial Corporation*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).  The

4   amount of disgorgement must be "a reasonable approximation of profits causally

5   connected to the violation."  *First City*, 890 F.2d at 1231; *see also Wellman v.*

6   *Dickinson*, 682 F.2d 355, 368 (2d Cir. 1982) ("the loss complained of must proceed

7   directly and proximately from the violation claimed and not be attributable to some

8   supervening cause") (citation omitted).

9        Here, the SEC does note attempt to identify the increase in the amount of

10   proceeds, if any, received by Peter Jensen that was caused by the putative

11   misrepresentations.  On the other hand, Mr. Jensen's independent expert estimates

12   that if the Opus, Thermax and other transactions that were restated due to revenue

13   recognition issues had been accounted for originally in the manner that the SEC

14   recommends, the effect on Mr. Jensen's (and his wife's) Basin Water holdings

15   would have been approximately $96,000. (Declaration of William Forman, ¶ 4, Ex.

16   C (August 1, 2012 Report of William Beaver).)  Instead of crunching the numbers,

17   the SEC relies on inapposite cases that involve the illegal sale of unregistered stock

18   – in other words, where the stock was worthless.  *See SEC v. Platforms Wireless*

19   *Int'l Corp.*, 617 F.3d 1072, 1097 (9th Cir. 2010) (defendants sold unregistered stock

20   that "could not be sold to the public *at all*." *SEC v. JT Wallenbrock & Associates*,

21   440 F.3d 1109, 1115 (9th Cir. 2006) (affirming disgorgement without deduction for

22   business and operating expenses because defendants' "entire business enterprise and

23   related expenses were not legitimate at all.") *See also United States v. Zolp*, 479

24   F.3d 715, 720-21 (9th Cir. 2007) (rejecting finding for loss calculation that shares

25   were "worthless" "because the stock continued to have value during the fraud …

26   and after").  The SEC does not claim, much less point to a factual record, that Basin

27   Water was a sham and had worthless stock.  The failure of the SEC to isolate the

28

23

1  portion of Mr. Jensen's stock proceeds supposedly inflated by fraud defeats the

2  demand for a judgment of disgorgement.

3  **I.      No Other Civil Penalty Is Warranted.**

4        The SEC also seeks the *maximum* fines under the Insider Trading and

5  Securities Fraud Enforcement Act of 1988 ("ITSFEA"), Section 21A of the

6  Exchange Act.   Notably, the SEC omits the factors to determine whether such a

7  penalty under the ITSFEA is warranted.  These factors include: (1) whether the

8  violation is egregious; (2) whether the conduct is of a repeated nature; (3) the

9  defendant's financial worth; (4) whether the defendant concealed his trading; (5)

10  other penalties arising as the result of the defendant's conduct; and (6) whether the

11  defendant is employed in the securities industry.  *See SEC v. Mellert*, 2006 U.S.

12  Dist. LEXIS 14070, at *3 (N.D. Cal. Mar. 28, 2006), *citing SEC v. Sargent*, 329 F.

13  3d 34, 42 (1st Cir. 2003).  Taking into account these factors, the SEC has failed to

14  proffer any evidence that would warrant any such penalty under ITSFEA.  *See, e.g.,*

15  *Mellert,* 2006 U.S. Dist. LEXIS 14070, at *5.  The SEC also seeks the harshest

16  penalties allowable under Section 21(d)(3)(B)(iii) of the Exchange Act, 15 U.S.C. §

17  78u(d)(3)(B)(iii).  For the reasons stated above, the SEC has failed to prove that Mr.

18  Jensen acted with the requisite scienter in connection with the Opus and Thermax

19  transactions.  For that reason alone, the SEC's request should be denied.

20  **J.      No Injunctive Relief Is Warranted.**

21        To obtain a permanent injunction, "the SEC has the burden of showing there

22  was a reasonable likelihood of future violations of the securities laws."  *SEC v.*

23  *Murphy*, 626 F. 2d 633, 655 (9th Cir. 1980) (citations omitted).  Further, there is "no

24  per se rule requiring the issuance of an injunction upon the showing of [a] past

25  violation." *SEC v. Koracorp Indus., Inc*., 575 F. 2d 692 (9th Cir.), cert. denied, 439

26  U.S. 953 (1978).  In "predicting the likelihood of future violations," the totality of

27  the circumstances include factors such as (1) the degree of scienter involved; (2) the

28  isolated or recurrent nature of the infraction; (3) the defendant's recognition of the

1  wrongful nature of his conduct; (4) the likelihood, because of defendant's

2  professional occupation, that future violations might occur; and (5) the sincerity of

3  his assurances against future violations.  *See Murphy*,  626 F. 2d at 655.

4          While the SEC enumerates the *Murphy* factors, it fails to demonstrate how

5  any facts in Mr. Jensen's case merit permanent exclusion.  *See Steadman v. SEC*,

6  603 F.2d 1126, 1140 (5th Cir. 1979).   Moreover, the SEC has failed to make its

7  requisite showing of scienter as to Mr. Jensen.  For these reasons, the SEC's request

8  should be denied.  For these same reasons, the SEC's demand for a permanent

9  Officer and Director bar must be denied.

10  **IV.    <u>CONCLUSION</u>**

11          The SEC has overreached in this Motion.  The SEC has simply ignored the

12  law and facts that it does not like.  For these and the other reasons stated above, the

13  SEC's Motion for Summary Judgment must be denied in its entirety.

14  DATED: August 14, 2012          Respectfully submitted,

15                                  SCHEPER KIM & HARRIS LLP
16                                  DAVID C. SCHEPER
17                                  WILLIAM H. FORMAN
                                    JEAN M. NELSON
18

19

20                                  By:   /s/ David C. Scheper
21                                        David C. Scheper
                                          Attorneys for Defendant Peter L. Jensen
22

23

24

25

26

27

28

25