1    **SCHEPER KIM & HARRIS LLP**
     DAVID C. SCHEPER (State Bar No. 120174)
2    dscheper@scheperkim.com
     WILLIAM H. FORMAN (State Bar No. 150477)
3    wforman@scheperkim.com
     JEAN M. NELSON (State Bar No. 150856)
4    jnelson@scheperkim.com
     601 West Fifth Street, 12th Floor
5    Los Angeles, CA  90071-2025
     Telephone: (213) 613-4655
6    Facsimile:  (213) 613-4656

7    **Attorneys for Defendant**
     **Peter L. Jensen**

8

9                 **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11                        **CENTRAL DIVISION**

12

13   SECURITIES AND EXCHANGE              CASE NO. CV11-05316 R (AGRx)
     COMMISSION,                          [Assigned to Hon. Manuel L. Real]
14
                    Plaintiff,            **MEMORANDUM OF POINTS AND**
15                                        **AUTHORITIES IN SUPPORT OF**
            v.                            **DEFENDANT PETER L. JENSEN'S**
16                                        **MOTION FOR PARTIAL**
     PETER L. JENSEN AND THOMAS C.        **SUMMARY JUDGMENT**
17   TEKULVE, JR.,
18                  Defendants.           Date:    September 17, 2012
                                          Time:    10:00 a.m.
19                                        Crtrm.:  8
20   ─────────────────────────────        Trial Date: October 16, 2012
21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................... 1

II.    STATEMENT OF FACTS ........................................................... 3

    A.    Peter and Lorna Jensen's Creation of Basin Water ................. 3

    B.    Development of Financial Controls and Certification Process .............. 5

    C.    In Late 2006, Michael Stark Takes Over Daily Operations ................. 7

    D.    Mr. Stark Controls the VLC and WSS Transactions ............................. 8

III.    MR. JENSEN IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ................................................................................. 10

    A.    The Fraud-Based Claims Regarding the VLC and WSS Transactions (First, Second, and Third Causes of Action) Fail Because There Is No Evidence of Scienter ........................................... 11

    B.    The SEC Cannot Establish "Control Person" Claims Under Section 20(a) Pertaining to the VLC and WSS Transactions (Second and Third Causes of Action) .................................................. 14

        1.    Mr. Jensen Was Not a Control Person During the Period of the VLC and WSS Transactions ............................................... 15

        2.    Even If Mr. Jensen Was a Control Person, Mr. Jensen's Good Faith Defense Absolves Him of Any Liability ................. 16

    C.    As A Matter of Law, The SEC Is Not Entitled To Remedies that Seek Disgorgement of Stock Proceeds Belonging to Lorna Jensen .................................................................................................. 18

    D.    The SEC is Not Entitled to Its Purported Disgorgement Remedy ....... 19

    E.    The SEC Is Not Entitled to Disgorge All of Mr. Jensen's Sales Proceeds Under SOX 304 ..................................................... 21

        1.    There is No "Profit" Subject to a Section 304 Remedy ............. 22

        2.    If There Are Any Section 304 Profits, They Must be Limited to Ill-Gotten Gains ................................................................ 24

IV.    CONCLUSION ........................................................................ 25

i

# <u>TABLE OF AUTHORITIES</u>

<u>Federal Cases:</u> <u>Page(s):</u>

*CEC Entm't, Inc. v. Kobra Props.,*
   2008 U.S. Dist. LEXIS 91179 (E.D. Cal. Oct. 24, 2008) ...............................11

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ..........................................................................................10

*Dellastatious v. Williams,*
   242 F. 3d 191 (4th Cir. 2001) ..........................................................................17

*Donohoe v. Consol. Operating & Prod. Corp.,*
   30 F. 3d 907 (7th Cir. 1994) .............................................................................17

*Dura Pharmaceuticals v. Broudo,*
   544 U.S. 336 (2005) ..........................................................................................25

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976) ..........................................................................................12

*Hollinger v. Titan Capital Corp.,*
   914 F. 2d 1564 (9th Cir. 1990) .........................................................................12

*Houghton v. South,*
   965 F.2d 1532 (9th Cir. 1992) ..........................................................................10

*Howard v. SEC,*
   376 F.3d 1136 (D.C. Cir. 2004) ........................................................................13

*In re Digimarc Corp. Derivative Litig.,*
   549 F.3d 1223 (9th Cir. 2008) ..........................................................................24

*In re Downey Sec. Litig.,*
   2009 U.S. Dist. LEXIS 83443 (C.D. Cal. Aug. 21, 2009) ..............................15

*In re Hansen Sec. Litig.,*
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...........................................................15

*In re Immune Response Sec. Litig.,*
   375 F. Supp. 2d 983 (S.D. Cal. 2005) ..............................................................15

*In re REMEC Sec. Litig.,*
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................................13, 14

*In re Silicon Graphics Inc. Sec. Litig,*
   183 F. 3d 970 (9th Cir. 1999) ...........................................................................12

*In re Worlds of Wonder,*
   35 F.3d 1407 (9th Cir. 1994) ............................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ..........................................................................................10

# <u>TABLE OF AUTHORITIES – Cont'd</u>

**<u>Federal Cases:</u>**                                                                 **<u>Page(s):</u>**

*Paracor Finance, Inc., et al. v. Gen. Electr. Capital Corp., et al.,*
  96 F.3d 1151 (9th Cir. 1996)....................................................14, 15, 16

*Pedroli v. Bartek,*
  564 F. Supp. 2d 683 (E.D. Tex. 2008.) ..........................................14

*SEC v. Blatt,*
  583 F. 2d 1325 (5th Cir. 1978)...................................................20, 24

*SEC v. Cavanagh,*
  445 F. 3d 105 (2d Cir. 2006) ...........................................................24

*SEC v. First City Financial Corporation,*
  890 F. 2d 1215 (D.C. Cir. 1989) ...............................................20, 24

*SEC v. First Pac. Bancorp,*
  142 F. 3d 1186 (9th Cir. 1998)........................................................20

*SEC v. Manor Nursing Centers, Inc.,*
  458 F. 2d 1082 (2d Cir. 1972)........................................................20

*SEC v. McGinn,*
  752 F. Supp. 2d 194 (N.D.N.Y. 2010) ...........................................18

*SEC v. Platforms Wireless Int'l Corp.,*
  617 F. 3d 1072 (9th Cir. 2010)........................................................20

*SEC v. Ross,*
  504 F. 3d 1130 (9th Cir. 2007)........................................................18

*SEC v. Snyder,*
  2006 U.S. Dist. LEXIS 81830 (S.D. Tex. 22, 2006)......................20

*SEC v. Wojeski,*
  752 F. Supp. 2d 220 (S.D.N.Y. 2010)............................................18

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.,*
  178 F. Supp. 2d 1099 (C.D. Cal. 2001)..........................................11

**<u>Federal Statutes:</u>**

15 U.S.C. § 78t(a) .................................................................................2

15 U.S.C. §7243(a) ......................................................................Passim

15 U.S.C. § 77q(a) ................................................................................1

# TABLE OF AUTHORITIES – Cont'd

**Federal Rules:**                                                                    **Page(s):**

Fed. R. Civ. Proc. 56............................................................................1

Fed. R. Civ. Proc. 56(a) ......................................................................10

**Federal Regulations:**

17 C.F.R. § 240.10b-5 ..........................................................................2

17 C.F.R. § 240.12b-20 ........................................................................2

17 C.F.R. § 240.13a-1 ..........................................................................2

17 C.F.R. § 240.13a-13 ........................................................................2

**Other Authorities**

FIN 46R ......................................................................................12, 14

# I.   __INTRODUCTION__

On June 24, 2011, when the SEC initiated this action, it leveled charges against Peter Jensen that not only lacked evidentiary support, but were, in several instances, flatly contrary to the evidence in its possession.  Now, fourteen months later, and after the depositions of 23 fact witnesses, the SEC continues to ignore the facts on the ground, having moved last month for summary judgment on the entirety of the profuse allegations, claims, and remedies found in its 57-page Complaint.

Mr. Jensen's own Motion for Partial Summary Judgment deals with the facts as they are, and is more modest in scope.  While the record shows that there is no merit to *any* part of the SEC's case, Mr. Jensen brings this motion for partial summary judgment on the following claims, issues and remedies that unquestionably are beyond dispute and are ripe for resolution without trial:

***Mr. Jensen's lack of scienter with respect to the VLC and WSS transactions.***[1] The SEC has failed to develop any evidence showing that Mr. Jensen knew that recognition of revenue from the VLC and WSS transactions in 2007 in any way constituted fraud.  Indeed, every witness who was asked confirmed that Mr. Jensen had no involvement in these transactions and exercised no role in the recognition of revenue from the transactions. Accordingly, the SEC's fraud-based claims against Mr. Jensen with respect to these transactions (first cause of action, violation of Section 17(a)(1) of the Securities Act (15 U.S.C. § 77q(a)),  second

---

[1] In addition to the VLC and WSS transactions, the SEC alleges that Mr. Jensen committed fraud in connection with two other transactions referred to as Opus and Thermax.  While Mr. Jensen vigorously denies any fraud with respect to the Opus and Thermax transactions, he acknowledges that he had some involvement in both Opus and Thermax, and that the SEC disputes the accounting for those transactions. Accordingly, Mr. Jensen does not move for summary judgment on the Opus and Thermax transactions, giving due consideration to the standards for granting summary judgment under FRCP 56.

1  cause of action, violation of Section 10(b) of the Exchange Act (15 U.S.C. §78j(b),

2  SEC Rule 10b-5, 17 C.F.R. § 240.10b-5), and third cause of action, violation of

3  Section 13(a) of the Exchange Act (15 U.S.C. § 78m(a), and SEC Rules 12b-20,

4  13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13), should

5  not proceed to trial.

6       ***No control person liability with respect to the VLC and WSS transactions***.

7  Mr. Jensen was not a control person during the time of the VLC and WSS

8  transactions.  Other than the assertion that Mr. Jensen was CEO of Basin Water and

9  2007, the SEC has failed in its attempts to develop *facts* showing that Mr. Jensen

10  was a "control person" for purposes of Section 20 liability under the Exchange Act

11  (15 U.S.C. §78t(a)) (Second and Third Causes of Action).  Again, witness after

12  witness in this matter has confirmed that Michael Stark, Mr. Jensen's designated

13  successor, had effectively taken control of Basin Water from Mr. Jensen in early

14  2007, and that Mr. Jensen played no role in the VLC and WSS transactions

15  themselves or in the accounting for those transactions.

16       ***No disgorgement of Mrs. Jensen's stock sale proceeds***.  The SEC seeks

17  through various remedies disgorgement of $9 million in stock sales from Peter

18  Jensen, choosing to ignore the evidence plainly showing that Mr. Jensen did not

19  own roughly half of the shares that were sold.  Every witness with knowledge of the

20  subject has testified that approximately half of the shares allegedly sold by Mr.

21  Jensen from 2006 through 2008 in fact belonged to Mrs. Lorna Jensen as her sole

22  and separate property.  As a matter of law, the SEC cannot proceed against the

23  proceeds from the sale of Mrs. Jensen's stock, and those amounts must be excluded

24  from any disgorgement or other remedy sought against Peter Jensen.

25       ***No basis for Section 304 reimbursement***.  The SEC's claim for

26  reimbursement under Section 304 of the Sarbanes-Oxley Act ("SOX") (15 U.S.C.

27  §7243(a)) (Seventh Cause of Action) cannot proceed because Mr. Jensen did not

28  realize any profit subject to reimbursement.  Many years before the events at issue

1  in this matter, Mr. Jensen received his Basin Water shares in recognition for his

2  contributions as the founder of the company and his service at below-market

3  compensation.  Before any alleged misrepresentation was made to the market

4  regarding Basin Water, Mr. Jensen's Basin stock had a market value of $25 million.

5  As the stock price dropped, he ultimately realized far less than that – approximately

6  $4.5 million when he sold stock.  The SEC relies on an unfounded interpretation of

7  Section 304 to claim that the *entirety* of that $4.5 million is profit and should be

8  taken from him.  The SEC is wrong:  Mr. Jensen clearly lost money by not selling

9  stock when he could have, and thus should not be compelled to reimburse Basin

10  Water any amount.  In the alternative, controlling authority requires that this Court

11  reject the SEC's construction of "profits" under Section 304 and limit any Section

12  304 reimbursement to the gain (if any) in share value realized by Mr. Jensen that

13  was caused by the wrongdoing alleged in the Complaint.

14       A full and complete factual record exists for this Court to resolve each of the

15  issues above.  The Court should trim this matter for trial and dispose of those claims

16  and issues for which there is no dispute as a matter of law.

17  II.   **STATEMENT OF FACTS**

18       A.   **Peter and Lorna Jensen's Creation of Basin Water**

19       Peter Jensen is a chemical engineer who developed a low-cost, efficient way

20  to provide municipalities with safe, clean drinking water by removing contaminants

21  such as nitrate, perchlorate, arsenic, uranium, and chromium-6.  (Jensen's Statement

22  of Undisputed Facts ("Fact") No. 1.)  In 1999, Mr. Jensen started Basin Water, Inc.

23  ("Basin Water") with the help of his wife Lorna Jensen.  (Fact No. 2.)  Mr. Jensen

24  created the vision for Basin Water, which was to provide ion-exchange water

25  treatment units with footprints small enough to clean contaminated well-water at the

26  well head while creating far less waste water than the treatment systems of other

27  companies in the field.  (Fact No. 3.)  To execute this vision, Mr. Jensen put

28  together a team of engineers and scientists to develop a mobile, prototype ion-

1  exchange water treatment unit, and obtained for Basin Water several patents

2  developed by him and the members of his team.  (Fact No. 4.)

3        In February 2000, Basin Water's Board of Directors authorized a grant of

4  950,000[2] shares to Mr. Jensen for the contributions in time and money he had made

5  and in lieu of a market-rate salary for his service as Basin Water's Chief Executive

6  Officer and President.  (Fact No. 7.)  Critical to the remedies the SEC is seeking in

7  this case is its assumption that all of those original founder's shares remained Peter

8  Jensen's sole property and should be subject to disgorgement.  This assumption is

9  incorrect.  Peter and Lorna Jensen agreed that they would share Mr. Jensen's interest

10  in his stock in the fledgling company.  (Fact No. 8.)  Accordingly, from 2001

11  through September 2005, Mr. Jensen periodically transferred large blocks to Mrs.

12  Jensen as her sole and separate property.  (Fact No. 9.)  By September 2005 (eight

13  months before Basin Water went public), Mrs. Jensen owned as her sole and

14  separate property approximately 1,320,000 shares. (Fact No. 10.)

15        At Mrs. Jensen's suggestion, she and Mr. Jensen entered into a Voting Trust

16  Agreement in 2002, which gave Mr. Jensen the right to vote Mrs. Jensen's shares.

17  (Fact No. 11.)  Although Mr. Jensen had the right to vote Mrs. Jensen's shares

18  pursuant to the Voting Trust Agreement, Mrs. Jensen specifically retained

19  ownership over the shares, and Mr. Jensen did not have the power either to sell Mrs.

20  Jensen's shares or force her to sell them.  (Fact No. 12.)  Consistent with the Voting

21  Trust Agreement, Lorna Jensen exercised control over her shares.  The Jensens

22  jointly made decisions regarding whether and how many of their respective shares to

23  sell, and Mrs. Jensen controlled the proceeds from the sales.  (Fact No. 13.)

24

25  _____

26  [2] This amount increased to at total of 2,850,000 shares after a three-to-one stock

27  split in October 2001.  (Solar Dec., ¶ 11.)

28

1   By the time of Basin Water's Initial Public Offering ("IPO"), Mr. and Mrs.

2   Jensen owned 2,777,857 shares, of which approximately 1,320,000 shares belonged

3   to Lorna Jensen.  (Fact No. 14.)  Together, their shares of Basin Water stock had a

4   market value of approximately $47 million in the weeks following the IPO.  (Fact

5   No. 15.)  Nonetheless, neither Mr. Jensen nor Mrs. Jensen sold any of their shares in

6   the IPO or for approximately six months thereafter. (Fact No. 16.)

7   In December 2006, Mr. and Mrs. Jensen each sold 25,000 shares, and then

8   placed 200,000 shares each into a formal 10b5-1 plan, effectively ending any say

9   either of them had on the timing of the sale of those shares.  (Fact No. 18.)  That

10  10b5-1 plan remained in effect, unmodified, throughout the Jensens' tenure at Basin

11  Water.  (Fact No. 19.)  The great majority of Mr. and Mrs. Jensen's shares remained

12  outside the 10b5-1 plan.  (Fact No. 20.)  While Mr. and Mrs. Jensen worked at Basin

13  Water, the remainder of their sales were pursuant to the 10b5-1 plan, over which

14  neither Jensen had control.  (Fact No. 21.)  All of the sales pursuant to the 10b5-1

15  plan occurred between February and July of 2007.  *Id*.  Mr. Jensen and Mrs. Jensen

16  did not sell any of their respective remaining shares until well after they left Basin

17  Water in 2008.  (Fact No. 23.)

18      **B.**     **Development of Financial Controls and Certification Process**

19  In its own motion for summary judgment (Doc. No. 40-1)("SEC Motion"),

20  the SEC attempts to portray Peter Jensen as a CEO who knowingly manipulated

21  deals to recognize illusory income in willful violation of accounting rules.  The

22  evidence shows otherwise:  Peter Jensen was an executive with little accounting

23  experience, acknowledged this shortcoming, hired competent professionals, and let

24  them do their work without any interference from him.  (Fact No. 24.)  In other

25  words, Mr. Jensen acted in a manner entirely opposite to that of a man who is

26  attempting to perpetrate an accounting fraud.

27  As Basin Water grew through the years, Mr. Jensen realized he needed a

28  larger and more sophisticated accounting department, especially because he had

little accounting experience of his own.  *Id*.  Mr. Jensen hired Thomas Tekulve in 2004 as Chief Financial Officer to establish financial controls to support Basin Water.  (Fact No. 25.)

Mr. Jensen and Mr. Tekulve took several steps to build proper accounting, financial, and legal systems within Basin Water to ensure the accurate reporting of financial information and in order to make Basin Water "a[s] solid [an] organization as humanly possible."  (Fact No. 26.)  To that end, Mr. Tekulve developed and implemented policies and procedures designed to meet public reporting requirements, including hiring personnel and implementing procedures to generate financial statements that Mr. Jensen would certify.  (Fact No. 27.)

Next, Mr. Tekulve sought out an independent auditing firm to review Basin Water's financial statements.  (Fact No. 29.)  Because Basin Water had a relatively small finance department, Tekulve wanted an auditing firm with whom he could consult on accounting issues.  *Id*.  Tekulve recommended Singer Lewak Greenbaum & Goldstein LLP ("Singer") as Basin Water's auditor in part because Gale Moore, Singer's audit partner, agreed to act as a sounding board for Tekulve on accounting questions.  (Fact No. 30.)  In addition to the outside auditor, Basin Water also received legal advice from Keith R. Solar, an attorney and board member, and Latham & Watkins.  (Fact No. 31.)  With these professionals in place, in May 2006, Basin Water raised approximately $75 million through its IPO.  (Fact No. 32.)

As Basin Water's CEO, Mr. Jensen was required to certify the accuracy of Basin Water's financial statements.  When certifying Basin Water's financials, Mr. Jensen was aware that Basin Water's finance department, outside auditors, Audit Committee, and attorneys reviewed Basin Water's filings and transactions to ensure accuracy and compliance with the applicable laws and regulations.  (Fact No. 33.)  For instance, Singer performed quarterly reviews and annual audits at Basin Water's headquarters.  (Fact No. 34.)  Basin Water gave Singer's auditors access to all of Basin Water's contract files, and Basin Water maintained an open dialogue with

Singer about Basin Water's transactions.  (Fact No. 35.)  Basin Water discussed accounting issues with Singer by phone, at Basin Water's Audit Committee meetings, and during Singer's quarterly reviews and yearly audits.  (Fact No. 36.) Gale Moore testified that Basin Water's management was "always very consultative with the [Singer] audit team" and "always appeared to be very concerned that they were accounting for transactions appropriately." (Fact No. 37.)

Basin Water's Audit Committee also oversaw Tekulve and Singer's work. (Fact No. 38.)  Singer met with Basin Water's Audit Committee at least quarterly and Singer concluded in a 2007 year-end audit workpaper that "the potential risk of material misstatement due to fraud . . . is low because the Audit Committee pays close and detail [sic] attention to operations and transactions."  (Fact No. 39.)  At the end of each Audit Committee meeting, Singer reported on its relationship with management and any impediments it had.  (Fact No. 40.)  Legal counsel also served as the secretary for meetings of Basin Water's Audit Committee.  (Fact No. 41.)

In addition to Basin Water's formal accounting and compliance functions, Mr. Jensen generally fostered an atmosphere of ethical compliance and business conduct.  (Fact No. 42.)  Mr. Jensen never instructed any Basin Water employee to withhold any information from Mr. Tekulve or Singer.  (Fact No. 43.)  Mr. Tekulve is unaware of any information being deliberately withheld from Singer. *Id.*  As a result, Mr. Jensen understood that Basin Water's financial transactions were receiving adequate oversight and that all material facts regarding Basin Water's revenues were being disclosed.  (Fact No. 44.)

### C.   In Late 2006, Michael Stark Takes Over Daily Operations

Soon after Basin Water went public in May 2006, Mr. Jensen decided to replace himself with someone who had greater experience in running a national service organization.  (Fact No. 45.)  Mr. Jensen approached Michael Stark about joining Basin Water because Mr. Stark recently had served as CEO of the North American division of Veolia, the world's largest water utility and services company.

1   (Fact No. 46.)  Mr. Stark was also familiar with Basin Water, having twice

2   attempted to invest in and/or purchase it.  (Fact No. 47.)  Mr. Stark started at Basin

3   Water in October 2006 as President and Chief Operating Officer.  (Fact No. 48.)

4          By early 2007, Mr. Stark had effectively "taken over" from Mr. Jensen nearly

5   all aspects of managing Basin Water.  (Fact No. 49.)  Most importantly, Mr. Stark

6   had taken complete control of deal negotiations and executive oversight of Basin

7   Water's accounting and finance functions.  (Fact No. 50.)  At Mr. Stark's request,

8   Mr. Jensen did not involve himself in deal negotiations or interactions with

9   customers.  (Fact No. 51.)  Similarly, Mr. Tekulve began reporting directly to Mr.

10  Stark.  (Fact No. 53.)  In particular, Mr. Stark directed Mr. Tekulve in early 2007 to

11  find a way to obtain third-party financing for systems already under contract with

12  municipalities.  (Fact No. 54.)  Mr. Stark's directive to generate third-party

13  financing led to the VLC and WSS transactions in 2007.  *Id.*

14          **D.    Mr. Stark Controls the VLC and WSS Transactions**

15          In 2007, Mr. Stark stated in conference calls with market analysts his

16  intention to engage in third-party financed sales as a means of generating cash and

17  revenue for Basin Water.  (Fact No. 55.)  Mr. Stark arranged the hiring of a

18  consultant, Charles Litt, to conduct these financing transactions, oversaw the

19  negotiation of them, participated in Basin Water meetings concerning them, and

20  informed the investing public about these transactions.  (Fact No. 56.)  At Mr.

21  Stark's direction, Mr. Tekulve began working with Mr. Litt, who pursued financing

22  arrangements with financial institutions whereby Basin Water would sell leased

23  units and transfer its rights to the capital portion of the lease payments in exchange

24  for a quicker cash recovery of its investment in building the units.  (Fact No. 57.)  A

25  series of these third-party financed sales – known as VLC and WSS – are the subject

26  of some of the SEC's allegations against Mr. Jensen.  (Fact No. 58.)

27          Mr. Jensen had no involvement whatsoever with the negotiation of or

28  accounting for the VLC or WSS transactions.  (Fact No. 59.)  Mr. Jensen was not

present at the Audit Committee meeting where the VLC transactions were discussed. (Fact No. 60.)  Also, Mr. Jensen's undisputed testimony states that he was only generally aware of the VLC transactions and knew even less about the WSS transactions.  (Fact No. 61.)  Mr. Jensen had no understanding of what VL Capital was, how it came to be created, or even whether it was related to Basin Water in any way.  *Id.*  What's more, Mr. Jensen had no understanding as to whether the WSS transactions were similar in structure to the VLC transactions. (Fact No. 61.)

Using Basin Water's audit and review process, Singer and Basin Water's Audit Committee reviewed and approved the transactions at issue.  (Fact No. 62.) With respect to VLC, Singer undertook an intensive review of the transactions. (Fact No. 63.)  It reviewed relevant transaction documents; spoke to Basin Water's outside counsel about the binding nature of Basin Water's agreement with VLC; spoke to Lloyd Ward, VLC's sole member; reviewed Basin Water's White Paper; and discussed the transactions with Basin Water's Audit Committee.  *Id.*  After this review, Singer and the Audit Committee approved (1) the VLC transactions, (2) the company's accounting treatment for VLC, and (3) disclosure of the transactions in the second quarter Form 10-Q.  (Fact No. 65.)

With respect to the WSS transactions, Mr. Tekulve reviewed and edited another comprehensive White Paper describing the WSS transaction and the company's proposed accounting treatment.  (Fact No. 66.)  During its review of the third quarter financial statements, Singer considered the WSS White Paper and spoke by telephone to Mr. Ward and Mr. Litt regarding the WSS transactions.  (Fact No. 67.)  Singer agreed with Basin Water's decision to recognize revenue for the WSS transactions in the third quarter of 2007.  (Fact No. 68.)  At the conclusion of its year-end audit for 2007, Singer rendered a clean audit opinion related to Basin Water's 2007 financial statements.  (Fact No. 69.)  Mr. Jensen did not certify Basin Water's 2007 10-K; Mr. Stark did.

### III.   MR. JENSEN IS ENTITLED TO PARTIAL SUMMARY JUDGMENT

Mr. Jensen is entitled to partial summary judgment on the issues identified below because he can show "that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Specifically, the following claims, issues of law, and remedies should be adjudicated in Mr. Jensen's favor:

- The SEC's fraud claims against Mr. Jensen in connection with the VLC and WSS transactions fail because there is no evidence that he had any involvement at all with these transactions, much less acted with fraudulent intent.

- The SEC's claims of control person liability against Mr. Jensen in connection with the VLC and WSS transactions fail because Michael Stark had taken control of Basin Water by the time of these transactions and Mr. Jensen played no role whatsoever in them.

- As a matter of law, proceeds from Lorna Jensen's sales of her own stock cannot be the subject of the remedies the SEC seeks against Peter Jensen.

- Remedies sought by the SEC contradict controlling authority, as the SEC is seeking to disgorge or otherwise take from Mr. Jensen all proceeds that he realized from the sale of Basin Water stock, without regard to whether any such proceeds were profits or "ill-gotten" gains caused by any fraudulent misrepresentations.

The SEC also has before this Court a motion for summary judgment on these very claims and remedies.  Accordingly, the Court is positioned to dispose of all of these issues on partial summary judgment, and in Mr. Jensen's favor.

The SEC, as the party opposing summary judgment, must point to specific facts establishing a genuine issue of material fact for trial.  *Celotex Corp*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986).  A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party based on that evidence. *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).  If the nonmoving party fails to make such a showing for any of the elements for which it bears the burden of proof, the court should grant summary judgment.   *Celotex Corp*., 477 U.S. at 322.

1   The court can grant summary adjudication of remedies and issues of law, in

2   addition to facts.  *See Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp.

3   2d 1099, 1122 (C.D. Cal. 2001) (granting defendant's motion for summary

4   adjudication on the grounds that disgorgement of all revenues was not available as a

5   matter of law); *see also CEC Entm't, Inc. v. Kobra Props.*, 2008 U.S. Dist. LEXIS

6   91179, at *7-8 (E.D. Cal. Oct. 24, 2008) (noting court on summary adjudication can

7   determine scope of remedies in a contract dispute as a matter of law where there is

8   no genuine factual dispute).  As the facts and the law plainly show, the SEC cannot

9   meet its burden on any of the claims and issues that are subject to this motion.

10   **A.   The Fraud-Based Claims Regarding the VLC and WSS**

11   **Transactions (First, Second, and Third Causes of Action) Fail**

12   **Because There Is No Evidence of Scienter.**

13   The SEC alleges that Mr. Jensen committed fraud in connection with the VLC

14   and WSS transactions because he supposedly knew that the transactions were

15   improperly accounted for, yet continued to certify Basin Water's financial statements

16   that included revenue from these transactions.  But as of yet, despite years of

17   investigation, there is not a single document or witness that supports the SEC's

18   accusations.  Nonetheless, the SEC moved this Court to rule that Mr. Jensen

19   committed fraud in connection with the VLC and WSS transactions.  Summary

20   adjudication with respect to the VLC and WSS transactions is appropriate, but not for

21   the reasons advanced by the SEC.  There is simply no basis for Mr. Jensen to stand

22   trial for fraud on the VLC and WSS transactions.  The SEC itself fails to point to any

23   conduct or any statement demonstrating a fraudulent intent on Mr. Jensen's part.  On

24   the other side of the ledger, the record is replete with evidence of Mr. Jensen's lack

25   of involvement in the transactions and his reliance on the Basin Water accounting

26   staff and its independent auditors to exercise their professional judgment.

27   To establish scienter, the SEC must prove that Mr. Jensen knew that revenue

28   from the VLC and WSS transactions was illusory and that statements attributed to

11

him regarding such revenue were made with knowledge of such falsity and the intent to deceive. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics Inc. Sec. Litig*, 183 F. 3d 970, 979 (9th Cir. 1999).  Negligence, even if inexcusable, is not sufficient. *Hollinger v. Titan Capital Corp.*, 914 F. 2d 1564, 1569 (9th Cir. 1990) (citations and quotations omitted).  While the SEC can "establish scienter by proving either actual knowledge or recklessness," *id*. (quotation omitted), recklessness requires "a form of intentional or knowing misconduct" and, at a minimum, requires a showing of conscious or "deliberate recklessness." *Silicon Graphics*, 183 F. 3d at 976-77.

The record is bereft of any evidence that Mr. Jensen knew that the accounting for the VLC and WSS transactions was improper under FIN 46R[3] and nevertheless certified Basin Water's financial statements.  *All* that the SEC can say about Mr. Jensen's supposed knowledge of falsity is that Mr. Jensen participated in unidentified "internal Basin discussions" and that he failed to "ask questions" about the transactions. (SEC Motion, Doc. No. 40-1 at 16:4-11.)  These allegations, even if true, fall woefully short of the requisite standards of knowledge of falsity or "deliberate recklessness" articulated in *Hochfelder* and *Silicon Graphics*.

The undisputed facts demonstrate that, as acknowledged by the SEC, Mr. Jensen was not an involved actor in the VLC and WSS transactions in any respect. Mr. Stark directed and shepherded these deals through by bringing in his friend, relative, and business associate, Charles Litt, to work with Mr. Tekulve.  (Fact No. 56.)  Mr. Stark, not Mr. Jensen, advised analysts before June 2007 that the first deal, VLC, would generate revenues in the second quarter of 2007.  (Fact Nos. 55-56.)  Further, Mr. Stark, not Mr. Jensen, answered analyst questions about VLC before

_____

[3]  FIN 46R provides guidelines and interpretation of when a Variable Interest Entity must be consolidated with the financial statements of the issuer. *See* Boudreau Declaration, Doc. No. 40-3, Exhibit 4.

1    and after the deal was completed.  *Id.*  In fact, Mr. Stark, not Mr. Jensen, was

2    present at the Audit Committee meeting on August 9, 2007, when the committee

3    and Singer reviewed the VLC transaction.  (Fact No. 60.)  Finally, Mr. Stark, and

4    not Mr. Jensen, signed the management representation letters to Singer Lewak for

5    the second and third quarters of 2007 when revenue from the first VLC and WSS

6    transactions was recognized.  (Fact Nos. 52, 65, 68.)  Mr. Jensen did not instruct

7    anyone at Basin Water or Singer as to how the transactions should be accounted for;

8    indeed, he did not even participate in any discussions as to whether or how revenues

9    should be recognized.  (Fact No. 43; Jensen Opp. Decl. (Doc. No. 40-1) at ¶ 6.)

10   Simply put, the SEC's disapproval of the accounting for the WSS and VLC

11   transactions is not proof of Mr. Jensen's scienter, or even suggestive of it.

12          Mr. Jensen's conduct is consistent only with a *lack* of scienter.  The law is

13   clear that Mr. Jensen's decision to respect the expertise, analysis and conclusions of

14   Basin Water's CFO, President and Chief Operating Officer, accounting department,

15   audit committee, and independent auditor on complicated revenue recognition issues

16   negates an inference of scienter.  *See, e.g., In re REMEC Sec. Litig.*, 702 F. Supp. 2d

17   1202, 1239-1252 (S.D. Cal. 2010); *Howard v. SEC,* 376 F.3d 1136, 1147-48 (D.C.

18   Cir. 2004) (executive's actions did not amount to "an extreme departure from the

19   standards of ordinary care" when executive was told of counsel's advice and

20   followed it, which suggests "good faith") (internal quotations omitted).

21          In *REMEC*, the court granted summary judgment for a CEO under Section

22   10(b), holding that the CEO did not act with scienter when he relied on the

23   accounting decisions made by the company's CFO, accounting department, and

24   outside auditor.  702 F. Supp. 2d at 1239-41.  Like this case, *REMEC* also involved

25   an issue of complexity calling for the expertise of accountants and finance

26   personnel, *i.e.*, when goodwill has been impaired and what forecasts should be used

27   in making such determinations.  Like the CEO in REMEC, Mr. Jensen relied on the

28   "competence and expertise" of Basin Water's professionals, and precludes a

13

1   reasonable trier of fact from concluding by a preponderance of the evidence that he

2   acted with scienter.  *REMEC*, 702 F. Supp. 2d at 1240-1241.  *And the SEC can point*

3   *to no evidence to the contrary*.

4         While Mr. Jensen certified two public filings relevant to the VLC and WSS

5   transactions – the August 14, 2007 Second Quarter Form 10-Q and the November

6   14, 2007 Third Quarter Form 10-Q (*See* Ex. 55, Complaint, ¶¶ 66, 74) –

7   certification, without more, does not establish scienter.[4]  *Pedroli v. Bartek*, 564 F.

8   Supp. 2d 683, 689 (E.D. Tex. 2008.)  Given the level of scrutiny by the company's

9   President and COO, CFO, accounting department, and outside auditors of the VLC

10  and WSS transactions, Mr. Jensen in reviewing those filings had no reason to

11  believe or even suspect that the VLC or WSS transactions required further

12  investigation on his part.  Indeed, it is unreasonable to expect that Mr. Jensen should

13  have waded through all the paperwork involving these transactions when he did not

14  have the necessary accounting expertise to discern whether the VLC and WSS

15  transactions received the proper accounting treatment under FIN 46R.

16      **B.**    **The SEC Cannot Establish "Control Person" Claims Under**

17              **Section 20(a) Pertaining to the VLC and WSS Transactions**

18              **(Second and Third Causes of Action).**

19        The SEC's control-person claim here can only survive if it establishes (1) a

20  violation of the Act[5] and (2) that the defendant directly or indirectly controlled the

21  violator.  *Paracor Finance, Inc., et al. v. Gen. Electr. Capital Corp., et al.*, 96 F.3d

22  _____

23  [4] It is also noteworthy that Mr. Jensen did not sell any stock after the August 14,

24  2007 Form 10-Q while he was at the company (Fact Nos. 18-21), which in and of itself "dispels an inference of scienter."  *REMEC*, 702 F. Supp. 2d at 1246, *citing*

25  *Worlds of Wonder*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("minimal sales of stock also negates an inference of scienter" in summary judgment motion).

26  [5] For the purposes of this motion alone, Mr. Jensen does not dispute the allegations

27  that Basin Water was a primary violator of the Exchange Act.

28

1    1151, 1161 (9th Cir. 1996).  The facts plainly show that the SEC will not be able to

2    establish at trial that Mr. Jensen was a control person for purposes of the VLC and

3    WSS transactions.

4                    **1.    Mr. Jensen Was Not a Control Person During the Period of**

5                    **the VLC and WSS Transactions.**

6           To establish control, the SEC must demonstrate that Mr. Jensen was "active

7    in the day-to-day affairs" of the violator (Basin Water) or that he had "specific

8    control over the preparation and release of the alleged statements."  *In re Immune*

9    *Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031 (S.D. Cal. 2005).  The SEC, aware

10   of all the testimony that Mr. Stark took over for Mr. Jensen and then shepherded the

11   VLC and WSS transactions, nonetheless *itself* moved for summary judgment on

12   control-person liability.  The Court now knows exactly what the SEC's control

13   person argument is:  Mr. Jensen should be held liable under Section 20 merely

14   because he held the title of CEO.  (SEC Motion, Doc. No. 40-1 at 5-6.)  But based

15   on that argument, the Court should grant summary judgment *for Mr. Jensen*.

16   Serving as a CEO, director or other high ranking officer within a company does not

17   create a presumption of control.  The SEC needs to point to more than a lofty title;

18   its failure and inability to do so doom its control-person claims.  *Paracor*, 96 F.3d

19   at 1163; *see also In re Hansen Sec. Litig.*, 527 F. Supp. 2d 1142, 1163 (C.D. Cal.

20   Oct. 17, 2007); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 U.S.

21   Dist. LEXIS 83443, at *49 (C.D. Cal. Aug. 21, 2009) (granting former CEO's

22   motion to dismiss with prejudice and rejecting as insufficient allegations of control

23   based on the defendant's position at the company, participation in setting

24   underwriting guidelines and loan loss reserves, and ownership of company stock).

25          *Paracor* is particularly instructive.  In *Paracor*, investors who purchased

26   debentures brought an action against the corporation, its CEO, and several other

27   directors and officers alleging violations of federal securities laws.  Although the

28   CEO was consulted on every major company decision, the evidence demonstrated

1    that other individuals "managed the company on a day-to-day basis without [the

2    CEO]." *Id*. at 1163 (internal quotation marks omitted).  The CEO was described as

3    "the classic conceptualizer and idea man who leaves behind a long swath of details

4    for someone else to handle." *Id*. (internal quotation marks omitted).  Based on these

5    facts and the CEO's lack of involvement in the challenged transactions, the Court

6    held the CEO was not a "controlling person" and affirmed summary judgment in his

7    favor.  *Id.* at 1164, 1167.

8         Here, it is undisputed that, while Mr. Jensen may have been consulted on and

9    participated in major transactions in the company's early days, he was not involved

10   in the day-to-day management of Basin Water after Michael Stark was hired in

11   October 2006.  (Fact Nos. 48-51.)  It is also undisputed that, as of early 2007, Mr.

12   Stark was the primary contact for Basin Water's customers and took over the

13   primary responsibility for Basin Water's daily operations.  *Id.*  In fact, there is no

14   evidence that Mr. Jensen had *any* involvement in the VLC or WSS transactions, as

15   Mr. Stark was in charge of those transactions.  (Fact Nos. 55-61.)

16        The SEC, in its own Motion, has shown its hand and that all it can say about

17   Mr. Jensen's involvement or "control" in the 2007 to February 2008 time frame is

18   that he held the title of CEO.  Given the unambiguous facts, the SEC could say little

19   else.  In the absence of *facts* showing that Mr. Jensen was a control person, this

20   motion must be granted with respect to the VLC and WSS transactions.

21        **2.    Even If Mr. Jensen Was a Control Person, Mr. Jensen's**

22             **Good Faith Defense Absolves Him of Any Liability.**

23        Even where a defendant is a control person under Section 20(a), the defendant

24   may demonstrate that (i) he acted in good faith, without scienter, and (ii) that he

25   "did not directly or indirectly induce the act or acts constituting the violation." 15

26   U.S.C. § 78t(a); *Paracor*, 96 F. 3d at 1161, 1164 (CEO's lack of involvement in the

27   challenged transaction and lack of absolute control over the day-to-day management

28   of the company was sufficient to prove the good faith defense).  As shown above,

1   Mr. Jensen lacked scienter with respect to the VLC and WSS transactions.  The

2   record also establishes beyond dispute that Mr. Jensen acted in good faith in relying

3   on Basin Water personnel and its outside auditors, and that he did not directly or

4   indirectly play any role in the recognition of revenue from the transactions.

5       Good faith may be negated by reckless conduct, but not by negligence.

6   ("[n]egligence on the part of defendants is insufficient to establish liability."

7   *Dellastatious v. Williams*, 242 F. 3d 191, 194 (4th Cir. 2001).)  Moreover, a

8   defendant's good faith can be established by justifiable reliance on others with

9   technical expertise and on the processes used to draft and review documents.  *See*

10  *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F. 3d 907, 912-13 (7th Cir. 1994)

11  (affirming summary judgment in favor of principals of corporation who relied in

12  good faith on the "superior technical expertise" of other principal defendant);

13  *Dellastatious*, 242 F.3d at 196-197 (affirming summary judgment in favor of

14  corporation's directors who relied in good faith on officers with technical expertise

15  and the corporation's process for drafting and reviewing the offering documents at

16  issue).  The record shows that Mr. Jensen had no involvement in the transactions at

17  issue and had established procedures that he relied on in good faith.  Mr. Jensen was

18  comfortable signing the certifications because he "had faith in [Basin Water's]

19  accounting department; [he] had faith in [Basin Water's] outside auditors." (Fact

20  Nos. 44, 70.)

21      The record demonstrates that Basin Water's accounting department followed

22  the advice of the outside auditors.  For example, in reviewing the 10-Q for the

23  second quarter of 2007, Singer recommended that the Company "beef up" the

24  disclosure regarding the VL Capital transaction.  (Fact No. 64.)  In response, Basin

25  Water's accounting department included additional information.  *Id*.  The fact that

26  Basin Water revised the documents in response to concerns "suggests that a [sic]

27  effective policy was in place and the reviewers were scrutinizing what the drafters

28  wrote."  *See Dellastatious*, 242 F. 3d at 196-197.  As Gale Moore, the engagement

1  partner for Singer testified, Basin Water staff "always appeared to be very
2  concerned that they were accounting for transactions appropriately." (Fact No. 37.)
3  Because Mr. Jensen acted in good faith in adhering to the conclusions of Basin
4  Water's President and COO, CFO, accounting department, audit committee, and
5  outside auditors in recognizing revenue from the VLC and WSS transactions, the
6  Section 20(a) claim fails with respect to those transactions.

7          **C.**    **As A Matter of Law, The SEC Is Not Entitled To Remedies that**
8                **Seek Disgorgement of Stock Proceeds Belonging to Lorna Jensen.**

9         Through various remedies it is seeking, the SEC contends that Mr. Jensen
10  realized approximately $9 million in proceeds from the sale of Basin Water stock
11  and that the entirety of these proceeds must be disgorged.   (Ex. 55, Complaint, ¶ 87
12  at 46-48 (chart calculating gross proceeds as Mr. Jensen's profit); SEC Motion, Doc.
13  No. 40-1 at 22.)  The SEC's position is an astonishing overreach:  approximately
14  half of the stock sales that are subject to the SEC's disgorgement remedies were
15  shares sold by *Mrs.* Jensen.  It is undisputed that Lorna Jensen was the lawful owner
16  of approximately 50% of the shares sold.  (Fact Nos. 9, 10, 14, 22.)  Accordingly, as
17  a matter of law, half the proceeds from stock sales that the SEC contends are subject
18  to this action cannot be subject to any order of disgorgement or other remedy.

19         **It should go without saying, but apparently must be said, that the SEC**
20  **cannot seize the property of unaccused, non-parties.**  The SEC cannot seek
21  disgorgement of Lorna Jensen's share proceeds because she is not a party to this
22  lawsuit.  *See, e.g., SEC v. Ross*, 504 F. 3d 1130, 1140-41 (9th Cir. 2007) (finding no
23  jurisdiction to seize the property of a non-party as ill-gotten gains because the
24  receiver "failed to take steps consistent with the Due Process Clause" by not filing  a
25  complaint against or naming the owner  as a relief defendant ); *SEC v. McGinn,* 752
26  F. Supp. 2d 194, 219 (N.D.N.Y. 2010) (denying asset freeze over house owned by
27  defendant's wife as she was "not a party to this action in any capacity") (*reversed on*
28  *other grounds* by *SEC v. Wojeski*, 752 F. Supp. 2d 220 (S.D.N.Y. 2010).)

1    To the extent the SEC intends to argue that Lorna Jensen did not own these

2  shares because Mr. Jensen controlled them, this is completely inconsistent with all

3  of the evidence.  Mrs. Jensen acquired Basin Water shares from 2001 through

4  September 20, 2005, and owned 1,320,000 shares in her name and as her sole and

5  separate property.  (Fact No. 9-10.)  She and Mr. Jensen set up a voting trust

6  agreement in 2002 whereby Mr. Jensen held her shares as trustee so he could have

7  voting rights in these shares.  (Fact No. 11.)  Mr. Jensen did not and could not

8  control when Lorna Jensen sold these shares.  (Fact No. 12.)   In addition, Mrs.

9  Jensen monitored the sales of her shares through communications with employees at

10  each of the brokerage firms that maintained custody of the shares, and directed the

11  disposition of proceeds from the sale of her shares.  (Fact No. 13.)

12    Accordingly, the SEC's demand for the disgorgement of $9 million in stock

13  sales must be denied, as well as its demand that, pursuant to Section 304 of the

14  Sarbanes-Oxley Act of 2002 ("Section 304"), Mr. Jensen reimburse Basin Water for

15  $9 million in stock sales.   *See* Section 304 (providing that only the CEO and CFO

16  of company in question are subject to requirement to reimburse profits).

17  Accordingly, the Court should enter a judgment that proceeds from the sale of Mrs.

18  Jensen's shares cannot be the subject of any disgorgement remedy or SOX 304

19  reimbursement sought by the SEC.

20    **D.    The SEC is Not Entitled to Its Purported Disgorgement Remedy**

21    In connection with the SEC's allegations of insider trading, its seeks as a

22  remedy to disgorge virtually *all* of the proceeds that Mr. Jensen realized from the

23  sale of his Basin Water stock from December 2006 to August 6, 2008.  (SEC

24  Motion, Doc. No. 40-1 at 21-22.)[6]  The SEC's proposed remedy of disgorgement of

25  _____

26  [6] While the SEC in its Complaint vaguely asserts that Mr. Jensen's "ill-gotten gains"
   are subject to disgorgement (Ex. 55, Complaint, ¶ 87), its Motion and proposed
27  judgment make clear that it is seeking to disgorge virtually all proceeds realized by
28  (footnote continued)

all proceeds from stock sales has no basis in law.  Even if one assumes that Mr. Jensen did engage in insider trading, the remedy of disgorgement would apply only to Mr. Jensen's' *ill-gotten gains*, *i.e.*, the amount of the proceeds that Mr. Jensen realized *because* of fraud.

As the Ninth Circuit has explained, "[d]isgorgement is designed to deprive the wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable."  *SEC v. First Pac. Bancorp*, 142 F. 3d 1186, 1191 (9th Cir. 1998); *see also SEC v. Platforms Wireless Int'l Corp.*, 617 F. 3d 1072, 1096 (9th Cir. 2010) (citation omitted).  Disgorgement, however, must be limited only to the amount by which the defendant "profited from his wrong doing.  Any further sum would constitute a penalty assessment."  *SEC v. Blatt*, 583 F. 2d 1325, 1335 (5th Cir. 1978).  *See also SEC v. Manor Nursing Centers, Inc.*, 458 F. 2d 1082, 1104-05 (2d Cir. 1972) (holding that defendant could be compelled only to disgorge profits and interest wrongfully obtained).  Because disgorgement serves to prevent unjust enrichment, the SEC must distinguish between legally and illegally obtained profits.  *SEC v. First City Financial Corporation*, 890 F. 2d 1215, 1231 (D.C. Cir. 1989).

The amount of disgorgement should "be a reasonable approximation of profits causally connected to the violation." *First City*, 890 F. 2d at 1231; *SEC v. Snyder*, No. H-03-04658, 2006 U.S. Dist. LEXIS 81830, at *28-29 (S.D. Tex. 22, 2006) (where defendant sold shares after filing misleading 10Q, court adopted the SEC's estimate of loss avoided as the difference between the price at which defendant sold his shares and the SEC expert's estimated drops in share price due to the disclosed negative information).  Here, the SEC's $9 million "calculation," in

---

Mr. Jensen from the sale of his Basin Water stock, without regard to the amount, if any, that Mr. Jensen's stock was inflated by any fraudulent statements.

1   addition to its baseless imputation to Mr. Jensen of the shares sold by Mrs. Jensen,

2   does not even purport to estimate any inflation in share price that Mr. Jensen may

3   have realized because of the alleged fraud.  (*See* Ex. 55, Complaint, ¶ 87 at 46-48

4   (chart calculating gross proceeds from Mr. Jensen's stock sales as Mr. Jensen's

5   profit); SEC Motion, Doc. No. 40-1 at 22.)

6        Putting aside the shares belonging to Mrs. Jensen, the only basis on which the

7   SEC could proceed with its remedy that all proceeds from Mr. Jensen's Basin Water

8   stock sales should be disgorged is if all the proceeds were caused by the alleged

9   fraud; in other words, if Basin Water's stock from May 2006 to August 2008 was

10  literally worthless.  But the SEC has not asserted this in its Complaint, and there is

11  zero evidence to support this notion.  As Keith R. Solar, the former outside General

12  Counsel of Basin Water, has declared:

13          Mr. Jensen also anticipated that state legislatures and government

14          agencies would lower the maximum contaminant level of arsenic and
            other chemicals allowed in public drinking water systems, which could

15          be expected to result in increased demand for a cost-effective water

16          treatment system. . . .   Mr. Jensen's foresight in anticipating this
            demand, and his ability to conceptualize and cause to be built a scalable

17          and cost-effective water treatment system, gave Basin Water an
            advantage over its competitors.

18

19  (Solar Decl., ¶ 10.)  Mr. Jensen's contributions had value, and the market

20  price of Basin Water stock reflected that.  The SEC may not seek a remedy that

21  ignores this value and lay claim to *all* proceeds that Mr. Jensen received from his

22  sale of Basin Water stock.

23  **E.     The SEC Is Not Entitled to Disgorge All of Mr. Jensen's Sales**

24  **        Proceeds Under SOX 304**

25       The SEC also seeks as a remedy that Mr. Jensen reimburse Basin Water

26  under Section 304 of the Sarbanes-Oxley Act for over $9 million in "profits"

27  he supposedly realized from the sale of Basin Water stock.   Section 304

28

21

1   provides in pertinent part that when an issuer is required to prepare an
2   accounting restatement as a result of misconduct, "the chief executive officer
3   and chief financial officer of the issuer shall reimburse the issuer for any
4   profits realized from the sale of securities of the issuer" in the year following
5   the first public issuance of the financial statements that were later restated.  15
6   U.S.C. §7243(a).

7        The SEC's Section 304 claim (Ex. 55, Complaint, ¶¶ 112-115) must be
8   adjudicated in Mr. Jensen's favor.  First, roughly half of the stock that the
9   SEC has put at issue belonged to Mrs. Jensen and thus is not subject to
10  Section 304, which is limited to stock sales by "the chief executive officer
11  and chief financial officer of the issuer."   But even when limited to Mr.
12  Jensen's stock sales, the SEC cannot prevail on its Section 304 claim as
13  styled.  First, Mr. Jensen has not realized any Section 304 profits from the
14  sale of Basin Water stock.  Second, even if there are any such profits, the
15  SEC's construction of Section 304 violates due process and accordingly the
16  Section 304 remedy must be limited to any ill-gotten gains.

17        **1.    There is No "Profit" Subject to a Section 304 Remedy.**

18        The text of Section 304 provides no guidance on what is meant by "profits
19  realized from the sale of securities of the issuer."  The SEC, in its demand that Mr.
20  Jensen reimburse Basin Water, contends that the entirety of the proceeds of his sales
21  be deemed "profits" and taken from him.  (Ex. 55, Complaint, ¶¶ 87 and 114; SEC
22  Motion, Doc. No. 40-1 at 22-23.)  Under the SEC's theory, Mr. Jensen, as founder of
23  Basin Water, did not pay anything for his shares, and thus everything he received from
24  the sale of the shares must be deemed profit under Section 304.

25        To state the SEC's position is to reveal the absurdity of it.  The SEC's
26  construction of "profits" under Section 304, when applied to founder's shares,
27  would automatically result in a 100% confiscation of sales proceeds from those
28  persons least deserving of such Draconian punishment – the persons who built a

company from scratch.  Just because a founder of a company, to the SEC's way of thinking, pays "nothing" for his shares, it does not follow that all of the proceeds realized upon sale should be considered "profit" for the purposes of Section 304. By way of illustration, when Microsoft CEO Steve Ballmer was hired in 1980, he received 8% of the Microsoft shares in lieu of a higher salary.  If Mr. Balmer were to now sell a billion dollars worth of the shares he received in 1980, and then next year Microsoft were forced to restate its prior year's earnings, the SEC would claim that the entirety of that billion dollars should be "reimbursed" to Microsoft – *regardless of when Mr. Balmer first acquired the stock or its value before any alleged misstatement was made to the market.*

Clearly, the SEC's interpretation of "profits" is nonsensical in the context of founder's shares, as it intentionally ignores all value the founder creates in the years before any alleged misrepresentation is made to the market.  Here, there is an undisputed record of the value that Mr. Jensen created in the Basin Water stock before the time any alleged misrepresentation could have inflated the value of the stock.  Mr. Jensen founded Basin Water and provided it with significant assistance in its earliest days.  (Fact Nos. 1-7.)  He invested money in Basin Water, took on numerous roles and accepted reduced compensation in his role as CEO.  *Id.*  He assigned five U.S. Patents and four international patents to Basin Water, all critical to Basin Water's core operations.  (Fact No. 4.)  In return, Mr. Jensen received equity in Basin Water.  (Fact No. 7.)  By the time of the IPO, stock held by him amounted to approximately 1.4 million shares.  (Fact No. 14.)

Mr. Jensen's Basin Water stock was priced at $12 per share in the May 2006 IPO, and quickly rose to almost $17 per share (for a total market value of approximately $25 million).  (Fact No. 15.)  This $12-17 dollar range in the stock was functionally his basis in the stock and represented, as much as cash would have, compensation for his prior years of service, contribution, and ingenuity for building the Company from nothing.  And the market price of at least $12 per share also

1  represented the price of the stock "uninflated" by any alleged misrepresentations, as

2  Basin Water did not file its initial 10-Q until June 26, 2006 (which contained the

3  revenue associated with the Opus transaction).  Yet in the subsequent years that Mr.

4  Jensen's stock was traded through his 10b5-1 plan, he only realized one sale of

5  20,000 shares in the $12-17 range; all of his other sales were at levels well below

6  this range.  (Fact No. 21.)  For instance, of the over 1 million shares sold by either

7  Mr. or Mrs. Jensen through 2009, these shares were sold as the price for Basin

8  Water shares fell into penny stock territory.  (Fact Nos. 14, 17, 18, 20, 21, 23.)  In

9  the end, Mr. Jensen did not realize the $25 million in wealth conferred by the May

10  2006 IPO.  *Id.*  And while $4.5 million in sales is a significant number, it strains any

11  notion of statutory construction to call a $20 million evaporation of wealth a "profit"

12  for which Mr. Jensen should reimburse Basin Water.

13          In short, Mr. Jensen had losses, not profits, in the years that are subject to the

14  SEC's 304 action.  Therefore, the SEC's demand for Section 304 reimbursement

15  should be denied in its entirety.

16          **2.      If There Are Any Section 304 Profits, They Must be Limited**

17                   **to Ill-Gotten Gains.**

18          Section 304's directive that a CEO reimburse the issuer creates a remedy, and

19  cannot be construed as a penalty.  In *In re Digimarc Corp. Derivative Litig.*, 549

20  F.3d 1223, 1233 (9th Cir. 2008), the Ninth Circuit  interpreted Section 304 as a

21  disgorgement "remedy" requiring reimbursement of "*ill-gotten* gains." (emphasis

22  added).  Courts have emphasized that remedial relief (for example, disgorgement)

23  "may not be used punitively" and is limited to amounts "causally related to the

24  wrongdoing." *First City*, 890 F. at 1231.  As noted above, the remedy of

25  disgorgement is limited "to the return of amounts obtained as a result of the

26  defendant's wrongdoing." *SEC v. Blatt*, 583 F. 2d 1325, 1335 (5th Cir. 1978); *SEC*

27  *v. Cavanagh*, 445 F. 3d 105, 117 n. 25 (2d Cir. 2006).  Any amount in excess of this

28  constitutes the imposition of a penalty. *Blatt*, 583 F. 2d at 1335.  As with its

1  disgorgement claim, the amount subject to the SEC's Section 304 claim cannot

2  exceed the amount of inflation due to fraud that Mr. Jensen may have realized from

3  the sale of his shares; any amount in excess of this —such as $4.5 million –

4  functions as a penalty.  Accordingly, the only "profits" that may be disgorged under

5  Section 304 are those that were caused by the wrongdoing  – *i.e.*, the inflation in

6  share price due to the alleged misrepresentations to the market.  *Dura*

7  *Pharmaceuticals v. Broudo*, 544 U.S. 336, 342 (2005).

8      Here, the SEC has brazenly sought *all* proceeds realized from the sale of

9  stock by Mr. Jensen (and even by his wife), regardless of the fact that such an

10 amount necessarily includes proceeds unrelated to any fraud.  (SEC Motion, Doc.

11 No. 40-1 at 21-22.)  In the alternative to a determination that Mr. Jensen has not

12 realized any profit subject to Section 304 reimbursement, the SEC's claim for

13 Section 304 reimbursement must be limited, as with the disgorgement remedy, to

14 any inflation in Mr. Jensen's shares caused by the supposed fraud.

15 **IV.   <u>CONCLUSION</u>**

16      For all of the foregoing reasons, this Court should grant Defendant Peter L.

17 Jensen's Motion for Partial Summary Judgment.

18 DATED: August 20, 2012        SCHEPER KIM & HARRIS LLP

19                                DAVID C. SCHEPER
                                 WILLIAM H. FORMAN

20                                JEAN M. NELSON

21

22

23                          By:  /s/ David C. Scheper

24                                David C. Scheper
                                 Attorneys for Defendant Peter L. Jensen

25

26

27

28