1
2
3
4
5
6
7                           UNITED STATES DISTRICT COURT

8                           CENTRAL DISTRICT OF CALIFORNIA

9

10   SECURITIES AND EXCHANGE              )   CASE NO.   CV 11-5316-R
11   COMMISSION,                          )
                                          )
12                        Plaintiff,      )   FINDINGS OF FACT AND
                                          )   CONCLUSIONS OF LAW
13         v.                             )
                                          )
14   PETER L. JENSEN AND THOMAS C.        )
15   TEKULVE, JR.,                        )
                                          )
16                        Defendants.     )
                                          )
17   ──────────────────────────────       )

18         On June 24, 2011 the Securities and Exchange Commission's ("SEC" or "Commission")

19   filed a complaint ("Complaint") against Peter L. Jensen ("Jensen") and Thomas C. Tekulve, Jr.

20   ("Tekulve") (collectively "Defendants"). The Court held a nine-day trial starting on October 15,

21   2013.

22         Having considered the arguments of the parties and the testimony and exhibits presented at

23   trial, the Court makes the following findings of fact and conclusions of law.

                                    **I.  Findings of Fact**

24

25   *A.  Stipulated Facts*

26         The following facts were agreed to be true by the parties in the Final Pre-Trial Conference

27   Order. Doc. no. 193.

28         Jensen is the founder of Basin Water, Inc. ("Basin"). He was chief executive officer and

chairman of the Board of Directors of Basin from December 1999 until February 19, 2008, when he resigned as CEO. Jensen continued to be a member of the Board of Directors, however, until March 11, 2008. Jensen received a master's degree in Chemical Engineering from the Massachusetts Institute of Technology in 1974.

Tekulve was the chief financial officer of Basin from September 2004 to May 2008 and Vice President of Business Development from June 2008 until he resigned effective October 8, 2008. As CFO, Tekulve had responsibility for, among other things, Basin's financial structure and organization. Prior to his tenure at Basin, Tekulve was an officer of two other public companies: from 1999 to 2004 he was the VP of Finance of Southwest Water, Inc., and from 1994 to 1998 he was the CFO of Safeguard Health Enterprises. Tekulve was licensed by the State of Oregon as a certified public accountant in 1978. During the relevant period, Tekulve's CPA license was on inactive status. Tekulve earned an MBA degree in 1987. Basin was a Delaware corporation headquartered in Rancho Cucamonga, California. During the relevant period, Basin was engaged in the business of designing, manufacturing and servicing groundwater treatment systems. It was founded by Jensen on or about December 1999. Basin became a public company on May 11, 2006, when its stock was initially registered with the Commission pursuant to Section 12(g) of the Exchange Act, Title 15 U.S.C. § 78*l*(g). Basin's stock traded on the Nasdaq National Market until July 31, 2006, when its common stock became registered pursuant to Section 12(b) of the Exchange Act, Title 15 U.S.C. § 78*l*(b), and began trading on the Nasdaq Global Market. On August 5, 2009, the Nasdaq delisted Basin's stock effective August 17, 2009.

Singer Lewak Greenbaum & Goldstein, LLP ("SingerLewak" or "Singer") was Basin's outside auditor throughout the time period relevant to this case.

Jensen and Tekulve signed various management representation letters that were sent to SingerLewak, as well as quarterly and annual reports (on Forms 10-Q and 10-K) which were filed with the SEC on behalf of Basin.  Tekulve also reviewed and caused to be filed with the SEC several earnings releases.

From December 12, 2006 through August 2008 Jensen sold shares of Basin stock that he owned. During that time period, he also donated shares of Basin stock to MIT.

On February 10, 2009, Basin filed a restatement on Form 10- K/A ("Restatement") with the Commission. The Restatement amended the annual report on Form 10-K for the year ended December 31, 2007, filed with the Commission on March 17, 2008. The Restatement also included amended and restated consolidated financial statements and related financial information for the years ended December 31, 2006 and 2007, including the financial results in each of the quarterly periods in 2006 and 2007.

### B. Witnesses Called by the Parties

The SEC called the following witnesses: Defendant Thomas Tekulve; Martin Benowitz, with whom Basin negotiated the Opus Trust transaction; James Sabzali, with whom Basin negotiated the Thermax transaction; Lloyd Ward, the managing member of VLC and WSS; Michael Stark, Basin's former CEO; Defendant Peter Jensen; Marc Florin, a stockbroker for Jensen; and Professor Carla Hayn, the SEC's expert on accounting and financial reporting.

In their case in chief, Defendants called the following witnesses: Keith Solar, former Chairman of Basin's Board of Directors; Pat Kelly, Basin's former General Manager; Defendant Thomas Tekulve; Victor Fryling, former Chairman of Basin's Audit Committee; Divakar Gupta of Latham & Watkins, Basin's former outside securities counsel; Leslie Ward-Cline, Basin's former Controller; and Professor William Holder, Defendants' expert on accounting and financial reporting.

The Court makes the following findings regarding the credibility of the witnesses:

Sabzali's testimony suffered from a lack of credibility in general. He admitted at trial that he had pled guilty to a felony and that he had committed the act to which he had pled guilty (Sabzali, Trial Tr. at 482:17-483:5.) He was impeached with testimony from his deposition where he denied that he had engaged in the conduct to which he pled guilty. (*Id.* at 482:17-484:6.) Assessing these facts, along with Sabzali's demeanor and attitude during his testimony, the Court places little weight on the substance of his testimony.

Lloyd Ward testified on direct examination that he is a lawyer in private practice in Dallas, Texas (Ward, Trial Tr. at 489:21-490:7.) On cross-examination, however, he admitted that in [July] 2013, his license to practice law was suspended for eleven months. Ward was placed on two

months of active suspension and nine months of probation. The basis of his suspension was an ethical violation as a member of the Texas bar. (*Id.* at 533:9-534:5.) Ward also admitted that he is subject to a 2011 Cease and Desist Order by the Connecticut [Banking Commission] for providing illegal debt relief services to over 50 Connecticut residents. The Connecticut [Banking Commission] enjoined Ward from further violations of law and ordered him to pay a $500,000 fine (*Id.* at 534:9-536:6.) Ward further admitted that he is subject to a final judgment in Kansas for providing illegal debt relief services in that state. The Kansas court enjoined Ward and ordered him to pay a $100,000 fine (*Id.* at 539:12-540:5.) Considering these facts, as well as Ward's demeanor and attitude during his testimony, the Court places little weight on the substance of his testimony.

Michael Stark testified that he did not have a close personal relationship with Charles Litt, and that he had never done a deal with Litt before VLC (Stark, Trial Tr. at 603:19-604:19.) He testified that he played a marginal role in the VLC transaction, merely introducing Litt to Tekulve and, in substance, leaving the two of them to determine whether and how to pursue a third-party financed sale (*Id.* at 605:23-606:6, 634:5-636:6). The Court finds Stark to have been impeached on each of these points.

At the time he began work at Basin, Stark had just returned from a three-week vacation in Italy with Litt and his wife, who was Stark's wife's cousin (*Id.* at 638:4-7.) Email correspondence between Litt and Stark included exchanges of holiday greetings and terms of endearment such as "We love you and miss you all." (*Id.* at 635:10-21.) Stark testified in his deposition that he considered Litt a member of the family and that they, in fact, had a close personal relationship (*Id.* at 639:12-21.)

Stark testified at trial that he had never done a deal with Litt before VLC (*Id.* at 604:2-9.) He was confronted on cross-examination with a May 12, 2007 email to a business colleague in which he stated, "I have a financial guy who does all my deals. . . . His name is Charlie Litt." (*Id.* at 644:9-18.) Stark testified that the email, rather than his trial testimony, was false (*Id.* at 645:1-6.) At trial, Stark had a motive to disassociate himself from prior dealings with Litt; therefore the Court believes that the email likely more closely portrays the truth of Stark's prior business

relationship with Litt. Either way, the Court finds Stark's credibility to have been impeached.

Stark's characterization of his role in the VLC transaction was contradicted by a series of email exchanges and transcripts of analyst calls from 2007 (Exs. 812, 813, 815, and 816 emails with Litt.) Based on those documents, it was clear to the Court that Stark not only knew the terms of the VLC transaction but was the principal driving force behind it.

Considering these facts, as well as Stark's demeanor and attitude while testifying, the Court finds that Stark was lacking in credibility and assigns little weight to the substance of his testimony.

Professor Hayn and Professor Holder testified, respectively, as the SEC's and Defendants' expert accountant. While both are highly qualified academics who are extremely knowledgeable in their field, the Court found Professor Holder's testimony more persuasive.

The Court finds that the methodology used by Professor Hayn to arrive at her opinions was unreliable. In the Court's view, Professor Hayn's opinion did not sufficiently take into consideration the role of professional judgment in accounting for transactions and relied excessively on hindsight in evaluating the accounting issues in this case, rather than viewing the facts as they existed at the time.  The Court considers Professor Holder's opinion to reflect a more real world view of the events and accounting issues in this case.

The Court finds all of the other witnesses who testified in this case to be credible.

*C. Facts Established at the Trial*

**1. General Characteristics of the Company, Including its Products, Practices and Personnel**

Jensen is a chemical engineer who developed a technology to provide municipalities with drinking water by using an ion-exchange method to remove contaminants such as nitrate and perchlorate. (Solar, Trial Transcript ("Trial Tr.") at 1143:4-22.) In 1999, Jensen started Basin with the help of his wife Lorna Jensen. (*Id*. at 1146:10-17, 1145:4-7; Exhibit 1645 (First Actions of Basin Board of Directors) at 1645-1.)

Jensen's application of ion-exchange technology differed from existing methods of treating water. (Solar, Trial Tr. at 1143:4-22.)  Before Basin, water treatment facilities were large and

capital-intensive. (*Id.* at 1143:4-22.)  Conventional facilities used miles of pipe to carry contaminated water from wellheads to a central facility to clean the water and then transport the cleaned water to consumers. (*Id.*) Basin changed this model. It constructed relatively small ionexchange units and installed these units directly atop well-heads, obviating the need for a central treatment facility and the attendant infrastructure. (*Id.*)

In Basin's early years, Jensen was responsible for operations of the company, customer service, attracting investors, and development of Basin's business strategy. (Fryling, Trial Tr. At 1385:16-25; Solar, Trial Tr. at 1147:19-23.)

Just a few years after its founding, Basin had contracts with several large municipalities in California and was purifying millions of gallons of drinking water each day. (See Solar, Trial Tr. at 1150:23-1151:7 (Basin demonstrated that its technology worked by getting units out in the field); Tekulve, Trial Tr. at 1284:18-20 (Basin's customers were principally municipalities).)

Jensen was neither an accountant nor known for his accounting acumen. (Fryling, Trial Tr. at 1386:8-16; Solar, Trial Tr. at 1156:24-1157:10 (Board "didn't expect Peter [Jensen] to review financial statements").) For the first few years of its existence, Basin relied on a single part-time accountant to manage its books. (Tekulve, Trial Tr. at 109:11-18; Jensen, Trial Tr. at 989:20-24; Solar, Trial Tr. at 1149:17-1150:1.) As Basin grew, Jensen saw the need for a larger and more sophisticated accounting department. (Jensen, Trial Tr. at 988:13-18; Tekulve, Trial Tr. at 109:3 18 (responsibility for Basin's financial structure and organization); Solar, Trial Tr. at 1157:3-13 (Jensen's responsibility was "to hire and staff an accounting group.").)

After conducting a national search, Jensen hired Thomas Tekulve in 2004 as Chief Financial Officer to establish financial controls to support Basin. (Jensen, Trial Tr. at 988:19-23.). Prior to Basin, Tekulve had been Vice President of Finance and Treasurer of Southwest Water, a large water utility that operated in the same market as Basin. (Tekulve, Trial Tr. at 108:7-15; Jensen, Trial Tr. at 988:24-989:7; Final Pretrial Conf. Order (Doc. No. 193), ¶5(b) at 4.)

Tekulve's first order of business was to create a finance and accounting department by hiring the necessary personnel and developing the necessary systems and processes. (Jensen, Trial

Tr. at 989:25-990:12; Tekulve, Trial Tr. at 109:11-18; Ward-Cline, Trial Tr. at 1257:16-1258:11.) For personnel, Tekulve drew heavily on his colleagues from Southwest Water, hiring Doug Hansen as his Director of Finance and Leslie Ward-Cline as his Controller. (Tekulve, Trial Tr. at 109:11-20, 1286:4-9.)

Tekulve and his colleagues in the finance department put in place accounting processes and procedures that would allow Basin to issue a public offering. (Tekulve, Trial Tr. at 1285:25 1286:20; Ward-Cline, Trial Tr. at 1258:12- 1259:20.) This work included creating policies and procedures to ensure accountability within the accounting department, to ensure that Basin's financial statements would comply with Generally Accepted Accounting Principles ("GAAP"), and to enable the company to satisfy Sarbanes-Oxley reporting requirements. (Tekulve, Trial Tr. at 1285:25-1287-6; Ward-Cline, Trial Tr. at 1258:12-1259:20.) Tekulve and Leslie Ward-Cline both stated that the policies and procedures put in place were effective in ensuring compliance with GAAP and Sarbanes-Oxley. (Tekulve, Trial Tr. at 1286:21-22; Ward-Cline, Trial Tr. at 1261:7-20.)

In 2005, Tekulve began searching for an outside auditor with public company experience to support Basin's goal of going public. (Tekulve, Trial Tr. at 1288:15-24.)  After interviewing several audit firms, Tekulve recommended that Basin's Audit Committee hire Singer. (Tekulve, Trial Tr. at 1288:22-1289:6, 1290:8-13.)

Tekulve recommended Singer because he was impressed with the engagement partner Gale Moore's background with two Big Four accounting firms and years of audit experience. Also important to Tekulve's choice was Moore's willingness to consult with Basin on an ongoing basis, which Tekulve considered to be critical given Basin's small size and relative inexperience. (Tekulve, Trial Tr. at 1289:20-1290:1, 1290:14-22.)

After Basin went public in May 2006, Singer began performing quarterly reviews and annual audits at Basin's headquarters. (Tekulve, Trial Tr. at 1304:2-10, 1304:23-1305:1; Ward Cline, Trial Tr. at 1267:1-7, 1270:16-24; Ex. 630 at SEC-LA3478-01646017 (Singer Audit Report for 2006); Ex. 236 at SECLA3478- 00003247 (Singer Audit Report for 2007).) Because Basin typically conducted only a few transactions each quarter, Singer's quarterly reviews generally

1    included 100% of the significant transactions for the quarter. (Tekulve, Trial Tr. at 1304:12-22;

2    Ward-Cline, Trial Tr. at 1270:25-1271:5.) Singer had complete, open, and unfettered access to all

3    of Basin's financial records. (Tekulve, Trial Tr. at 1305:2-8; Ward-Cline, Trial Tr. at 1273:10-20.)

4    Singer was also provided with all of the information it requested from Basin's finance department.

5    (Tekulve Trial Tr. at 387:2-6, 1304:23-1305:8; Ward-Cline, Trial Tr. at 1271:6-10; Fryling, Trial

6    Tr. at 1374:3-1375:5; Gupta, Trial Tr. at 1405:11-15.) Even apart from the quarterly reviews and

7    annual audits, Tekulve and his finance team often consulted with Moore and her team at Singer

8    regarding the proper accounting for specific transactions. (Ex. 913 (2/23/2006 e-mail string

9    between Gale Moore and Doug Hansen regarding review of Benowitz transaction); Tekulve, Trial

10   Tr. at 1302:2-1303:2; Ward-Cline, Trial Tr. at 1264:8-1265:17.)

11          As part of its engagement, Singer met with Basin's Audit Committee prior to the release of

12   Basin's Form 10-Q. (Tekulve, Trial Tr. at 1299:9-24; Fryling, Trial Tr. at 1373:17-1375:14;

13   Gupta, Trial Tr. at 1405:7-10.) The Basin Audit Committee was comprised of members who, in

14   the words of one Basin Director, had the expertise to serve as Basin's CFO. (Solar, Trial Tr. at

15   1152:22- 1153:3.) The Audit Committee met at least quarterly and reviewed material

16   transactions. (Fryling, Trial Tr. at 1371:4-13, 1397:25-1398:2.) As Singer concluded in a 2007

17   audit work paper, "the potential risk of material misstatement due to fraud . . . is low because the

18   audit committee pays close and detail[ed] attention to operations and transactions." (Ex. 887

19   (3/15/08 Singer Discussion).)

20          Basin's Audit Committee was chaired by Victor Fryling, who had previously served as the

21   CFO of Fortune 500 company. (Fryling, Trial Tr. at 1365:11-20.) Usually, Fryling held a "pre

22   meeting" with Tekulve to discuss the quarterly results and the Audit Committee presentation.

23   (Fryling, Trial Tr. at 1370:18-1371:13; Tekulve, Trial Tr. at 1295:12-1296:15, 1297:2-23.)

24   Tekulve circulated a draft 10-Q to members of the Audit Committee before the meetings. (Ex. 679

25   (8/7/2007 e-mail from Tekuvle to Audit Committee with draft 10-Q for Second Quarter 2007);

26   Tekulve, Trial Tr. at 1298:22-1299:8.) Fryling and the other members of Basin's Audit Committee

27   provided a "robust" examination of the proposed financial statements submitted by Tekulve.

28   (Fryling Trial Tr. at 1366:8-1370:2, 1371:14-20.)

At every Audit Committee meeting, the Committee would have discussions with Singer, usually without management present. (Fryling, Trial Tr. at 1373:17-1375:15; Tekulve, Trial Tr. at 1299:25-1300:18.) During each of these discussions, the Audit Committee members asked Singer if it had any disputes with management and if management had cooperated fully with Singer's review. (Fryling, Trial Tr. at 1374:3-1375:15; Gupta, Trial Tr. at 1405:11-15.) Singer never reported any disputes with management or impediments in auditing Basin's financial statements. (Fryling, Trial Tr. at 1374:3-1375:3; Gupta, Trial Tr. at 1405:11-15.) The Audit Committee also asked if there were any issues related to Basin's accounting that they should know about; Singer reported none. (Fryling, Trial Tr. at 1374:3-1375:3; Gupta, Trial Tr. at 1405:11-15.)

Following each quarter Singer issued clean reviews and at each year end, Singer issued clean audit opinions. (Fryling, Trial Tr. at 1373:17-1375:3; Holder, Trial Tr. at 1459:9-14; Ex. 630 at SEC-LA3478-01646017 (Singer Audit Report for 2006); Ex. 236 at SEC-LA3478-00003247 (Singer Audit Report for 2007).)

There were other levels of review for transactions at Basin in addition to Singer. The terms of material transactions were also reviewed by the Board of Directors. (*See*, *e.g.*, Tekulve, Trial Tr. at 363:1-7 (reviewing basic structure and economics of transaction for VLC at Board meeting); Solar, Trial Tr. at 1159:1-1160:10 (reviewing Opus transaction).) Given Basin's relatively small size, nearly all transactions in each quarter were material. (Solar, Trial Tr. at 1179:5-16 (General Counsel Scott Hamilton determined that all transactions were material).)

Significant transactions – including the SPE transactions at issue in this litigation – were reviewed by Basin's legal counsel as well. Before the IPO, Solar, one of the original directors and a lawyer with expertise in the water industry, reviewed agreements and provided draft templates to Tekulve. (Solar, Trial Tr. at 1135:3-21, 1136:22-1137:6, 1138:7-16, 1138:24-1139:8.) In connection with its IPO, Basin retained Latham & Watkins ("Latham") as outside counsel. Going forward, Latham served as Basin's securities counsel, drafting and reviewing its filings with the SEC and drafting the documentation for several significant transactions. (Gupta, Trial Tr. at 1400:12-1401:24, 1402:7-24; Solar, Trial Tr. at 1139:13-21.) Both Jensen and Tekulve sought and received counsel from Latham on securities law issues. (Gupta, Trial Tr. at 1410:14-24, 1412:23-

1414:11.)

Scott Hamilton, Basin's General Counsel hired in June 2007, served as an additional level of review. (Jensen, Trial Tr. at 905:7-21; Solar, Trial Tr. at 1169:13-22; Ex. 211 (Form 10Q for Q2 2007) at SEC-LA3478-00002975.) Hamilton, a former attorney in the Division of Enforcement of the SEC, had worked with Stark at Veolia and was hired at his recommendation. (Stark, Trial Tr. at 678:10-23; Solar, Trial Tr. at 1169:2-9.) The Basin Board hired Hamilton in part because of his experience as an attorney in the Division of Enforcement at the SEC. (Solar, Trial Tr. at 1169:13-22 (The Board viewed the hiring of a former enforcement attorney as "a good thing" because "[i]t would help to have someone who worked at the SEC so that the Company was doing everything it should in accordance with SEC rules and regulations").) Hamilton was involved in reviewing and documenting the SPE transactions, and Tekulve interacted with him in this review process. (Stark, Trial Tr. at 615:15-25 (Stark, Basin's COO and President, received information "in terms of the contractual agreements" from Scott Hamilton), 679:2-4 (appears that "three attorneys working on reviewing the – this [VLC] transaction"), 685:9-12 ("reassured by this process that the VLC transaction had been appropriately reviewed and approved"); Tekulve, Trial Tr. at 213:1-12 ("we had multiple discussions with Scott Hamilton, our general counsel…"); Ex. 1020 (Tekulve Diary) at TCT 248 ("Calls, e-mails, et cetera with Charlie Litt, Scott Hamilton …"); Ex. 619 (8/9/07 Audit Committee Minutes).)

Jensen himself never participated in decisions on how or when to recognize revenue from transactions. (Jensen, Trial Tr. at 852:19-854:6, 905:7-906:8; Kelly, Trial Tr. at 1240:10-13; Ward-Cline, Trial Tr. at 1275:5-1277:10; Fryling, Trial Tr. at 1387:2-5.)

Neither Jensen or Tekulve ever instructed any Basin employee to withhold information from Singer, or to provide less than full cooperation with the auditors. (Ward-Cline, Trial Tr. at 1272:1-12, 1277:11-20; Jensen, Trial Tr. at 993:25-996:5; Tekulve, Trial Tr. at 1344:6-12, 1349:5-25; Fryling, Trial Tr. at 1373:21-1374:9; Kelly, Trial Tr. at 1240:14-25.) No witness testified that Tekulve or Jensen ever instructed any Basin employee to do an improper act. All witnesses who were asked testified to the absolute integrity, prudence, and honesty of both men. (Kelly, Trial Tr. at 1241:8-19 (did not have any reason to doubt Jensen's integrity or honesty), 1248:2-9; Ward

10

Cline, Trial Tr. at 1278:5-8 (did not have "any occasion to doubt his [Jensen's] integrity or his honesty"), 1274:1-19 (Tekulve "wanted thing[s] to be right and that was the message that he conveyed to his staff"), 1262:12-16 (Tekulve "wanted them [Basin's financial statements] to be right"); Solar, Trial Tr. at 1190:3-1191:4 ("Because I have known Peter [Jensen] more than 20 years, and I know he is not like that. And I was there when the alleged events happened, and they weren't true."), 1210:14-22 ("Tom [Tekulve] is impeccably honest."); Gupta, Trial Tr. at 1405:16-21 (Singer did not question Tekulve's honesty or ethics), 1410:25-1411:1 ("As far as I saw, he was very honest. I always trusted him in the transactions – in the interactions I had with him [Tekulve].").)

## 2. Transactions at Issue in this Case

With the exception of certain circumstances regarding the insider trading allegations against Jensen, the alleged misconduct in this case centers around six transactions.  The SEC alleges that Defendants improperly recognized revenue on these transactions—or otherwise misrepresented the character of those transactions—and in doing so misled the investing public, Singer, and the SEC.

### a. Opus Trust Transaction

In 2005, Jensen approached potential investors about acquiring water treatment systems from Basin to use in possible conjunction with BION, a new, proprietary technology Jensen helped to develop along with internationally-known experts in the field of water treatment. (Jensen, Trial Tr. at 815:17-816:10.)

In the Fall of 2005, Jensen spoke with attorney Martin Benowitz about Opus acquiring two water treatment systems and an interest in the BION technology from Basin.  (Jensen, Trial Tr. at 817:9-818:22; Benowitz, Trial Tr. at 405:1-20.)  Benowitz was a shareholder of Basin. Further, Jensen had a long business relationship with Benowitz and understood him to represent foreign investors. (Jensen, Trial Tr. at 815:14-16, 958:6-959:17; Benowitz, Trial Tr. at 442:2-7; Solar, Trial Tr. at 1159:1-1160:2.) Benowitz also represented a group of foreign investors who did business through an entity known as Opus Trust ("Opus"). Benowitz was enthusiastic about the BION technology. (Benowitz, Trial Tr. at 407:22-408:2 ("[T]he motivation for us to get an interest

here was that the thought was that this was something that could not only be used by Basin, but would be a product that could be used by any other water company that needed to dispose of that which would make it a much substantial market."), 434:21-435:4 ("It was all about the stock… it was all about the five percent stock ownership."); Jensen, Trial Tr. At 959:1-10 ("[H]e [Benowitz] was very excited about the technology").  Benowitz agreed that Opus would buy two Basin systems if the deal included BION shares.  (Benowitz, Trial Tr. at 408:11-14 ("We were getting two units and five percent of the stock of BION"), 434:21-435:4; Ex. 12 (3/30/06 Formal Agreement); Ex. 514 (Letter Agreement).) Once Jensen and Benowitz reached a basic agreement in December 2005, the Basin Board of Directors reviewed the deal terms and approved it on December 20, 2005. (Solar, Trial Tr. at 1159:4-1160:4.)

On December 29, 2005, Benowitz, on behalf of Opus, executed an "Agreement for purchase of two Basin ion exchange units" ("Letter Agreement"). (Benowitz, Trial Tr. at 409:25-410:12; Ex. 514 (Letter Agreement).  The Letter Agreement stated a purchase price of $1.5 million, with 10% (or $150,000) to be paid upon execution, and the remainder to be paid over two years. (Ex. 514 (Letter Agreement), ¶ 1a. at SEC-LA3478-00842086.) In exchange, Opus would receive 5% of the shares of the subsidiary that would own the BION technology. Opus immediately paid Basin $150,000. (Ex. 4 (12/29/05 Checks).) Benowitz testified that the Letter Agreement was binding. (Benowitz, Trial Tr. at 435:24-436:20 ("it was your full intention that it [Ex. 514] be binding on the Opus Trust, correct? A: Correct").)  The Letter Agreement also explicitly states that it is "binding" on both parties. (Ex. 514 (Letter Agreement), ¶ 5 at SEC-LA3478-00842088.)

The Letter Agreement contained the key economic terms of the sale, and committed the parties to enter into a more detailed contract containing customary terms and conditions at a later date. (Ex. 514 (Letter Agreement), ¶ 1 at SEC-LA3478-00542087.) Basin had a practice of establishing the key terms of a transaction in a letter agreement, followed by a more detailed contract that would include more customary terms and conditions. (Tekulve, Trial Tr. at 1295:25-1296:10.)

In March 2006, Benowitz obtained a home equity loan of $250,000 to pay for an option to

extend the Letter Agreement. (Benowitz, Trial Tr. at 429:13-18, 439:21-23; Ex. 529 (3/20/06 E-mail).) During this time, however, Jensen and Tekulve were preparing for Basin's IPO, which occurred in May 2006. (Jensen, Trial Tr. at 829:17-25; Final Pretrial Conf. Order (Doc. No. 193), ¶5(c) at 4.)  Hence, Tekulve and Benowitz did not exchange drafts of more formal documentation of the agreement ("Unit Purchase Agreement" or "UPA") until June 2006. The Unit Purchase Agreement ("UPA") was executed by Benowitz sometime after March 30, 2006, (Benowitz, Trial Tr. at 437:8-20; Ex. 12 (UPA)), and by Jensen some time before September 2006, (Jensen, Trial Tr. at 844:15-845:9).

The UPA stated that it was "effective as of" March 30, 2006. (Ex. 12 (UPA) at SEC-LA3478-1919.) Benowitz testified that, in his experience as a transactional attorney, parties use the phrase "effective as of" to indicate they entered the agreement prior to executing it. Used this way, "effective as of" does constitute "backdating." The UPA, on its face, clearly indicates that it is effective "as of" March 30, 2006; it does not purport to have been signed on March 30, 2006. (Benowitz, Trial Tr. at 437:21-438:14.) Contrary to the SEC's allegations, it is thus not a back-dated document. (*Id.*) Benowitz testified that on April 1, 2006, he began receiving lease payments due under both the Letter Agreement and the Unit Purchase Agreement. Benowitz's receipt of these payments as owner of the water treatment units supports that the sale was "effective as of" March 30, 2006. (Ex. 5 (Payments to Western Water); Benowitz, Trial Tr. at 432:12-19.)

The UPA modified certain terms of the Letter Agreement. The Letter Agreement did not specifically identify the two units being sold to Opus, whereas the UPA identified them by unit numbers. The parties to the Letter Agreement were Basin and Opus, whereas the parties to the UPA were BionBasin, Inc., a wholly-owned subsidiary of Basin, and Opus. (Ex. 514 (Letter Agreement); Ex. 12 (UPA); Tekulve, Trial Tr. at 346:19-347:5.) The term of the UPA was three years, whereas the term of the Letter Agreement was two years. (Ex. 12 (UPA), ¶2.1 at SEC-LA3478-1920; Ex. 514 (Letter Agreement), ¶2(b)(ii) at SEC-LA3478-09530986.)

The UPA also included a liquidated damages clause. (Hayn, Trial Tr. at 1009:17-1010:7.) Under the liquidated damages clause, if Opus breached the agreement, Basin's damages were limited to retaining any sums Opus had paid prior to breach, and the return of the two units. (Ex.

12 (UPA), ¶18 at SECLA3478-1927.) Benowitz testified that he did not request the liquidated damages clause. (Benowitz, Trial Tr. at 438:19-439:1.) Tekulve testified that he believed the clause may have been a vestige of a contractual template he relied on in preparing a draft of the UPA. (Tekulve, Trial Tr. at 1310:11-21, 1311:2-5; *see also* Solar, Trial Tr. at 1160:17-1161:12.)

Regardless of the liquidated damages clause, Benowitz testified that Opus had a significant economic incentive to perform its obligations. "The whole purpose" of the agreement with Basin, as far as Benowitz was concerned, was to obtain the 5% share of BionBasin, Inc. (Benowitz, Trial Tr. at 425:17-23 ("really, our big concern was about the five percent interest in the stock"), 434:21-435:4 ("It was all about the stock … It was all about that five percent stock ownership"), and 439:2-12 ("This was all about getting that five percent stock").) If Opus did not pay for the two units in full, it would not receive the shares in BionBasin, Inc. (Benowitz, Trial Tr. at 439:13-17.) Thus Opus fully intended to perform, had in fact obtained funding (through the Benowitz home equity line) to perform, and understood that one way or the other Basin would have "to be paid" and that Opus "would have to do that." (Benowitz, Trial Tr. at 418:21-419:17.)

The terms and conditions added in the UPA were not intended to modify the material economic terms of the Letter Agreement but were added to protect Basin's intellectual property rights in connection with its water processing units and to provide standard "boilerplate" contractual terms. (Tekulve, Trial Tr. at 120:25-121:16.) Singer was familiar with Basin's practice of documenting a transaction through a letter agreement that set forth the key economic terms, followed by a more formal contract. (Tekulve, Trial Tr. at 345:24-13.)

Basin provided the Letter Agreement to Singer in the first quarter of 2006. (Ex. 913 (2/23/2006 email string between Doug Hansen and Gale Moore re Benowitz transaction); Tekulve, Trial Tr. at 1307:9-22.) In February 2006, Singer advised Basin that it could not record revenue from the sale to Opus in the fourth quarter of 2005 because the Letter Agreement did not identify the specific units sold. (Tekulve, Trial Tr. at 1307:9-22.) Basin followed Singer's advice. In March 2006, Basin identified the specific units sold to Opus and recognized revenue in the first quarter of 2006. (Tekulve, Trial Tr. at 1307:9-1308:1.) On June 26, 2006, Basin filed its 10-Q for the first quarter of 2006, including $1.5 million in revenue from the Opus sale. (Ex. 628 (6/26/2006 Basin

10-Q for the Q1 2006.)

In determining whether to recognize revenue for public companies, accountants evaluate a series of factors outlined by the SEC in Staff Accounting Bulletin 104 ("SAB 104"). (Hayn, Trial Tr. at 1007:13-24; Holder, Trial Tr. at 1446:18-1447:2.) These criteria include: (1) whether there is persuasive evidence of an arrangement; (2) whether delivery has occurred or services have been rendered; (3) whether the price is fixed or determinable; and (4) whether collectability is reasonably assured. (Hayn, Trial Tr. at 1007:18-1008:4; Holder, Trial Tr. at 1447:13-1448:6.) The SAB 104 criteria apply to all six transactions at issue in this case.

The revenue Basin recognized on Opus Trust in the first quarter of 2006 was based on the Letter Agreement, which constituted "persuasive evidence of an arrangement," under SAB 104. (Tekulve, Trial Tr. at 346:14-15; Holder, Trial Tr. at 1459:16-1460:4.) Ownership of the units was transferred to Opus Trust as of March 30, 2006, and the $1.5 million price for the sale was fixed by the terms of the Letter Agreement. (Tekulve, Trial Tr. at 131:24-132:9, 343:10-344:7, 1309:15-25; Holder, Trial Tr. at 1460:8-19, 1461:17-21.) Sufficient evidence enabled Tekulve and Basin to conclude that collectability from Opus Trust was reasonably assured. That evidence included the $150,000 cash down payment, the Basin Board of Director's approval of the transaction, and Benowitz's long- standing business relationship with both Basin and Jensen. (Tekulve, Trial Tr. at 113:19-114:3, 129:17-25, 343:24-344:4; Holder, Trial Tr. at 1461:24-1462:12.) Under these circumstances, Tekulve's decision to recognize revenue from the Opus Trust transaction was reasonable under GAAP. (Holder, Trial Tr. at 1459:16-1462:12; Ex. 1762 (SAB 104 factors applied to Opus transaction).)

Tekulve reasonably relied on the professional advice of Basin's auditors in deciding to recognize revenue from the Opus Trust transaction in the first quarter of 2006. (Tekulve, Trial Tr. at 1311:20-1312:5; Holder, Trial Tr. at 1462:14-1463:8.) Basin provided Singer with the Letter Agreement and disclosed all material information related to the Opus Trust transaction. (Tekulve, Trial Tr. at 1311:5-9, 1311:16-19; Ward-Cline Trial Tr. at 1270:25-1271:10; (Ex. 913 (2/23/2006 e-mail string between Doug Hansen and Gale Moore re Opus transaction.) Singer provided specific guidance regarding revenue recognition for the transaction, and Tekulve followed that

1    advice. (Tekulve, Trial Tr. at 1308:2-9, 1307:13-22.)

2          Singer received the UPA in August 2006. (Ex. 866 (8/1/2006 e-mail from Tekulve to

3    Helen Wuu at Singer, attaching UPA); Tekulve Trial Tr. at 147:9-15.) Singer possessed the UPA,

4    which included the liquidated damages clause, at the time Singer performed its audit of Basin's

5    year-end 2006 financial statements. As part of the 2006 year-end audit, Singer obtained third-party

6    confirmation of the Opus Trust transaction. (Ex. 528 (2/9/2007 Letter from M. Benowitz to Singer

7    and attaching Basin Water Audit Letter Acknowledgment Regarding Ion Exchange Units);

8    Benowitz, Trial Tr. at 441:8-442:1.) No one at Basin made misleading statements to Singer about

9    the transaction or withheld requested information or documents. (Tekulve, Trial Tr. at 348:15-17;

10   Ward-Cline, Trial Tr. at 1272:1-12.) Singer approved Basin's decision to record revenue on the

11   Opus Trust transaction in its 2006 year-end financial statements.

12         Only in hindsight has the Opus Trust transaction come under attack. (Holder, Trial Tr. at

13   1445:16-23.) In 2008, one of the units was damaged in an automobile accident before Opus Trust

14   had made its final scheduled payment. (Tekulve, Trial Tr. at 344:8-21, 345:12-20.) The accident

15   resulted in threatened litigation between Opus Trust and Basin over responsibility for insuring the

16   units and the interpretation of the liquidated damages clause in the UPA. (Tekulve, Trial Tr. at

17   344:8-345:11.) A car running off the road and crashing into a unit is not something that Tekulve

18   could have foreseen when he decided to recognize revenue on this transaction in 2006. The mere

19   existence of the liquidated-damages clause at that time does not make the decision to recognize

20   revenue unreasonable. (Holder, Trial Tr. at 1464:23-1465:23.) Professor Hayn's focus on the

21   liquidated damages clause is an example of her flawed methodology of relying excessively on

22   hindsight to analyze a transaction, as the liquidated damages clause only became an issue after the

23   occurrence of the unforeseeable automobile accident.

24                        **b. Thermax Transaction**

25         In late 2005, Jensen was contacted by James Sabzali, a salesman for Thermax, a large

26   international company that sells resins and water treatment systems in Asia and world-wide.

27   Sabzali and Jensen discussed the possibility of entering into a broad-based strategic relationship

28   between Thermax and Basin. Sabzali also told Jensen that Thermax wanted to sell Basin systems

                                        16

to PDVSA, a government-owned petroleum company in Venezuela. (Sabzali, Trial Tr. at 450:12-20.) As both Jensen and Sabzali testified, Thermax had incentives to buy systems from Basin regardless of whether PDVSA ever ordered systems from Thermax; namely, Thermax had an interest in licensing and marketing Basin's technology in Asian markets. (*Id*. at 470:4-10; Jensen, Trial Tr. at 870:20-871:2, 871:13-21.)

On September 25, 2006, Sabzali e-mailed a letter (the "September 25 Letter") to Jensen, stating that Thermax would purchase the Basin systems subject to several "caveats" and "T&C's" (terms and conditions). (Sabzali, Trial Tr. at 451:17-452:14; Ex. 512 (9/25/06 Letter).) Attached to the e-mail was a two-page unsigned letter from Sabzali. The "caveats" were listed on the first page of the September 25 Letter and "[t]he details of the system we will be ordering are on page 2." (Ex. 512 (9/25/06 Letter).) The first caveat was that Thermax's purchase order would be "predicated on Thermax Inc. receiving a similar order from PDVSA." The second caveat was that, if Thermax did not receive a PDVSA purchase order by November 30, 2006, Thermax would cancel its purchase order with Basin and replace it with a new order from Thermax. (*Id*., ¶ 2 at SECLA3478-01642153.) Sabzali described this second point as an "escape clause" for Thermax, and testified that it was an important part of the deal for Thermax. (Sabzali, Trial Tr. at 476:11-15.) In the cover e-mail to the September 25 Letter, Sabzali asked Jensen to confirm by reply e-mail the "agreements with caveats and Ts&C's on the PO." (Ex. 512 (9/25/06 Letter).) Sabzali testified that he and his superior, Shastri, the President of Thermax, were expecting written confirmation from Jensen. (Sabzali, Trial Tr. at 474:6-23, 476:16-18, 477:12-478:7.) Sabzali also testified that he never received written confirmation affirming the "caveats." (Sabzali, Trial Tr. at 474:475:3.).

Jensen forwarded the September 25 Letter to Pat Kelly, Basin's General Manager. (Jensen, Trial Tr. at 878:22-879:10, 964:2-14; Ex. 537 (9/26/06 E-mail).) Kelly discussed the September 25 Letter with Jensen, pointed out the contingency caveats on page one, and said that Basin could not agree to any of them. (Jensen, Trial Tr. at 879:13-25.) Realizing that he had received a contingent offer, Jensen called Sabzali and rejected it. (Jensen, Trial Tr. at 880:23-881:11.) Jensen told Sabzali that if Thermax wanted to do business with Basin, Thermax would have to send a clean

purchase order. (Jensen, Trial Tr. at 881:1-8.) On September 28, 2006, Thermax's Finance Unit, not the Sales Department, delivered such a purchase order ("Purchase Order"), *i.e.*, one that did not include any of the caveats that Kelly and Jensen had rejected. (Ex. 500 (Purchase Order); Jensen, Trial Tr. at 966:8-13.) The purchase order attached as an addendum a version of page 2 of the September 25 Letter, which described "[t]he details of the system" that Thermax was ordering, such as the size and type of systems to be provided and the price. (Ex. 500 (Purchase Order).)

The addendum listed the shipping date as "TBA" (or "to be advised") and the "T&C" as "TBA" and "Agreed that the T&C to Basin will reflect the T&C's on PDVSA's PO to Thermax Inc." (Ex. 500 (Purchase Order at SEC-LA3478-01643054.) Because the Purchase Order did not contain the caveats of the September 25 Letter, Jensen understood that the Purchase Order to be "clean" and free of contingencies. (Jensen, Trial Tr. at 883:23-884:9 (describing Purchase Order as "noncontingent").)

Sabzali testified that Jensen agreed to the caveats in at least one phone conversation in September. (Sabzali, Trial Tr. at 477:1-16.) Sabzali's testimony on this point is not credible given that: (1) Sabzali asked for Jensen's written confirmation of the terms of the September 25 Letter (including the "escape clause") and never received such confirmation; (2) the Purchase Order did not attach any of caveats of the September 25 Letter; (3) Sabzali confirmed that there was no "escape clause" in the Purchase Order, and; (4) despite never receiving a purchase order from PDVSA, Thermax did not exercise the "escape clause" provision of the September 25 Letter, and Sabzali had no explanation for the failure to exercise the "escape clause." (*Id*. at 474:17-475:3; 476:11-18; 478:8-17; 485:13-19; 488:22-489:3.)

Pat Kelly, the General Manager of Basin, provided corroborating testimony that Jensen had rejected the "caveats" in the September 25 Letter and that the Purchase Order was non contingent. Kelly was a credible witness. Prior to coming to Basin, Kelly had been a general manager of various divisions at Osmonics. (Kelly, Trial Tr. at 1215:17-24.) He had dealt with manufacturing purchase orders for many years. (*Id*. at 1215:18-21, 1216:5-12, 1217:16-20.) Kelly confirmed that, when he saw the September 25 Letter, he informed Jensen that it contained impermissible contingencies and that it was unacceptable. (*Id*. at 1221:7- 1223:18.) When Kelly

saw the Purchase Order, however, he believed, based on his experience, it was a valid Purchase Order, including the "TBA" and "T&Cs" provisions of the addendum. (*Id.* at 1224:23-1226:23, 1228:17-1229:7, 1230:4-1231:20.) It was common for shipping dates "to be arranged" later by purchasers of Basin units given that extensive preparation at the well-head site might be required. (*Id.* at 1229:1-1230:3.) Furthermore, unspecified "terms and conditions" relating to shipment, such as preparation of units for ocean-going travel, did not preclude Basin from beginning construction on the units. (*Id.* at 1231:13-20; Tekulve, Trial Tr. at 187:13-17.) After Kelly received the Purchase Order, he directed the construction and completion of the units in Basin's shop. (Kelly, Trial Tr. at 1226:24-1227:6, 1227:19-1228:12, 1231:23-1232:7.)

On September 28, 2006, Tekulve received the Thermax Purchase Order. It stated a total purchase price of $860,320 and was signed by Thermax's Finance Manager, Heather Boulton. Based on the Purchase Order, Basin began recording revenue in the third quarter of 2006 using the percentage of completion revenue recognition method. (Ex. 30 (9/28/2006 e-mail from Pat Kelly to Basin personnel initiating construction of units according to specifications in Thermax PO); Kelly, Trial Tr. at 1227:19-1228:12; Tekulve, Trial Tr. at 1313:4-6; Holder, Trial Tr. at 1466:20-23.) The percentage of completion method of accounting is widely accepted for orders of custom equipment that require time to construct. (Holder, Trial Tr. at 1466:24-1468:2.) Under this method, revenue is recorded as the equipment is built. Basin's use of the this accounting methodology for the Thermax order was reasonable. (Holder, Trial Tr. at 1466:24-1468:2.)

Basin's recognition of revenue on the Thermax sale was consistent with GAAP. (Holder, Trial Tr. at 1470:2-6.) Thermax's Purchase Order constituted "persuasive evidence of an arrangement," as required under SAB 104. (Ex. 500 Thermax P.O.; Tekulve, Trial Tr. at 350:7-8; Holder, Trial Tr. at 1466:8- 17.) The price for the sale was fixed by the terms of the Purchase Order. (Ex. 500, (9/28/2006 E-mail from H. Boulton to pljensen@basinwater.com, attaching Thermax Purchase Order.) There was also sufficient evidence to conclude that collectability from Thermax was reasonably assured based on its status as a large multinational corporation. (Tekulve, Trial Tr. at 349:9-23, 1312:13-25; Holder, Trial Tr. at 1468:7-14.) This transaction had economic substance.

Tekulve reasonably relied on the professional advice of Basin's auditors in deciding to recognize revenue from the Thermax transaction. (Tekulve, trial Tr. at 1315:2-15.) Singer performed a quarterly review of Basin's financial statements for the third quarter of 2006. (Ex. 630 at SEC-LA3478-01646017 (Singer Audit Report for 2006); Ex. 236 at SEC-LA3478-00003247 (Singer Audit Report for 2007); Ward-Cline, Trial Tr. at 1265:18-22, 1268:10-25.) Singer received a copy of the Thermax Purchase Order in connection with that review. (Ex. 874 at SEC-LA3478-01268790 (Singer work paper identifying Thermax transaction and relevant terms from the PO); Hayn, Trial Tr. at 1110:10-1112:1.)

Singer also reviewed the Thermax Purchase order in connection with its audit of Basin's year-end 2006 Financial statements. Singer's work papers for the year-end 2006 audit reflect that Singer specifically identified the "TBA" terms of the Thermax transaction. (Ex. 874 at SEC LA3478-01268790 (Singer work paper identifying Thermax transaction and relevant terms from the PO).) (Tekulve, Trial Tr. at 352:17-22.) No one at Basin misled Singer about the Thermax transaction or failed to provide requested information. (Tekulve, Trial Tr. at 352:14-16; Ward-Cline, Trial Tr. at 1272:1-12; Fryling, Trial Tr. at 1374:3-1375:3; Gupta, Trial Tr. at 1405:11-15.) Singer raised no concerns about the Thermax transaction and issued an unqualified report for the third quarter 2006 as well as a clean audit opinion for Basin's 2006 year-end financial statements. (Ex. 630 at SEC-LA3478-01646017 (Singer Audit Report for 2006); Holder, Trial Tr. at 1459:9-14, 1469:5-9; Tekulve, Trial Tr. at 1315:5-13; Fryling, Trial Tr. at 1374:3-1375:3; Gupta, Trial Tr. at 1405:11-23.)

Thermax ultimately refused to make good on its September 28, 2006 Purchase Order. (Tekulve, Trial Tr. at 1316:19-1317:8, 1317:21-1318:5.) After notifying Singer that this debt was unlikely to be paid, Basin took a reserve in the third quarter of 2007 against the revenues previously recognized from the Thermax transaction. (Tekulve, Trial Tr. at 1316:19-1317:12.)

Tekulve could not have foreseen that Thermax would refuse to honor its Purchase Order when deciding to recognize revenue in 2006. He was not even aware of the potential "caveats" to Thermax's Purchase Order until April 2007. (Tekulve, Trial Tr. at 185:10-186:11.) Tekulve did not violate GAAP when he recognized revenue for the Thermax transaction. (Tekulve, Trial Tr. at

1349:5-21.)

### c. Stark Takes over as CEO

Before the next transactions at issue in this case were consummated, a change in leadership at Basin occurred as Stark took over for Jensen as CEO. Soon after Basin went public in May 2006, Jensen decided that he needed to replace himself as the operational head of the company with someone who had greater managerial experience due to the planned nationwide expansion of Basin. (Jensen, Trial Tr. at 967:21-968:20.) In June, one month after the IPO, Jensen approached Michael Stark about joining Basin because Stark recently had served as CEO of the North American division of Veolia, the world's largest water utility and services company. (*Id.*, 967:3-11, 969:15-970:10; Stark, Trial Tr. at 583:24-584:19, 710:4-20, 711:7-11; Solar, Trial Tr. at 1158:1-14.)

In recruiting Stark to Basin, Jensen made clear his intention that Stark would run the Company. (Jensen, Trial Tr. at 968:21-969:14; Solar, Trial Tr. at 1158:1-14; Stark, Trial Tr. at 586:13-24, 712:3-11, 716:15-717:5; Ex. 901 (2008 Waterworld Article).) As Stark explained to a water industry reporter:

> "When he and I first talked about this, I said, 'Peter, you know there can't be two roosters in this hen house. I'm used to running pretty big businesses. This is a pretty small business. That's going to be enough of a challenge for me. I can't have you walking around doing what you do. There has got to be one person.'" Peter Jensen says: "'Mike, I don't want to do it. It is yours.' And when he became a CEO and made me COO, until the day he resigned as CEO and I became CEO he never, ever argued with me about anything in the market or anything about operations." (Stark, Trial Tr. at 718:17-719:21; Ex. 901 (2008 Waterworld Article) at 901-6.)

Stark started at Basin in October 2006 as President and Chief Operating Officer. (Solar, Trial Tr. at 1158:1-14, 1164:9-23; Stark, Trial Tr. at 711:12-15.) Stark's influence over Basin was immediate. Pat Kelly recalled that "Mike Stark was running Basin from Day One." (Kelly, Trial Tr. at 1244:2-11.) Even though Jensen retained the title of CEO, Tekulve testified, "when Stark was brought on board, he essentially took command of the company." (Tekulve, Trial Tr. at 191:5-

11.) By his own account, Stark was responsible for sales and for the operating system. (Stark, Trial Tr. at 587:13-17.) While Stark denied running the finance department in 2007 (Stark, Trial Tr. at 587:18-20), Tekulve testified that he began reporting directly to Stark as soon as Stark joined Basin. (Tekulve, Trial Tr. at 388:18-389:5 (Stark was boss at Basin for 2007 and took over operation of the company shortly after he was hired).) From his vantage point on the Board, Keith Solar also observed Stark exerting immediate control over the company. (Solar, Trial Tr. at 1166:14-20, 1164:9-23, 1165:2-4, 1168:9-23, 1172:20-1173:9, 1176:13-1178:15; Ex. 1396 (3/22/07 Board Minutes) at 1396-3; Ex. 1574 (5/9 and 5/10/07 Board Minutes) at 1574-4; Ex. 813 (5/14/07 Earnings Call); Ex. 832 (8/14/07 Earnings Call).)

After Jensen turned the reins of Basin over to Stark and his team of professionals, Jensen devoted himself to discrete projects, including the development of the assets of the West Riverside Canal, also known as Empire Water. (Jensen, Trial Tr. at 977:2-978:15; Stark, Trial Tr. at 725:10-726:14.) In February 2008, Jensen resigned as CEO of Basin and focused, through Empire Water, on his interest in developing the canal rights full time. (Jensen, Trial Tr. at 981:16-982:10; Stark, Trial Tr. at 749:6-13; Solar, Trial Tr. at 1177:25-1178:11.) On March 11, 2008, Jensen resigned from the Basin Board. (Final Pretrial Conf. Order (Doc. No. 193), ¶5(a) at 4.)

### d.  VL Capital Transaction

Stark pursued a new business strategy for Basin. (Stark, Trial Tr. at (Ex. 813 (Q1 2007 analyst call); Tekulve, Trial Tr. at 1318:7-10; Fryling, Trial Tr. at 1377:22-1378:5.) Stark's plan was for Basin to sell its water treatment units using third-party financing after they were leased to a municipality. (Stark, Trial Tr. at 616:7-618:15; Ex. 984 (Q4 2006 analyst call); Ex. 813 (Q1 2007 analyst call); Tekulve, Trial Tr. at 1318:11-21).) In analyst calls, Stark openly stated his intention to engage in third-party financed sales as a means of generating both cash and revenue. (Ex. 984 (Q4 2006 analyst call); Ex. 813 (Q1 2007 analyst call).)

Stark had a close and longstanding personal and business relationship with Charles Litt, who specialized in arranging financing deals of this kind. (Ex. 777 (11/24/2006 e-mail from Stark to Litt; Ex. 781 (2/29/2007 e-mail Stark to Jackson Re: Charlie); Ex. 782 (6/21/2007 e-mail Stark to Litt Re: CCH – Great News); Tekulve, Trial Tr. at 196:2-10, 371:15-25, 1319:12-20.) Within a

month of starting at Basin, Stark directed Tekulve to work with Litt to secure sources of financing for the sale of Basin units. (Exh 797 (11/10/2006 e-mail Stark to Litt Re: Heritage); Tekulve, Trial Tr. at 1319:21-1320:2.)

In the Spring of 2007, Stark asked for a report on Tekulve's efforts to locate third-party financing. Tekulve provided a discouraging report. Stark then forcefully urged Tekulve to work with Litt on this project.

During Spring 2007, Stark committed to Basin's Board of Directors and to the public markets that third-party financed sales would take place during the second quarter 2007. (Ex. 764 (4/11/2007 e-mail from Stark to the Board); Stark, Trial Tr. at 654:8-25.) For example, in May 2007, Stark told analysts that Basin would complete third-party financed sales of its units by the end of the second quarter. (Ex. 813 (Q1 2007 analyst call); Stark, Trial Tr. at 660:11-661:6.)

In emails sent during May and June 2007, Stark pushed Litt with greater urgency to find a source of financing and arrange a sale by quarter end. On May 1, 2007, for example, Stark wrote to Litt, "These must be financed and done deals before [Q2] end. We have no room for error." (Ex. 812.) On May 3, 2007, Stark wrote, "I need this badly." (Ex. 816.) On May 19, 2007, five days after the May analyst call, he wrote to Litt, "I really really really need to get those systems placed." (Ex. 815.)

By May 2007, Stark had concluded that Tekulve either would not be able to get the financing done or would not be able to get it done within the necessary time frame. At that point, Stark was relying on Litt to conclude the deal by quarter end. (Stark, Trial Tr. at 662:17-664:10.)

Litt kept Stark and Tekulve apprised of the potential deals he identified. On May 22, 2007, Stark asked Tekulve to walk him through spreadsheets analyzing various deal scenarios Litt was developing. (Ex. 819.)

On June 21, 2007, Litt relayed to Stark and Tekulve the "great news" that a European financing group called CCH was willing to finance a $5 million sale of Basin units. (Ex. 782; Stark, Trial Tr. at 669:8-24.) Although Tekulve was unfamiliar with CCH, Litt had previously done business with that organization. (Ex. 801 (11/12/2006 e-mail string between Stark and Litt referencing CCH.) Stark, too, in November 2006, had expressed an interest in having CCH

provide financing to Basin. (Stark, Trial Tr. at 640:13-641:4.) Later the same day, June 21, 2007, Stark and Litt discussed the proposed CCH transaction as well as proposed transaction with Lakeland Bank. (Ex. 824 (good news e-mail); Ex. 822 (more good news email).) In a private e-mail to Litt, Stark asked "What's the best deal out there now . . . ?" Litt recommended CCH. (Ex. 826 (Stark to Litt re recommendation); Ex. 827 (Litt recommendation).)

The sale was completed on June 30, 2007.  Tekulve testified that Basin's goals for entering into the sale included the following: (1) to establish a relationship with a lending institution for purposes of future financing transactions; (2) to create a deal template for future third-party financed sales; (3) to establish a financing mechanism by which Basin could expand in the marketplace without using its own cash; (4) to generate cash, to the extent possible; and (5) to generate revenue, to the extent possible.

Under the terms of the transaction, Basin sold ten leased units to a special purpose entity called VL Capital ("VLC") for $5 million, less the present value of taxes and insurance for the units. (Ex. 824 -(6/21/2007 e-mail Stark to Litt Re: CCH – Great News); Ex. 112 (6/29/2007 Equipment Purchase Commitment Letter).) CCH would provide the funding for the SPE to acquire the units and would recover the stand-by fees from the municipalities. (Ex. 825 (CCH commitment letter).

Litt told Tekulve that the SPE was being formed at CCH's request and for its benefit. (Tekulve, Trial Tr. at 376:3-22.) Tekulve viewed VLC as an intermediary for CCH. (Ex. 825 (CCH commitment letter.) Litt arranged for his associate Lloyd Ward, an attorney in Dallas, Texas, to form and manage VLC. (Ex.1640 (Operating Agreement for VLC ); Ward, Trial Tr. at 491:25-492:21; Tekulve, Trial Tr. at 201:25-202:3.) Tekulve had never done a deal involving an SPE before but he trusted Litt, Stark's hand-picked financial consultant, to recommend an appropriate deal structure. (Tekulve, Trial Tr. at 375:20-377:7).

Based on Tekulve's analysis of the deal, he concluded that using an SPE did not disadvantage Basin. (Tekulve, Trial Tr. 1339:-1342:5.)

Basin, VLC, and CCH entered into letter agreements on June 29, 2007 that established the material terms of the sale and the financing. (Exh 658 - 6/27/2007 VLC Equipment Purchase

Commitment.) Latham subsequently assisted Basin with preparing the formal contracts associated with this transaction. (Gupta, Trial Tr. at 1402:17-24; Tekulve, Trial Tr. at 356:25-357:18.). Formal documentation of the deal was completed in September 2007. (Ex. 108 (letter enclosing final documentation.)

In May 2007, Tekulve met with Singer to alert them that Basin was planning a transaction different than those it had done in the past. On July 11, 2007, Tekulve met with Singer auditors Gale Moore and Ian Lawson to discuss Basin's financial results for the second quarter of 2007 and the VLC sale in particular. (Ex. 877 (7/10/2007 e-mail string between Gale Moore and Doug Hansen arranging meeting); Tekulve, Trial Tr. at 362:9-15.)

In July and August 2007, Singer undertook an extensive review of the VLC transaction. This review included:

• reviewing a 7-page Basin-prepared white paper describing the sale and analyzing the company's proposed accounting treatment. (Ex. 881 (8/7/2007 e-mail string between Gale Moore and Doug Hansen discussing topics to be included in white paper); (Ex. 921 (8/8/2007 e-mail from D. Hansen to T. Tekulve Re: Revised VLC Memo, attaching 8/8/2007 Memorandum from D. Hansen to File Re: Equipment Sale to VL Capital, LLC); Tekulve, Trial Tr. at 243:7-14.)

• reviewing the VLC agreement; (Ex. 882 (e-mail string between Hansen and Moore discussing whether agreement was binding); Tekulve, Trial Tr. at 1323:22-1324:2.)

• reviewing a confirmation letter from Ward regarding the agreement; (Ex. 709 (8/7/2007 letter from Lloyd Ward to Basin confirming binding agreement to purchase units).)

• reviewing a confirmation letter from CCH regarding the agreement; (Ex. 710 (8/7/2007 letter from CCH to VLC confirming binding agreement to pledge assets for CCH's purchase of units from Basin).)

• receiving an opinion from Divikar Gupta of Latham & Watkins about the binding nature of the letter agreement between VLC and Basin; (Ex. 883:

25

Singer workpaper noting that Div Gupta confirmed via phone that the letter agreement was legally binding); Ex. 882 (8/7/2007 e-mail from Gale Moore to Doug Hansen indicating that a written legal opinion was not needed).)

• reviewing the accounting for VLC with Basin's Audit Committee; (Ex. 619 (8/9/2007 Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Basin, Inc.)

• recommending expanded disclosure of the transaction in the company's Form 10-Q. (Ex. 882 (8/7/2007 e-mail from G. Moore to D. Hansen Re: VLC Transaction; Tekulve, Trial Tr. at 252:22-253:9, 364:3-7.)

Basin's Audit Committee met on August 9, 2007 to review the financial results for the second quarter and the draft 10-Q. The participants at that meeting included representatives of management (President/COO Stark, CFO Tekulve, Director of Finance Doug Hansen); Basin's General Counsel, Scott Hamilton; Basin's outside counsel, Divikar Gupta of Latham & Watkins; the members of the Audit Committee, led by Victor Fryling; and Basin's independent audit or Gale Moore of Singer. Peter Jensen did not attend this meeting. (Ex. 619 (8/9/07 Audit Minutes) at SEC-LA3478-0214705.)

At that meeting, the Audit Committee conducted a "lengthy discussion" of the VLC transaction. (Ex. 619 (8/9/2007 Minutes of a Telephonic Meeting of the Audit Committee of the Board of Directors of Basin, Inc.); Fryling, Trial Tr. at 1380:8-1382:5; Tekulve, Trial Tr. at 363:8-15.) Moore spoke to the Audit Committee and specifically addressed the "accounting for the VLC transaction." Members of the Audit Committee had an opportunity to question Moore about the draft 10-Q. Basin's Audit Committee approved of the VLC deal because it set the stage for future third-party financed transactions. (Ex. 619 (8/9/2007 minutes); (Ex. 832 (8/14/2007 Final Transcript of BWTR - Q2 2007 Basin Earnings Conference Call).)

The evidence was uncontroverted that Jensen had no involvement whatsoever with the negotiation, accounting, or announcement of the VLC or WSS transactions. He had no more knowledge of this transaction than any other member of the Board of Directors. (Tekulve, Trial Tr. at 212:21-213:21, 216:22-217:14.) Jensen was not present at the Audit Committee meeting where

the VLC transaction was vetted. (Exhibit 619 (8/9/2007 Audit Committee Minutes) at SEC LA3478-01214705-06.) Yet, Basin's financial and operational team - Stark, Hamilton, Tekulve, Hansen, Moore, and Gupta from Latham - were all in attendance. (Ex. 619 (8/9/2007 Audit Committee Minutes) at SEC-LA3478-01214705.) Stark, not Jensen, signed the management representation letters to Singer regarding the VLC and WSS transactions. (Stark, Trial Tr. At 731:23-736:21; Ex. 641 (8/13/17 Management Rep. Letter) at 64-4; Ex. 642 (11/13/07 Management Rep. Letter) at 642-5; Ex. 643 (3/17/08 Management Rep. Letter) at 643-6.) Stark, and not Jensen, certified Basin's audited financial statements for 2007 in its 2007 10-K filing. (Stark, Trial Tr. at 737:11-738:17; Ex. 236 (Basin 10-K) at SEC-LA3478-00003285 and SEC LA3478-00003287.) Lloyd Ward, the Manager and sole member of VLC, testified that he did not even know who Peter Jensen was. (Ward, Trial Tr. at 541:4-6.)

The VLC transaction had economic substance. (Stark, Trial Tr. at 673:21-647:19; Gupta, Trial Tr. at 1411:4-15; Tekulve, Trial Tr. at 1323:5-21, 364:23-365:4). Basin entered into the transaction for legitimate business reasons including, among other things, to establish an ongoing relationship with a lender and to establish a model for future third-party financed sale. (Exh. 832 (Q2 2007 analyst call); Stark, Trial Tr. at 685:9-23; Tekulve, Trial Tr. at 1322:6-1323:4.) Stark and Ward, witnesses for the SEC, testified that they considered the transaction legitimate. Ward confirmed the transaction to Singer in August 2007 and again in March 2008. The VLC transaction was approved after review by Basin's management, its Audit Committee, its outside counsel, its internal counsel, and an exhaustive review by Singer. (Stark, Trial Tr. at 683:19-684:16; Fryling, Trial Tr. at 1380:8-1383:2; Tekulve, Trial Tr. at 364:23-366:9).

Singer was provided with all relevant material and information related to the VLC transaction. No one testified to the contrary. As noted above, Singer discussed the accounting treatment for the VLC transaction at the August 9, 2007 Audit Committee meeting. (Ex. 619 (8/9/2007 minutes); Fryling, Trial Tr. at 1380:8-1383:2.) Singer identified no issues of concern about the transaction to the Audit Committee. (Exh. 619 (8/9/2007 minutes); Fryling, Trial Tr. at 1380:8-1383:2.) Nor did Singer indicate any disputes with Basin's management or difficulties reviewing the transaction. (Exh. 619 (8/9/2007 minutes); Fryling, Trial Tr. at 1380:8-1383:2;

1  Gupta, Trial Tr. at 1405:11-15.)

2       The June 29, 2007 Letter Agreement between the parties constituted "persuasive evidence

3  of an arrangement," as required under SAB 104. (Tekulve, Trial Tr. at 208:20-25; Holder, Trial

4  Tr. at 1470:13-18.) Ownership of the units was transferred to VLC, and the price for the sale was

5  determinable based on the terms of the Letter Agreement and a present value calculation of the tax

6  and insurance costs. (Tekulve, Trial Tr. at 209:17-210:5; Holder, Trial Tr. at 1471:4-21.) There

7  was also sufficient evidence to conclude that collectability from VLC was reasonably assured

8  based on its financing agreement with CCH and the standby fees it would receive from

9  municipalities. (Tekulve, Trial Tr. at 211:5-212:8; Holder, Trial Tr. at 1471:24-1472:12.) Under

10  these circumstances, Tekulve's decision to recognize revenue from the VLC transaction was

11  reasonable under SAB 104. (Holder, Trial Tr. at 1470:13-1472:12; Ex. 1764 (SAB 104 factors

12  applied to VLC transaction).)

13       The accounting for VLC was incorrect because of Basin's failure to apply FIN 46(R). The

14  testimony showed that FIN 46(R) is a relatively new and complex accounting rule that changed

15  the conceptual framework for consolidation. (Holder, Trial Tr. at 1475:5-1476:8.) Tekulve had no

16  experience applying FIN 46(R) at the time of the VLC transaction. (Tekulve, Trial Tr. at 1340:10

17  12.) CFOs are not required to be fluent with every accounting rule under GAAP. (Holder, Trial Tr.

18  at 1455:22-24.) No one at Basin or Singer recognized the potential application of FIN 46(R) at the

19  time revenue was recognized on VLC. (Tekulve, Trial Tr. at 1340:20-25, 1341:16-21; Gupta, Trial

20  Tr. at 1408:22-1409-11; 1430:12-24.) Given the scrutiny applied to VLC from all quarters,

21  Tekulve's own diligence both in establishing accounting and finance processes at Basin and in

22  applying those processes to VLC, the rule's novel and recently adopted approach to consolidation

23  and the consequent difficulty in spotting its potential application, and the universal failure of

24  accounting professionals involved at the time to recognize FIN 46(R) as a potential issue, the

25  Court concludes that Tekulve's failure to apply FIN 46(R) did not result from any lack of

26  diligence or professional care.

27       Tekulve reasonably relied on the professional advice of Basin's auditors in deciding to

28  recognize revenue from the VLC transaction. (Tekulve, Trial Tr. at 1323:22-1324:10, 1324:19-

1325:3; Holder, Trial Tr. at 1473:4-22.) Singer performed an extensive review of the transaction, including verifying information with third party sources, and affirmatively approved the accounting for the transaction to Basin's audit committee. (Ex. 619 (8/9/2007 minutes of Basin Audit Committee meeting); Fryling, Trial Tr. at 1382:13-25) Singer approved the revenue from and the disclosure of the transaction in the second quarter 2007 10-Q. Further, Singer issued a clean audit opinion for Basin's 2007 year-end financial statements. (Ex. 236 at SEC-LA3427-0003247 (2007 Audit Report); Holder, Trial Tr. at 1473:4-21.) No one at Basin misled Singer about the VLC transaction or failed to provide requested information. (Tekulve, Trial Tr. at 387:2-5; 1305:2-8; Ward-Cline, Trial Tr. at 1272:1-12; Fryling, Trial Tr. at 1373:6-9.) Tekulve's decision to recognize revenue on VLC at the end of the second quarter of 2007 was not negligent, reckless, or fraudulent.

### e. Subsequent SPE Transactions

After Basin filed its Form 10-Q for the second quarter of 2007, Stark led an analyst call in which he discussed the VLC deal. (Exh. 832 (Q2 2007 analyst call); Stark, Trial Tr. at 685:13-23.) Stark noted that although the terms of the VLC sale were not ideal, the transaction was valuable to Basin as a model for future third-party financed sales. (Ex. 832 (Q2 2007 analyst call); Stark, Trial Tr. at 685:13-23.)

After the extensive review of the first VLC deal, Tekulve believed he was authorized to proceed with transactions modeled after VLC. (Exh. 832, p. 11 OR p.018/033 (Q2 2007 analyst call re "mechanism in place"); Tekulve, Trial Tr. 1338:17-23.) With Litt's help, and Stark's knowledge and approval, Tekulve completed additional third-party financed sales that mirrored the economic terms of and accounting for VLC. (Tekulve, Trial Tr. at 1335:19-21, 1336:11-17, 1337:2-15; Stark Trial Tr. at 686:11-687:15.) The only significant variation in the later SPE sales was that some involved water treatment units that had not yet been built. (Tekulve, Trial Tr. at 1336:2-8; Holder, Trial Tr. at 1480:18-22.) On those sales, Basin recognized revenue on a percentage-of-completion basis. (Tekulve, Trial Tr. at 316:9; Holder, Trial Tr. at 1480:18-23.)

In the third quarter of 2007, Basin agreed to construct and lease to the City of Cottonwood, Arizona 17 new water treatment units. (Ex. 731 (9/10/2007 Letter Agreement between WSS and

Basin re Equipment Purchase – Cottonwood Project, attaching Equipment Lease Agreement and Water Services Agreement); Tekulve, Trial Tr. at 377:8-378:14.)4 Using the VLC template, Basin sold these units to Water Services Solutions, LLC ("WSS"), an SPE formed by Lloyd Ward. National City Energy Capital ("NCEC") financed the sale to WSS. (Exh. 213 (Nat City Commitment Letter).) Under its agreement with WSS, Basin sold the units for $3,845,073, including a $1,506,140 down payment payable when the units were accepted by Cottonwood. (Exh. 731 (WSS Letter agreement).) Litt arranged for NCEC to finance the sale through a loan to WSS and told Tekulve that, like VLC, WSS was formed for the benefit of NCEC. (Tekulve, Trial Tr. at 273:15-274:14.)

At Singer's request, Hansen prepared and Tekulve reviewed and edited another white paper describing the WSS transaction and analyzing the company's proposed accounting treatment. (Ex. 894 (10/31/2007 Memorandum D. Hansen to File Re: Equipment Sale to Water Services Solutions, LLC).) During its review of Basin's third-quarter financial statements, Singer reviewed the white paper and spoke with Ward and Litt regarding the WSS transaction. (Ex. 895 (Singer WP re WSS transaction).) Following its review, Singer agreed with the accounting for WSS. (Tekulve, Trial Tr. at 387:7-9.)

In the fourth quarter of 2007, Basin entered into two additional transactions modeled after VLC. (Tekulve, Trial Tr. at 1335:19-1336:1.) On December 28, 2007, Basin sold a unit to VLC that it had recently contracted to manufacture and lease to Cal Water. (Ex. 145 (12/31/2007 between Basin and VLC re CW65); Tekulve, Trial Tr. at 316:22-317:10.) That same month Basin sold another unit to WSS that it had contracted to build and lease to the East Valley Water District. (Ex. 121 (12/26/2007 Agreement between Basin and WSS re EVWD); Tekulve, Trial Tr. at 311:10-21.)

In spring 2008, Singer audited Basin's 2007 year-end financial statements, which included all of the VLC and WSS transactions. (Ex. 236 at SECLA3478-00003247 (Singer Audit Report for 2007).) Singer received audit confirmations from Lloyd Ward on behalf of WSS and VLC. (Ex. 893 (3/5/2008 letter from Lloyd Ward to Singer confirming economic terms of WSS I transaction); Ex. 900 (3/5/2008 letter from Lloyd Ward to Singer confirming economic terms of

WSS II transaction); Ex. 899 (2/15/2008 confirmation from L. Ward-Cline re VLC transactions).) At the conclusion of the audit, Singer rendered a clean audit opinion. (Ex. 236 at SEC-LA3478 00003247 (Singer Audit Report for 2007); Holder Trial Tr. at 1482:4-6.)

Similar to Jensen's lack of involvement in the VLC transaction, the evidence also was uncontroverted that Jensen had no involvement whatsoever with the negotiation, accounting or announcement of any subsequent SPE transactions. (Hayn, Trial Tr. at 1115:19-1116:17.) With respect to Jensen's alleged liability on the WSS transaction, the SEC introduced evidence showing only that Jensen was aware of the transaction. (Jensen, Trial Tr. at 912:12-18, 914:5-21.) No evidence was introduced showing that Jensen had any more knowledge of the transaction than what was disclosed in Basin's 10-Q filing for the third quarter of 2007.

The two WSS transactions and the second VLC transaction had economic substance. These transactions had substantially the same economic structure as the first VLC transaction, which had been thoroughly reviewed and approved by Basin management, its Audit Committee, its General Counsel, its outside counsel, and its auditors. (Holder, Trial Tr. at 1473:4-22, 1480:1-4, 1482:7-12.) The economic basis for these transactions was not disputed at the time they were finalized, and no events since that time suggest that the true nature of these transactions was concealed. (Tekulve, Trial Tr. at 385:19-386:14, 1343:7-22.)

Tekulve's decisions to recognize revenue from the WSS transactions and the second VLC transaction were also reasonable under SAB 104. (Holder, Trial Tr. at 1480:24-1481:3, 1482:7-15.) The material terms for each of these transactions were documented in letter agreements between the parties that constituted "persuasive evidence of an arrangement." (Ex. 145 (12/31/2007 between Basin and VLC re CW65); (Ex. 121 (12/26/2007 Agreement between Basin and WSS re EVWD); Holder, Trial Tr. at 1479:18-25, 1482:7-15.) The prices for the sales were also determinable based on the terms of the letter agreements and a present value calculation of the taxes and insurance costs. (Tekulve, Trial Tr. at 209:17-210:5; Holder, Trial Tr. at 1481:4-9, 1482:7-15.) There was also sufficient evidence to conclude that collectability from WSS was reasonably assured based on the financing provided by NCEC, which had done business with Basin in the past. (Holder, Trial Tr. at 1481:10-12; Tekulve, Trial Tr. at 298:12-15.) Collectability

from VLC was reasonably assured based on its financing agreement with CCH and the stand-by fees it would receive from municipalities. (Holder, Trial Tr. at 1471:24-1472:12; Tekulve, Trial Tr. at 319:19-25.)

The accounting for the WSS and second VLC transactions was incorrect because of Basin's failure to apply FIN 46R. For the same reasons articulated in connection with the first VLC transaction, however, Tekulve's failure to apply FIN 46R did not result from any lack of diligence or professional care.

Tekulve reasonably relied on Singer's professional advice in deciding to recognize revenue from these transactions. (Holder, Trial Tr. at 1482:4-15; Tekulve, Trial Tr. at 1344:13-20.) Singer performed an extensive review of the initial VLC transaction and the later transactions with WSS and VLC were explicitly modeled after that deal. Singer also contacted Litt and Ward to verify the structure of the WSS transactions. (Ex. 895 (Singer WP re WSS transaction).) Singer raised no concerns about the accounting for these transactions to Basin's audit committee and issued an unqualified report for the third quarter of 2007 and a clean audit opinion for Basin's 2007 year-end financial statements. (Exh. 236 at bates 3247; (Ex. 1469 (2007 audit report); Gupta, Trial Tr. at 1405:7-23). No one at Basin misled Singer about these transactions or failed to provide requested information. (Tekulve, Trial Tr. at 1349:5-25; Ward-Cline, Trial Tr. at 1272:1-12.) Tekulve did not negligently, recklessly or fraudulently record revenue on the WSS or the second VLC transaction.

### 3. Findings of Fact Relating to Insider Trading Allegations

The SEC's insider trading allegations are based on two theories: 1) Jensen impermissibly traded during black-out periods and 2) Jensen traded while possessing the material non-public information that Basin's financial statements were fraudulent.  The SEC introduced no evidence showing that Jensen traded on inside information other than his alleged knowledge of the supposed fraud.

Jensen did authorize the sale of approximately 882,000 shares on August 7, 2008 – three days before the Company announced that it might restate certain financial statements. (Florin, Trial Tr. at 788:3-15, 802:25-803:8; Ex. 595 (Albert Fried Account Statement 8/1/2008) at SEC-

LA3478-00009727.) However, in testimony elicited by the SEC, Marc Florin, the Jensens' broker, confirmed that he initiated the phone call on August 7 informing Jensen that a buyer was interested in purchasing a large amount of Basin stock. (Florin, Trial Tr. at 788:3-15.) Florin further testified that Jensen had not expressed any urgency to sell Basin stock in the days before the August 7 phone call (or at any time, for that matter). (Florin, Trial Tr. at 803:21-804:10, 802:14-20). Florin testified that Jensen agreed with Florin's strategy, proposed in June 2008, to sell Basin stock in small enough increments so as to not harm the market for the stock. (Florin, Trial Tr. at 802:4-24.) Florin's testimony thus contradicts any argument by the SEC that Mr. Jensen had advance warning of the August 11, 2008 Press Release. Certainly, no witness so testified.

The SEC also argued at trial that Jensen's trades in the spring and summer of 2008 were improper because they occurred during black-out periods – periods where insiders of Basin were prohibited from trading stock – and that Jensen somehow remained an insider of Basin during this period. First, there is no charge in the Complaint that Jensen violated the securities law by trading during "black-out" periods. Second, the charge is also unfounded.  Jensen resigned as CEO in February 2008, and resigned from the Board in March 2008. (Final Pretrial Conf. Order (Doc. No. 193), ¶5.a. at 4.) A "Termination and Consulting Agreement," executed in March 2008, makes plain that Jensen is no longer an employee of the company. (Ex. 971 (Employment Transition and Consulting Agreement); see also Solar, Trial Tr. at 1181:20-22; Gupta, Trial Tr. at 1425:25-1426:20.) Thus, under no theory was Mr. or Mrs. Jensen an "insider" of the company during this time. Finally, a letter authored by Scott Hamilton, the former SEC enforcement attorney who was at the time Basin's General Counsel, approved the removal of restrictive legends from the Jensens' stock and referred to the Jensens as "Selling Shareholders, and confirmed that they were not "affiliates" of Basin. (Ex. 592 (E-mail attaching 7/10/2008 Letter from S. Hamilton) at AFC00506.) As Solar testified, the only reason to remove restrictive legends is to sell shares. (Solar, Trial Tr. at 1186:2-12.) It makes no sense that Basin's General Counsel would approve the Jensens' sale of shares and acknowledge that they were not affiliates and were "Selling Shareholders," if Jensen was prohibited from selling shares.

The SEC also suggested that Mr. and Mrs. Jensen's sales of Basin stock in 2007 through a 10b5-1 plan were also improper because some of those sales occurred during a "black-out" periods. However, the plan itself contains no such restrictions. (Ex. 969 (Jensens' 10b5-1 Plan); Solar, Trial Tr. at 1162:5-1164:7; Gupta, Trial Tr. at 1415:8-15.) The SEC never provided any evidence to contradict the plain language of the plan or Jensen's understanding of that plan.

Other evidence contradicts an inference of scienter. Mr. and Mrs. Jensen first sold shares in December 2006, and then only a small amount (50,000 shares out of 2.7 million shares owned). (Ex. 1024 (2/15/2008 Basin Form 13D/A) at SEC-LA3478-00006502 (Mr. and Mrs. Jensen each sold 25,000 shares); Ex. 1023 (5/15/06 Form S-8) at SEC-LA3478-00006192 (2,777,857 shares owned by Jensens at IPO).)

Thereafter, Mr. and Mrs. Jensen placed 200,000 shares each into their 10b5-1 plan, which remained in effect, unmodified, throughout Jensen's tenure at Basin. (Ex. 969 (Jensens' 10b5-1 Plan); Gupta, Trial Tr. at 1416:6-11.) While Mr. and Mrs. Jensen worked at Basin, the remainder of their sales were pursuant to the 10b5-1 plan. (Final Pretrial Conf. Order (Doc. No. 193), ¶5(a) at 4 (Jensen resigned in March 2008), ¶6(a) at 7-8 (listing dates of trades and accounts); Jensen, Trial Tr. at 922:2-13; Exs. 1033 and 1034 (2006-2008 Cannacord records).) All of the sales pursuant to the 10b5-1 plan occurred between February and July of 2007. (*Id.*) Mr. and Mrs. Jensen did not sell any of their respective remaining shares until after they resigned from Basin. (*Id.*; see also Exs. 1033, 1035-1039 (2008 Charles Schwab records); Exs. 593-595, 598, and 600 (2008 Albert Fried records).)

The evidence showed that when Jensen sold shares from May to August 2008 – after he resigned from Basin – he did so with the full knowledge of Basin's Board, General Counsel and outside securities counsel. (Solar, Trial Tr. at 1179:5-16, 1182:17-22; 1186:2-12; Tekulve, Trial Tr. at 1351:25-1352:12, 1352:22-1353:18; Gupta, Trial Tr. at 1421:15-1422:6, 1433:25-1434:25; Ex. 592 (E-mail attaching 7/10/2008 Letter from S. Hamilton) at AFC00506.) Jensen made plain that one of the reasons he was resigning from Basin was so that he could sell shares, and use the proceeds for the Empire Water project. (Tekulve, Trial Tr. at 1351:25-1352:12; see also Jensen, Trial Tr. at 982:19-983:1.) No one told Jensen that he couldn't sell his shares. (Jensen, Trial Tr. at

34

983:23-984:2; Gupta, Trial Tr. at 1421:10-1425:19; see also Solar, Trial Tr. at 1185:17-1186:21.)

The defense also established that of the 2,777,857 shares owned by the Jensens at the time of the IPO, 1,320,000 were owned by Lorena Jensen as her sole and separate property. (Solar, Trial Tr. at 1140:16-1142:7, 1149:10-16; Ex. 1023 (5/15/06 Form S-8) at SEC-LA3478 00006192; Jensen, Trial Tr. at 915:21-916:2 and 917:5-11; Ex. 1184 (9/20/05 Agreement for Transfer of Stock), ¶¶ 2-3 at 1184- 1 to 1184-2.) As Florin testified in the SEC's case in chief, the Jensens sold their shares in equal amounts when executing sales. (Florin, Trial Tr. at 801:19-25.) Thus 48% of the sales put at issue in the Complaint (1.3/2.7) were in fact sales by Mrs. Jensen of her sole and separate property.

### 4. Nature of Jensen and Tekulve's Compensation

For many years, neither Mr. nor Mrs. Jensen took any salary from the Company. (Solar, Trial Tr. at 1146:1-14, 1148:6-8.) When Jensen did begin receiving salary, it was well below market. (Solar, Trial Tr. at 1148:9-13.) At the time of the incorporation of the Company, Jensen received 950,000 in shares in the Company, or 95% of the outstanding stock. (Solar, Trial Tr. at 1147:8-17; Exhibit 1645 (First Actions of Basin Board of Directors) at 1645-3.) This stock was earned by Jensen, both for his role as the founder and leader of the Company, and as compensation for his work. (*Id.* at 1147:12-23.) In addition, Jensen donated his patents on ion-exchange to the Company (*Id.* at 1146:18-1147:1.)

The SEC elicited no testimony that Jensen received incentive-based compensation in 2006 and 2007. The evidence was to the contrary. (Solar, Trial Tr. at 1201:5-1202:1.) To the extent that Jensen "profited" from the sale of stock, this was stock he received upon founding the company in 1999. (Solar, Trial Tr. at 1147:12-17; see also Jensen, Trial Tr. at 915:21-916:13.)

Tekulve did not profit from Basin's decision to recognize revenue on any of the disputed transactions. Neither his salary nor his bonuses were linked to Basin's revenue or stock price. (Solar, Trial Tr. at 1196:17-1197:9, 1201:20-1202:1; Ex. 558 (3/22/07 Compensation Minutes) at 3; Ex. 559 (12/28/07 Compensation Minutes) at 7; Final Pretrial Conf. Order (Doc. No. 193), ¶5(d) at 5.)

Tekulve's first bonus of $100,000 in March 2007 was awarded in recognition of his efforts

in preparing Basin's initial public offering. (Solar, Trial Tr. at 1196:17-1197:9 and Ex. 558 (3/22/07 Compensation Minutes) at 3; Final Pretrial Conf. Order (Doc. No. 193), ¶5(d) at 5.)

His $50,000 year-end bonus for 2007 was granted as part of an unstructured incentive program that was not tied to financial targets. (Ex. 559 (12/28/07 Compensation Minutes) at 7; Solar, Trial Tr. at 1201:20-1202:1.)

While Tekulve received a significant portion of his compensation in Basin stock and stock options, Tekulve sold none of his Basin stock until after the restatement and his departure from the company. (Tekulve, Trial Tr. at 1348:18-22.) The proceeds of those sales totaled $1,200. (Tekulve, Trial Tr. at 1348:18-1349:2.)

**5. Basin's Restatement**

In May 2008, Stark demoted Tekulve and replaced him with Chris Chisholm, who had served as Stark's CFO at a prior company. (Stark, Trial Tr. at 687:16-23.) After Chisholm started at Basin, he investigated certain transactions from 2006 and 2007. (Stark, Trial Tr. at 687:24 688:3.) He asked that an ongoing Audit Committee investigation led by the law firm of Drinker Biddle be expanded to include review of those transactions. (Stark, Trial Tr. at 688:6-9.)

On October 28, 2008 Basin's Audit Committee met to hear a report from Drinker Biddle regarding the results of the internal investigation. The investigation included review of all of the transactions at issue in this litigation, in addition to others. (Ex. 853 (10/28 and 10/29/08 Audit Minutes.) The Audit Committee concluded that there was no evidence of fraud. (Fryling, Trial Tr. at 1387:16-19, 1398:22-1399:5; see also Ex. 583 (10/29/08 Minutes) at SEC-LA3478-01230505 and 01230509; see also Stark, Trial Tr. at 689:12-691:3.)

Basin decided to restate its 2006 and 2007 financial results, including the transactions at issue in this case. Basin retained Singer as the auditor for the restatement. On February 10, 2009, Basin filed restated financial statements for 2006 and 2007. (Ex. 845 (Form 10K-A).) As part of their audit of the restated financial statements, Singer specifically determined that the transactions at issue here were not being restated as a result of fraud. (Ex. 851 (Basin Water, Inc. Memo on Fraud 2006 and 2007); Ex. 873 (Basin Water, Inc. SL Memo of Restatement Transactions of 2006 & 2007 Audit and Q1 2008 Review); Fryling, Trial Tr. at 1387:16-19, 1398:22-1399:5; Solar,

1   Trial Tr. at 1189:19-22; Ex. 851 (Singer Memo on Fraud) at SEC-LA3478-1272322, 1272324,

2   1272326 ("Fraud consideration: No").)

3           In March 2009, Latham responded on Basin's behalf to a comment letter from the SEC

4   about the restatement. (Ex. 1166 (3/30/09 Comment Letter).) The SEC comment letter asked

5   specifically why the VLC and WSS transactions had been restated. Basin's response was reviewed

6   by Basin senior management and Singer before it was provided to the SEC. (Ex. 1165 (3/26/2009

7   E-mail from S. Hamilton to C. Chisholm, D. Gupta, G. Moore, I. Lawson, and D. Hansen Re:

8   "Revised Response to SEC Comment Letter").) The letter noted that "FIN 46(R) is a complex

9   standard that [Basin] had not previously had occasion to apply." (Ex. 1166 at 1166-8 (3/30/09

10  Comment Letter).) The letter went on to state that the Basin personnel involved with the original

11  accounting of the VLC and WSS transactions "lacked a sufficiently robust accounting

12  background" to identify all relevant accounting issues with these transactions. (Ex. 1166 at 1166-8

13  (3/30/09 Comment Letter).) Basin's response to the SEC made no mention of fraud or intentional

14  misconduct by Tekulve or Jensen, neither of whom worked at Basin at the time the response was

15  written.

16                                   **II.  Conclusions of Law**

17          *A.  Bench Trial was Appropriate*

18          The trial appropriately proceeded as a bench trial. The Complaint did not contain a request

19  for a jury trial. Doc. no. 1. On August 1, 2011 Tekulve filed an answer that contained a request for

20  a jury trial. Doc. no. 8. Also on August 1, 2011, defendant Jensen filed an answer that contained a

21  request for a jury trial. Doc. no. 11. The SEC never requested a jury trial.

22          On March 29, 2013 Defendants filed a notice that they were waiving their right to a jury

23  trial and consenting to a trial by the Court. Doc. no. 166. Also on March 29, 2013, the SEC filed a

24  response to the defendants' waiver, which argued that the Defendants' notice should be

25  "disregarded by the court." Doc. no. 67.

26          The Court issued a minute order on April 1, 2013, which provided that:

27          The Court continues the Final Pre-Trial Conference to September 9, 2013 at 11:00
            a.m., and sets the matter for Court Trial (defendants having filed a waiver of trial
28          by jury on March 29, 2013, and only the defendants timely requested a jury trial)

on October 15, 2013 at 9:00 a.m.

The SEC did not file a motion asking the court to reconsider this order and did not otherwise object to it until doing so in the proposed pre-trial order filed on September 5, 2013. Doc. no. 190. A party's failure to object to an order scheduling a non-jury trial may be treated as a waiver of that party's right to a jury trial. *Sewell v. Jefferson County Fiscal Court*, 863 F.2d 461, 465 (6th Cir. 1988). The SEC's failure to object to the April 1, 2013 order in any way until September 5, 2013 constituted such a waiver. In the proposed pre-trial order, Defendants stated that they relied on the Court's April 1, 2013 order—and the SEC's lack of objection to that order—in preparing for a bench trial after the order was issued.  This reliance of Defendants, the substantial amount of time between the issuance of the April 1, 2013 order and any objection by the SEC, and the fact that the SEC never requested a jury trial means that the SEC waived any right to a jury trial it may have had.

### B.  Analysis of the Causes of Action in the Complaint

The Complaint contains seven causes of action. Summary judgment was granted in favor of Defendants on the sixth cause of action. Doc. no. 109. This left causes of action one, two, three, four, five, and seven to be tried. It was the burden of the SEC to establish at trial, by a preponderance of the evidence, that Defendants violated the law as alleged in the Complaint. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983).

### 1.  First Cause of Action: Violation of Section 17(a) of the Securities Act

The SEC alleges that Defendants violated all three subsections of Section 17(a). Section 17(a) provides that:

> It shall be unlawful for any person in the offer or sale of any securities . . . (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Title 15 U.S.C. § 77q(a).

Section 17(a)(1) "proscribe[s] only knowing or intentional misconduct." *Aaron v. SEC*,

1   446 U.S. 680, 696 (1980). In other words, a finding of liability under Section 17(a)(1) requires a

2   finding of scienter. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). Along with

3   intentional misconduct, the scienter requirement can also be met by a showing of recklessness. *Id.*

4   Recklessness is defined as "conduct that consists of a highly unreasonable act, or omission, that is

5   an extreme departure from the standards of ordinary care, and which presents a danger of

6   misleading buyers or sellers that is either known to the defendant or is so obvious that the actor

7   must have been aware of it." *Id.*

8        Sections 17(a)(2) and (3) consist of a negligence standard, which requires a showing that

9   the defendant acted without reasonable prudence.  *Id.* at 857.

10       Leading up to the trial, the SEC's position was that the six transactions were shams. *See,*

11  *e.g.*, SEC's Trial Brief, Doc. no. 196 (stating that Defendants engaged "in a two-year scheme to

12  record phony revenues from sham transactions purportedly engaged in by Basin Water, Inc."). No

13  documentary evidence or witness testimony presented at the trial tended to show that any of the

14  transactions were shams. In fact, everybody involved in the various transactions testified that they

15  were actual, legitimate deals.

16       Apparently recognizing this, the SEC now concedes that these transactions were legitimate

17  and argues that scienter is present because Defendants recognized revenue in ways that were either

18  in contravention of GAAP and/or misleading because revenue was recognized on transactions that

19  "had no economic substance." SEC's Proposed Findings of Fact and Conclusions of Law, Doc.

20  no. 216, p. 124. As recounted above, the evidence does not support the SEC's position because

21  revenue was properly recognized on all six transactions in accordance with GAAP and the

22  transactions had economic substance.

23       The SEC's entire case essentially rests on allegations of improper accounting. The only

24  evidence that supports the SEC's position in this regards is the testimony of Professor Carla Hayn.

25  As discussed above, the Court does not find Professor Hayn's testimony to be persuasive. The

26  Court does find the opinion of Professor William Holder to be persuasive.

27       Further under-cutting the SEC's position is the fact that the case-law recognizes that "[t]he

28  provisions of GAAP are subject to interpretation." *In re Fannie Mae 2008 Sec. Litig.*, 742

F.Supp.2d 382, 408 (S.D.N.Y. 2010). "Financial accounting, in short, is hospitable to estimates, probabilities, and reasonable certainties." *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 543 (1979). "Accountants long have recognized that generally accepted accounting principles are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. Generally accepted accounting principles, rather, tolerate a range or reasonable treatments, leaving the choice among alternatives to management." *Id.* at 544.

Revenue on the various transactions was recognized in a way that was not consistent with Professor Hayn's interpretation of GAAP. However, as discussed above, the Court gives very little weight to Professor Hayn's opinion because of her excessive reliance on hindsight (among other deficiencies in her methodology). In the opinion of everybody who viewed the transactions without the benefit of hindsight, revenue recognition was consistent with GAAP. This includes Professor Holder, as well as the individuals who analyzed the transactions concomitantly with the revenue being recognized; namely Basin's auditors, Board of Directors, and, in certain cases when they were asked to opine, Basin's outside and general counsel. The revenue recognition at issue in this case was within the range of reasonable treatment and therefore consistent with GAAP. *Thor Power Tool Co.*, 439 U.S. at 544.

The argument that the transactions lacked economic substance is similarly without merit. As recounted above, there were valid economic justifications for all six of the transactions.

The SEC has not presented any direct evidence that Jensen of Tekulve knowingly or intentionally mislead anybody. The SEC's position that scienter can be inferred from circumstantial evidence is also not persuasive. There is also no evidence of recklessness, as the Defendants' conduct was not an extreme departure from the standard of ordinary care. *Dain Rauscher*, 254 F.3d at 856.

Finally, the evidence shows that Defendants did not act negligently. They had in place several levels of internal and external review, and thoroughly vetted all the transactions at issue in this case before deciding to record revenue on those transactions. The evidence shows that Tekulve personally worked diligently on ensuring that he got the accounting right. This included his reasonable reliance on the advice of the numerous professionals working both inside and

40

outside Basin.  As for Jensen, the evidence shows that he was not familiar with accounting and he reasonably relied on professionals who were familiar with it to generate Basin's financial reports.

The evidence does not support a finding that Defendants violated Section 17(a).

## 2.  Second Cause of Action: Violation of Section 10(b) of the Exchange Act as Primary Violators and Control Persons

Rule 10b-5, which is promulgated by the SEC pursuant to its authority under Title 15 U.S.C. § 78j, provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To establish a violation of Rule 10b-5 a showing of scienter is required. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

In addition to alleging that Defendants each individually violated Rule 10b-5, the SEC alleges that Defendants are liable as control persons under Section 20(a).  To establish a violation of Section 20(a), a showing must be made that "(1) there is a violation of the [Securities] Act and (2) the defendant directly or indirectly controls the person liable for the violation."  *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).

As discussed above, Defendants did not act with scienter with respect to the allegations of improper revenue recognition. Therefore they are not liable under Rule 10b-5 with respect to those allegations.  There is also no evidence that Basin itself or anybody else working at Basin violated any securities laws.  As no violations of the securities laws took place, there can be no control person liability. *Todd*, 642 F.3d at 1223.

The SEC also alleges that Jensen violated 10b-5 with respect to his sale of Basin stock. As set out above, no evidence was presented showing that Jensen possessed material non-public

information when he traded.  *United States v. O'Hagan*, 521 U.S. 642, 651 (1997). Furthermore, after he left the company he was not subject to the black-out periods. The SEC's allegations that Jensen's knowledge of the fraudulent scheme constitutes material non-public information are without merit because the evidence does not support a finding that there was fraudulent scheme. There is also no evidence that Jensen knew the restatement was going to be issued when he sold his stock.

**3.  Third Cause of Action: Issuer Reporting Violations Under Section 13(a)**

Section 13(a) requires a company to file "financial statements that (1) are prepared in conformity with GAAP; and (2) contain a report by an independent auditor certifying that the auditor had audited the company's financial statements . . . to determine whether the statements were prepared in accordance with GAAP." *Ponce v. SEC*, 345 F.3d 722, 735 (9th Cir. 2003). The company also has a duty to "correct any misstatements or omissions the documents filed with the SEC" and the documents must have enough information to prevent them from being misleading. *Id.*

Individuals are liable for a company's violation of Section 13(a) if the individual (1) willfully aided and abetted the violation or (2) was a control person. Title 15 U.S.C. § 78t.

A finding of aiding and abetting liability premised on a primary violation of Section 13(a) requires a showing that (1) a primary violation occurred; (2) the individual knew about the violation and his or her own role in furthering that violation; and (3) the individual substantially assisted in the primary violation. *Ponce*, 345 F.3d at 737.

A finding of control person liability premised on a primary violation of Section 13(a) requires a showing that (1) a violation of Section 13(a) occurred and (2) the defendant directly or indirectly controls the company or individual responsible for the violation. *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).

The evidence does not support this claim because the financial statements at issue were prepared in conformance with GAAP and contained the required certification.

/ / /

/ / /

**4.  Fourth Cause of Action: Record-Keeping Violations under Section 13(b)(5)**

Section 13(b)(5) provides that "no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account . . . ." Title 15 U.S.C. § 78m(b)(5). Scienter is a required element under Section 13(b)(5). *SEC v. Retail Pro, Inc.*, 673 F.Supp.2d 1108, 1141 (S.D. Cal. 2009). The SEC alleges that Defendants are liable under Section 13(b)(5) because they falsified the books, records, and accounts of Basin.

As discussed above, the evidence does not support a claim that Defendants falsified any financial statements or other books, records, or accounts of Basin. Also, the evidence shows that Defendants had in place an adequate system of internal accounting controls. There is therefore insufficient evidence to support this claim.

**5.  Fifth Cause of Action: Misrepresentations to Accountants (against Tekulve only)**

The SEC alleges that Tekulve is liable under Section 13(b)(5) because he mislead Basin's accountants by either misstating information or failing to inform the accountants of material information. 17 C.F.R. § 240.13b2-2. The evidence presented at trial shows that Tekulve gave accurate and complete information to Basin's outside accountants, Singer. Tekulve worked closely with Singer to ensure that he was properly accounting for the various transactions.

Notably, the SEC did not call any witnesses from Singer.

**6.  Seventh Cause of Action: Failure to Reimburse Pursuant to Section 304 of the Sarbanes-Oxley Act**

Title 15 U.S.C. § 7243 specifies that if "an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct" the CEO and CFO must reimburse the issuing company for "any bonus or other incentive-based or equity-based compensation" or "any profits realized from the sale of securities."  Reimbursement is only required if the compensation or stock sale profits were received "during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement." Title 15 U.S.C. § 7243.

43

Basin's restatement was not issued due to any misconduct on the part of Defendants. As discussed above, Defendants did not act with scienter or negligence in preparing the financial documents that were restated. Additionally, Singer specifically found that the restatement was not necessitated by any fraud and Basin's Board of Directors never made a determination that the restatement was required due to misconduct by Jensen or Tekulve. Solar, Trial Tr. at 1189:19-22.

### III. Conclusion

The SEC has not carried its burden of proof with respect to any of the causes of action in the Complaint.

**IT IS HEREBY ORDERED** that judgment is to be entered for Defendants on all causes of action in the Complaint.

Dated: December 10, 2013.

_____
MANUEL L. REAL
UNITED STATES DISTRICT JUDGE